# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: CONCRETE AND CEMENT ADDITIVES ANTITRUST LITIGATION | Case No. 24-MD-03097 (LJL)<br><br>MDL No. 3097 |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS<br><br>1:24-cv-00460-LJL<br>1:24-cv-00512-LJL<br>1:24-cv-00564-LJL<br>1:24-cv-03026-LJL<br>1:23-cv-10875-LJL<br>1:24-cv-03224-LJL<br>1:24-cv-03965-LJL<br>1:24-cv-03229-LJL<br>1:24-cv-03256-LJL<br>1:24-cv-03224-LJL | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I. NATURE OF THE ACTION .................................................................................2

II. JURISDICTION AND VENUE .........................................................................11

III. PARTIES AND UNNAMED CO-CONSPIRATORS ......................................12

    A. Plaintiffs ...................................................................................................12

    B. Defendants ................................................................................................15

        1. The BASF Group Defendants .................................................15

        2. The Sika Group Defendants ....................................................16

        3. The Saint-Gobain Group Defendants .....................................19

        4. The Cinven Group Defendants ...............................................23

        5. The RPM Group Defendants ..................................................24

        6. The Mapei Group Defendants .................................................25

IV. FACTUAL ALLEGATIONS ..............................................................................26

    A. The Additives and Admixtures Market .....................................................26

        1. Additives and Admixtures Are Necessary Inputs in Cement, Concrete, and Mortar ..............................................................26

        2. Types of Additives and Admixtures and Their Function .........................30

        3. How Additives and Admixtures Are Sold and Who Buys Them .............32

    B. The Market for Additives and Admixtures in the United States and Its Territories ............................................................................................33

    C. Defendants Have Consolidated Their Control of the Additives' and Admixtures' Market ..............................................................................34

        1. The Chryso Transactions Involving Defendants Cinven, Saint Gobain and RPM .....................................................................35

        2. The MBCC Transactions Involving Defendants Cinven and Sika ...........35

E.    Defendants Effectuated Their Conspiracy Through Their Shared Trade Associations ...................................................................................36

E.    Defendants' Price Increases During the Class Period ..........................................40

    1.    Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges ...................................................................43

    2.    Defendants Have Admitted That Normal Market Forces Do Not Explain Their Price Increases or Surcharges And That They Hae Been Able To Increase Their Profits And Margins ...............................45

F.    The Structure and Characteristics of the Market for Additives and Admixtures Support the Existence of a Conspiracy ...........................................47

    1.    The Supply Side of the Additives and Admixtures Market Is Highly Concentrated, and the Defendants Are the Dominant Firms ........47

    2.    Barriers to Entry Are High ........................................................................48

    3.    The Demand Side of the Additives and Admixtures Market Is Unconcentrated .........................................................................49

    4.    Demand for Additives and Admixtures Is Inelastic ...................................50

    5.    There are No Substitutes for Additives and Admixtures ...........................50

G.    Defendants' Fraudulently Concealed Their Conduct ...........................................50

V.    PASS-THROUGH OF OVERCHARGES TO CLASS MEMBERS ..............................51

A.    The Additives and Admixtures Product Distribution Chain Is Relatively Short and Simple ..................................................................................52

B.    The Concrete, Cement and Mortar Markets Downstream from Defendants Are Highly Competitive, Making Pass-through an Economic Necessity ............53

C.    Defendants' Additives and Admixtures Can Be Traced Through the Chain of Distribution to Class Members. .......................................................55

D.    The Amount of Defendants' Overcharge Passed Through the Chain of Distribution May be Measured and Quantified. ..................................................56

VI.    CLASS ACTION ALLEGATIONS ................................................................................57

VII.    DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS ........61

VIII.    CLAIMS FOR RELIEF ..................................................................................................62

A.      VIOLATION OF FEDERAL ANTITRUST LAWS ............................................62

COUNT ONE
VIOLATION OF SECTIONS 1 & 3 OF THE SHERMAN ACT
(15 U.S.C. §§ 1, 3) (on behalf of Plaintiffs and the Nationwide Injunctive
Relief Class) ...............................................................................................62

B.      VIOLATIONS OF STATE ANTITRUST LAWS ..............................................63

COUNT TWO
Violation of Arizona Uniform State Antitrust Act (Ariz. Rev. Stat. §§ 44-
1401, *et seq.*) (on behalf of Plaintiffs and the Damages Class)...........................63

COUNT THREE
Violation of California Cartwright Act (Cal. Bus. & Prof. Code § 16700,
*et seq.*) (on behalf of Plaintiffs and the Damages Class) .....................................64

COUNT FOUR
Violation of Connecticut Antitrust Act (Conn. Gen. Stat. Ann. §§ 35-24, *et
seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................65

COUNT FIVE
Violation of District of Columbia Antitrust Act (D.C. Code Ann. §§ 28-
4501, *et seq.*) (on behalf of Plaintiffs and the Damages Class)...........................66

COUNT SIX
Violation of Guam Antitrust Law (Guam Code Ann. tit. 9 §§ 69.10, *et
seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................67

COUNT SEVEN
Violation of Hawaii Antitrust Act (Haw. Rev. Stat. § 480-4) (on behalf of
Plaintiffs and the Damages Class) .......................................................................68

COUNT EIGHT
Violation of Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/1-11) (on
behalf of Plaintiffs and the Damages Class).........................................................69

COUNT NINE
Violation of Iowa Competition Law (Iowa Code §§ 553.1, *et seq.*) (on
behalf of Plaintiffs and the Damages Class).........................................................70

COUNT TEN
Violation of Kansas Restraint of Trade Act (Kan. Stat. Ann. §§ 50-101, *et
seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................71

COUNT ELEVEN
Violation of Maine Antitrust Statute (Me. Rev. Stat. Ann. tit. 10, §§ 1101,
*et seq.*) (on behalf of Plaintiffs and the Damages Class) ....................................72

COUNT TWELVE
Violation of Maryland Antitrust Act (Md. Code, Com. Law §§11-201, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................72

COUNT THIRTEEN
Violation of Michigan Antitrust Reform Act (Mich. Comp. Laws §§ 445.771, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ......................73

COUNT FOURTEEN
Violation of Minnesota Antitrust Law (Minn. Stat. §§ 325D.49, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .................................................74

COUNT FIFTEEN
Violation of Mississippi Antitrust Statute (Miss. Code Ann. §§ 75-21-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................75

COUNT SIXTEEN
Violation of Nebraska Junkin Act (Neb. Rev. Stat. §§ 59-801, *et seq.*) (on behalf of Plaintiffs and the Damages Class).........................................................76

COUNT SEVENTEEN
Violation of Nevada Unfair Trade Practices Act (Nev. Rev. Stat. §§ 598A.010, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ...................77

COUNT EIGHTEEN
Violation of New Hampshire's Antitrust Statute (N.H. Rev. Stat. §§ 356:1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ....................................78

COUNT NINETEEN
Violation of New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................79

COUNT TWENTY
Violation of New York Donnelly Act (N.Y. Gen. Bus. Law §§ 340, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................80

COUNT TWENTY-ONE
Violation of North Carolina General Statutes (N.C. Gen. Stat. §§ 75-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................................80

COUNT TWENTY-TWO
Violation of North Dakota Uniform State Antitrust Act (N.D. Cent. Code §§ 51-08.1-01, *et seq.*) (on behalf of Plaintiffs and the Damages Class).............81

COUNT TWENTY-THREE
Violation of Oregon Antitrust Law (Or. Rev. Stat. §§ 646.705, *et seq.*) (on behalf of Plaintiffs and the Damages Class).......................................................82

COUNT TWENTY-FOUR
Violation of Puerto Rico Antitrust Statute (P.R. Laws Ann. tit. 10 §§ 258, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .....................................83

COUNT TWENTY-FIVE
Violation of Rhode Island Antitrust Act (R.I. Gen. Laws §§ 6-36-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ..........................................84

COUNT TWENTY-SIX
Violation of South Dakota Antitrust Statute (S.D. Codified Laws §§ 37-1-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class)...................................85

COUNT TWENTY-SEVEN
Violation of Tennessee Trade Practices Act (Tenn. Code Ann. §§ 47-25-101, *et seq.*) (on behalf of Plaintiffs and the Damages Class).............................86

COUNT TWENTY-EIGHT
Violation of Utah Antitrust Act (Utah Code Ann. §§ 76-10-3101, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ...................................................87

COUNT TWENTY-NINE
Violation of West Virginia Antitrust Act (W. Va. Code §§ 47-18-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ..........................................88

COUNT THIRTY
Violation of Wisconsin Antitrust Act (Wis. Stat. Ann. §§ 133.01, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ...................................................88

C.      VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ....................89

COUNT THIRTY-ONE
Violation of Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §§ 4-88-101, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ....................90

COUNT THIRTY-TWO
Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.) (on behalf of Plaintiffs and the Damages Class) .....................91

COUNT THIRTY-THREE
Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ..........93

COUNT THIRTY-FOUR
Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ......................................................................................94

v

COUNT THIRTY-FIVE
Violation of Massachusetts Consumer Protection Act (Mass. Gen. Laws
Ch. 93A §§ 1, *et seq.*) (on behalf of Plaintiffs and the Damages Class)..............95

COUNT THIRTY-SIX
Violation of Michigan Consumer Protection Act (Mich. Comp. Laws Ann.
§§ 445.901, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ................96

COUNT THIRTY-SEVEN
Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. §§
325F.68, *et seq.*) (on behalf of Plaintiffs and the Damages Class)......................98

COUNT THIRTY-EIGHT
Violation of Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-
1601, *et seq.*) (on behalf of Plaintiffs and the Damages Class)...........................99

COUNT THIRTY-NINE
Violation of Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§
598.0903, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ..................100

COUNT FORTY
Violation of New Hampshire Consumer Protection Act (N.H. Rev. Stat.
Ann. tit. XXXI §§ 358-A, *et seq.*) (on behalf of Plaintiffs and the Damages
Class)........................................................................................................................102

COUNT FORTY-ONE
Violation of New Mexico Unfair Trade Practices Act (N.M. Stat. Ann. §§
57-12-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ....................103

COUNT FORTY-TWO
Violation of New York Deceptive Practices Act (N.Y. Gen. Bus. Law §§
349, *et seq.*) (on behalf of Plaintiffs and the Damages Class)...........................105

COUNT FORTY-THREE
Violation of North Carolina Unfair and Deceptive Trade Practices Act
(N.C. Gen. Stat. §§ 75-1.1, *et seq.*) (on behalf of Plaintiffs and the
Damages Class)......................................................................................................106

COUNT FORTY-FOUR
Violation of North Dakota Unfair Trade Practices Act (N.D. Cent. Code
§§ 51-10-01, *et seq.*) (on behalf of Plaintiffs and the Damages Class)..............108

COUNT FORTY-FIVE
Violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann.
§§ 39-5-10, *et seq.*) (on behalf of Plaintiffs and the Damages Class) ...............109

COUNT FORTY-SIX
Violation of South Dakota Deceptive Trade Practices and Consumer
Protection Act (S.D. Codified Laws §§ 37-24, *et seq.*) (on behalf of
Plaintiffs and the Damages Class) ...................................................................110

COUNT FORTY-SEVEN
Violation of Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-
11-1, *et seq.*) (on behalf of Plaintiffs and the Damages Class) .........................112

COUNT FORTY-EIGHT
Violation of Vermont Consumer Fraud Act (Vt. Stat. Ann. tit. 9 §§ 2451,
*et seq.*) (on behalf of Plaintiffs and the Damages Class) ...................................113

COUNT FORTY-NINE
Violation of State Common Law Unjust Enrichment Laws (on behalf of
Plaintiffs and the Damages Class) ...................................................................115

IX.    RELIEF REQUESTED ...............................................................................116

X.     JURY TRIAL DEMANDED ......................................................................117

Indirect Purchaser Plaintiffs SMBA Construction, LLC, Charles W. Hughes Construction, LLC, Lucas Contracting, LLC, County-Wide Masonry Corp., Cal Prime, Inc., Lakewood Concrete Corp, Jon Tate Construction, LLC, Jon S. Garrett d/b/a Black River Masonry, Morgan Building Constructors, Sioux City Engineering Co., Covered Bridge Outdoor Construction Corporation, and Park Construction Co., ("Plaintiffs") bring this action on behalf of themselves and on behalf of all contractors in the United States and its territories that indirectly purchased (a) chemical additives for cement, (b) chemical admixtures for concrete, (c) chemical admixtures for mortar, (hereafter "Additives and Admixtures") that were manufactured by one or more of the Defendants and/or (d) products containing one or more Additives or Admixtures (collectively, "CCAs"), for commercial use in the installation or repair of and/or in other construction using concrete, cement or mortar, from at least January 1, 2017, until the present (the "Class Period"). "Contractors" means, for the purposes of this Consolidated Amended Complaint ("Complaint"), persons or entities which purchased CCAs for construction projects which they performed in whole or in part. All Plaintiffs are Contractors that indirectly purchased CCAs from a Defendant as described below for commercial use in the installation or repair of and/or in other construction using concrete, cement or mortar.

Plaintiffs bring this action on behalf of a nationwide class of Contractors against Defendants for injunctive relief under the antitrust laws of the United States, and on behalf of a single multistate class of Contractors for damages under various state antitrust, consumer protection , unfair trade practices, and unjust enrichment laws (defined below and hereinafter the "Classes"), and demand a trial by jury. Plaintiffs allege facts regarding themselves based on personal knowledge, and all other facts below on information and belief after an investigation by counsel, including with consultants.

1

## I.    NATURE OF THE ACTION

1.    This civil antitrust action seeks damages and injunctive relief arising out of the collusive and concerted restraint of trade by the Defendants—all of whom are competitors and leading manufacturers or suppliers of Additives and Admixtures—during the Class Period.  But for Defendants' and their co-conspirators' collusive conduct as alleged herein, Plaintiffs and members of the Classes that Plaintiffs seek to represent would not have paid—and would not continue to pay—artificially inflated prices for CCAs. Defendants' scheme included both price increases and the imposition of surcharges on Additives and Admixtures sold in the United States and its territories.

2.    This lawsuit arises from Defendants' unlawful agreement to fix the prices of Additives and Admixtures that are added to concrete, cement, and mortar to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing or preventing cracking, and inhibiting corrosion. Globally, the market for Additives and Admixtures reached more than $18 billion in 2020 and $27 billion in 2022. The U.S. market for Additives and Admixtures was valued at $3 billion in 2022 and is estimated to reach $4.7 billion by 2032.

3.    A preliminary regression analysis undertaken by Plaintiffs' counsel's consultant, based on publicly-available data, demonstrates that Defendants' collusion during the Class Period created higher prices than that which Plaintiffs and the Classes would have paid absent the conspiracy. The determination of a price effect, if any, and the estimation of damages attributable to collusive behavior, if any, typically involves the comparison of prices during the period affected by the alleged unlawful conduct (referred to as the "damages" or "Class" period) to competitive prices during a "benchmark" period, *i.e.*, prices in a market or during a time period likely unaffected by the alleged unlawful conduct. The benchmark prices provide information that can

be used to estimate "but-for" prices that would have prevailed during the damages period in the absence of the alleged unlawful conduct. The following graph compares <u>actual</u> Additives and Admixtures prices to prices buyers <u>would have paid</u> in a collusion free market (the "but-for" prices).

COMPARISON OF ACTUAL AND BUT-FOR CCA PRICES



Figure 1. Comparison of Actual and But-For CCA Prices.

4.      As part of this analysis, it is common and proper to employ econometric methods to account for factors that affect prices but that are unrelated to collusion (*e.g.*, cost and demand factors) to isolate the price effects, if any, of the alleged conspiracy. Plaintiffs' consultant  applied the well-known and widely accepted dummy variable multiple regression methodology to estimate the price effects of the alleged conspiracy. The dummy variable multiple regression methodology implements the comparison described above, in that it relies on comparing "prices in the impact

period to available prices before the alleged period of impact," while controlling for other factors that affect prices.

5.        Specifically, the multiple regression analysis illustrated in Figure 1 controls for supply and demand factors including: (1) raw materials cost, (2) freight cost, (3) labor cost, (4) cement and concrete production that accounts for downstream demand for Additives and Admixtures, (5) an indicator variable for COVID-19 period, and (6) calendar quarter fixed effects, which accounts for seasonality in prices. As shown in Figure 1, actual prices for Additives and Admixtures are significantly higher than their corresponding but-for prices in the period from January 1, 2017 to the present. Specifically, the estimated overcharge is 14.8%, and highly statistically significant. The overcharge regression results demonstrate that prices of Additives and Admixtures were inflated above competitive levels during the damages period, accounting for major non-conspiracy factors that affect prices of Additives and Admixtures.

6.        Defendants are six separate corporate families: (i) the "BASF" Group Defendants, comprised of BASF SE and its wholly-owned U.S. subsidiary, New Jersey-based BASF Corporation, which during the conspiracy period also owned Ohio-based Master Builders Solutions Admixtures US, LLC ("MB-USA") as well as Germany-based Master Builders Solutions Deutschland GmbH ("MB-Germany"), both now wholly-owned by Defendant Cinven, Ltd.; (ii) the "Sika" Group Defendants, comprised of Swiss corporation Sika AG and its wholly-owned U.S. subsidiary, New Jersey-based Sika Corporation;  (iii) the "Saint-Gobain" Group Defendants, comprised of the French conglomerate Compagnie de Saint-Gobain S.A. and three wholly-owned U.S.-based subsidiaries it currently controls, Chryso, Inc., headquartered in Texas; Georgia-based GCP Applied Technologies Inc.; its French-based wholly-owned subsidiary Chryso S.A.S.; and Saint-Gobain Corporation ("Saint-Gobain Corp."), based in Malvern, Pennsylvania; (iv) the

"Cinven" Group Defendants, comprised of British corporation Cinven Ltd., its two wholly-owned U.S. subsidiaries, New York City-based Cinven, Inc., MB-USA, and MB-Germany (the latter two, as stated above, having been previously owned by Defendant BASF); (v) the "RPM" Group Defendants, comprised of RPM International Inc. ("RPM"), and its wholly-owned subsidiary, The Euclid Chemical Company, both of which are based in Ohio; and (vi) "Mapei" Group Defendants comprising of Emme Esse Vi s.r.l., MAPEI S.P.A., and its wholly owned subsidiary, Illinois-based Mapei Corporation. These six defendant families manufactured and sold the majority of Additives and Admixtures sold in the United States. Defendants' scheme included both price increases and the imposition of surcharges on Additives and Admixtures sold in the United States and its territories.

7.      The United States Department of Justice's Antitrust Division ("U.S. DOJ") has confirmed in a letter filed with the Court that "a grand jury investigation has been initiated related to the concrete and cement additives industry" (ECF No. 67, filed May 29, 2024) with a grand jury currently empaneled in Philadelphia. The U.S. DOJ has issued grand jury subpoenas to CCA market players, including on information and belief all of the U.S.-based Defendants, with what one subpoena recipient publicly described as being issued "in connection with an investigation of possible antitrust law violations in the cement additives and concrete admixtures sector." In addition, "Switzerland-based construction chemicals major Sika said that authorities from the three involved state bodies, [European Commission ("EC"), United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA")], had visited some of its premises, and that contact with US antitrust authorities has been established." In another indication that the global antitrust probes involve U.S. investigators working closely with their foreign counterparts, Defendant Mapei, S.p.A., – whose U.S. subsidiary operates over a dozen

Additives and Admixtures facilities throughout the country – disclosed in its financial statements for the period ended December 31, 2023, signed by its auditors on June 14, 2024 that, "Competition authorities in the EU, UK, Turkey and North America launched an antitrust investigation into the concrete and cement admixtures sector in 2023. Mapei is one of the European and global companies covered by the investigation and is fully cooperating with the authorities."

8.    Plaintiffs and the Classes first became aware of Defendants' unlawful scheme on October 17, 2023, when the EC announced that it had, together with the CMA and the TCA, carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States" and "that it had also been in contact with the US Department of Justice's Antitrust Division" in connection with these dawn raids. A European antitrust bi-monthly bulletin noted "[t]his is the first international cartel investigation carried out jointly by competition authorities in several years."  The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."

9.    On October 17, 2023, the CMA released a statement that it had launched an investigation, pursuant to the U.K.'s equivalent of Section One of the Sherman Act, "into suspected anti-competitive conduct relating to the supply of chemical admixtures and additives for use in concrete, cement, mortars and related construction products . . . involving a number of suppliers of these chemicals and some industry bodies" (which Plaintiffs believe to refer to trade associations).   The CMA, like its EC counterpart, has also confirmed that it was working with the

U.S. DOJ in connection with its investigation.

10.    On November 6, 2023, the UK's Competition Appeals Tribunal ("CAT") approved the issuance of at least three search warrants sought by the CMA in connection with what the CMA described as surprise inspections of companies active in the "supply of chemical admixtures and additives for use in concrete, cement, mortar and related construction products," carried out three weeks prior to their warrant application. The CMA's requests for warrants stemmed in part from a concern that relevant evidence would be destroyed, with the CMA asserting "reasonable grounds for suspecting that, if the documents the subject of the warrant were required to be produced, they would be concealed, removed, tampered with or destroyed," and that therefore the application must be made in secret. Based on the warrants having been executed, the November 6th judgment indicated the order approving the warrants should not remain closed. On April 22, 2024, CAT granted the CMA permission to search a private residence in connection with the CMA's probe of the chemicals admixtures industry. Sarah Cardell, Chief Executive of the CMA, stated the following: "With the increase of remote-working – and electronic communication – it's essential that we're able to search domestic premises to secure evidence of potential breaches of competition law where appropriate to do so."

11.    The TCA subsequently disclosed that the "on-site inspections carried out by the Turkish Competition Authority on October 17 were conducted simultaneously and in coordination with" the EC and the CMA, and that it had opened a formal investigation targeting Defendants BASF's Turkish unit, Sika, Chryso, Cinven's Master Builders unit, and Mapei, along with two trade associations, for possible violations of Turkey's equivalent of Section One of the Sherman Act by "agreeing on price increases and pricing strategies, exchanging competitively sensitive information [and] bid rigging."

12.     On October 18, 2023, Switzerland-based Defendant Sika AG stated that "authorities from the three involved state bodies [EC, CMA and TCA] had visited some of its premises, and that contact with US antitrust authorities has been established." And in its Q3 2023 earnings call with industry analysts held on October 20, 2023, Thomas Hasler, Sika AG's CEO, stated: "I can confirm that the antitrust authorities in the EU, in the U.K. as well as in Turkey [where Sika AG has a significant presence] and in the U.S. have started an investigation into the concrete admixture market. This is an investigation across the whole industry."

13.     France-based Saint-Gobain confirmed by phone to the press "that the company is aware of and cooperating with the investigation."  Cinven-owned MB-Germany also "confirmed they are involved in a cross-border cartel probe." The next day, it was reported that both Switzerland-based Sika and France-based Saint-Gobain were cooperating with international antitrust authorities, and that Switzerland-based Sika had been in contact with the U.S. DOJ.

14.     In its financial statements for the period ended December 31, 2023, signed by its auditors on June 14, 2024, Mapei disclosed that, "Competition authorities in the EU, UK, Turkey and North America launched an antitrust investigation into the concrete and cement admixtures sector in 2023. Mapei is one of the European and global companies covered by the investigation and is fully cooperating with the authorities."

15.     As set forth above, the investigation is being coordinated by global antitrust regulators. The investigation involves global pricing of Additives and Admixtures and global collusion by Defendants which operated throughout the world and globally coordinated their price increases and surcharges. Upon information and belief, the foreign-based Defendants, who are the parents of the United States-based Defendants, are being investigated for anti-competitive activity throughout the world, including their direct participation in antitrust violations in the United States.

8

There are additional foreign entities owned and/or controlled by the foreign Defendants who import, or imported, Additives and Admixtures, and/or the precursor chemicals for them, into the United States from abroad. Plaintiffs reserve the right to seek discovery related to those entities, and/or add them as defendants at the appropriate time.

16.    The Additives and Admixtures market is highly susceptible to collusion: on information and belief, Plaintiffs estimate that Defendants' control between eighty and ninety percent (80-90%) of the Additives and Admixtures market in the United States and are members of various trade associations. Also, there are high barriers to entry, no substitute products available, and demand for Additives and Admixtures is inelastic.

17.    Defendants have continued to consolidate the Additives and Admixtures market and with no meaningful check on their pricing power, they have instituted price increases on Additives and Admixtures, and surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

18.    Defendants have an understanding that they will not undercut one another on the one thing they can compete on, price. For example, one industry analyst, in discussing at least the third price increase announced by Sika in 2021 ("We are going to increase prices further. We have increased prices in January and we will do it again in March"), stated, "They are not losing sales when increasing prices because competitors will also not sell at lower prices." Similarly, Frank Sullivan, the Chairman, President, and CEO of Defendant RPM recognized on a July 2023 earnings call that the company was charging higher prices for its Additives and Admixtures, noting that we "held our pricing and held our discipline" and, as a result, reaped substantial supracompetitive profits on its Additives and Admixtures.

19.    Moreover, Defendants' claimed justifications for these price hikes and surcharges is

9

pretextual. Their alleged spike in raw material and shipping costs was either non-existent or short-lived. In comparison, Defendants' price increases, including surcharges, on Additives and Admixtures have been both extreme and persistent.

20.     As discussed below, Defendants' conspiracy was facilitated through their shared membership in numerous trade associations, some of which are also targets of the global antitrust investigation. Both the CMA and the TCA stated they "were investigating trade associations."

21.     Beginning at least as early as January 1, 2017, Defendants – who by that time had begun to consolidate their control over the global Additives and Admixtures market through a series of sales and acquisitions including amongst themselves – entered into an agreement to fix the prices of those products. This agreement was effectuated in part through several Defendants' continual, close interactions with each other in connection with a series of inter-defendant sales and acquisitions involving Chryso (now owned by Saint-Gobain) and Master Builders (now owned by Cinven). In addition, for several years of the Class Period, Saint-Gobain had a substantial (nearly 11%) ownership interest in Sika, making it Sika's largest shareholder, and Sika stated that "[t]he two groups will . . . continue their substantial existing business relationship and seek to further expand it to areas of mutual benefit while preserving and respecting each group's economic and legal independence."

22.     These transactions, which are summarized in the timeline graphic below and detailed in Section IV(D) of this Complaint, gave the Defendants unique opportunities to obtain and exchange highly sensitive competitive information regarding pricing, production, and sales territories.



**Defendants' Mergers and Acquisitions Timeline**

23.     In addition, during this time period, Defendants also acquired numerous other producers of Additives and Admixtures. This rapid industry consolidation, and Defendants' effective elimination of their independent competitors, helped cement Defendants' cartel, which in turn resulted in Plaintiffs and members of the Classes paying supra-competitive prices for CCAs in the United States and its territories. Through this action, Plaintiffs, on behalf of themselves and members of the Classes, seek to enjoin Defendants' unlawful conduct and to recover the overcharges Plaintiffs and the damages class suffered.

## II.    JURISDICTION AND VENUE

24.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring state law class claims on behalf of the multistate damages class to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' anticompetitive conduct, which resulted in prices for CCAs being artificially inflated at supra-competitive levels throughout the Class Period.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331,

1337, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

25.    Venue is proper in this District pursuant to Sections 12 and 16 of the Clayton Act (28 U.S.C. §§ 22 and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

26.    This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, imported, and/or delivered substantial quantities of Additives and Admixtures, or products needed to manufacture Additives and Admixtures, throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

27.    The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

III.    **PARTIES AND UNNAMED CO-CONSPIRATORS**

    A.    **Plaintiffs**

28.    Plaintiff SMBA Construction, LLC ("SMBA") is a business incorporated in the State of New Jersey with its primary place of business at 9 Moore Place, North Arlington, New Jersey 07031. During the Class Period, Plaintiff SMBA purchased and continues to purchase, in New Jersey, CCAs manufactured by one or more of the Defendants at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages

as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

29.    Plaintiff Charles W. Hughes Construction, LLC ("Hughes") is a North Carolina limited liability company with its principal place of business in La Grange, North Carolina. During the Class Period, Hughes purchased, in North Carolina, CCAs manufactured by one or more of the Defendants at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and wrongful acts in furtherance thereof.

30.    Plaintiff Lucas Contracting, LLC ("Lucas") is a North Carolina limited liability company with its principal place of business 1101 Diane Blvd., Kinston, North Carolina. During the Class Period, Lucas purchased, in North Carolina, CCAs manufactured by one or more of the Defendants at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and wrongful acts in furtherance thereof.

31.    Plaintiff County-Wide Masonry Corp. ("County-Wide") is a New York corporation with its principal place of business at 711 S. Columbus Avenue, Mount Vernon, NY 10550. During the Class Period, County-Wide purchased, in New York, CCAs manufactured by one or more of the Defendants at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and wrongful acts in furtherance thereof.

32.    Plaintiff Cal Prime, Inc. ("Cal Prime") is a business incorporated in the state of California with its primary place of business at 10101 Michele Avenue, Bakersfield, California 93312. During the Class Period, Cal Prime purchased, in California, CCAs at supra-competitive

prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

33.     Plaintiff Lakewood Concrete Corp. ("Lakewood") is a business incorporated in the State of New York with its primary place of business at 185 East Livingston Avenue, Jamestown, New York 14701. During the Class Period, Lakewood purchased, in New York, CCAs at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

34.     Plaintiff Jon Tate Construction, LLC ("Jon Tate Construction") is a business incorporated in the state of Mississippi with its primary place of business at 4949 Attala County Hwy 14, Goodman, MS 39079. During the Class Period, Plaintiff Jon Tate Construction purchased, in Mississippi, CCAs at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

35.     Plaintiff Jon S. Garrett d/b/a Black River Masonry ("Black River Masonry") is a sole proprietorship with its primary place of business at 6095 Attala County Hwy 14, Goodman, MS 39079. During the Class Period, Plaintiff Black River Masonry purchased, in Mississippi, CCAs at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

36.     Plaintiff Morgan Building Constructors ("MBC") is a business located in the state of Florida with its primary place of business in Orlando, Florida. During the Class Period, MBC

purchased, in Florida, CCAs at supracompetitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

37.    Plaintiff Sioux City Engineering Co. ("SCEC") is a corporation located in the state of Iowa with its primary place of business in Sioux City, Iowa. During the Class Period, SCEC purchased in Iowa and Nebraska CCAs at supracompetitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

38.    Plaintiff Covered Bridge Outdoor Construction Corporation ("CBOC") is a business incorporated in the state of New Hampshire with its primary place of business in Manchester, New Hampshire. During the Class Period, Plaintiff CBOC purchased, in New Hampshire and Massachusetts, CCAs at supracompetitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

39.    Plaintiff Park Construction Co. ("Park") is a business incorporated in the state of Minnesota with its primary place of business at 1481 81st Ave NE, Minneapolis, Minnesota 55432. During the Class Period, Park purchased and continues to purchase, in Minnesota, North Dakota, Wisconsin, Nebraska, Iowa, South Dakota and Texas, CCAs at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

**B.    Defendants**

**1.    The BASF Group Defendants**

40.    Defendant BASF SE (Societas Europaea –"SE") ("BASF SE") is a publicly traded

European company with its principal place of business at Carl-Bosch-Str. 38, Ludwigshafen Am Rhein, Rheinland-Pfalz, Germany 67056. During the Class Period, until selling its Additive and Admixture businesses (Master Builders entities collectively known in the industry as "MBCC") on October 1, 2020, BASF SE manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates or subsidiaries. BASF SE also makes and exports to the United States a number of the precursor chemicals used to manufacture Additives and Admixtures in the U.S., including ethylene oxide.

41.     Defendant BASF Corporation ("BASF Corp.") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. During a portion of the Class Period, when BASF SE owned MB-USA and MB-Germany, BASF Corp. manufactured and sold Additives and Admixtures in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries. Defendant BASF SE controls BASF Corp. both generally and with respect to the conduct of BASF Corp. in furtherance of the unlawful acts alleged in this Complaint.

42.     BASF SE and BASF Corp. are collectively referred to herein as "BASF." Plaintiffs seek to hold BASF liable for the period of time prior to its sale in 2020 of its construction chemicals business.

### 2.     The Sika Group Defendants

43.     Defendant Sika AG is a Swiss corporation with its principal place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries.

44.     Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave. Lyndhurst, New Jersey 07071. During the Class Period, Sika

Corporation manufactured and sold Additives and Admixtures in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries. Sika AG and Sika Corporation are collectively referred to herein as "Sika."

45.    Defendant Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint. Sika Corporation has nearly 30 locations in the United States. For instance, Sika AG's Organizational Rules make clear that it exercises control over Sika Corporation. Under the Rules, the "executive bodies" of Sika AG, as the parent company of the Sika group of companies, exercise control over the direction of the entire group. Those "executive bodies" include Sika AG's Board of Directors, CEO, and Group Management ("KL").

46.    Sika AG's Board of Directors is responsible for "the overall direction and control of the management of Sika," and its duties include determining the company's strategy, financial planning, and "fundamental policies and rules"; approving its annual budget; and appointing and removing members of the KL.

47.    Sika AG's CEO reports to the Chair of the Board. His duties include: achieving the company's strategic objectives, setting its operational priorities, and managing its resources. Sika AG's KL is responsible for "the operational management of Sika based on the resolutions of the Board with a view to reaching the budget and the strategic goals." The KL is led by Sika AG's CEO, and its Regional Managers and Functional Managers are members.

48.    Mike Campion is the Regional Manager of the Americas for Sika AG. His duties include "assum[ing] full responsibility for the region with a view to achieving the budget and the strategic goals" and "implement[ing] the resolutions of the Board, Chair, and the KL." Like all Sika AG Regional Managers, Campion serves on the KL, meaning he is heavily involved in the

operational management of Sika, including Sika Corporation. He was appointed by Sika AG's Board of Directors and is charged with implementing the Board's resolutions in the Americas, including in the United States and its territories. The Board has the power to terminate him if he fails to do so.

49.     In addition to his role as Regional Manager of the Americas for Sika AG and member of the KL, Campion is one of three members of the Board of Directors for Sika Corporation. These overlaps in his roles, combined with the fact that he reports directly to Sika AG's Board of Directors, show that Sika AG exercises significant control over its U.S. subsidiary, Sika Corporation.

50.     Christoph Ganz, Campion's predecessor, served as Regional Manager of the Americas and a member of the KL, from 2018 through 2023. He also served from June 2019 to June 2024 as the President of the Board of Directors of Sika Management Americas AG, a Swiss corporation also based in Baar ZG whose purpose is defined as follows: "Provision of services of all kinds for the companies of the Sika Group, in particular services in the areas of management and coordination, purchasing, sales and production as well as legal and personnel." According to Switzerland's Commercial Registry, Ganz lived in New York in 2018 and possibly 2019. In January of 2024, Ganz took over as Regional Manager of the Europe, Middle East & Africa ("EMEA") for Sika AG.

51.     Jim Walther is the CEO and President of Sika Corporation, as well as the Area Manager of the United States for Sika AG. He also serves on Sika Corporation's Board of Directors. As an Area Manager, Walther was appointed by the KL and could be terminated by them at any time.

52.     As the leaders of Sika AG's management team for the Americas and, in particular,

the United States, Campion and Walther "bear full profit and loss responsibility" and "set country-specific growth and sustainability targets and allocate resources" based on Sika AG's strategy.

### 3.    The Saint-Gobain Group Defendants

53.    Defendant Compagnie De Saint-Gobain S.A. ("Saint Gobain France") is a French corporation with its principal place of business in greater Paris. During the Class Period, Saint-Gobain France manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries, including its wholly owned subsidiaries Chryso S.A.S., Texas-based Chryso, Inc., Georgia-based GCP, and Pennsylvania-based Saint-Gobain Corp.

54.    Defendant Chryso S.A.S. is a French company with its principal place of business at Tour Saint-Gobain, 12 Place de l'Iris, 92400 Courbevoie, France. During the Class Period, Chryso S.A.S. manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries.

55.    Defendant Chryso, Inc. is a wholly-owned subsidiary of Chryso S.A.S. and a Michigan corporation with its principal place of business in Rockwall, Texas. During the Class Period, Chryso, Inc. manufactured and sold Additives and Admixtures in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries.

56.    Chryso S.A.S. and Chryso, Inc. are collectively referred to herein as "Chryso."

57.    Defendant Saint-Gobain France controls Chryso both generally and with respect to the conduct of Chryso in furtherance of the unlawful acts alleged in this Complaint.

58.    Defendant GCP is a Georgia corporation with its primary place of business in Alpharetta, Georgia. Defendant Saint-Gobain S.A. controls GCP both generally and with respect to the conduct of GCP in furtherance of the unlawful acts alleged in this Complaint.

59.    Defendant Saint-Gobain Corp. is a Pennsylvania corporation with its principal

place of business in Malvern, Pennsylvania. During the Class Period, Saint-Gobain Corp.
manufactured and sold Additives and Admixtures in the United States and its territories, directly
or through its predecessors, affiliates, or subsidiaries. Defendant Saint-Gobain S.A. controls Saint-
Gobain Corp. both generally and with respect to the conduct of Saint-Gobain Corp. in furtherance
of the unlawful acts alleged in this Complaint.

60.    Saint-Gobain France, Chryso, GCP, and Saint-Gobain Corp. are collectively
referred to herein as "Saint Gobain."

61.    Saint-Gobain France exercises control over business matters at GCP, Chryso, and
Saint-Gobain Corp. Saint-Gobain France includes its subsidiaries in its strategic plans and
describes its "operating model" as being "organized on a country-by-country basis." Saint-Gobain
France notes that "the mobilization of all our teams on every continent" is what makes it possible
for the company to achieve its strategic goals, including "seek[ing] more growth in North
America[.]"

62.    Upon its acquisition of GCP and Chryso, Saint-Gobain France combined the two
companies into a new business unit within the existing Saint-Gobain Additives and Admixtures
business called the "Construction Chemicals Business Unit," which is in turn part of Saint-Gobain
France's "High Performance Solutions" business segment.

63.    Saint-Gobain France requires every Saint-Gobain business to submit a strategic
plan for approval every year. The plans include sales projections, long-term plans, and details on
profitability. Within North America, each business head submits its plan to the head of Saint-
Gobain Corp., who combines them to create an overall plan for the region. The head of Saint-
Gobain Corp. then presents that plan to the leadership of Saint-Gobain France. Saint-Gobain
France also requires Saint-Gobain Corp. to submit a proposed budget for approval each year.

64.     Saint-Gobain France also presents and discusses the finances and employee compensation of Saint-Gobain Corp., GCP, and Chryso, along with Saint-Gobain France overall in the company's 2023 Financial Statements. Saint-Gobain France also advertises openings for employment positions with Saint-Gobain Corp. on the Saint-Gobain France website. Saint-Gobain France has also posted a "General Principles of Conduct and Action" for the whole Group as well as an employee engagement and diversity and inclusion policy, with targets identified.

65.     Saint-Gobain France executives play a central role in the operations of its subsidiaries, including Saint-Gobain Corp. Top executives of Saint-Gobain Corp., including division head Mark Rayfield, report directly to Benoit Bazin, the CEO of Saint-Gobain France.

66.     Further, while Saint-Gobain France had been in the Additives and Admixtures business since the start of the Class Period, upon Saint-Gobain's acquisition of both Chryso and GCP in 2021, it appointed individuals who held leadership positions in Saint-Gobain France as executives of both new subsidiaries. Indeed, the CMA predicted as much in advance of Saint-Gobain France's acquisition of GCP, stating: "As a result of the Merger, these enterprises will cease to be distinct."

67.     Specifically, Chryso S.A.S. reported three new Directors in its 2021 annual report, all three of whom list the same address in Issy-Les-Moulineaux, France and two of whom, Thierry Bernard and Hadrien Costa De Beauregard, report positions with Saint-Gobain France (CEO of Constructions Chemicals, and General Counsel and CCO of Construction Chemicals, respectively). Bernard later became President of Chryso in 2023, at which time Chryso also disclosed a new director from Saint-Gobain France, who is their CEO for High Performance Solutions and is on their Executive Committee. In the same 2023 annual report, Chryso reported hiring individuals associated with Saint-Gobain Corp., including Treasurer Vincent Dinenna III

and Secretary La-Toya Hackney, who both office at Saint-Gobain Corp.'s Pennsylvania address.

68.     Similarly, GCP's filings with the Georgia Secretary of State following its acquisition by Saint-Gobain France reported a new CEO, Secretary, and CFO, all of whom also held leadership positions at Saint-Gobain Corp. and listed the same current address—that of Saint-Gobain Corp.'s operations in Pennsylvania. The new CEO of GCP, Mark Rayfield, also leads Saint-Gobain Corp.; the new Secretary of GCP is also Senior Vice President, General Counsel, and Secretary of Saint-Gobain Corp.; and the new CGO of GCP is also Vice President of Finance and CFO of Saint-Gobain Corp. Rayfield also serves on the Executive Committee of Saint-Gobain France and is listed as the Senior Vice President and CEO of Saint-Gobain Corp.

69.     Representatives of Saint-Gobain France likewise serve in leadership positions at Saint-Gobain Corp. Tom Kinisky ("Kinsey"), the former head of Saint-Gobain Corp. from January 2017 to January 2019 and then the Chairman of Saint-Gobain Corp. from February 2019 onwards, also served as a Senior Vice President for Saint-Gobain France and as a member of Saint-Gobain France's Management Team during the same period. Kinisky's replacement as division leader, Mark Rayfield, is simultaneously a Senior Vice President at Saint-Gobain France, has been a member of Saint-Gobain France's Executive Committee since 2020, and has worked for various subsidiaries within the Saint-Gobain family for 30 years. Valerie Gervais, the former Global HR Director of "Innovative Materials" at Saint-Gobain France relocated to Saint-Gobain Corp., where she simultaneously managed human resources in North America and continued to "support the global Performance Plastics business" for Saint-Gobain France.

70.     In addition, there are many examples of Saint-Gobain executives holding consecutive leadership positions at Saint-Gobain France, Saint-Gobain Corp., GCP, and Chryso.

71.     Saint-Gobain France views the U.S. as a "key" market, and its U.S. subsidiaries as

a means to "establish a leading worldwide presence in the growing construction chemicals sector" and further its strategy "as a worldwide leader in light and sustainable construction."

### 4.    The Cinven Group Defendants

72.    Defendant Cinven Ltd., a global private equity firm, is a British business entity with its principal place of business in London, England. For a portion of the Class Period, Cinven Ltd., through its predecessors, affiliates, or subsidiaries, including MB-USA and MB-Germany, sold Additives and Admixtures throughout the world, including in the United States and its territories. Cinven, Ltd. also owned Defendant Chryso until 2021, when it sold the company to Defendant Saint-Gobain France.

73.    Defendant Cinven, Inc., a private equity firm and wholly owned subsidiary of Defendant Cinven, Ltd., is a New York corporation with its principal place of business at 12 East 49th Street, New York, NY. During a portion of the Class Period, Cinven Inc., through its predecessors, affiliates, or subsidiaries, including MB-USA and MB-Germany, sold Additives and Admixtures in the United States and its territories.  Defendant Cinven Ltd. controls Cinven, Inc. both generally and with respect to the conduct of Cinven, Inc. in furtherance of the unlawful acts alleged in this Complaint.

74.    Defendant MB-USA is a Delaware corporation with its primary place of business in Beachwood, Ohio, 44122. During the Class Period, MB-USA manufactured and sold Additives and Admixtures in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries. Defendant Cinven Ltd. controls MB-USA both generally and with respect to the conduct of MB-USA in furtherance of the unlawful acts alleged in this Complaint.

75.    Defendant MB-Germany is a German corporation with its principal place of business in Mannheim, Germany. During the Class Period, MB-Germany manufactured and sold Additives and Admixtures around the world, including in the United States and its territories,

23

directly or through its predecessors, affiliates, or subsidiaries. Defendant Cinven Ltd. controls MB-Germany both generally and with respect to the conduct of MB-Germany in furtherance of the unlawful acts alleged in this Complaint.

76.    MB-Germany regularly hires from U.S. labor markets to fill positions that facilitate the marketing and sale of Additives and Admixtures to U.S. markets. MB-Germany also sets terms and conditions of employment for U.S. employees, including retirement and healthcare benefits. In addition, MB-Germany executives exercise control over MB-USA and its operations in the United States. For example, Boris Gorella, the CEO of MB-Germany, is responsible for global operations, including its operations in the United States, and Bruce Christensen, the "Cluster Head [of] Americas" at MB-Germany, is President of MB-USA.

77.    Cinven Ltd., Cinven, Inc., MB-USA, and MB-Germany are collectively referred to herein as "Cinven."

### 5.    The RPM Group Defendants

78.    Defendant RPM International, Inc. ("RPM") is a Delaware corporation with its principal place of business in Medina, Ohio. During the Class Period, RPM manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates, or subsidiaries.

79.    Defendant The Euclid Chemical Company ("Euclid") is an Ohio corporation with its principal place of business in Cleveland, Ohio. During the Class Period, Euclid manufactured and sold Additives and Admixtures around the world, including in the United States and its territories. Defendant RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

80.    RPM and Euclid are collectively referred to herein as "RPM."

### 6.    The Mapei Group Defendants

81.    Defendant Emme Esse Vi s.r.l. ("Emme Esse") is an Italian company with its principal place of business in Milan, Italy. During the Class Period, Emme Esse manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates or subsidiaries, including  MAPEI S.P.A. and Mapei Corporation.

82.    Mapei S.P.A., a subsidiary of Emme Esse, is an Italian corporation with its principal place of business in Milan, Italy.  During the Class Period, Mapei S.P.A. manufactured and sold Additives and Admixtures around the world, including in the United States and its territories, directly or through its predecessors, affiliates or subsidiaries. Mapei S.P.A. is listed in global market reports as one of the "[m]ajor players in the chemical admixtures market" and the CMA found that, "Mapei was the second largest supplier of cement admixtures to UK customers after GCP in 2021, with a [20-30]% share of supply."

83.    Defendant Mapei Corporation is an Illinois corporation with its principal place of business in Deerfield Beach, Florida, with Additives and Admixtures production sites in numerous states, including Florida, Georgia, California, Virginia, Texas, Illinois, New Jersey, Arizona, Minnesota, and Missouri. During the Class Period, Mapei Corporation manufactured and sold Additives and Admixtures in the United States and its territories, directly or through its predecessors, affiliates or subsidiaries. Mapei Corporation is a major U.S. admixture and additives manufacturer with more than 1,500 employees, 12 admixture manufacturing plants, and 5 admixture distribution centers.

84.     Defendant Mapei S.P.A. controls Mapei Corporation both generally and with respect to the conduct of Mapei Corporation in furtherance of the unlawful acts alleged in this Complaint For example, Mapei Inc. relies on the support from the "Mapei R&D Corporate

Laboratory, a centre of excellence for concrete admixtures, located in Milan, Italy" and engages in "monthly meetings" to "discusses projects and priorities with the R&D Centre in Milan."

85.    In addition, the same executives who run Mapei S.P.A. also direct the operations of Mapei Corporation in the United States. Siblings Marco and Veronica Squinzi have served as co-CEOs of Mapei S.P.A. since July of 2019.  At the same time, they serve as the only two directors of Mapei Corporation.  They also share ownership of Mapei S.P.A, along with their cousin, Simona Giorgetta.

86.    Emme Esse, Mapei S.P.A. and Mapei Corporation are collectively referred to herein as "Mapei."

87.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

88.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

89.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

## IV.    FACTUAL ALLEGATIONS

### A.    The Additives and Admixtures Market

#### 1.    Additives and Admixtures Are Necessary Inputs in Cement, Concrete, and Mortar

90.    Additives and Admixtures are essential chemicals that are added to cement, concrete and mortar to modify and improve their properties and provide them with specific

qualities. The main component of Additives and Admixtures – other than water, which makes up anywhere from 45 to 77 percent of a given Additive and Admixture, depending on its application – are one or more chemicals, which are akin to "building blocks" of the Additives and Admixtures that are ultimately sold to direct purchasers (and then on to Plaintiffs and other indirect purchasers) or incorporated into ready mix-concrete (also purchased by Plaintiffs and other indirect purchasers for use in their jobs and projects).

91.    These "building blocks," which include chemicals such as ammonia, naphthalene, ethylene oxide, nitric acid, and corn syrup, can make up to 66 percent of a given Additive or Admixture, depending on the application and ultimate use of that particular CCA. For example, accelerators (described in more detail below) have a significantly high percentage (up to 33 percent) of calcium chloride, as that polymer aids in speeding up the curing of poured concrete; retardants (also described below) have a significantly large percentage of hydroxycarboxylic acids (about 35 percent), as that polymer helps slow down the speed at which poured concrete cures (that is, dries and becomes solid).

92.    These "building blocks" are produced both in the United States and overseas. The more vertically- or back-integrated Defendants, produce these "building blocks" themselves, and both use them in production of their own Additives and Admixtures and sell them to their United States subsidiaries or to other Defendants to make their Additives and Admixtures. These "building blocks" are commodity chemicals that are produced, transported and sold in liquid form.

93.    The supply chain is fairly simple: the large chemical companies around the world that make the "building blocks" ship those chemicals to producers of Additives and Admixtures, which mix those chemicals with other materials – mostly water – to create Additives and

Admixtures with varying properties and performance specifications. The Additives and Admixtures are then sold by the Defendants to direct purchasers, including ready-mix concrete, cement and mortar manufacturers and suppliers, and to distributors and retailers in one or more forms, depending on the volume being purchased. For example, smaller volumes are sold by gallon, drum or the "tote" which is a roughly, 20 ft.³ package; for larger customers, the products are sold by the tanker truckload.

94.    Additives and Admixtures are added to cement, concrete, and mortar primarily to (a) reduce their overall cost (by reducing the amount of cement required to produce them); (b) improve the performance and workability of cement, concrete, and mortar, particularly their strength and durability; (c) reduce the environmental impact of cement, concrete, and mortar that have traditionally been carbon intensive; and (d) reduce the time needed to produce cement, concrete, and mortar.

95.    Cement is a binding agent made from limestone and clay and is also used extensively in buildings in the United States. Cement production in the United States reached its highest level in more than a decade in 2022, amounting to 95 million metric tons. Traditional cement, known as Portland cement, is a mixture of burned limestone, clay, and other minerals and chemicals including cement additives. The burning creates $CO_2$ gases. After burning, these materials are ground to create a powder.

96.    Concrete is an important resource for all kinds of construction projects in the United States. Over half of the low-rise (less than three-stories in height) structures in the United States are built using concrete. Concrete mix refers to a combination of cement, aggregates (such as sand and gravel or crushed stone), water, and often admixtures depending on the application.

97.    Mortar is a combination of cement and sand and is primarily used to hold in place

ready-made building units (like bricks or blocks).

98.    Cement manufacturing is highly energy intensive and produces a large amount of $CO_2$ gases. As a result, and to promote greener manufacturing practices, environmental regulators across the world, including in Europe and several U.S. states including California and Wisconsin, have imposed substantial $CO_2$ taxes on cement manufacturers. Therefore, in an effort to reduce these costs, and in general, cement manufacturers have begun to use ground, rather than burned, limestone, which reduces the amount of cement and produces fewer $CO_2$ gases. But, in order to make this product function as does Portland cement, manufacturers have been adding significantly more additives for cement and admixtures for concrete. And in the manufacture of cement, in order to reduce friction and the amount of energy required to grind the cement, manufacturers have been adding admixtures to make the grinding easier. Government programs have greenlighted these practices. For example, current Wisconsin Department of Transportation (WisDOT) practice allows for replacement of a portion of Portland cement with supplemental cementitious materials (SCMs) such as coal fly ash or slag cement, both industrial by-products of coal and iron production, respectively.

99.    Additives and Admixtures are "an essential input in the production" of cement, concrete, and mortar, and integral to the construction of America's infrastructure, including residential, commercial, and industrial buildings, roads, bridges, tunnels, and airports.  Indeed, Paul Hälg, Sika's Chair of its Board of Directors stated that "A significant proportion of our [admixture] products are system critical."

100.    The market for concrete, cement, and mortar and the market for Additives and Admixtures are inextricably linked and intertwined because the market for Additives and Admixtures exists to serve the concrete, cement, and mortar market. Similarly, without concrete,

cement, and mortar, Additives and Admixtures have little to no value because they have no independent utility.

101.    The essential nature of Additives and Admixtures is shown below in a depiction from the Saint-Gobain Group, which illustrates the variety of projects using concrete, cement, and/or mortar incorporating Additives and Admixtures:



## 2.    Types of Additives and Admixtures and Their Function

102.    As noted above, Additives and Admixtures are used as: (a) chemical additives for cement, (b) chemical admixtures for concrete, and (c) chemical admixtures for mortar. The CMA has described the uses for each as follows:

> Chemical additives for cement are added to cement in order to reduce the amount of energy required to grind the cement (i.e., grinding aids) as well as to improve the performance of the cement (i.e., performance enhancers or quality improvers);

> Chemical admixtures for concrete are added to improve the properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and

Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete, for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.

103.    The American Society for Testing and Materials ("ASTM") C494 "Standard Specification for Chemical Admixtures for Concrete" classifies admixtures into categories based on performance and identifies seven primary types: (a) Type A—water reducing that either increases the slump (consistency and fluidity) of freshly mixed concrete without increasing the water content or that maintains the slump with a reduced amount of water; (b) Type B—retarding (decreases the rate of reaction of cementitious materials thus increasing time of setting of concrete); (c) Type C—accelerating (increases the rate of reaction of cementitious materials thus reducing time of setting and increasing the rate of early-age strength development of concrete); (d) Type D—water reducing and retarding (reduces the quantity of mixing water required to produce concrete of a given slump and increases the time of setting of concrete); (e) Type E—water reducing and accelerating (reduces the quantity of mixing water required to produce concrete of a given slump, reduces the time of setting, and increases the rate of early-age strength development); (f) Type F—water reducing, high range (reduces the quantity of mixing water required to produce concrete of a given slump by 12% or greater); and (g) Type G—water reducing, high range, and retarding (reduces the quantity of mixing water required to produce concrete of a given slump by 12% or greater and increases the time of setting of concrete). The ASTM also recognizes several other types of admixtures that do not fit into these seven categories, including those that have air entraining (to enhance compressive or flexural strength of concrete), shrinking reduction, and cold weather setting properties.

104.    The following table shows the seven primary types of admixtures, the materials used to manufacture them, and lists the intended effects on the final products:

| Type of Admixture | Desired effect | Materials |
|---|---|---|
| ASTM C494 Type A—Water-reducing admixture | Reduce water content by at least 5% | Lignosulfonates<br>Hydroxylated carboxylic acids<br>Carbohydrates |
| ASTM C494 Type B—Retarding (*i.e.*, delay setting) admixture | Retard (delay) setting time | Lignin<br>Borax<br>Sugars<br>Tartaric acid<br>salts |
| ASTM C494 Type C—Accelerating admixture | Accelerate setting and early-strength development | calcium chloride<br>Triethanolamine<br>sodium thiocyanate<br>calcium formate<br>calcium nitrite<br>calcium nitrate |
| ASTM C494 Type D—Water-reducing and retarding admixture | Reduce water content by at least 5% and delay concrete setting | See Type A and Type B |
| ASTM C494 Type E—Water-reducing and accelerating admixtures | Reduce water content by at least 5% and accelerate concrete setting | See Type A and Type C |
| ASTM C494 Type F—Water-reducing, high range (superplasticizers) admixture | Reduce water content minimum 12% | Sulfonated melamine formaldehyde condensates<br>Sulfonated naphthalene formaldehyde condensates<br>Lignosulfonates<br>Polycarboxylates |
| ASTM C494 Type G—Water-reducing, high range, and retarding admixture | Reduce water content minimum 12% and delay concrete setting | See Type B and Type F |

105.    Manufacturers of Additives and Admixtures use the same equipment and chemicals to produce these products, so they can quickly and cost-effectively shift production from one category to another.

### 3.    How Additives and Admixtures Are Sold and Who Buys Them

106.    Most Additives and Admixtures are sold in ready-to-use liquid form and can be added to the aggregate either at the plant where the aggregate product is produced (*e.g.*, ready-made concrete mix) or at the jobsite where it is to be used.

107.    An example of how products are packaged and sold is shown below:



## SikaMix AE-6

**Water Repelling and Efflorescence Reducing Admixture**

SikaMix AE-6 is a high performance water repelling and efflorescence reducing admixture for various concrete applications. SikaMix AE-6 is formulated to meet ASTM E514 "Standard Test Method for Water Penetration and Leakage Through Masonry."

SikaMix AE-6 is suitable for the production of drycast and wet cast concrete.    Use of SikaMix AE-6 results in:

✓  Improved water repellency.
✓  Reduced efflorescence.
✓  Improved color vibrancy and pigment efficiency.

⬇ PRODUCT DATA SHEET    ⬇ SAFETY DATA SHEET    SHOW ALL DOCUMENTS

108.    Purchasers of Additives and Admixtures operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete, pre-cast concrete, major construction companies working on national infrastructure projects, as well as other local, typically independent, concrete producers.

109.    Purchasers of Additives and Admixtures consider price to be a very important factor when choosing a supplier.

110.    In general, Additives and Admixtures are sold by Defendants directly to suppliers of cement and ready-mix concrete and masonry, as well as to distributors and retailers.

**B.    The Market for Additives and Admixtures in the United States and Its Territories**

111.    Globally, the market for Additives and Admixtures reached more than $18 billion in 2020 and $27 billion in 2022. The U.S. market was valued at $3.1 billion in 2022 and is expected to reach an estimated $4.7 billion by 2032.

112.    Additives and Admixtures are commodity products and Defendants compete solely on price. For example, during the CMA's review of the proposed merger between Sika and MBCC, the companies admitted to the CMA that:

[T]here is no closeness of competition concern in this case because there is no differentiation in the supply of chemical admixtures for cement and concrete. In particular: (a) Chemical admixtures are commodities and homogenous products, not differentiated products. Any differentiation between suppliers is based on various add-on services and is marginal at best as these services are easily replicated by competitors and generally all suppliers offer such services. Competition between suppliers is largely based on price. (b) [Sika and MBCC] do not exercise an important competitive constraint on one another due to the homogenized and undifferentiated nature of the products, with neither [Sika or MBCC] being a 'maverick' player. (c) There is no innovation concern in this case. 'True' innovation and R&D in the supply of chemical admixtures is extremely limited, and [Sika's and MBCC's] investments in innovation are not comparable to dynamic competition between them, as they are aimed at improving their respective range of products, for example to reduce water usage and to create more sustainable products, rather than developing wholly new technologies or products.

113.    Moreover, suppliers of Additives and Admixtures represented to the CMA that there are no or very low additional costs when switching production from one type of chemical to another and that they can use the same production equipment and inputs to produce different types of Additives and Admixtures.

114.    Defendants are the dominant manufacturers and sellers of Additives and Admixtures in the world, and in the United States and its territories. On information and belief, Plaintiffs estimate that Defendants' market share in the United States is between eighty and ninety percent (80-90%).

115.    Defendants manufacture and sell Additives and Admixtures in the United States and its territories, as well as around the world. The import of Additive and Admixture precursor chemicals from the foreign Defendants involves "import trade or import commerce" within the meaning of the Foreign Trade Antitrust Improvement Act ("FTAIA").

C.    **Defendants Have Consolidated Their Control of the Additives' and Admixtures' Market**

116.    Defendants have spent billions of dollars acquiring their competitors in order to consolidate and control the market for Additives and Admixtures, playing musical chairs with their

ownership stakes that gave Defendants' executives – many of whom worked at more than one Defendant during the Class Period – significant opportunities to exchange confidential sales, production and pricing information under the guise of business transactions.

### 1. The Chryso Transactions Involving Defendants Cinven, Saint Gobain and RPM

117.    Cinven entered the Additives and Admixtures business in 2017 when it bought Texas-based Chryso. In the following months Chryso, now under Cinven's ownership and control, acquired at least four competing manufacturers in Europe and Africa.

118.    On September 29, 2021, Saint-Gobain announced that it had acquired Texas-based Chryso from Cinven. According to the press release, Chryso, which Saint-Gobain said makes "comprehensive additives solutions for sustainable construction," became the newest of Saint-Gobain's "businesses serving the sustainable construction market within the High-Performance Solutions segment."

119.    Two months after buying Chryso from Cinven, Saint-Gobain acquired Georgia-based GCP, another competitor, and subsequently consolidated its management of these two erstwhile competitors under the control of a newly-created "Construction Chemicals Business Unit," and appointed the incumbent Chryso President, Steve Williams, as the President of this unit and incumbent Chryso CEO, Thierry Bernard (who was previously employed by Cinven), as the General Manager of this unit. Saint-Gobain then, several months later, sold Chryso's North American cement grinding aids and additives business to yet another competitor, Defendant RPM.

### 2. The MBCC Transactions Involving Defendants Cinven and Sika

120.    In November 2021, Sika acquired MBCC, which had been owned by Defendant BASF until late 2020. To assuage European antitrust regulators, Sika then split MBCC in half, selling its U.S. and European assets – MB-USA and MB-Germany, respectively – as well as its

Oceania assets, to its erstwhile competitor Cinven (which, as noted above, had just sold Chryso to Saint-Gobain); Sika kept MBCC's remaining global assets.

121.    The Sika-MBCC-Cinven series of transactions soon yielded anticompetitive effects. Sika has admitted that it views Cinven as its partner, not its competitor. Remarking on the spin-off of some of the MBCC assets it had acquired, Sika's CEO, Thomas Hasler, remarked, "Cinven with its extensive expertise in this sector is an ideal partner for continuing the successful growth path of this business. . . ." Hasler also bragged about Sika's dominance in the concrete admixture industry following the deal with MBCC, stating that its "product offering in the segment of concrete admixture is super strong and almost [] unchallengeable by others because we now have really the full innovation pipe-line for the future ready and also very strong backup with the supply chain that is coming together."

### D.    Defendants Effectuated Their Conspiracy Through Their Shared Trade Associations

122.    Defendants in global cartels frequently use trade associations as a means of providing "cover" for their cartel activities. In announcing the coordinated dawn raids, the CMA stated that the anticompetitive conduct at issue included not only individual companies, but also "some industry bodies." Various industry sources later confirmed that "Competition authorities in both the UK and Turkey were investigating trade associations." And "the Turkish competition authority has carried out raids at the premises . . . two trade associations, as part of a probe into suspected cartel on the market for construction chemicals." This is hardly surprising, given that Defendants share membership in a multitude of trade associations around the world. This gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for  Additives and Admixtures.

123.    In the United States, Defendants BASF Corp., Chryso, Inc., GCP, MB-USA, Sika

Corporation, and Euclid are all "super sponsors," and Sika Corporation, GCP, Chryso, Inc., MB-USA (listing BASF Coatings Ltd as its subsidiary) and Mapei Corporation are associate members of the National Ready-Mix Concrete Association ("NRMCA"), a trade association founded in 1930, long before most of the construction chemicals at issue came into existence.

124.    While many of NRMCA's members are buyers who buy Additives and Admixtures directly from Defendants and thus were harmed by Defendants' anticompetitive conduct, the NRMCA provided Defendants with yet a further opportunity to meet and collude among themselves under the guise of participation in a trade association. The NRMCA also provided Defendants with benchmarking analysis that Defendants could misuse to further their efforts to fix Additives and Admixtures prices. For example, NRMCA benchmark analysis includes a Performance Benchmarking Survey for ready mixed concrete. This highly popular survey collects information on ready mixed concrete production and the costs associated with the sales and support of concrete. All information collected is received and compiled by an independent certified public accounting firm and remains confidential. Monthly, quarterly, yearly Reporting of Key Metrics including average sales and cost metrics are also available to members.

125.    Defendants are also members of one or more of the following national CCA trade associations: Belgium (FIPAH); Finland (FINCAA); France (SYNAD); Germany (Deutsche Bauchemie e.V.); Italy (ASSIAD); Netherlands (VHB); Norway (NCCA); Poland (SPChB); Spain (ANFAH); Sweden (SACA); Switzerland (FSHBZ); Turkey (KÜB), which is a member of the Construction Materials Manufacturers' Federation, also known as the Building Materials Manufacturers' Federation ("YÜF"); and United Kingdom (CAA). Executives of Defendants have leadership positions with each of these trade associations.

126.    Each of these trade associations is in turn a member of the European Federation of

Concrete Admixtures Association ("EFCA"), headquartered in Brussels. EFCA is the umbrella global trade association. According to EFCA's website, "EFCA's total membership provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."

127.    EFCA's Executive Board, whose members are elected by the General Assembly, effectively manages operations on behalf of the Board by monitoring the progress of agreed action items by the committees, advising on the need to take action on new and developing issues and controlling finances, thus ensuring continuity of the Federation. The current EFCA management include the following:

Executive Board:

- President Gianluca Bianchin, Business Development Manager at Mapei SPA from 2015 to the present;

- Vice President Thomas Hirschi, Market Manager at Sika AG from January 2017 to the present;

- Vice President Osman Ilgen, Managing Director at Chryso Turkey from March 2015 to 2022 and Vice President at Saint-Gobain from 2022 to the present;

- Sustainability Committee Chair Nihal Kinnersley, Product Stewardship Manager EMEA at GCP – which is based in Alpharetta, Georgia – from February 2016 to July 2023 and Product Stewardship Director at Saint-Gobain from July 2023 to the present;

- Technical Committee Chair, Francesco Surico, R&D group leader at Mapei SPA from 2008 to the present.

- Kai Salo, Sika's technical department head from 2013 to the present;

- Claude Le Fur, Business Development Manager at Sika from September 2017 to July

2021; and

- Suat Seven, Manager of Construction Chemicals at BASF from October 2017 to March 2020 and Managing Director at MBCC from November 2020 to August 2023.

EFCA Technical Committee:

- Ian Ellis, Technical Services Manager at Master Builders UK from January 2008 to July 2022 and Head of Technical Admixtures at Mapei UK from July 2022 to the present;

- Marko Kaisanlahti, Admixture Sales Manager at Master Builders Finland from October 2012 to July 2022 and October 2022 to the present;

- Franz Wombacher, Head R&D at Sika from April 2016 – Present;

- Trond Solbo of Sika;

- Osman Tezel, Regional Sales Manager Admixture Systems at BASF from January 2013 to August 2018, Technical Service & Concrete Technology Manager Admixture Systems at BASF from August 2018 to October 2020, and Technical Service & Concrete Technology Manager Admixture Systems at MBCC from October 2020 – Present;

- Jean-Philippe Bigas, R&D at Chryso France from 2012 to the present; and

- Robert Hurkmans of Saint-Gobain

EFCA Environmental Committee:

- Marko Kaisanlahti and Maxime Julliot of MBCC;

- Mark Schneider, who worked for Sika from 2018 until October of 2022;

- Bjorn Stockmann of Sika;

- Anders Larsson of Sika; and

- Osman Tezel of Saint-Gobain.

128.    In addition, Defendants Mapei, Sika, BASF, MBCC, Saint-Gobain, Chryso, and

GCP are members of the European Federation for Construction Chemicals ("EFCC"). The EFCC, based in Brussels, represents construction chemical companies (both raw materials producers for construction chemicals and formulators of construction chemicals) and associations in Europe. EFCC acts as the spokesperson for the construction chemical industry before the European Union institutions and other public authorities, and communicates the industry's views on policy issues regarding product stewardship, standardisation, innovation and sustainability.

129.    EFCC Board members include or included Eric Dehasque (Sika Head of Mergers & Acquisitions - EMEA), Dr. Walter Nussbaumer (Head of Mapei's global admixture group), Olivier Bayard ("Global Head of Marketing and Sustainability Master Builders Solutions"), Michael Schinabeck (BASF's Vice President Research & Development, Construction Additives), and Thierry Bernard (Saint Gobain/Chryso/GCP CEO of construction chemicals).

130.    Defendants' membership in these trade associations provided many opportunities during the Class Period for Defendants to collude by discussing competitive information regarding Additives and Admixtures.

### E.    Defendants' Price Increases During the Class Period

131.    Defendants have consistently raised their prices for Additives and Admixtures, including through surcharges, during the Class Period. These price increases were often publicly announced as part of Defendants' efforts to signal their adherence to their collusive scheme. Price increases are also incorporated into contracts between Defendants and their customers. The following are examples of Defendants' price increases throughout the Class Period, which, as illustrated in Figure 1 above, resulted in higher prices for CCAs:

132.    In an earnings call with industry analysts on March 2, 2017, Gregory Poling, GCP's President, CEO & Director stated, "[we] remain focused on expanding margins in the concrete admixture business . . . through pricing."

133.    On May 15, 2017, BASF, which at the time owned MBCC, announced a 4-7% price increase of its construction chemicals products, which include Additives and Admixtures, effective that same day; BASF's price increase was preceded by a roughly 2-3% increase in prices for its Additives and Admixtures in the first quarter of 2017.

134.    On November 10, 2017, Sika announced price increases between 3–5 percent on all products, effective January 1, 2018.

135.    On May 14, 2018, BASF, which at the time owned MBCC, announced that it would be increasing prices for "all construction chemicals," including concrete admixtures, by at least 10%, effective the next day.

136.    In an earnings call with industry analysts on August 8, 2018, GCP's Gregory Poling stated, "[w]e are implementing a 3-point plan to improve the profitability of our SCC admixture business and to accelerate the penetration of high-margin technologies such as VERIFI. First, we're raising prices significantly in low-profit, high-volatility admixture markets."

137.    On February 22, 2019

138.    On November 13, 2020, Master Builders Solutions announced a 5-10% increase in the prices for liquid admixtures effective immediately.

139.    On December 21, 2020,  MBCC raised prices for all Master Builders Solutions products by an average of 4–6%.

140.    On March 22, 2021, Mapei USA imposed a 5% price increase on acrylics and liquids in its Concrete Restoration Systems product line, which includes liquid admixtures such as Planicrete AC, Planicrete UA, Planitop Accelerator, and Mapecure SRA.

141.    On April 1, 2021, MBCC increased prices for all Master Builders Solutions products by 5 - 20% effective immediately.

142.    On July 20, 2021, the Cinven Group Master Builders Solution announced that it would be increasing previously imposed surcharges on its products, including on Additives and Admixtures from six percent (6%) to nine percent (9%).

143.    On October 11, 2021, Defendant and RPM subsidiary Euclid announced a price increase for its line of concrete and masonry construction products, effective October 15, 2021.

144.    On November 22, 2021, GCP announced it was implementing price increases for concrete admixtures in North America of up to 10% for all concrete admixture, effective January 1, 2022.

145.    In January 2022, Sika Corp. announced that it would be increasing surcharges on its products, including Additives and Admixtures from sixteen percent (16%) to twenty percent (20%) effective February 1, 2022.

146.    On March 1, 2022, Mapei implemented a 6% price increase on all its products, including Additives and Admixtures.

147.    During earnings call in April of 2022, RPM's VP, Controller & CAO, Michael Laroche pointed to RPM's concrete admixtures products as one of the company's "fastest-growing businesses" and cited "selling price increases" as a key growth factor. One year later, in an earnings call with industry analysts on April 06, 2023, Mr. Laroche noted that "our Construction Products Group achieved record third quarter net sales of $497 million . . . led by pricing increases and strength in our concrete admixtures."

148.    On January 3, 2023, Mapei implemented a 9% price increase on all its products, including Additives and Admixtures.

149.    In its Q4 2022 earnings press release published on February 23, 2023, Benoit Bazin, Chief Executive Officer of Saint-Gobain, noted that "the Group once again delivered record results

. . . . thanks to a 14.6% price increase overall" and a 9.3% price increase in its High-Performance

Solutions (HPS) business, which includes Defendants Chryso and GCP.

150.    In its Q4 2023 earnings conference call with industry analysts on July 26, 2023,

Michael J. Laroche RPM's VP, Controller & CAO touted that "Sales growth was led by pricing

increases and strength in concrete admixture and repair products, which benefited from

infrastructure and reshoring related capital spending."

151.    In its Q4 2023 earnings press release published on February 29, 2024, Mr. Bazin,

Saint Gobain's CEO, noted that "well-managed pricing helped drive an improvement in the

operating margin and in free cash flow generation, which both reached all-time highs." The press

release stated that HPS sales and margin held firm and benefited from an increase in sales prices

mainly from Defendants GCP and Chryso.

152.    On March 1, 2024 Mapei implemented a 3% price increase on all its products,

including Additives and Admixtures.

153.    In sum, Defendants' price increases and surcharges have resulted in the prices for

Additives and Admixtures sold in the United States and its territories to increase dramatically during

the Class Period. Specifically, prices for these products sold in the United States and its territories

have roughly doubled during the Class Period.

   **1. Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges**

154.    Defendants have justified their price increases during the Class Period by citing

increases in input costs and supply chain constraints. For example, when Cinven Group raised

prices for its Additives and Admixtures by as much as 10% in November of 2020, the company

blamed "supply constraints in key raw materials" and "an increase in raw material cost and several

other related costs including freight." In explaining GCP's decision to raise its Additives and

Admixtures prices by 10% in January of 2022, GCP Specialty Construction Chemicals President David Campos stated, "The global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term." RPM's Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure."

155.    However, Defendants' material price increases for and imposition of surcharges on Additives and Admixtures cannot be explained by normal market forces. The prices for raw materials for Additives and Admixtures have remained steady (and in some instances, decreased) during the Class Period. Similarly, ocean freight rates spiked sharply and briefly during Covid, particularly for freight cargo, but have since fallen dramatically.

156.    Raw materials and freight cost increases alone do not explain Defendants' Additives and Admixtures price increases, including surcharges, during the Class Period. The timing and duration of the raw materials and freight cost increases do not fully align with the Additives and Admixtures price increases.

157.    For example, in April 2022, Defendant RPM reported its admixtures products as one of the company's "fastest-growing businesses" and cited "selling price increases" as a key growth factor, and in April 2023, RPM stated "our Construction Products Group achieved record third quarter net sales of $497 million . . . led by pricing increases and strength in our concrete admixtures;" Saint-Gobain, noted that it implemented a 9.3% and 4.3% price increase in 2022 and 2023 respectively in its High Performance business which includes its Additives and Admixtures business. However, as depicted below, raw material costs began to decline dramatically in 2022 as COVID subsided:





### 2.    Defendants Have Admitted That Normal Market Forces Do Not Explain Their Price Increases or Surcharges And That They Hae Been Able To Increase Their Profits And Margins

158.    Defendants have publicly admitted that their higher profit margins were driven by price increases that outpaced any increases in input costs.

159.    For example, during Saint-Gobain Group's earnings call in July of 2019, CFO Sreedhar N. noted that Saint-Gobain Group had "remained focused on price in spite of … the fact that there was a lower trend in the inflation." He explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increased profits. Over the next two years, Saint-Gobain Group continued to raise its prices and increase its profits. A press release from October of 2021 explained that Saint-Gobain Group was

"confident that it w[ould] be able to offset raw material and energy cost inflation over full-year 2021" given "the sharp 8.7% acceleration in prices" over the previous year, as well as "the new price increase announcements in Europe and in the [United States]. Similarly, Sika CFO Adrian Widmer admitted during earnings call in February of 2020 that the impact of increases in raw material costs was "only . . . marginal," and that Sika had continued to improve its margin by remaining "very much . . . focused on pricing." During earnings call one year later, Widmer explained that Sika's margin of 54.8% in 2020 was "supported by decreasing raw material costs . . . in combination with disciplined pricing," which allowed it to "add[] 50 basis points in price effect."

160.    Similarly, Robert Sullivan, RPM's Chairman, President, and CEO stated its company's ability to maintain high prices when asked by industry analysts whether it intended to cut prices in the face of slumping demand: "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it."

161.    Several Defendants have cited their "pricing discipline" in explaining profit margin increases to investors.

162.    For example, Sika CEO Thomas Hasler explained that the "remarkable" increase in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and excellence." This was echoed in Sika's 2023 Half-Year Report, which reported "disciplined sales price management," coupled with lower costs, as improving its gross margin.

163.    Similarly, in an October of 2021 press release, Saint-Gobain Group cited a

"[c]onstant focus on the price-cost spread" and "strong pricing discipline" as its "strategic priorities" for 2021.

164.    And in July of 2023, when an analyst asked RPM's Sullivan what had driven the "significant increase" in profit margin for RPM's construction segment in the prior quarter, Sullivan boasted about RPM Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think we held our pricing and held our discipline.  And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter."

**F.    The Structure and Characteristics of the Market for Additives and Admixtures Support the Existence of a Conspiracy**

165.    The structure and other characteristics of the market for Additives and Admixtures make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

**1.    The Supply Side of the Additives and Admixtures Market Is Highly Concentrated, and the Defendants Are the Dominant Firms**

166.    The presence of a small group of major sellers is one of the conditions that the U.S. DOJ has identified as being favorable to collusion. Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

167.    As the DOJ has noted, "mergers can reduce choices for consumers, workers, and other businesses, leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals." Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based."

168.    The Defendants that were targeted in dawn raids by European antitrust regulators,

inspections by the Turkish antitrust regulators, and/or being investigated by the U.S. DOJ – Sika, Saint-Gobain Group, BASF, Cinven Group, RPM, and Mapei – are among the largest producers of Additives and Admixtures in the world, as well as in the United States and its territories. Other manufacturers of Additives and Admixtures do not meaningfully compete with Defendants. Several of these other, smaller manufacturers of Additives and Admixtures told the CMA that even if they wanted to compete with the Defendants, they would not be able to do so effectively because among other things, smaller suppliers "manufacture a narrower range of chemical admixtures," "have limited, or no, production facilities," "rely on imports," are unable to "sourc[e] raw materials at a good price," and generally "cannot compete with bigger suppliers as they have economies of scale." In fact, at least some of the Defendants' internal documents indicate that they consider the other Defendants to be their "close competitors" in the market for the supply of chemical admixtures for cement, concrete, and wet mortar.

169.    Because the manufacture of Additives and Admixtures is highly concentrated, with the Defendants controlling most of the production, this market is highly susceptible to collusion.

## 2.    Barriers to Entry Are High

170.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

171.    There are high barriers to entry to effectively compete in the manufacture of CCAs, including the following: (a) the time and cost associated with effectively scaling CCAs manufacturing operations (*i.e.*, building new production and storage facilities in closer proximity to CCA purchasers); (b) the research and development investment required to develop new products (*i.e.*, polymers), and then support their introduction into the market; (c) sellers of the raw

materials necessary to manufacture CCAs (*i.e.*, polymers) favor the larger, entrenched manufacturers of CCAs; and (d) the long-standing, existing relationships between CCA manufacturers and customers.

172.    The CMA, in determining that the acquisition by Sika AG of MB-Germany would be anticompetitive, noted as follows: "There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent an SLC ["Substantial Lessening of Competition"] even if these plans materialise."

173.    These high barriers to entry are amplified by the difficulty purchasers of CCAs have in switching manufacturers once selected. This is because smaller suppliers of CCAs cannot quickly build up their scale and capacity for potentially switching customers, and because supply contracts typically have a term of one to three years. Purchasers of CCAs thus face switching costs and are frequently locked-in to purchasing CCAs from the Defendants in this case – the three largest manufacturers and sellers of CCAs in the world, including in the United States and its territories.

174.    The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

**3.    The Demand Side of the Additives and Admixtures Market Is Unconcentrated**

175.    The unconcentrated nature of the demand side of the Additives and Admixtures market also makes this market susceptible to collusion.

176.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.

177.    Such a large number of buyers, each of which has a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 4.    Demand for Additives and Admixtures Is Inelastic

178.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are two primary characteristics that demonstrate the inelasticity of demand for Additives and Admixtures: (a) a lack of substitute goods and (b) the essential nature of Additives and Admixtures in cement, concrete, and mortar.

### 5.    There are No Substitutes for Additives and Admixtures

179.    The DOJ has also recognized that the lack of substitutes for standardized products is a condition favorable to collusion, as substitute goods cannot restrain price increases and temper the effects of a price-fixing conspiracy.

180.    Purchasers of Additives and Admixtures, or products containing Additives and Admixtures, do not generally view them as interchangeable with other products, nor do purchasers view them as being substitutes for Additives and Admixtures. In addition, the inclusion of Additives and Admixtures in concrete and cement is, in practice, a necessity for the concrete and cement products to be used in the applications for which Plaintiffs and members of the Classes use those end-products.

### G.    Defendants' Fraudulently Concealed Their Conduct

181.    Plaintiffs had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and that it

was coordinating with the TCA, the CMA, and the U.S. DOJ. As a result, Plaintiffs did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17th, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for Additives and Admixtures.

182.    Therefore, the statute of limitation on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

183.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiffs reasonably believed they were purchasing CCAs in a competitive industry.

184.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here.

185.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiffs did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiffs that would have led a reasonably diligent person to investigate whether a conspiracy in the market for Additives and Admixtures existed prior to October 17, 2023.

186.    Moreover, because Plaintiffs could not discover the existence of their claims prior to October 17, 2023, Plaintiffs' claims did not accrue until that date.

## V.    PASS-THROUGH OF OVERCHARGES TO CLASS MEMBERS

187.    Defendants' overcharge on the Additives and Admixtures at issue was passed

through from direct purchasers to Plaintiffs and members of the proposed Classes of indirect purchasers. As a result, Defendants' conspiracy to raise, fix, or maintain the price of Additives and Admixtures at supra-competitive levels resulted in harm to Plaintiffs and the proposed Classes because it resulted in them paying higher prices for CCAs, including ready-mix concrete, cement, and mortar containing Additives and Admixtures, than they would have in the absence of Defendants' conspiracy.

      **A.**    **The Additives and Admixtures Product Distribution Chain Is Relatively Short and Simple.**

188.    The chain of distribution of Additives and Admixtures from Defendants to the Contractor class members here is relatively short and simple. First, Defendants sell their Additives and Admixtures to ready-mix concrete, cement, or mortar manufacturers and suppliers who, in turn, sell concrete, cement, or mortar to class members for use in their construction, installation, and other projects. The vast majority of Additives and Admixtures travel through this ready-mix concrete, cement, or mortar portion of the chain of distribution.

189.    Second, Defendants sell their stand-alone Additives and Admixtures products to distributors and/or retailers who, in turn, sell those stand-alone Additives and Admixtures products to Class members. For example, Sika manufactures and sells SikaMix® W-10, a stand-alone water repelling and efflorescence controlling admixture, which is offered for sale in five-gallon pails by distributors.

190.    Third, Defendants sell packaged concrete, cement, and mortar products containing Additives and Admixtures to distributors and/or retailers who, in turn, sell those products to Class members. For example, SikaTop® 122 Plus is a mortar product that includes the admixture Sika FerroGard 901, a corrosion inhibitor, which is also offered for sale by distributors. Each of these distribution routes contain only one or two links, simplifying the process of tracing Defendants'

Additives and Admixtures products and any related overcharge to class members. Below is a graphic depiction of the Additives and Admixtures chain of distribution at issue:



B.    **The Concrete, Cement and Mortar Markets Downstream from Defendants Are Highly Competitive, Making Pass-through an Economic Necessity**

191.    The ready-mix concrete, cement, and mortar market is highly competitive with numerous players striving to capture a significant industry share. For example, industry analysts recognize that concrete, cement, and mortar market participants face "intense competition based on price . . .." Similarly, participants in the concrete, cement, and mortar market recognize that they face "strong competition," "intense competition," and that the market is "highly competitive." Those market participants also recognize that such competition is predominantly based on price.

192.    To the extent Defendants' stand-alone Additives and Admixtures or products containing Additives and Admixtures are sold by distributors or retailers, those markets are also highly competitive. For example, Home Depot, which recognizes that it competes with

manufacturers, distributors, home improvement retailers, regional, and national hardware stores, and building material supply houses, acknowledges that its market is "highly competitive," and that the internet "facilitates competitive entry" and "price transparency." Other large retailers similarly acknowledge the "highly competitive" market within which they operate.

193.    When a firm's costs increase due to an overcharge or increasing raw materials costs, the firm will tend to pass on the cost increase by raising its price. Otherwise, it would lose money on each sale and be driven out of business. Conversely, when a firm's costs decrease, such as from improved production efficiency or decreasing energy costs, the firm will tend to pass on the cost decrease by lowering its price. Otherwise, competitors would be able to undercut its prices, taking market share.

194.    Economic theory predicts that cost pass-through occurs in the distribution chain at issue here. When distribution chain participants face an industry-wide, non-transitory increase in the costs, they increase their prices. Thus, when ready-mix concrete makers, for example, pay higher prices for the products they purchase, they also increase their prices. This process is duplicated in the other routes Additives and Admixtures take through distribution chain to Class members.

195.    The economic necessity of passing through cost changes increases with the degree of competition a firm faces. Economic theory shows that pass-through is likely to be close to 100% in markets that are highly competitive. In a highly competitive market, all businesses will set their prices slightly above their costs, resulting in narrow profit margins. If they did not, they would go out of business in the long run either by setting prices too low and losing money on every sale, or, setting prices too high and losing business to competitors.

196.    Given that, as shown above, the Additives and Admixtures distribution chain is

highly competitive, economic theory predicts that any overcharge due to the defendants' price-fixing conspiracy would be passed through the distribution chain to Contractors, ultimately resulting in higher prices paid by Plaintiffs and the Class members.

**C.    Defendants' Additives and Admixtures Can Be Traced Through the Chain of Distribution to Class Members.**

197.    When a Defendant's branded Additives and Admixtures product is purchased by Class members as a stand-alone product from a direct purchaser such as a distributor or retailer, it is directly traceable to the specific manufacturing Defendant by virtue of its branding. Similarly, Defendants' packaged products containing Additives and Admixtures are also directly traceable to the specific Defendant. The SikaTop® and SikaMix® products referenced above are examples of such products.

198.    Additives and Admixtures are also traceable when purchased by a Class member as part of ready-mix concrete, cement, or mortar products containing Additives and Admixtures. Due to their varied applications and specific characteristics, concrete admixtures are typically sold independent of the base material (*e.g.*, concrete, cement, or mortar mix). When purchased, they are usually listed as separate line items on invoices, indicating the type of admixture, quantity, and cost. This separation is necessary because different projects may require different types and amounts of admixtures. Notably, organizations such as the American Concrete Institute (ACI) and ASTM have guidelines and standards governing how concrete admixtures should be used and sold, which result in admixtures frequently being identified in purchase documentation and other documentation related to construction projects.

199.    Cement additives are materials added to cement for the optimization of the cement properties and the cement grinding process. Cement additives are classified into different product groups such as grinding aids, strength enhancers, and performance enhancers. Because cement

manufacturing is a technical process, cement makers and suppliers are required to track the quantities and type of cement additives used in their product formulations to attain homogenous quality of their products. For this reason, cement additives are dispensed through calibrated dosing systems used in cement production to track specific quantities used, and Defendants provide recommended addition rates for such additives. Like admixtures, cement additives have ASTM guidelines and standards governing how concrete additives should be used, sold, and tested.

200.    Since Additives and Admixtures are often tailored to specific performance requirements (*e.g.*, improving workability and enhancing strength, accelerating or retarding set time), their separate listing on an invoice and other records allows for precise documentation and billing based on the specific needs of the project. As such, Defendants' branded Additives and Admixtures products are typically listed as separate components or ingredients in mix design submittals, mix codes, Defendants' accompanying Additives and Admixtures product data sheets, and other purchase documentation supplied by direct purchasers and others to Class members purchasing concrete, cement, and mortar products in connection with construction, installation, and other projects.

201.    As a result, Defendants' Additives and Admixtures can be traced from Defendants to direct purchasers and other intermediaries who sell concrete, cement, and mortar products to the Class members here.

**D.    The Amount of Defendants' Overcharge Passed Through the Chain of Distribution May be Measured and Quantified.**

202.    Generally, admixtures can comprise 5% to 25% or more of the materials cost of ready-mix concrete, cement, or mortar products. Additionally, ready-mix concrete producers separately track admixture costs in pricing their products.

203.    Because Additives and Admixtures are identifiable and traceable through the chain

of distribution to the Class members at issue here, the precise amount of the overcharge impacting the prices of products containing Additives and Admixtures can be measured and quantified. As explained below, common and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through from direct purchasers of Additives and Admixtures to Class members.

204.    Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the business world, academia, and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Additives and Admixtures on concrete, cement, and mortar products even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Additives and Admixtures affects changes in the price of concrete, cement, and mortar products. In such models, the price of Additives and Admixtures would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Additives and Admixtures impact the price of concrete, cement, and mortar products containing Additives and Admixtures while controlling for the impact of other price-determining factors. Such models can estimate pass-through rates for direct purchasers, retailers, distributors, and others above Class members at every level of the distribution chain.

## VI.    CLASS ACTION ALLEGATIONS

205.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief

pursuant to federal law on behalf of the following Class (the "Nationwide Injunctive Relief Class"):

> All Contractors that purchased CCAs in the United States and its territories other than directly from Defendants or alleged co-conspirators for commercial use in the installation or repair of, and/or in other construction using concrete, cement, or mortar from at least January 1, 2017 until the present.

206.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Damages Class"):

> All Contractors that purchased CCAs other than directly from Defendants or alleged co-conspirators for commercial use in the installation or repair of, and/or in other construction using concrete, cement, or mortar in Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, from at least January 1, 2017, until the present.

207.    The Nationwide Injunctive Relief Class and the Damages Class are referred to as the "Classes," unless otherwise indicated.  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, all governmental entities, and entities who purchased CCAs directly from the Defendants or their alleged co-conspirators.

208.    Each of the Classes is individually so numerous that joinder of all members is impracticable.  Even though the exact number of members of each of the Classes is unknown at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in each Class and that their identities can be readily ascertained from records in the possession of Defendants and third parties.

209.    By their above-described anticompetitive conduct and wrongful actions,

Defendants violated the rights of Plaintiffs and members of the Classes in the same way by overcharging for Additives and Admixtures that, in turn, resulted in the infliction of antitrust injury, harm, and damages on Plaintiffs' and Class members' businesses and property.

210.    Certain questions of law and fact common to the proposed Classes predominate over any questions affecting individual member of the Classes, including, *inter alia*:

(i)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Additives and Admixtures sold in the United States;

(ii)    The identity of the participants of the alleged conspiracy;

(iii)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(iv)    Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

(v)    Whether the Defendants unjustly enriched themselves to the detriment of Plaintiffs and the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the following Claims for Relief;

(vi)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

(vii)    The effect of the alleged conspiracy on the prices of CCAs sold in the United States during the Class Period;

(viii)   Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(ix)    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and members of the Classes; and

(x)     The appropriate class-wide measure of damages for the Damages Class.

211.    Plaintiffs' claims are typical of the claims of members of the Classes because Plaintiffs and members of the Classes are all victims of the same above-described anticompetitive schemes involving Additives and Admixtures perpetrated on them by Defendants.

212.    Plaintiffs and their counsel will fairly and adequately represent the interests of members of the Classes. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of any of the members of the Classes. Plaintiffs' counsel are experienced in leading and prosecuting large multi-district antitrust class actions, and do not anticipate any difficulties in managing this action as a class action.

213.    Class action treatment is a superior method for fair and efficient adjudication of the controversy, in that, among other things, (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all members of the Classes to intervene as individual party-plaintiffs in this action, and (iii) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

214.    Absent a class action, Defendants will retain the benefits of their wrongdoing despite seriously violating the law and inflicting actual and consequential antitrust injury, harm, and damages on Plaintiffs and members of the Classes and their property and businesses.

215.    Certification of the Nationwide Injunctive Relief Class is, therefore, appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted (or refused to act) on

grounds generally applicable to the Class, thereby making equitable relief appropriate for the Class as a whole.

216.     Certification of the Damages Class also is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.     DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

217.     A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiffs and members of the Classes. Defendants inflicted new and accumulating injury on Plaintiffs and members of the Classes.

218.     Defendants' conduct constituted a continuing violation in which Defendants repeatedly sold Additives and Admixtures at supra-competitive prices during the Class Period and each member of the Damages Class paid supra-competitive prices for Defendants' products during the Class Period. Each purchase of a relevant product at supra-competitive prices constitutes a new and distinct injury.  A new cause of action accrues every time a member of the Classes suffers a new and distinct injury in the form of paying supra-competitive prices.

219.     The accrual of each new cause of action is based on independent, overt acts committed by Defendants within the limitations period. Defendants' price-fixing scheme continued when they continued to sell Additives and Admixtures and  Plaintiffs and members of the Classes purchased CCAs during the four-year period preceding the filing of the first indirect-purchaser class action complaint.  As such, Defendants' price-fixing necessarily caused Plaintiffs and Class members to suffer new and accumulating injury, harm, and damages.

## VIII.   CLAIMS FOR RELIEF

### A.   Violation of Federal Antitrust Laws

**COUNT ONE**
**VIOLATION OF SECTIONS 1 & 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)**
**(on behalf of Plaintiffs and the Nationwide Injunctive Relief Class)**

220.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

221.    Plaintiffs assert this claim pursuant to Section 16 of the Clayton Act on behalf of the Nationwide Injunctive Relief Class.

222.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy, either express or tacit, in restraint of trade to artificially fix, raise, stabilize, and control Additives and Admixtures prices in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

223.    The acts done by Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

224.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

225.    Defendants expressly aimed their anticompetitive acts at the U.S. marketplace, and their collusive conduct has resulted in an adverse effect on the purchasers of CCAs.

226.    Defendants' conspiracy had the following effects, among others:

i.    Price competition for Additives *and* Admixtures has been restrained, suppressed, and/or eliminated in the United States;

ii.    Prices of Additives and Admixtures sold by Defendants have been maintained at

artificially high, non-competitive levels throughout the United States; and

iii.    Plaintiffs and members of the Nationwide Injunctive Relief Class who purchased Additives and Admixtures indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

227.    Plaintiffs and members of the Nationwide Injunctive Relief Class have been injured and will continue to be injured in their business and property by paying more for Additives and Admixtures purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

228.    The alleged agreement, understanding, or conspiracy is a *per se* violation of the federal antitrust laws.

229.    Plaintiffs and members of the Nationwide Injunctive Relief Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

**B.    Violations of State Antitrust Laws**

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

231.    The following Counts Two through Thirty are pled under the antitrust laws of each state or jurisdiction identified below, on behalf of Plaintiffs and members of the Damages Class.

232.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same.  The above-alleged conduct, which violates the federal Sherman Antitrust Act will, if proven, establish a claim under each of the state laws cited below.

**COUNT TWO**
**Violation of Arizona Uniform State Antitrust Act (Ariz. Rev. Stat. §§ 44-1401, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

233.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. §§ 44-1401, *et seq.* with respect to purchases of CCAs in Arizona by Class members.

234.     Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

235.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

236.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

237.     Defendants' violations of Arizona law were flagrant.

238.     Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Arizona Revised Statutes § 44-1402.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

**COUNT THREE**
**Violation of California Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

239.     By reason of the conduct alleged herein, Defendants have violated California Bus. & Prof. Code §§ 16700, *et seq.* with respect to purchases of CCAs in California by Class members.

240.     During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of Section 16720, of the California Business and Professions Code.  Each Defendant has acted in violation of

Section 16720 to fix, raise, stabilize, and maintain prices of Additives and Admixtures at supra-competitive levels.

241.    The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Additives and Admixtures.

242.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated in California; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels in California; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

243.    During the Class Period, Defendants' illegal conduct substantially affected California commerce.

244.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

245.    As a result of Defendants' violation of Section 16720, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages pursuant to Section 16750(a) of the California Business and Professions Code.

## COUNT FOUR
### Violation of Connecticut Antitrust Act (Conn. Gen. Stat. Ann. §§ 35-24, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

246.    By reason of the conduct alleged herein, Defendants have violated Conn. Gen. Stat. Ann. §§ 35-24, *et seq.* with respect to purchases of CCAs in Connecticut by Class members.

247.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

248.    During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

249.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

250.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Conn. Gen. Stat. Ann. § 35-26.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Conn. Gen. Stat. Ann. §§ 35-24, *et seq.*

**COUNT FIVE**
**Violation of District of Columbia Antitrust Act (D.C. Code Ann. §§ 28-4501, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

251.    By reason of the conduct alleged herein, Defendants have violated District of Columbia Code §§ 28-4501, *et seq.* with respect to purchases of CCAs in the District of Columbia by Class members.

252.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Additives and Admixtures prices were raised, fixed, maintained, and

stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

253.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

254.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

255.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of District of Columbia Code § 28-4502. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under District of Columbia Code §28-4508.

**COUNT SIX**
**Violation of Guam Antitrust Law (Guam Code Ann. tit. 9 §§ 69.10, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

256.    By reason of the conduct alleged herein, Defendants have violated Guam Antitrust Law, Guam Code Ann. tit. 9 §§ 69.10, *et seq.* with respect to purchases of CCA in Guam by Class members.

257.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Guam; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Guam; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

258.    During the Class Period, Defendants' unlawful conduct substantially affected Guam's trade and commerce.

259.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

260.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Guam Code Ann. tit. 9 § 69.15. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Guam Code Ann. tit. 9 §§ 69.10, *et seq.*

### COUNT SEVEN
### Violation of Hawaii Antitrust Act (Haw. Rev. Stat. § 480-4)
### (on behalf of Plaintiffs and the Damages Class)

261.    By reason of the conduct alleged herein, Defendants have violated Hawaii Revised Statutes § 480-4 with respect to purchases of CCAs in Hawaii by Class members.

262.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

263.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

264.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for

Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

265.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Hawaii Revised Statutes § 480-4(a).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Hawaii Revised Statutes § 480-13.

**COUNT EIGHT**
**Violation of Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/1-11)**
**(on behalf of Plaintiffs and the Damages Class)**

266.    By reason of the conduct alleged herein, Defendants have violated Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1-11 with respect to purchases of CCAs in Illinois by Class members.

267.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

268.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

269.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

270.    Defendants entered into an unlawful contract, combination, or conspiracy in

restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/3.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under 740 Ill. Comp. Stat. Ann. 10/7.

## COUNT NINE
### Violation of Iowa Competition Law (Iowa Code §§ 553.1, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

271.    By reason of the conduct alleged herein, Defendants have violated Iowa Code §§ 553.1, *et seq.* with respect to purchases of CCAs in Iowa by Class members.

272.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

273.    During the Class Period, Defendants' unlawful conduct substantially affected Iowa's trade and commerce.

274.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

275.    Defendants' violations of Iowa law were willful or flagrant.

276.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Iowa Code § 553.4.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553.12.

**COUNT TEN**
**Violation of Kansas Restraint of Trade Act (Kan. Stat. Ann. §§ 50-101, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

277.    By reason of the conduct alleged herein, Defendants have violated Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* with respect to purchases of CCAs in Kansas by Class members.

278.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

279.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

280.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

281.    Defendants entered into arrangements, contracts, agreements, trusts, or combinations with at least one other person with a view or which tend to preclude full and free competition in the importation, transportation, or sale of Additives and Admixtures in Kansas in violation of Kan. Stat. Ann. § 50-101.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Kan. Stat. Ann. § 50-161.

## COUNT ELEVEN
### Violation of Maine Antitrust Statute (Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

282.     By reason of the conduct alleged herein, Defendants have violated Maine Antitrust Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* with respect to purchases of CCAs in Maine by Class members.

283.     Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Maine; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

284.     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

285.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

286.     Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Me. Rev. Stat. Ann. tit. 10, §§ 1104.

## COUNT TWELVE
### Violation of Maryland Antitrust Act (Md. Code, Com. Law §§11-201, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

287.     By reason of the conduct alleged herein, Defendants have violated Maryland

Antitrust Act, Md. Code, Com. Law §§11-201, *et seq.* with respect to purchases of CCAs in Maryland by Class members.

288.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maryland; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

289.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

290.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

291.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Md. Code, Com. Law § 11-204.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Md. Code, Com. Law § 11-209(4).

## COUNT THIRTEEN
### Violation of Michigan Antitrust Reform Act (Mich. Comp. Laws §§ 445.771, *et seq.*) (on behalf of Plaintiffs and the Damages Class)

292.    By reason of the conduct alleged herein, Defendants have violated Michigan Antitrust Reform Act, Michigan Comp. Laws. Ann. §§ 445.771, *et seq.* with respect to purchases of CCAs in Michigan by Class members.

293.    Defendants' combinations or conspiracies had the following effects: (1) Additives

and Admixtures price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

294.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

295.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

296.    Defendants' violations of Michigan law were flagrant.

297.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §445.772(2).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Mich. Comp. Laws Ann. §445.778.

**COUNT FOURTEEN**
**Violation of Minnesota Antitrust Law (Minn. Stat. §§ 325D.49, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

298.    By reason of the conduct alleged herein, Defendants have violated Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, *et seq.* with respect to purchases of CCAs in Minnesota by Class members.

299.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

300.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

301.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

302.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Minn. Stat. § 325D.51. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Minn. Stat. § 325D.57.

**COUNT FIFTEEN**
**Violation of Mississippi Antitrust Statute (Miss. Code Ann. §§ 75-21-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

303.    By reason of the conduct alleged herein, Defendants have violated Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-1, *et seq.* with respect to purchases of CCAs in Mississippi by Class members.

304.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

305.    During the Class Period, Defendants' illegal conduct substantially affected

Mississippi commerce.

306.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

307.    Defendants combined, contracted, understood and agreed, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Additives and Admixtures and hindering competition in the sale of Additives and Admixtures, in violation of Miss. Code Ann. § 75-21-1.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mississippi Code Ann. § 75-21-9.

**COUNT SIXTEEN**
**Violation of Nebraska Junkin Act (Neb. Rev. Stat. §§ 59-801, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

308.    By reason of the conduct alleged herein, Defendants have violated Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq.* with respect to purchases of CCAs in Nebraska by Class members.

309.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

310.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

311.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

312.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Neb. Rev. Stat. § 59-801.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Neb. Rev. Stat. § 59-821.

## COUNT SEVENTEEN
### Violation of Nevada Unfair Trade Practices Act (Nev. Rev. Stat. §§ 598A.010, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

313.    By reason of the conduct alleged herein, Defendants have violated Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.* with respect to purchases of CCAs in Nevada by Class members.

314.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

315.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

316.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

317.    Defendants entered into an unlawful contract, combination, or conspiracy in

restraint of trade in violation of Nev. Rev. Stat. §598A.060.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Nev. Rev. Stat. §598A.210.

**COUNT EIGHTEEN**
**Violation of New Hampshire's Antitrust Statute (N.H. Rev. Stat. §§ 356:1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

318.    By reason of the conduct alleged herein, Defendants have violated New Hampshire Antitrust Statute, N.H. Rev. Stat. §§ 356:1, *et seq.* with respect to purchases of CCAs in New Hampshire by Class members.

319.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

320.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

321.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

322.    Defendants' violations of New Hampshire law were willful and flagrant.

323.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of New Hampshire Rev. Stat. § 356:2.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under

New Hampshire Rev. Stat. § 356:11.

**COUNT NINETEEN**
**Violation of New Mexico Antitrust Act (N.M. Stat. Ann. §§ 57-1-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

324.    By reason of the conduct alleged herein, Defendants have violated New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* with respect to purchases of CCAs in New Mexico by Class members.

325.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

326.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

327.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

328.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under N.M. Stat. Ann. § 57-1-3(A).

**COUNT TWENTY**
**Violation of New York Donnelly Act (N.Y. Gen. Bus. Law §§ 340, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

329.     By reason of the conduct alleged herein, Defendants have violated New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* with respect to purchases of CCAs in New York by Class members.

330.     Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New York; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

331.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

332.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

333.     Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of New York Gen. Bus. Law § 340(1).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under New York Gen. Bus. Law §§ 340, *et seq.*

**COUNT TWENTY-ONE**
**Violation of North Carolina General Statutes (N.C. Gen. Stat. §§ 75-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

334.     By reason of the conduct alleged herein, Defendants have violated North Carolina

General Statutes, N.C. Gen. Stat. §§ 75-1, *et seq.* with respect to purchases of CCAs in North Carolina by Class members.

335.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

336.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

337.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

338.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. § 75-1.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-16.

### COUNT TWENTY-TWO
### Violation of North Dakota Uniform State Antitrust Act
### (N.D. Cent. Code §§ 51-08.1-01, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

339.    By reason of the conduct alleged herein, Defendants have violated North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* with respect to purchases of CCAs in North Dakota by Class members.

340.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

341.    During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

342.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

343.    Defendants' violations of North Dakota law were flagrant.

344.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-02.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under North Dakota Cent. Code § 51-08.1-08.

### COUNT TWENTY-THREE
### Violation of Oregon Antitrust Law (Or. Rev. Stat. §§ 646.705, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

345.    By reason of the conduct alleged herein, Defendants have violated Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705, *et seq.* with respect to purchases of CCAs in Oregon by Class members.

346.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Oregon;

(2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

347.    During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

348.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

349.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Oregon Rev. Stat. § 646.725. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Oregon Rev. Stat. § 646.780.

**COUNT TWENTY-FOUR**
**Violation of Puerto Rico Antitrust Statute (P.R. Laws Ann. tit. 10 §§ 258, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

350.    By reason of the conduct alleged herein, Defendants have violated Puerto Rico Antitrust Statute, P.R. Laws Ann. tit. 10 §§ 258, *et seq.* with respect to purchases of CCAs in Puerto Rico by Class members.

351.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Puerto Rico; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Puerto Rico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive,

artificially inflated prices for Additives and Admixtures.

352.    During the Class Period, Defendants' illegal conduct substantially affected Puerto Rico commerce.

353.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

354.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of P.R. Laws Ann. tit. 10 § 258.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under P.R. Laws Ann. tit. 10 § 268.

**COUNT TWENTY-FIVE**
**Violation of Rhode Island Antitrust Act (R.I. Gen. Laws §§ 6-36-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

355.    By reason of the conduct alleged herein, Defendants have violated Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* with respect to purchases of CCAs in Rhode Island by Class members.

356.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

357.    During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

358.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

359.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of R.I. Gen. Laws § 6-36-4.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under R.I. Gen. Laws § 6-36-11.

## COUNT TWENTY-SIX
## Violation of South Dakota Antitrust Statute (S.D. Codified Laws §§ 37-1-1, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

360.    By reason of the conduct alleged herein, Defendants have violated South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-1, *et seq.* with respect to purchases of CCAs in South Dakota by Class members.

361.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

362.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

363.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants'

85

unlawful conduct.

364.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under South Dakota Codified Laws § 37-1-24.

**COUNT TWENTY-SEVEN**
**Violation of Tennessee Trade Practices Act (Tenn. Code Ann. §§ 47-25-101, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

365.    By reason of the conduct alleged herein, Defendants have violated Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* with respect to purchases of CCAs in Tennessee by Class members.

366.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

367.    During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

368.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

369.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Tennessee Code Ann. § 47-25-101.  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Tennessee Code Ann. § 47-25-106.

**COUNT TWENTY-EIGHT**
**Violation of Utah Antitrust Act (Utah Code Ann. §§ 76-10-3101, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

370.    By reason of the conduct alleged herein, Defendants have violated Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* with respect to purchases of CCAs in Utah by Class members.

371.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Utah; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

372.    During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

373.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

374.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Utah Code Ann. § 76-10-3104.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Utah Code Ann. § 76-10-3109.

**COUNT TWENTY-NINE**
**Violation of West Virginia Antitrust Act (W. Va. Code §§ 47-18-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

375.    By reason of the conduct alleged herein, Defendants have violated West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.* with respect to purchases of CCAs in West Virginia by Class members.

376.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

377.    During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

378.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

379.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of West Virginia Code § 47-18-3(a).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under West Virginia Code §§ 47-18-9.

**COUNT THIRTY**
**Violation of Wisconsin Antitrust Act (Wis. Stat. Ann. §§ 133.01, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

380.    By reason of the conduct alleged herein, Defendants have violated Wisconsin

Antitrust Act, Wis. Stat. Ann. §§ 133.01, *et seq.* with respect to purchases of CCAs in Wisconsin by Class members.

381.    Defendants' combinations or conspiracies had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

382.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

383.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

384.    Defendants entered into an unlawful contract, combination, or conspiracy in restraint of trade in violation of Wis. Stat. Ann. §§ 133.03. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Wis. Stat. Ann. §§ 133.18.

### C.    Violations of State Consumer Protection Laws

385.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

386.    Defendants' above-described conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state statutes set forth below, which are sometimes referred to as "consumer protection" statutes. As a direct and

proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and members of the Damages Class paid higher prices for CCAs than they should have.

387.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members would not reasonably have avoided injury from Defendants' wrongful conduct.

388.    The following Counts Thirty-One through Forty-Eight are pled under the consumer protection or similar laws of each state or jurisdiction identified below, on behalf of Plaintiffs and members of the Damages Class.

## COUNT THIRTY-ONE
**Violation of Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §§ 4-88-101,** *et seq.***)**
**(on behalf of Plaintiffs and the Damages Class)**

389.    Defendants have engaged in deceptive and unconscionable acts or practices in violation of Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq.* with respect to purchases of CCAs in Arkansas by Class members.

390.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

391.    The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

392.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout Arkansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

393.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce.

394.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

395.    Accordingly, Plaintiffs and members of the Arkansas Class seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

**COUNT THIRTY-TWO**
**Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.)**
**(on behalf of Plaintiffs and the Damages Class)**

396.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* with respect to purchases of CCAs in California by Class members.

397.    During the Class Period, Defendants marketed, sold, or distributed Additives and Admixtures in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

398.    This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated the UCL.

399.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) violations of Sections 1 and 3 of the Sherman Antitrust Act, set forth above; (2) violations of the Cartwright Act, set forth above.

400.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of the Cartwright Act, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

401.    Defendants' acts or practices are unfair within the meaning of Section 17200 of California Business and Professions Code.

402.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200 of California Business and Professions Code.

403.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

404.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

405.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for Additives and Admixtures sold in California. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

406.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Accordingly, Plaintiffs and members of the Damages Class are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

**COUNT THIRTY-THREE**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(Fla. Stat. §§ 501.201, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

407.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* with respect to purchases of CCAs in Florida by Class members.

408.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Florida.

409.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Additives and Admixtures. The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the cost of Additives and Admixtures they purchased.

410.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord with the facts.

411.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing Additives and Admixtures at prices established by a free and fair market.

412.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Florida; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

413.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce.

414.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

415.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Fla. Stat. § 501.211.

### COUNT THIRTY-FOUR
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

416.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. §§ 505/1, *et seq.* with respect to purchases of CCAs in Illinois

by Class members.

417.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Illinois.

418.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

419.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

420.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

421.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief, under 815 Ill. Comp. Stat. Ann. § 505/10a.

**COUNT THIRTY-FIVE**
**Violation of Massachusetts Consumer Protection Act**
**(Mass. Gen. Laws Ch. 93A §§ 1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

422.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 2

with respect to purchases of CCAs in Massachusetts by Class members.

423.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

424.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

425.    During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

426.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

427.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available, including treble damages, under Mass. Gen. Laws Ch. 93A § 9.

**COUNT THIRTY-SIX**
**Violation of Michigan Consumer Protection Act**
**(Mich. Comp. Laws Ann. §§ 445.901, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

428.    Defendants have engaged in unfair, unconscionable, and deceptive acts or practices

in violation of Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq.* with respect to purchases of CCAs in Michigan by Class members.

429.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Michigan and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

430.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord with the facts.

431.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing CCAs at prices established by a free and fair market.

432.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

433.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

434.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

435.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**COUNT THIRTY-SEVEN**
**Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. §§ 325F.68, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

436.    Defendants have engaged deceptive acts or practices in violation of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq.* with respect to purchases of CCAs in Minnesota by Class members.

437.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Minnesota and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

438.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord with the facts.

439.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing Additives and Admixtures at prices established by a free and fair market.

440.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Minnesota;

(2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

441.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

442.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

443.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Minn. Stat. § 8.31.

**COUNT THIRTY-EIGHT**
**Violation of Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

444.    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commence in violation of Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* with respect to purchases of CCAs in Nebraska by Class members.

445.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Nebraska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

446.    Defendants' unlawful conduct had the following effects: (1) Additives and

Admixtures price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

447.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

448.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

449.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

## COUNT THIRTY-NINE
### Violation of Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*) (on behalf of Plaintiffs and the Damages Class)

450.    Defendants have engaged in deceptive trade practices in violation of Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.* with respect to purchases of CCAs in Nevada by Class members.

451.    Defendants engaged in the conduct described herein in connection with the sale of Additives and Admixtures in trade or commerce in a market that includes Nevada.

452.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Nevada, which conduct constituted unfair practices in that it was unlawful under federal and

state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

453.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Additives and Admixtures. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Additives and Admixtures they purchased.

454.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Additives and Admixtures by making public statements that were not in accord with the facts.

455.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Additives and Admixtures at prices established by a free and fair market.

456.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

457.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nev. Rev. Stat. § 598.0993.

**COUNT FORTY**
**Violation of New Hampshire Consumer Protection Act**
**(N.H. Rev. Stat. Ann. tit. XXXI §§ 358-A, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

458.    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commence in violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI §§ 358-A, *et seq.* with respect to purchases of CCAs in New Hampshire by Class members.

459.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in New Hampshire and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. A substantial part of Defendants' unlawful conduct specified herein occurred within New Hampshire.

460.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

461.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

462.    Defendants' violations were willful and knowing.

463.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for

Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

464.     Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## COUNT FORTY-ONE
**Violation of New Mexico Unfair Trade Practices Act (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

465.     Defendants have engaged in unfair or deceptive trade practices and unconscionable trade practices in violation of New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.* with respect to purchases of CCAs in New Mexico by Class members.

466.     During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

467.     The aforementioned conduct by Defendants constituted "unconscionable trade practices" in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by the Damages Class members and the price paid by them for Additives and Admixtures as set forth in N.M. Stat. Ann. § 57-12-2E.

468.     Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Additives and Admixtures. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in

purchasing Additives and Admixtures because they were unaware of the unlawful overcharge and there was no alternative source of supply through which they could avoid the overcharges. Defendants' conduct with regards to sales of Additives and Admixtures, including their illegal conspiracy to secretly fix the price of Additives and Admixtures at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Damages Class. Defendants took grossly unfair advantage of Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for Class members so that there was a gross disparity between the price paid and the value received for Additives and Admixtures.

469.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

470.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

471.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

472.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief

available under N.M. Stat. Ann. § 57-12-10.

## COUNT FORTY-TWO
### Violation of New York Deceptive Practices Act (N.Y. Gen. Bus. Law §§ 349, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

473.    Defendants have engaged in deceptive acts or practices in violation of New York Gen. Bus. Law § 349, *et seq.* with respect to purchases of CCAs in New York by Class members.

474.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

475.    Defendants made public statements about the prices of Additives and Admixtures that Defendants knew would be seen by Plaintiffs and Class members. Such statements either omitted material information that rendered that statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Additives and Admixtures; and Defendants alone possessed material information that was relevant to Plaintiffs and Class members, but failed to provide the information.

476.    Because of Defendants' unlawful trade practices in New York, Plaintiffs and Class members who indirectly purchased Additives and Admixtures in New York were misled to believe that they were paying a fair price for Additives and Admixtures or the price increase for Additives and Admixtures were for valid business reasons.

477.    Defendants knew that their unlawful trade practices with respect to pricing Additives and Admixtures would have an impact on indirect purchasers in New York and not just Defendants' direct customers.

478.    Defendants knew that their unlawful trade practices with respect to pricing

Additives and Admixtures would have broad impact, causing the Damages Class members to be injured by paying more for Additives and Admixtures than they would have paid in the absence of Defendants' unlawful trade acts and practices.

479.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

480.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout New York; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

481.    During the Class Period, Defendants, directly, or indirectly through affiliates, controlled, manufactured, marketed, sold and/or distributed Additives and Admixtures in New York.  Defendants' illegal conduct substantially affected New York commerce and members of the Damages Class.

482.    Accordingly, Plaintiffs and the Damages Class seek all forms of relief available under N.Y. Gen. Bus. Law § 349(h).

**COUNT FORTY-THREE**
**Violation of North Carolina Unfair and Deceptive Trade Practices Act**
**(N.C. Gen. Stat. §§ 75-1.1,** *et seq.***)**
**(on behalf of Plaintiffs and the Damages Class)**

483.    Defendants have engaged in unfair methods of competition, or unfair or deceptive

acts or practices in violation of North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* with respect to purchases of CCAs in North Carolina by Class members.

484.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

485.    Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

486.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

487.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

488.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

489.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available including treble damages under N.C. Gen. Stat. § 75-16.

<b>COUNT FORTY-FOUR</b><br><b>Violation of North Dakota Unfair Trade Practices Act</b><br><b>(N.D. Cent. Code §§ 51-10-01, <i>et seq.</i>)</b><br><b>(on behalf of Plaintiffs and the Damages Class)</b>

490.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Dakota Unfair Trade Practices Act, N.D. Cent. Code §§ 51-10-01, *et seq.* with respect to purchases of CCAs in North Dakota by Class members.

491.    Defendants engaged in the conduct described in this Complaint in connection with the sale of Additives and Admixtures in trade or commerce in a market that includes North Dakota.

492.    During the Class Period, Defendants knowingly agreed to, and did in fact affect, fix, control, and/or maintain, at supra-competitive levels, the prices at which Additives and Admixtures were sold, distributed, or obtained in North Dakota, which conduct constituted a fraudulent or deceptive act or practice and caused substantial injury to Plaintiffs and members of the Damages Class.

493.    Defendants concealed, suppressed, and omitted to disclose materials facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Additives and Admixtures. The concealed, suppressed, and omitted

108

facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Additives and Admixtures they purchased.

494.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord with the facts.

495.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Additives and Admixtures at prices established by a free and fair market.

496.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

497.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

498.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief under N.D. Cent. Code §§ 51-10-01, *et seq.*

## COUNT FORTY-FIVE
### Violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*)
### (on behalf of Plaintiffs and the Damages Class)

499.    Defendants have engaged in unfair methods of competition or unfair, or deceptive

acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.* with respect to purchases of CCAs in South Carolina by Class members.

500.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

501.    During the Class Period, Defendants' illegal conduct substantially affected South Carolina commerce.

502.    Defendants' violations were willful and knowing.

503.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

504.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief, including treble damages under S.C. Code Ann. § 39-5-140.

**COUNT FORTY-SIX**
**Violation of South Dakota Deceptive Trade Practices and Consumer Protection Act**
**(S.D. Codified Laws §§ 37-24, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

505.    Defendants have engaged in deceptive act or practice in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws §§ 37-24, *et seq.* with respect to purchases of CCAs in South Dakota by Class members.

506.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in

restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in South Dakota.

507.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Additives and Admixtures.  The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the cost of Additives and Admixtures they purchased.

508.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord with the facts.

509.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing CCAs at prices established by a free and fair market.

510.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

511.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

512.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

513.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief under S.D. Codified Laws § 37-24-31.

**COUNT FORTY-SEVEN**
**Violation of Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

514.    Defendants have engaged in unfair, unconscionable, or deceptive act or practice in violation of Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq.* with respect to purchases of CCAs in Utah by Class members.

515.    Defendants are suppliers within the meaning of Utah Code Ann. §13-11-3.

516.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Utah and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

517.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Additives and Admixtures.  The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the cost of Additives and Admixtures they purchased.

518.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions for Additives and Admixtures by making public statements that were not in accord

with the facts.

519.    Defendants' statements and conduct concerning the price of Additives and Admixtures were deceptive as they had the tendency or capacity to mislead members of the Damages Class to believe that they were purchasing Additives and Admixtures at prices established by a free and fair market.

520.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Utah; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

521.    During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

522.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

523.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Utah Code Ann. §§ 13-11-19 and 13-11-20.

### COUNT FORTY-EIGHT
**Violation of Vermont Consumer Fraud Act (Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*)**
**(on behalf of Plaintiffs and the Damages Class)**

524.    Defendants have engaged in unfair methods of competition or unfair or deceptive acts or practices in violation of Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. §§ 2451, *et seq.* with respect to purchases of CCAs in Vermont by Class members.

525.    During the Class Period, Defendants knowingly agreed to, and did in fact, act in restraint of trade or commence by affecting, fixing, controlling, and/or maintaining at supra-competitive levels the prices at which Additives and Admixtures were sold, distributed, or obtained in Vermont and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

526.    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Additives and Admixtures Defendants misrepresented to Class members during the Class Period that their prices for Additives and Admixtures were competitive and fair.

527.    Defendants' unlawful conduct had the following effects: (1) Additives and Admixtures price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Additives and Admixtures prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for Additives and Admixtures.

528.    During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

529.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property by paying more for Additives and Admixtures than they otherwise would have paid in the absence of Defendants' unlawful conduct.

530.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief including treble damages under Vt. Stat. Ann. tit. 9, §2465.

## COUNT FORTY-NINE
### Violation of State Common Law Unjust Enrichment Laws
### (on behalf of Plaintiffs and the Damages Class)

531.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs.

532.    Plaintiffs bring this claim under the unjust enrichment laws of the following states: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

533.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of Additives and Admixtures.

534.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and members of the Damages Class for Additives and Admixtures.

535.    Plaintiffs and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and members of the Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Classes may make claims on a pro rata basis.

536.    Pursuit of any remedies against the firms from which Plaintiffs and members of the Damages Class purchased Additives and Admixtures subject to Defendants' conspiracy would have been futile.

## IX.    RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully request that the Court certify this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint them as class representatives, and appoint their counsel as Class counsel. Plaintiffs further request that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described price-fixing scheme, and the above-described wrongful and anticompetitive acts engaged in by Defendants in furtherance thereof, violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), state antitrust, consumer protection, and unjust enrichment laws alleged herein, and further, judgment be entered, in favor of Plaintiffs and members of the Classes, and against Defendants, as follows:

(i)    The unlawful conduct, contract, conspiracy, or combination alleged herein constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act;

(ii)    Plaintiffs and members of the Nationwide Injunctive Relief Class have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Sections 1 and 3 of the Sherman Act;

(iii)    The unlawful conduct, contract, conspiracy, or combination alleged herein violated the state antitrust, consumer protection, and unjust enrichment laws as set forth herein;

(iv)    Plaintiffs and members of the Damages Class have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of listed state antitrust, consumer protection, and unjust enrichment laws;

(v)    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under the applicable state laws, and that joint and several judgments in favor of Plaintiffs and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

116

(vi)     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

(vii)    Defendants be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(viii)   Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law;

(ix)    Plaintiffs and members of the Classes be awarded pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest lawful rate; and

(x)     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## X.    <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Date: September 9, 2024

Respectfully submitted,
*/s/ Robert N. Kaplan*
Robert N. Kaplan
Matthew P. McCahill
Elana Katcher
Jason A. Uris
Chang Hahn
**KAPLAN FOX & KILSHEIMER, LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
T: (212) 687-1980

117

rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
ekatcher@kaplanfox.com
juris@kaplanfox.com
chahn@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Indirect Purchaser Classes and Counsel for Plaintiffs SMBA Construction, LLC, Charles W. Hughes Construction, LLC, Lucas Contracting, LLC and County-Wide Masonry Corp.*

Michael J. Flannery
**CUNEO GILBERT & LADUCA, LLP**
Two City Place Drive, Suite 200
St. Louis, MO  63141
T: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley
Lissa Morgans
Cody McCracken
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW, Suite 200
Washington, DC 20016
T: (202) 789-3960
evelyn@cuneolaw.com
lmorgans@cuneolaw.com
cmccracken@cuneolaw.com

*Interim Co-Lead Counsel for the Proposed Indirect Purchaser Classes and Counsel for Plaintiff Lakewood Concrete Corp.*

Heidi M. Silton
Jessica N. Servais
Joseph C. Bourne
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

*Interim Co-Lead Counsel for the Proposed Indirect Purchaser Classes*

Christopher T. Micheletti (*pro hac vice*)
Qianwei Fu (*pro hac vice*)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com

*Counsel for Plaintiffs Covered Bridge Outdoor Construction Corporation, Morgan Building Constructors, and Sioux City Engineering Co*

Richard L. Coffman
**THE COFFMAN LAW FIRM**
3355 West Alabama, Suite 240
Houston, TX 77098
T: (713) 528-6700
rcoffman@coffmanlawfirm.com

*Counsel for Plaintiff Lucas Contracting, LLC*

Eric R. Lifvendahl
**LIFVENDAHL LAW, LLC**
265 Latrobe Avenue
Northfield, Illinois 60093
T: (847) 830-7002
eric@liflaw.com

*Counsel for Plaintiff County-Wide Masonry Corp.*

John P. Marshall
Matthew S. Sullivan
**WHITE & ALLEN, P.A.**
106 South McLewean Street
PO Box 3169
Kinston, NC 28501
T: (252) 527-8000
jmarshall@whiteandallen.com
msullivan@whiteandallen.com

*Counsel for Plaintiff Charles W. Hughes Construction, LLC*

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.**
5015 Grand Ridge Drive
Suite 100
West Des Moines, IA 50265
T: (515) 223-4567
goplerud@sagwlaw.com
marty@sagwlaw.com

Jon A. Tostrud
Anthony Carter
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
T: (310) 278-2600
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

*Counsel for Plaintiff Cal-Prime, Inc.*

Lee Albert
**GLANCY PRONGAY & MURRAY LLP**
230 Park Ave., Suite 358
New York, NY 10169
T: (212) 682-5340
lalbert@glancylaw.com

*Counsel for Plaintiff Lakewood Concrete Corp.*

John W. ("Don") Barrett
Sarah Sterling Aldridge
Katherine Barrett Riley
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, MS 39095-0927
T: (662) 834-2488
Dbarrett@Barrettlawgroup.com
Saldridge@Barrettlawgroup.com
Kbriley@Barrettlawgroup.com

*Counsel for Plaintiffs Jon Tate Construction, LLC and Jon S. Garrett D/B/A Black River Masonry*

Shawn M. Raiter
**LARSON • KING, LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101
T: (651) 312-6500
sraiter@larsonking.com

*Counsel for Plaintiff Park Construction Co.*

121