## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE:<br><br>CONCRETE AND CEMENT ADDITIVES<br>ANTITRUST LITIGATION<br><br>*This Document Relates to:*<br>*All Direct Purchaser Plaintiff Actions*<br><br>1:24-cv-3056-LJL<br>1:24-cv-3033-LJL<br>1:24-cv-3045-LJL<br>1:24-cv-3246-LJL<br>1:24-cv-3255-LJL<br>1:24-cv-3236-LJL<br>1:24-cv-3817-LJL<br>1:24-cv-3806-LJL | Case No. 24-MD-3097 (LJL)<br><br>**Jury Trial Demanded** |

## DIRECT PURCHASER PLAINTIFFS'
## CONSOLIDATED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 11

III.   PARTIES AND UNNAMED CO-CONSPIRATORS ........................... 12

   A.    PLAINTIFFS ...................................................................................... 12
   B.    DEFENDANTS ................................................................................... 14
      1.   *The Sika Group* ....................................................................... *14*
      2.   *The Saint-Gobain Group* ......................................................... *17*
      3.   *The Cinven Group* .................................................................... *25*
      4.   *The BASF Group* ..................................................................... *27*
      5.   *The RPM Group* ....................................................................... *28*
      6.   *The Mapei Group* .................................................................... *29*
      7.   *Doe Defendants* ....................................................................... *31*
   C.    AGENTS AND UNNAMED CO-CONSPIRATORS .................................. 31

IV.    FACTUAL ALLEGATIONS ............................................................... 31

   A.    BACKGROUND ON CCAS ................................................................. 31
      1.   *CCAs Are an Essential Input in Cement, Concrete, and Mortar* ............... *31*
      2.   *There Are Seven Primary Types of CCAs* ................................. *34*
      3.   *Most CCAs Are Sold in Ready-to-Use Form* ............................ *37*
      4.   *CCA Purchasers Operate in the Construction and Industrial Sectors* ........ *39*
   B.    DEFENDANTS DOMINATE THE $3 BILLION U.S. MARKET FOR CCAS................ 40
   C.    NUMEROUS GLOBAL ANTITRUST AUTHORITIES ARE INVESTIGATING DEFENDANTS'
      ANTICOMPETITIVE CONDUCT IN THE CCA INDUSTRY, AND THE DOJ HAS IMPANELED A
      CRIMINAL GRAND JURY IN PHILADELPHIA TO INVESTIGATE THE SAME............. 44
   D.    DEFENDANTS EFFECTUATED THE CONSPIRACY THROUGH SHARED TRADE ASSOCIATIONS
      ...................................................................................................... 50
   E.    DEFENDANTS HAVE CONSISTENTLY INCREASED CCA PRICES DURING THE CLASS PERIOD,
      INCLUDING THROUGH THE IMPOSITION OF SURCHARGES, OFTEN IN LOCKSTEP ............. 61
   F.    NORMAL MARKET FORCES DO NOT EXPLAIN DEFENDANTS' PRICE INCREASES ............. 68
   G.    DEFENDANTS HAVE ADMITTED THAT THEIR PRICE INCREASES DROVE PROFIT GROWTH  75
   H.    DEFENDANTS HAVE CONSOLIDATED THEIR CONTROL OVER THE CCA INDUSTRY .......... 78
   I.    THE CCA MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION ........................... 84
      1.   *The Supply Side of the CCA Market Is Highly Concentrated and Defendants Are the
         Dominant Firms* .................................................................... *84*
      2.   *New Entrants into the CCA Market Face High Barriers to Entry* ............... *86*
      3.   *The Demand Side of the CCA Market Is Unconcentrated* ........... *87*
      4.   *Demand for CCAs Is Inelastic* ................................................ *87*
         a.   CCAs are Commodity Products and There Are No Substitutes for Them................ 88
         b.   CCAs Are Essential to the Production of Concrete, Cement, and Mortar and Are
            Therefore Necessary for Construction ........................................ 89
      5.   *Defendants Had Numerous Opportunities to Collude* ................ *89*
   J.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT ........................... 90
   K.    DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS ................... 91

V.      CLASS ACTION ALLEGATIONS ................................................................. 92

VI.     INTERSTATE TRADE AND COMMERCE ................................................ 94

VII.    ANTITRUST INJURY ................................................................................... 95

VIII.   CLAIMS FOR RELIEF ................................................................................ 96

IX.     PRAYER FOR RELIEF................................................................................ 98

X.      JURY DEMAND........................................................................................... 99

## TABLE OF FIGURES

Figure 1: Share of the Saint-Gobain Group's 2023 Operating Income by Region....................... 24

Figure 2: Cement vs. Concrete vs. Mortar..................................................................... 33

Figure 3: How CCAs Are Used ................................................................................... 34

Figure 4: Types of CCAs by ASTM Code...................................................................... 36

Figure 5: Picture of SikaMix AE-6 Packaging ............................................................... 38

Figure 6: Picture of Sika ViscoCrete-125P Packaging ..................................................... 39

Figure 7: CCAs Sold by the Sika Group........................................................................ 41

Figure 8: CCAs Sold by the Saint-Gobain Group ........................................................... 41

Figure 9: CCAs Sold by the Cinven Group .................................................................... 42

Figure 10: CCAs Sold by the BASF Group.................................................................... 43

Figure 11: CCAs Sold by the RPM Group ..................................................................... 43

Figure 12: CCAs Sold by the Mapei Group.................................................................... 44

Figure 13: Prices of CCAs Imported into the United States ($/kg) ...................................... 68

Figure 14: Actual vs. But-For Prices of CCAs in the United States...................................... 70

Figure 15: Actual vs. But-For Prices of Water Reducing CCAs .......................................... 71

Figure 16: Actual vs. But-For Prices of CCA Expanding Agents ......................................... 71

Figure 17: Actual vs. But-For Prices of Accelerator CCAs................................................. 72

Figure 18: Actual vs. But-For Prices of Air Entrainer CCAs .............................................. 72

Figure 19: Actual vs. But-For Prices of Corrosion Inhibitor CCAs ...................................... 73

Figure 20: Actual vs. But-For Prices of CCA Retarding Agents.......................................... 73

Figure 21: Actual vs. But-For Prices of Other Types of CCAs ........................................... 74

Figure 22: U.S. Prices for Sodium Lignosulfonate........................................................... 75

Figure 23: Timeline of Defendants' CCA Acquisitions ..................................................... 83

Direct Purchaser Plaintiffs M&D Peterson, LLC; Keystone Concrete Block & Supply Co. Inc.; 570 Concrete, LLC; H&S Redi-Mix, Inc.; D'Onofrio General Contractors Corp.; J&L Imperium Industries, LLC; and Benevento Concrete Corp. (collectively, "Direct Purchaser Plaintiffs" or "Plaintiffs"), individually and on behalf of all others similarly situated (the "Direct Purchaser Class" or "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to the federal antitrust laws and demand a trial by jury on all matters so triable.

## I.    NATURE OF THE ACTION

1.    This lawsuit arises from Defendants' unlawful agreement to fix the prices for: (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing (collectively, "CCAs"). CCAs, which can be either in liquid or powdered form, are added to concrete, cement, and mortar before or during the aggregate's mixing with water in order to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing the product or preventing cracking, and inhibiting corrosion.[1] Globally, the market for CCAs reached more than $18 billion in 2020[2] and $27 billion in 2022.[3]

---

[1]    The Constructor, 15 Types of Admixtures Used in Concrete, https://theconstructor.org/concrete/types-concrete-admixtures/5558/#:~:text=15.%20Coloring%20Admixtures%20%20%20Admixture%20%20,%20%20Green%20%203%20more%20rows%20.

[2]    Fortune Business Insights, Concrete Admixtures Market Size (Jan. 2020), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832.

[3]    Global News Wire, Concrete Admixture Market Is Projected to Reach US $27.5 Billion with a Share of 36.1% by 2032 (July 13, 2022), https://www.globenewswire.com/en/news-release/2022/07/13/2479255/0/en/Concrete-Admixture-Market-is-projected-to-reach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights-Inc.html.

2.     Defendants are six (6) corporate families that manufacture and sell the vast majority of CCAs sold in the United States and its territories, as well as in Europe. These corporate families are (1) the "**Sika Group**," comprised of Swiss corporation Sika AG and its wholly owned U.S. subsidiary Sika Corporation ("Sika USA"); (2) the "**Saint-Gobain Group**," comprised of the French conglomerate Compagnie de Saint-Gobain S.A. ("Saint-Gobain France") and its wholly owned U.S. subsidiaries Saint-Gobain Corporation d/b/a Saint-Gobain North America ("Saint-Gobain USA"), GCP Applied Technologies, Inc. ("GCP"), and Chryso, Inc. ("Chryso USA"), as well as Chryso USA's French parent, Chryso S.A.S. ("Chryso France" and together with Chryso USA, "Chryso"); (3) the "**Cinven Group**," comprised of British corporation Cinven Limited ("Cinven UK") and U.S. corporation Cinven, Inc. ("Cinven USA" and together with Cinven UK, "Cinven"), as well as Cinven's wholly owned subsidiaries Master Builders Solutions Admixtures U.S., LLC ("MBSA"), and Master Builders Solutions Deutschland GmbH ("MBSD" and together with MBSA, "MBS"); (4) the "**BASF Group**," comprised of German conglomerate BASF SE and its wholly-owned U.S. subsidiary, BASF Corporation[4]; (5) the "**RPM Group**", comprised of U.S. corporation RPM International Inc. ("RPM") and its wholly-owned U.S. subsidiary, the Euclid Chemical Company ("Euclid"); and (6) the "**Mapei Group**," comprised of the Italian conglomerate Emme Esse VI S.R.L. ("Emme Esse"), its wholly owned Italian subsidiary Mapei S.p.A. ("Mapei Italy"), and its wholly owned U.S. subsidiary Mapei Corporation ("Mapei USA"). In addition, Plaintiffs presently believe that other subsidiaries, affiliates, and/or agents that are wholly owned and/or controlled by Defendants also engaged in conduct in furtherance of the conspiracy alleged herein, including, for example, exporting Defendants' price-fixed CCAs into

---

[4]     The BASF Group wholly owned and controlled the global MBS brand and assets, including MBSD and MBSA, until it sold them to Lone Star on September 30, 2020.

the United States and its territories. Plaintiffs reserve the right to add these other wholly owned and/or controlled subsidiaries, affiliates, and/or agents as parties to this action at a later date.

3.     Defendants' unlawful agreement caused direct purchasers of CCAs in the United States and its territories, including Plaintiffs and the putative Class, to pay supra-competitive prices for CCAs sold by Defendants during the period beginning no later than January 1, 2017, and running through the date on which any Class herein is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Defendants' scheme included both price increases and the imposition of surcharges on CCAs.

4.     Plaintiffs and the Class first became aware of Defendants' unlawful scheme on October 17, 2023, when the European Commission ("EC") announced that it had, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States."[5]

5.     Both the EC and the CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into the United States and its territories.[6]

---

[5]    Press Release, European Comm'n, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

[6]    EC Press Release, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061; Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/; ICIS, EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/.

6.      Consistent with the EC and CMA's announcement, and on information and belief, a criminal grand jury impaneled in the United States District Court for the Eastern District of Pennsylvania authorized the issuance of subpoenas on players in the CCA industry on or around October 17, 2023. The DOJ is overseeing this criminal antitrust investigation into the CCA industry in the United States.  Indeed, on May 29, 2024, the DOJ filed a letter in this action (ECF No. 67), confirming that "a grand jury investigation has been initiated related to the concrete and cement additives industry" and, thereby, suggesting that one or more Defendants are involved.

7.      Also on October 17, 2023, the CMA released a statement that it had "launched an investigation . . . into suspected anti-competitive conduct relating to the supply of chemical admixtures and additives for use in concrete, cement, mortars and related construction products in the UK," and that its "investigation concern[ed] a suspected infringement or infringements of Chapter I [of the Competition Act 1998 ("CA 1998")] involving a number of suppliers of these chemicals and some industry bodies."[7] Chapter I of CA 1998 "prohibits agreements and concerted practices between undertakings ([*e.g.*,] businesses) and decisions by associations of undertakings ([*e.g.*,] trade associations) which have as their object or effect the prevention, restriction or distortion of competition within the UK and which may affect trade within the UK."[8] Thus, Chapter I of CA 1998 is the UK's equivalent to Section 1 of the Sherman Act.

8.      In addition, on October 12, 2023, the UK's Competition Appeals Tribunal ("CAT") approved the issuance of three search warrants for the business premises of Sika Group and Cinven Group entities companies active in the "supply of chemical admixtures and additives for use in

---

[7]      CMA, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry.

[8]      CMA, Guidance on the Application of the Chapter I Prohibition in the Competition Act 1998 to Horizontal Agreements 6 (2023).

concrete, cement, mortar and related construction products." The CMA's requests for warrants stemmed in part from its concern that relevant evidence would be destroyed, with the CMA asserting that it had "reasonable grounds for suspecting that, if the documents the subject of the warrant were required to be produced, they would be concealed, removed, tampered with or destroyed," and that therefore the warrant applications must be made in secret. The CMA executed the three warrants against the Sika Group and the Cinven Group on October 17, 2023.[9]

9.     The TCA has disclosed that the "on-site inspections carried out by the [TCA] on October 17 were conducted simultaneously and in coordination with" the EC and CMA, and that it has opened a formal investigation targeting the BASF Group's Turkish unit, the Sika Group, Chryso, Cinven's MBS, and the Mapei Group, along with two trade associations, for possible violations of Turkey's equivalent of Section 1 of the Sherman Act by "agreeing on price increases and pricing strategies, exchanging competitively sensitive information [and] bid rigging."[10]

10.     Public sources have confirmed that the Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are targets in this global antitrust investigation, and that the Sika Group and the Saint-Gobain Group are in contact with these authorities, including the DOJ.[11]

---

[9]     Competition and Markets Authority v Another [2023] CAT 68 1611/13/12/2023 (W), 1612/13/12/2023 (W), 1613/13/12/2023 (W), 1614/13/12/2023 (W), [8(2)] (Eng., Wales, Scot.).

[10]     TCA Press Release, Investigation Initiated About Undertakings Operating in the Market for Construction Chemicals in Turkey (Dec. 19, 2023), https://www.rekabet.gov.tr/en/Guncel/investigation-initiated-about-undertakin-13ea2baf0b9fee118eca00505685da39.

[11]     GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe; Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/; Mapei Italy, 2023 Consolidated Financial Statements, 57 (Jul. 2024), https://cdnmedia.mapei.com/docs/librariesprovider2/default-document-library/mapei-bilancio-d'esercizio-2023-eng_web.pdf?sfvrsn=5dacfe88_5 https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.; Mapei Italy, 2023 Consolidated

11.     The origins of Defendants' conspiracy can be traced to 2014, when Saint-Gobain France attempted a hostile takeover of Sika AG.[12] Over the next four years, Saint-Gobain France consolidated its control of Sika AG, acquiring nearly a quarter of Sika AG's stock and becoming its largest single stakeholder. On May 11, 2018, Saint-Gobain France abandoned its takeover attempt and agreed to reduce its stake in Sika AG to around ten percent for at least two years.[13] Saint-Gobain France remained the largest shareholder in Sika AG until it sold its stock in 2020.[14] Beginning at least as early as 2017, these two Defendants' aligned financial interests incentivized them to reduce competition and collusively agree to charge supra-competitive prices for CCAs.

12.     The alleged conspiracy was born from this attempted merger. At the time it was launched, the CCA market was **_already_** highly susceptible to collusion: the supply side was concentrated, with high barriers to entry; the demand side was unconcentrated; and the demand for CCAs was inelastic. Sika AG and Saint-Gobain France, with their shared financial interest through Saint-Gobain France's significant financial stake in Sika AG, leveraged these market susceptibilities and agreed to cease competing with each other in order to ensure they both obtained higher prices for CCAs in the United States and its territories. Their anticompetitive agreement

---

Financial Statements, at 57 (Jul. 2024), https://cdnmedia.mapei.com/docs/librariesprovider2/default-document-library/mapei-bilancio-d'esercizio-2023-eng_web.pdf?sfvrsn=5dacfe88_5.

[12]     Reuters, Saint-Gobain Remains Committed to Deal to Take Over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 6, 2016).

[13]     Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Reuters, Saint-Gobain's U.S. Deal Will Cement Its Sika Envy (Dec. 6, 2021), https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/.

[14]     VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Reuters, Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle (May 27, 2020), https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1.

faced a problem, however: there were a handful of other, competing manufacturers of CCAs. Because those competitors posed a threat to the Saint-Gobain Group and the Sika Group's agreement to charge higher prices for CCAs, the two co-conspirators agreed to a joint worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their mutual competitors between 2017 and the present. As Sika AG told investors in 2022, it successfully "consolidate[d] fragmented [market segments]" to strengthen its core business.[15] The Mapei Group, the RPM Group, and MBS all joined this unlawful conspiracy, as did the BASF Group (at least prior to September of 2020) and the Cinven Group (beginning in at least May of 2023).

13. Defendants' unlawful agreement became more effective the more they consolidated their market power, and prices for CCAs continued to rise. With no meaningful check on their pricing power, Defendants agreed to institute both price increases on CCAs and surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

14. Defendants have been secure in their knowledge that their competitors—the other Defendants—will not undercut them on price. As one industry analyst explained in discussing at least the ***third*** price increase made by the Sika Group in 2021,[16] "They are not losing sales when increasing prices because competitors will also not sell at lower prices."[17] Similarly, RPM CEO

---

[15]    Sika AG Annual Report 2022, 13, https://www.sika.com/dms/getdocument.get/ 55534c2a-608c-4ec2-bc9f-df21d5ada6bd/glo-ar-2022-sika-business-year.pdf?_gl=1*t666q1*_g a*NTI2NDMwNTU0LjE2OTc2MzU0ODg.*_ga_K04G1QB2XC*MTY5NzgyODQ5Ni43LjEu MTY5NzgzMTU4OC4wLjAuMA.

[16]    Reuters, Sika Raises Prices to Counter Jump in Raw Material Costs, https:// www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw- material-costs-idUSZ8N1UN01Y (last updated Feb. 22, 2019) (noting Sika's prior price increases in January 2021 and March 2021).

[17]    Reuters, Update 2-Chemicals Group Sika Tackles Higher Costs by Raising Prices, https:// www.reuters.com/article/sika-results/update-2-chemicals-group-sika-tackles-higher-costs-by- raising-prices-idUSL4N2RI0XW (last updated Oct. 21, 2021).

Frank Sullivan admitted during an earnings call in July 2023 that the RPM Group was charging too much for its CCAs but that the company (trusting that it would not be undercut on price) "held our pricing and held our discipline" and, as a result, reaped supra-competitive profits on CCAs.[18]

15.    Defendants' claimed justifications for these CCA price hikes are pretextual. The purported increases in input costs and freight costs during COVID-19 were either non-existent or short-lived, while Defendants' CCA price increases have been both extreme and persistent.

16.    Defendants effectuated and facilitated their conspiracy through their shared membership in numerous trade associations. Specifically, all six Defendant groups are members of numerous CCA trade associations around the World, which provided them with ample opportunities to meet and conspire. These shared CCA trade associations include the Belgian CCA trade association, Federatie van Invoerders en Producenten van Hulpstoffen voor betons en mortels ("FIPAH");[19] the Finnish Concrete Admixture Association ("FINCAA");[20] the Belgian CCA trade association, Fédération des Importateurs et Producteurs d'Adjuvants pour Béton ("FIPAH");[21] the French CCA trade association, Syndicat National des Adjuvants pour Bétons et Mortiers ("SYNAD");[22] the German CCA trade association Deutsche Bauchemie e.V.;[23] the Italian CCA trade association, Associazione Italiana Produttori Additivi e Prodotti per Cemento e Calcestruzzo

---

[18]    Q4 2023 RPM International Inc. Earnings Call Transcript (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf.

[19]    FIPAH, Members, https://www.fipah.be/fr/membres/.

[20]    EFCA, Finland – FINCAA, https://www.efca.info/efca-members/finland-fincaa/.

[21]    FIPAH, Members, https://www.fipah.be/fr/membres/.

[22]    Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[23]    Deutsche Bauchemie, Our Members, https://qdb.de/mitgliedsunternehmen.

("ASSIAD");[24] the Dutch CCA trade association, Vereniging van Fabrikanten en Leveranciers van Hulpstoffen voor Mortels en Beton ("VHB");[25] Norwegian Committee for Concrete Admixtures ("NCCA");[26] the Polish CCA trade association, Stowarzyszenie Producentów Chemii Budowlanej ("SPChB");[27] the Spanish CCA trade association, Asociación Nacional de Fabricantes de Aditivos para Hormigón y Mortero ("ANFAH");[28] the Swedish Association for Concrete Admixtures ("SACA");[29] the Swiss CCA trade association, Fachverband Schweizerischer Hersteller von Betonzusatzmitteln ("FSHBZ");[30] the Turkish CCA trade association, Beton ve Harç Kimyasal Katkı Maddeleri Üreticileri Derneği ("KÜB");[31] and the UK CCA trade association, Cement Admixtures Association ("CAA").[32] Each of these national CCA trade associations also belongs to a Europe-wide umbrella trade association: the European Federation of Concrete Admixtures Association ("EFCA"). EFCA describes itself as a "partnership" of thirteen (13) national CCA trade associations, "formed in 1984 in order to represent the interests of the industry."[33] According to EFCA, the association's "total membership provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."[34]

---

[24]    ASSIAD, The Structure, https://www.assiad.it/LAssociazione/Lastruttura?__cf_chl_rt_tk =u7pLurzdoe4b4m7JWGOfds7HNRCC9lGE05zRTEktZi4-1700142619-0-gaNycGzNChA.

[25]    VHB, Members, https://www.vhb-hulpstoffen.nl/leden/.

[26]    NCAA, https://ncca.no/.

[27]    SPChB, About Us, https://spchb.pl/o-nas/#czlonkowie.

[28]    ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[29]    SACA, Member Companies, https://www.saca.se/medlemmar.html.

[30]    FSHBZ, Member Companies, https://www.fshbz.ch/html/mitglieder.html.

[31]    KÜB, About Us, https://kub.org.tr/hakkimizda/.

[32]    Cement Admixtures Association, Members, https://www.admixtures.org.uk/members

[33]    EFCA, About Us, https://www.efca.info/about-us/.

[34]    *Id.*

17.     In the United States, Defendants BASF USA, Chryso USA, GCP, MBSA, Sika USA, and Euclid are all "super sponsors" of the NRMCA, a trade association founded in 1930, long before most of the construction chemicals at issue in this action came into existence. Chryso USA, GCP, MBSA, Sika USA, and Mapei USA are all current associate members.

18.     Many other NRMCA members are companies who bought CCAs directly from Defendants and thus were harmed by Defendants' anticompetitive conduct. Still, the NRMCA— even if not a co-conspirator—gave Defendants yet another opportunity to meet and collude on CCA prices under the guise of participation in a legitimate trade association.

19.     The conspiracy was further bolstered by Defendants' continuous close interactions with each other in connection with several inter-Defendant sales and acquisitions. For example, during the Class Period: (1) Saint-Gobain France bought Chryso from Cinven; (2) Cinven bought the Master Builders Solution brand and assets in the United States, including MBSA, and in Europe, including MBS Germany, while Sika AG bought much of the remainder; and (3) the RPM Group purchased Chryso's cement grinding additives business from the Saint-Gobain Group. These transactions, among others, created opportunities for Defendants to exchange highly sensitive competitive information about each other's pricing, production, and sales strategies.

20.     The Defendants capitalized on these opportunities. Economic evidence, based on available data, demonstrates that Plaintiffs paid higher prices for CCAs during the Class Period than can be explained by normal market forces. Specifically, a dummy variable multiple regression—controlling for (1) raw materials cost, (2) freight cost, (3) chemical manufacturing labor cost, (4) cement and concrete production (to account for downstream demand for CCAs), (5) an indicator variable for the COVID-19 period, and (6) calendar quarter fixed effects (to account for seasonality in prices that compared the prices before the Class Period to the prices during the

Class Period)—shows that beginning no later than January 1, 2017, the prices for CCAs in the United States and its territories were, on average, roughly 15 percent higher than can be explained by normal market forces—a finding that is consistent with collusion.

21.    In sum, beginning no later than January 1, 2017, Defendants entered into an agreement to consolidate control of the global CCA industry and charge supra-competitive prices for CCAs. Defendants effectuated the agreement through their shared membership in CCA trade associations, which gave them ample opportunities to conspire, as well as their joint participation in numerous acquisitions that allowed them to exchange confidential information under the guise of due diligence. As a result of Defendants' unlawful agreement, Plaintiffs and members of the Class paid supra-competitive prices for CCAs in the United States and its territories.

22.    Through this action, Plaintiffs, on behalf of themselves and members of the Class, seek to recover the overcharges they paid to Defendants for CCAs during the Class Period.

## II.    JURISDICTION AND VENUE

23.    Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States and its territories for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

25.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the claims alleged in this Complaint, one or more of the Defendants resided,

transacted business, was found, or had agents in this District; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

26.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant made the following contacts with the United States as a whole, with the state of Pennsylvania (the forum state where the present actions were originally filed), and with this District: (a) each Defendant transacted business in the United States, including in Pennsylvania and in this District; (b) each Defendant directly or indirectly manufactured and/or sold CCAs in the United States, including in Pennsylvania and in this District; (c) each Defendant has substantial aggregate contacts with the United States, with the state of Pennsylvania, and with this District; and/or (d) at least one Defendant engaged in one or more overt acts in furtherance of the alleged conspiracy in the United States, in the state of Pennsylvania, and in this District.

## III.    **PARTIES AND UNNAMED CO-CONSPIRATORS**

### A.    **Plaintiffs**

27.     Plaintiff M&D Peterson, LLC, is a business incorporated in the State of New York with its primary place of business at 1801 Washington Street, Jamestown, New York 14701. M&D Peterson purchased CCAs in the United States at supra-competitive prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

28.     Plaintiff Keystone Concrete Block & Supply Co. Inc. is a business incorporated in the State of Pennsylvania with its primary place of business at 600 Glenn Street, Scranton, Pennsylvania 18509. Keystone purchased CCAs in the United States and its territories at supra-competitive prices directly from one or more Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

29.     Plaintiff 570 Concrete, LLC, is a business incorporated in the State of Pennsylvania with its primary place of business at 600 Glenn Street, Scranton, Pennsylvania 18509. 570 Concrete purchased CCAs in the United States and its territories at supra-competitive prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

30.     Plaintiff H&S Redi-Mix, Inc., is a business incorporated in the State of Wisconsin with its primary place of business at N6200 County Road XX, Onalaska, Wisconsin 54650. H&S Redi-Mix purchased CCAs in the United States and its territories at supra-competitive prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

31.     Plaintiff D'Onofrio General Contractors Corp. is a business incorporated in the State of New York with its primary place of business at 202 28th Street, Brooklyn, New York 11232. D'Onofrio purchased CCAs in the United States and its territories at supra-competitive prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

32.     Plaintiff J&L Imperium Industries, LLC, is a business incorporated in Texas with its primary place of business at 1700 South Riverfront Boulevard, Dallas, Texas 75207. J&L Imperium purchased CCAs in the United States and its territories at supra-competitive prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

33.     Plaintiff Benevento Concrete Corp. is a business incorporated in the State of Massachusetts with its primary place of business at 900 Salem Street, Wilmington, Massachusetts 01887. Benevento purchased CCAs in the United States or its territories at supra-competitive

prices directly from one or more of the Defendants during the Class Period and was injured in its business or property due to Defendants' alleged violations of the Sherman Act.

    B.    **<u>Defendants</u>**

        1.    *The Sika Group*

    34.    Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including Sika USA.

    35.    On information and belief, Sika AG, directly and/or through its wholly owned and/or controlled subsidiaries, affiliates, and/or agents, exported CCAs to the United States and its territories during the Class Period.

    36.    Defendant Sika USA is a New Jersey corporation with its primary place of business at 201 Polito Avenue, Lyndhurst, New Jersey 07071. Sika USA has approximately 28 locations in the United States, including three (3) in Pennsylvania, where this action originated.[35] During the Class Period, Sika USA manufactured and sold CCAs in the United States and its territories.

    37.    Sika USA is a wholly owned subsidiary of Sika AG.,[36] Sika AG effectively controls the ordinary business operations of Sika USA, as well as its other subsidiaries, both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

    38.    The Sika Group's Organizational Rules make clear that Sika AG controls the operations of its subsidiaries, including Sika USA and its foreign subsidiaries that export CCAs to the United States. Under those Rules, the "executive bodies" of Sika AG exercise control over the

---

[35]    Sika USA, Locations, https://usa.sika.com/en/about-us/sika-usa-locations.html.

[36]  .    Sika AG Annual Report 2023, at 248-54 (Feb. 13, 2024).

direction of the entire Sika Group.[37] Those "executive bodies" include Sika AG's Board of Directors, CEO, and Sika Group Management Team (known as the "KL").[38]

39.    Sika AG's Board of Directors is responsible for "the overall direction and control of the management of Sika," and its duties include determining the company's strategy, financial planning, and "fundamental policies and rules"; approving its annual budget; and appointing and removing members of the KL.[39]

40.    Sika AG's KL is responsible for "the operational management" of Sika's subsidiaries, including Sika USA.[40] The KL is led by Sika AG's CEO, and Sika AG's Regional Managers and Functional Managers are members.[41]

41.    Mike Campion is the Regional Manager of the Americas for Sika AG and a member of the KL. He is thus heavily involved in the operational management of Sika USA. His duties include "assum[ing] full responsibility for the region with a view to achieving the budget and the strategic goals."[42] He was appointed by Sika AG's Board of Directors and is charged with implementing the Board's resolutions in the Americas, including in the United States and its territories.[43] The Board has the power to terminate him if he fails to do so.

42.    In addition to his role as Regional Manager of the Americas for Sika AG and member of the KL, Campion is one of *just three* members of the Board of Directors for Sika USA.

---

[37]    Sika AG and Sika Group, Organizational Rules, at 3 (Feb. 2022), https://www.sika.com/dam/dms/corporate/media/glo-sika-organizational-rules.pdf.

[38]    *Id.*

[39]    *Id.* at 5.

[40]    *Id.* at 7.

[41]    *Id.*

[42]    *Id.* at 8.

[43]    *Id.*

These overlaps in his roles, combined with the fact that he reports directly to Sika AG's Board of Directors, give Sika AG significant operational control over its U.S. subsidiary Sika USA.

43.    Christoph Ganz, Campion's predecessor, served as Regional Manager of the Americas and a member of the KL from 2018 through 2023 and also served on Sika USA's Board of Directors. While serving as Regional Manager of the Americas, he also served from June 2019 to June 2024 as the President of the Board of Directors of Sika Management Americas AG, a Swiss subsidiary owned by Sika AG also based in Baar ZG that provides routine operational services for Sika AG's subsidiaries, including Sika USA,  whose purpose is defined as follows: "Provision of services of all kinds for the companies of the Sika Group, in particular services in the areas of management and coordination, purchasing, sales and production as well as legal and personnel."

44.    Jim Walther is the CEO and President of Sika USA, as well as the Area Manager of the United States for Sika AG. He also serves on Sika USA's Board of Directors. As an Area Manager, Walther was appointed by Sika AG's KL and could be terminated by the KL at any time.

45.    As the leaders of Sika AG's management team for the Americas and, in particular, the United States, Campion and Walther "bear full profit and loss responsibility" and "set country-specific growth and sustainability targets and allocate resources" based on Sika AG's strategy.[44]

46.    Sika AG's stated policy is that boards of directors for Sika Group subsidiaries "will only be maintained where legally required with the minimum amount of members," and that "the Regional and/or the Area Manager, as well as the Regional Controller," will always be members of a subsidiary's board.[45] Thus, Sika AG actively and directly controls its subsidiaries' operations, including by eliminating any independent board control. Indeed, Sika AG regularly refers to its

---

[44]    Sika AG Annual Reports 2018-2023.

[45]    Sika AG and Sika Group, Organizational Rules, at 8.

foreign and domestic subsidiaries as "units" rather than independent companies.

47.    Consistent with that degree of control by Sika AG, Sika USA's Board of Directors is made up solely of the KL's Regional Manager of the Americas, the CFO of Region Americas, and the CEO and President of Sika USA. In other words, Sika USA has no independent directors at all; the subsidiary is wholly and solely controlled by Sika AG and Sika AG's KL, with operational assistance services provided by Sika Management Americas AG.

48.    The extent of the control that Sika AG exercises over Sika USA and other Sika Group subsidiaries is further evidenced by its Organizational Rules governing "authorities in business matters."[46] Those Rules give Sika AG the exclusive authority to make financial investments; buy, lease, or rent real estate; acquire interests in third parties; divest interests to third parties. and secure external debt financing on behalf of the Sika Group.[47] The Rules also give Sika AG's KL the exclusive authority to incorporate Sika Group subsidiary companies.[48]

## 2.    *The Saint-Gobain Group*

49.    Defendant Saint-Gobain France is a French corporation with its primary place of business at Tour Saint Gobain, 12 Place de l'Iris, Courbevoie, 92400 France. During the Class Period, Saint-Gobain France manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, or agents, including Saint-Gobain USA, GCP, Chryso France, and Chryso USA.

50.    On information and belief, Saint-Gobain France, directly and/or through Chryso France and/or Saint-Gobain France's other wholly owned and/or controlled subsidiaries, affiliates,

---

[46]    *See id.* at 9.

[47]    *Id.*

[48]    *Id.*

and/or agents, exported CCAs to the United States and its territories during the Class Period.

51.     Defendant Saint-Gobain USA is a Pennsylvania corporation with its primary place of business at 20 Moores Road, Malvern, Pennsylvania 19355. Saint-Gobain USA has about 106 locations in the United States, including four (4) in Pennsylvania, where this action originated.[49] During the Class Period, Saint-Gobain USA manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents.

52.     Defendant GCP is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450 Alpharetta, Georgia 30009. GCP employs roughly 2,400 people in more than forty (40) countries, serving customers in more than 110 countries, including in the United States.[50] During the Class Period, GCP manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents.

53.     Defendant Chryso France is a French corporation registered at Tour Saint-Gobain, 12 Place de l'Iris, Courbevoie, 92400 France, with its primary place of business at 7 Rue de l'Europe Z.I., Sermaises du Loiret, 45300 France. During the Class Period, Chryso France manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, or agents, including Chryso USA.

54.     On information and belief, Chryso France, directly and/or through its wholly owned and/or controlled subsidiaries, affiliates, and/or agents, exported CCAs to the United States and its territories during the Class Period.

55.     Defendant Chryso USA is a Michigan corporation with its primary place of business at 1611 Highway 276, Rockwall, Texas 75032. Chryso USA has two innovation centers,

---

[49]     Saint-Gobain USA, Manufacturing Sites, https://www.saint-gobain-northamerica.com/manufacturing-sites.

[50]     GCP, Locations, https://ca.gcpat.com/en/about/locations.

four regional applicative labs, and more than fifteen (15) operation facilities across North America.[51] During the Class Period, Chryso USA manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, or subsidiaries.

56.    Chryso USA is a subsidiary of Chryso France.[52]

57.    Saint-Gobain USA, GCP, and Chryso are wholly owned subsidiaries of Saint-Gobain France, which controls Saint-Gobain USA, GCP, and Chryso both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

58.    Saint-Gobain France exercises control over Saint-Gobain USA, GCP, and Chryso. Saint-Gobain France includes its subsidiaries in its strategic plans and describes its "operating model" as being "organized on a country-by-country basis."[53] Saint-Gobain France notes that "the mobilization of all our teams on every continent" is what makes it possible for the company to achieve its strategic goals, including "seek[ing] more growth in North America[.]"[54]

59.    After its acquisitions of Chryso and GCP in 2021 and 2022, Saint-Gobain France combined the two companies into a new business unit within the Saint-Gobain Group called the "Construction Chemicals Business Unit."[55] Now, Chryso and GCP, together with their subsidiaries, hold themselves out to the public as "Saint-Gobain Construction Chemicals."[56] The Executive Committee biographies for the individuals in charge of this newly formed business unit

---

[51]    Chryso USA, Homepage, https://www.chrysoinc.com/.

[52]    Chryso USA Rule 7.1 Disclosure Statement, *M&D Peterson LLC v. Sika AG*, No. 2:23-cv-04711, ECF No. 20 (E.D. Pa. Jan. 3, 2023).

[53]    Document d'enregistrement universel (DEU) 2023, page 5.

[54]    *Id.*

[55]    Chryso Press Release, New Business Unit Within Saint-Gobain High Performance Solutions: Construction Chemicals (Oct. 3, 2022), https://www.chryso.com/news/new-business-unit-within-saint-gobain-high-performance-solutions-construction-chemicals/.

[56]    Chryso and GCP, Curbing CO2 at the Source, https://www.curbingco2atthesource.com/.

refer to different geographies as having separate CEOs, but they do not refer to the names of any particular subsidiary or entity in doing so, despite these individuals' roles at Saint-Gobain France and its subsidiaries, including Saint-Gobain USA.

60.    On information and belief, Saint-Gobain France requires every Saint-Gobain Group business to submit a strategic plan and proposed budget for approval every year. The strategic plans include sales projections, long-term plans, and details on profitability. Within North America, each business head submits their plan and proposed budget to the CEO of Saint-Gobain USA, who combines them to create an overall plan and budget for the region. The CEO of Saint-Gobain USA then presents that overall plan and budget to the leadership of Saint-Gobain France.

61.    Saint-Gobain France also presents and discusses the finances and employee compensation of Saint-Gobain USA, GCP, and Chryso, along with Saint-Gobain France overall in the company's 2023 Financial Statements. Importantly, Saint-Gobain France also maintains control of human resources for Saint-Gobain USA, advertising openings for job openings at Saint-Gobain USA on the Saint-Gobain France website. Saint-Gobain France has also posted a "General Principals of Conduct and Action" for the whole Group,[57] as well as an employee engagement and diversity and inclusion policy applicable to all subsidiaries, with targets identified.[58]

62.    Saint-Gobain France executives play a central role in the operations of its subsidiaries, including Saint-Gobain USA. Top Saint-Gobain USA executives, including CEO Mark Rayfield, report directly to Benoit Bazin, the CEO of Saint-Gobain France.

---

[57]    Saint-Gobain Group, General Principles of Conduct and Action of the Saint-Gobain Group, https://www.saint-gobain.com/sites/sgcom.master/files/principles_en.pdf.

[58]    Saint-Gobain Group, Employee Engagement and Diversity, https://www.saint-gobain.com/en/corporate-responsibility/our-pillars/employee-engagement-and-diversity; Saint-Gobain Group, Promoting Equal Opportunities, https://www.saint-gobain.com/en/be-inclusive-promoting-equal-opportunities.

63.     Furthermore, upon Saint-Gobain France's acquisition of both Chryso and GCP in 2021, it appointed individuals who held leadership positions in Saint-Gobain France as executives of both subsidiaries. Indeed, the CMA predicted as much in advance of Saint-Gobain France's acquisition of GCP, stating: "As a result of the Merger, these enterprises will cease to be distinct."[59]

64.     Specifically, Chryso USA reported three new directors in the 2021 annual report it filed with the Michigan Secretary of State. All three new directors listed the same address in Issy-Les-Moulineaux, France, and two of them—Thierry Bernard and Hadrien Costa De Beauregard—reported simultaneous positions with Saint-Gobain France (CEO of Constructions Chemicals, and General Counsel and CCO of Construction Chemicals, respectively). Bernard became President of Chryso in 2023, at which time Chryso USA disclosed another new director, who serves as Saint-Gobain France's CEO for High Performance Solutions and sits on its Executive Committee.

65.     Saint Gobain USA controls GCP from Malvern, Pennsylvania. GCP's filings with the Georgia Secretary of State following its acquisition by the Saint-Gobain Group reported a new CEO, Secretary, and CFO, all of whom also held leadership positions at Saint-Gobain USA and listed the address of Saint-Gobain USA's operations in Pennsylvania as their address. The new CEO of GCP, Mark Rayfield, is also President of Saint-Gobain USA; the new Secretary of GCP is also Senior Vice President, General Counsel, and Secretary for Saint-Gobain USA; and the new CGO of GCP is also Vice President of Finance and CFO for Saint-Gobain USA. Rayfield also serves on the Executive Committee of Saint-Gobain France and is listed as the Senior Vice

---

[59]     CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, at 1 (Sept. 22, 2022), available at https://assets.publishing.service.gov.uk/media/63625ecdd 3bf7f04f3a54799/20220922_FINAL_Saint_Gobain-GCP_-_Decision.pdf; *see also id.* at 4.

President and CEO of Saint-Gobain France's North America Region.[60]

66.    Representatives of Saint-Gobain France likewise serve in leadership positions at Saint-Gobain USA. Tom Kinisky, the former President and CEO of Saint-Gobain USA from January 2017 to January 2019 and then the Chairman of Saint-Gobain USA from February 2019 to the present, also served as a Senior Vice President for Saint-Gobain France and as a member of Saint-Gobain France's Management Team during the same period. Mark Rayfield, Kinisky's replacement as President and CEO of Saint-Gobain USA, simultaneously serves as a Senior Vice President at Saint-Gobain France. He has also been a member of Saint-Gobain France's Executive Committee since 2020 and has worked for various Saint-Gobain subsidiaries over the last 30 years.

67.    Saint Gobain France provides human resources support for Saint Gobain USA. Valerie Gervais, the former Global HR Director of "Innovative Materials" at Saint-Gobain France, went on to relocate to the United States, where she currently simultaneously manages HR for Saint-Gobain USA, as well as certain units for Saint-Gobain France.[61]

68.    Saint-Gobain France executives travel from France to Saint-Gobain USA's headquarters in Pennsylvania at least quarterly, usually for earnings calls or to discuss strategy with U.S. executives. For example, Saint-Gobain France CEO Benoit Bazin visits Pennsylvania at least twice per year. In October of 2021, Bazin noted that he had traveled to the United States to oversee the initial stages of "the Chryso integration" and reported that "[t]he teams are all aligned

---

[60]    Saint-Gobain France, Executive Committee, https://www.saint-gobain.com/en/group/corporate-governance/executive-committee.

[61]    Saint-Gobain USA Press Release (May 18, 2017), https://www.saint-gobain-northamerica.com/company/newsroom/news-releases/saint-gobain-corporation-appoints-new-senior-vice-president-human.

and engaged."[62] And Saint-Gobain USA CEO Mark Rayfield returns the favor, visiting the Saint-Gobain Group's headquarters in Paris, France, twice per year. Leaders from across the Saint-Gobain Group also gather for a global leadership meeting every summer.

69.    Saint-Gobain France emphasizes that its presence in North America began 195 years ago and that it is a key player in the North American construction industry.[63]

70.    Saint-Gobain France views the U.S. as a key market and sees its U.S. subsidiaries as a means to "establish a leading worldwide presence in the growing construction chemicals sector" and further its strategy "as a worldwide leader in light and sustainable construction."[64]

71.    As shown in **Figure 1**, below, from the Saint-Gobain Group's investor materials, the North America region made up one-third of the Group's operating income in 2023.[65]

---

[62]    Saint-Gobain France Q3 2021 Sales and Revenue Call Transcript (Oct. 28, 2021), *accessed via* Bloomberg Terminal.

[63]    Saint-Gobain Group, Facebook Post, https://www.facebook.com/SaintGobainGroupFR/videos/1584807762096516/ (last updated July 4, 2024).

[64]    Saint-Gobain France, 2023 Consolidated Financial Statements, 16, https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/comptes_conso_31-12-2023_eng.pdf.

[65]    Saint-Gobain France, North America Investor Meeting Presentation, 5 (Sept. 22, 2023), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/20230922_USA_Investor_Meeting.pdf.

**Figure 1: Share of the Saint-Gobain Group's 2023 Operating Income by Region**



72.     Saint-Gobain France itself conducts business in the United States. This business includes a renewable energy deal that will directly benefit its subsidiaries by "reduc[ing] Saint-Gobain's electricity-related CO2 emissions . . . in North America [by] 90,000 tonnes per year."[66] Saint-Gobain France also participated in an electronics conference in San Francisco in 2024.[67]

73.     As of 2023, Saint-Gobain France had at least seven (7) subsidiary companies conducting business in the United States and its territories, including Saint-Gobain USA.

74.     Saint-Gobain France has also described significant industrial investment in the United States in recent years, including "23 new plans and production lines . . . in the fast growing

---

[66]     Saint-Gobain USA Press Release, Saint-Gobain Corporation Appoints New Senior Vice President of Human Resources (Aug. 20, 2024), https://www.saint-gobain-northamerica.com/company/newsroom/news-releases/enhanced-operations-and-process-improvements-lead-significant-energy#:~:text=In%20September%202023%2C%20Saint%2DGobain,90%2C000%20metric%20tons%20per%20year.

[67]     Furon, SEMICON West (Jul. 11, 2024), https://www.furon.com/events/semicon-west.

construction chemicals and light construction markets."[68] It noted that the value of this investment would total more than €350 million by 2023.[69] Saint-Gobain France has also highlighted its strategic focus on North America for 2024, emphasizing that "construction in North America [must] remain robust, both for new-build and renovation projects."[70]

### 3.    *The Cinven Group*

75.    Defendant Cinven UK is a British private equity firm with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, UK. During the Class Period, Cinven UK manufactured and sold CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, subsidiaries, and/or agents, including MBSA.

76.    Defendant Cinven USA is a New York corporation with its primary place of business at 12 East 49th Street, New York, New York 10017.[71] During the Class Period, Cinven USA manufactured and sold CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, subsidiaries, and/or agents, including MBSA.

77.    On information and belief, Cinven, through its wholly owned and/or controlled subsidiaries, affiliates, and/or agents, exported CCAs to the United States and its territories during the Class Period.

78.    Defendant MBSD is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the World, including in the United States and its territories,

---

[68]    Saint-Gobain France, 2023 Document D'enregistrement Universel, at 146, 149 (Feb. 29, 2024), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/Saint-Gobain_2023_DEU_VF.pdf.

[69]    *Id.*

[70]    *Id.* at 151.

[71]    Cinven, Locations, https://www.cinven.com/site-tools/cinven-offices.

directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including MBSA.

79.     Defendant MBSA is a Delaware corporation with its primary place of business at 23700 Chagrin Boulevard, Beachwood, Ohio, 44122. MBSA has approximately fifteen (15) locations throughout North America, including at least three (3) in the United States.[72] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents.

80.     MBSD and MBSA are wholly owned companies in Cinven's private equity portfolio. As such, Cinven controls MBSD and MBSA both generally and with respect to their conduct in furtherance of the unlawful acts alleged herein. In addition, MBSD controls MBSA both generally and with respect to its conduct in furtherance of the unlawful acts alleged herein.

81.     Cinven's partners exercise control over MBS's operations from the UK. For example, Pontus Pettersson, one of two Cinven partners who led the company's acquisition of MBS in 2023,[73] currently serves as the "Non Executive Chairman" of MBS.[74] The other Cinven partner who led the MBS acquisition, Anthony Cardona, currently serves as a "Non Executive Director" of MBS.[75] Jacopo Bruschi, a principal at Cinven, is also a "Non Executive Director" of

---

[72]     MBS, About Us, https://master-builders-solutions.com/about-us/; MBS, Sustainability Report 2022, at 54, 61 (June 8, 2023), https://assets.ctfassets.net/ctspkgm1yw3s/DMSY-1685695220129069/50398b29650aaa17c112771101d33abb/mbs_sustainability_report_2022.pdf.

[73]     Cinven Press Release, Cinven Agrees to Acquire MBCC Admixtures (Mar. 22, 2023), https://www.cinven.com/media/news/cinven-agrees-to-acquire-mbcc-admixtures/.

[74]     Pontus Pettersson, LinkedIn Profile, https://www.linkedin.com/in/pontus-pettersson-362334/?originalSubdomain=uk.

[75]     Anthony Cardona, LinkedIn Profile, https://www.linkedin.com/in/anthony-cardona-91b6895/?originalSubdomain=uk.

MBS,[76] and Paul Vega, a partner at Cinven, is a "Board Observer" for MBS.[77]

82.    German MBSD executives, in turn, exercise control over the operations of MBSA. For example, Boris Gorella, the CEO of MBSD,[78] is responsible for MBS's global operations, including its operations in the United States and its territories, and Bruce Christensen, the "Cluster Head [of] Americas," is President of MBS in the United States and Canada.[79]

83.    MBSD regularly hires from U.S. labor markets to fill positions that facilitate the marketing and sale of CCAs to the United States.[80] MBSD also exercises operational control over MBSA's human resources, setting terms and conditions of employment for MBS employees in the United States, including retirement and healthcare benefits.[81]

### 4.    *The BASF Group*

84.    Defendant BASF SE is a German company with its principal place of business at Carl-Bosch-Str. 38, Ludwigshafen Am Rhein, Rheinland-Pfalz, Germany 67056. BASF SE wholly owned and controlled MBS's CCA business during the Class Period. As such, during the Class Period, BASF SE manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, and/or agents,

---

[76]    Jacopo Bruschi, LinkedIn Profile, https://www.linkedin.com/in/jacopo-bruschi-6b4b6959/.

[77]    Paul Vega, LinkedIn Profile, https://www.linkedin.com/in/pauljvega/.

[78]    MBS, CEO and Management Team, https://master-builders-solutions.com/ceo-and-management-team/; Boris Gorella, LinkedIn Profile, https://de.linkedin.com/in/boris-gorella.

[79]    Tunnelling Journal, New USA and Canada Master Builders Solutions President Announced, https://tunnellingjournal.com/new-usa-canada-master-builders-solutions-president-announced/.

[80]    *E.g.*, Master Builders Solutions, Careers, https://jobs.master-builders-solutions.com/_/j/038ED5F62C/; https://jobs.master-builders-solutions.com/_/j/72FB8F7944/.

[81]    Master Builders Solutions, Sustainability Report 2022 (June 8, 2023) at 59, https://assets.ctfassets.net/ ctspkgm1yw3s/DMSY-1685695220-129069/50398b29650aaa17c11277110 1d33abb/ mbs_sustainability_report_2022.pdf.

including BASF USA and MBS USA.

85.    On information and belief, BASF SE, directly and/or through its wholly owned and/or controlled subsidiaries, affiliates, and/or agents, exported CCAs to the United States and its territories during the Class Period.

86.    Defendant BASF USA is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. During the Class Period, BASF USA manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including its former subsidiary, MBSA.

87.    BASF SE and BASF USA are collectively referred to herein as the "BASF Group." When Plaintiffs refer to the "BASF Group" in discussing events that occurred prior to 2020, it also includes the MBS entities previously owned by BASF SE, including MBSD and MBSA.

88.    BASF USA is a wholly owned subsidiary of BASF SE, which controls BASF USA both generally and with respect to its conduct in furtherance of the unlawful acts alleged herein.

89.    Likewise, MBSD and MBSA were wholly owned subsidiaries of BASF SE until September of 2020. As such, prior to that date, BASF SE controlled MBSD and MBSA both generally and with respect to their conduct in furtherance of the unlawful acts alleged herein.

### 5.    *The RPM Group*

90.    Defendant RPM is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including Euclid.

91.    Defendant Euclid is an Ohio corporation with its primary place of business at 19215 Redwood Road, Cleveland, Ohio 44110. Euclid has sales representatives assigned to regions all over the United States, including at least ten in Pennsylvania, the forum state where this action

originated.[82] During the Class Period, Euclid manufactured and sold CCAs in the United States or its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents.

92.    Euclid has been a wholly owned subsidiary of RPM since 1984.[83] RPM controls Euclid generally and with respect to its conduct in furtherance of the unlawful acts alleged herein.

93.    For example, RPM operates and maintains Euclid's website.[84]

94.    RPM also assigned the right to certain of Euclid's past and future receivables as part of a credit securitization facility executed in 2014,[85] which remains in effect today.[86]

### 6.    *The Mapei Group*

95.    Defendant Emme Esse is an Italian corporation with its principal place of business in Milan, Italy. During the Class Period, Emme Esse manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including Mapei Italy and Mapei USA.

96.    Defendant Mapei Italy is an Italian corporation with its principal place of business at Via Cafiero, 22, 20158, Milan, Italy. During the Class Period, Mapei Italy manufactured and sold CCAs around the World, including in the United States and its territories, directly and/or through its predecessors, affiliates, subsidiaries, and/or agents, including Mapei USA.

97.    On information and belief, Emme Esse, directly and/or through Mapei Italy and/or

---

[82]    Euclid, Sales Rep Locator, https://www.euclidchemical.com/help-support/sales-rep-locator/.

[83]    RPM, Our History, https://www.rpminc.com/about-rpm/our-history/.

[84]    Euclid, Terms of Use, https://www.euclidchemical.com/terms-of-use/.

[85]    RPM Form 8-K (May 9, 2014), https://content.edgar-online.com/ExternalLink/EDGAR/0001193125-14-201268.html?hash=8652baad27b44f874a88f2098657eae40c188598 1931ba79573a44fc9dd6b028&dest=d727926dex101_htm#d727926dex101_htm.

[86]    RPM Form 10-K for FY Ending May 31, 2024, at 108-144, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000110621/0f2a0aad-fead-4327-99fe-84e45d4c138d.pdf.

Emme Esse's other wholly owned and/or controlled subsidiaries, affiliates, and/or agents, exported CCAs to the United States and its territories during the Class Period.

98.    Defendant Mapei USA is an Illinois corporation with its primary place of business at 1144 E. Newport Center Drive, Deerfield Beach, Florida 33442. Mapei USA has approximately fifteen (15) plants and distribution centers in numerous states, including Florida, Georgia, California, Virginia, Texas, Illinois, New Jersey, Arizona, Minnesota, and Missouri.[87] During the Class Period, Mapei USA manufactured and sold CCAs in the United States and its territories directly and/or through its predecessors, affiliates, subsidiaries, and/or agents.

99.    Mapei Italy is a wholly owned subsidiary of Emme Esse, which controls Mapei Italy both generally and with respect to its conduct in furtherance of the unlawful acts alleged herein. Likewise, Mapei USA is a wholly owned subsidiary of Mapei Italy,[88] which controls it both generally and with respect to its conduct in furtherance of the unlawful acts alleged herein.

100.    For example, the same executives who run Mapei Italy also direct the operations of Mapei USA in the United States. Siblings Marco and Veronica Squinzi have served as co-CEOs of Mapei Italy since July of 2019.[89] At the same time, they serve as the only two directors of Mapei USA.[90] They also share ownership of Mapei Italy, along with their cousin, Simona Giorgetta.[91]

---

[87]    Mapei USA, Locations, https://www.mapei.com/us/en-us/about-us/mapei-in-the-usa/mapei-locations; Mapei Group 2022 Consolidated Financial Statements, 8-9 (Jul. 2023), https://cdnmedia.mapei.com/docs/librariesprovider2/default-document-library/mapei-bilancio-esercizio-2022-en.pdf?sfvrsn=3d412389_5.

[88]    Mapei Group 2022 Consolidated Financial Statements, 6 (Jul. 2023), https://cdnmedia.mapei.com/docs/librariesprovider2/default-document-library/mapei-bilancio-esercizio-2022-en.pdf?sfvrsn=3d412389_5.

[89]    Forbes, Profile of Marco Squinzi, https://www.forbes.com/profile/marco-squinzi/.

[90]    Mapei USA 2024 Foreign Profit Corporation Annual Report (filed with the Florida Secretary of State on Apr. 11, 2024).

[91]    Forbes, Profile of Marco Squinzi, https://www.forbes.com/profile/marco-squinzi/.

### 7.    *Doe Defendants*

101.    Doe Defendants 1-100 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiffs. These include, among other entities, the "industry bodies" referenced in the CMA's statement regarding its investigation,[92] as well as each Defendant's wholly owned and/or controlled subsidiaries, affiliates, and/or agents that imported CCAs into the United States and its territories during the Class Period. Plaintiffs expect the identity of these Doe Defendants to be revealed during discovery, and Plaintiffs presently intend to seek leave to amend their complaint to add them in place of the Doe Defendants at the appropriate time.

### C.    **Agents and Unnamed Co-Conspirators**

102.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while they were actively engaged in the management and operation of Defendants' businesses or affairs.

103.    Various persons and/or firms not named as Defendants in this Complaint may have participated as co-conspirators in the conspiracy alleged herein and may have performed acts and made statements in furtherance of that conspiracy.

104.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## IV.    **FACTUAL ALLEGATIONS**

### A.    **Background on CCAs**

### 1.    *CCAs Are an Essential Input in Cement, Concrete, and Mortar*

105.    CCAs are added to cement, concrete, and mortar (collectively, "cementitious

---

[92]    *See* CMA, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry.

products") to improve the safety and functionality of those products.

106.    Cement is a binding agent made from limestone and clay and is used extensively in building in the United States and its territories. Cement production in the United States and its territories amounted to 95 million metric tons in 2022, its highest level in more than a decade.[93]

107.    Concrete is an important resource for all kinds of construction projects in the United States and its territories. Just over half of the low-rise structures (*i.e.,* those standing less than three-stories in height) in the United States and its territories are built out of concrete.[94]

108.    Mortar is a combination of cement and sand that is primarily used to hold ready-made building units (like bricks or blocks) in place.

109.    **Figure 2** illustrates the components and uses of cement, concrete, and mortar.[95]

---

[93]    Statista, Apparent Cement Consumption in the U.S. from 2010 to 2022 (Oct. 30, 2023), https://www.statista.com/statistics/273367/consumption-of-cement-in-the-us/.

[94]    PCA, Buildings & Structures, https://www.cement.org/cementconcrete/paving/buildings-structures.

[95]    The Spruce, Differences Between Cement, Concrete, and Mortar, https://www.thespruce.com/thmb/r3NjpAf8yDRYLArSXx2BX2iwcOM=/1500x0/filters:no_upscale():max_bytes(150000):strip_icc()/difference-between-cement-concrete-and-mortar-2130884-final-ac-5c1aa0e546e0fb0001909553-fd07f31197cd491e85bf0eb8200f6f5e.png.

| Figure 2: Cement vs. Concrete vs. Mortar |
|:---:|



110.    CCAs are integral to the construction of infrastructure such as residential, commercial, and industrial buildings, roads, bridges, tunnels, and airports around the World, including in the United States and its territories.[96] Indeed, the CMA recently concluded that CCAs are "an essential input in the production" of cement, concrete, and mortar.[97]

111.    The essential nature of CCAs in the construction industry is illustrated in **Figure 3**, below, from the Saint-Gobain Group.[98]

---

[96]    International Association of Certified Home Inspectors, Concrete Admixtures, https://www.nachi.org/concrete-admixtures.htm.

[97]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 4 (Sept. 23, 2022).

[98]    Joana Alberto, LinkedIn Post, https://www.linkedin.com/posts/joanaalberto_construction chemestry-solutions-decarbonazation-activity-6940612387087503360-sqzk/?utm_source=share &utm_medium=member_desktop.

| Figure 3: How CCAs Are Used |
| :---: |



112.    Due to the essential nature of CCAs, the vast majority of construction projects that use concrete, cement, or mortar also use CCAs.

### 2.    There Are Seven Primary Types of CCAs

113.    As noted above, CCAs include (a) concrete admixtures, (b) cement additives, and (c) admixtures for mortar. The CMA has described the uses for each as follows:

> Chemical admixtures for cement are added to cement in order to reduce the amount of energy required to grind the cement ([*i.e.,*] grinding aids) as well as to improve the performance of the cement ([*i.e.,*] performance enhancers or quality improvers);

> Chemical admixtures for concrete are added to improve the properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and

> Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete,

for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.[99]

114.    Manufacturers of CCAs use the same equipment and chemicals to produce these different types of CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[100] On the other hand, purchasers of CCAs do ***not*** view CCAs as interchangeable, nor do purchasers consider any other products to be substitutes for CCAs.

115.    The American Society for Testing and Materials ("ASTM") categorizes CCAs into seven primary types based on the qualities they add to the aggregate material: (a) Type A—water reducing (or plasticizer) CCAs; (b) Type B—retarding CCAs; (c) Type C—accelerating CCAs; (d) Type D—water reducing and retarding CCAs; (e) Type E—water reducing and accelerating CCAs; (f) Type F—water reducing, high range ("HRWR," or superplasticizer) CCAs; and (g) Type G—water reducing, high range, and retarding CCAs.[101] The ASTM also recognizes several other types of CCAs, including those that have air entraining properties (which enhance the compressive or flexural strength of concrete) and those that have cold weather setting properties.

116.    The various types of CCAs are shown in **Figure 4**, below.[102]

---

[99]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, n. 57 (Sept. 23, 2022).

[100]    *Id.*

[101]    ASTM, Standard Specification for Chemical Admixtures for Concrete, https://www.astm.org/c0494_c0494m-17.html (last updated Mar. 10, 2020).

[102]    *Id.*; ASTM, Standard Specification for Air-Entraining Admixtures for Concrete, https://www.astm.org/c0260_c0260m-10ar16.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Admixtures to Inhibit Chloride-Induced Corrosion of Reinforcing Steel in Concrete, https://www.astm.org/c1582_c1582m-11r17e01.html (last updated July 28, 2017); ASTM, Standard Specification for Cold-Weather Admixture Systems, https://www.astm.org/c1622_c1622m-10r16e01.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Pigments for Integrally Colored Concrete, https://www.astm.org/c0979_c0979m-16.html (last updated Dec. 27, 2016); Concrete Network, Admixtures by Classification, https://www.concretenetwork.com/photo-gallery/site_26/chris-sullivan_14351/.

| ASTM Code | Use | Active Ingredient(s)[103] |
|---|---|---|
| C494 Type A | Water reducing ("plasticizers") (reduce the volume of water needed for cementitious products to achieve a certain desired consistency) | Lignosulfonates; hydroxylated carboxylic acids; melamine sulfonate; phosphonate salts; naphthalene sulfonate |
| C494 Type B | Retarding (slow down the setting of cementitious products and allow them to remain workable longer) | Amino trimethylene phosphonic acid |
| C494 Type C | Accelerating (speed up the setting of cementitious products and promote early strength development) | Calcium chloride; triethanolamine; aluminum hydroxide; aluminum sulfate; calcium nitrite; oxalic acid; sodium thiocyanate; sodium thiosulfate; calcium formate; silica fume; silica gel |
| C494 Type D | Water reducing and retarding | *See* Type A and Type B |
| C494 Type E | Water reducing and accelerating | *See* Type A and Type C |
| C494 Type F | Water reducing, high range ("HRWR" or "superplasticizers") | Polyether alcohols |
| C494 Type G | HRWR and retarding | *See* Type B and Type F |
| C260 | Air entraining (improve durability and compressive and flexural strength of cementitious products) | Salts of wood resins; some synthetic detergents; salts of sulfonated lignin; salts of petroleum acids; salts of proteinaceous material; fatty and resinous acids and their salts; alkydbenzene sulfonates; fatty alcohols and other surfactants |
| C618 | Improve workability and plasticity of cementitious products, thereby reducing the cost of construction | Natural pozzolans; fly ash |

**Figure 4: Types of CCAs by ASTM Code**

---

[103]    Bisley International, Raw Materials for Concrete Admixture, https://bisleyinternational.com/raw-materials-for-concrete-admixture.

| C494 Type S | Water repelling (decrease the permeability of the finished surface) | Stearate of calcium, aluminum, ammonium, or butyl; Petroleum greases or oils; Soluble chlorides |
|---|---|---|
| C1582 | Corrosion inhibiting | Calcium nitrite<br><br>Lithium nitrate |
| 1622 | Cold weather setting | Sodium nitrite |

117.    As **Figure 4** shows, CCAs are made by blending various polymers and other chemicals. Manufacturing these raw materials is difficult, as they require specialized facilities and significant research and development. Whereas Defendants research, develop, and manufacture at least some of these polymers and chemicals in-house (in addition to purchasing them from third parties),[104] smaller manufacturers of CCAs are forced to source them exclusively from third parties.

118.    In recent years, there has been a reported shortage of the polymers and chemicals necessary to manufacture CCAs, thus giving Defendants a competitive advantage over smaller CCA manufacturers.[105] However, as set forth in greater detail herein, the alleged shortage and corresponding increase in the cost of these polymers does not and cannot fully explain the huge CCA price increases and surcharges that Defendants implemented during the Class Period.

### 3.    *Most CCAs Are Sold in Ready-to-Use Form*

119.    Most CCAs are sold in ready-to-use form and can be added to cementitious products either at the plant where the cementitious products are produced (as in the case of ready-

---

[104]    CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶ 88 (Sept. 22, 2022).

[105]    *Id.*

made concrete mix) or at the jobsite where the cementitious products are to be used.[106]

120.    CCAs are sold in either liquid or powder form.

121.    **Figure 5** shows an example of how CCAs are packaged and sold in liquid form.[107]

| Figure 5: Picture of SikaMix AE-6 Packaging |
| --- |



122.    **Figure 6** shows an example of how CCAs are packed and sold in powder form.[108]

---

[106]    Sika, Corporate Governance (2022), https://www.sika.com/dam/dms/corporate/media/glo-ar-2022-corporate-governance.pdf.

[107]    Sika USA, SikaMix AE-6, https://usa.sika.com/en/constructionproducts/concrete/concrete-admixtures/dry-cast-admixtures/efflorescence-control/sikamix-ae-6.html; *see also* Master Builders Solutions, Concrete Admixtures, https://www.master-builders-solutions.com/en-us/products/concrete-admixtures; Chryso, CHRYSOQuad, https://www.chrysoinc.com/solutions/chrysoquad/; Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

[108]    Sika USA, Sika ViscoCrete-125P, https://usa.sika.com/en/construction-products/concrete/concrete-admixtures/water-reduction/high-range-waterreducingpowder/sika-viscocrete-125p.html.

**Figure 6: Picture of Sika ViscoCrete-125P Packaging**



#### 4. *CCA Purchasers Operate in the Construction and Industrial Sectors*

123.    In general, CCA purchasers operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete,[109] and pre-cast concrete.[110]

124.    CCA purchasers typically buy the majority of their CCAs from a single supplier.[111]

125.    In general, Defendants sell CCAs directly to suppliers of ready-mix concrete, shotcrete, and pre-cast concrete, though they also sell some CCAs through distributors.

---

[109]    Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for building concrete walls, such as in tunnels.

[110]    Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

[111]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 49 (Sept. 23, 2022).

39

**B.**    **Defendants Dominate the $3 Billion U.S. Market for CCAs**

126.    The United States and its territories are one of the largest markets for CCAs in the World, with total revenue averaging about $3 billion per year.[112] At least $100 million worth of CCAs are imported into the United States and its territories each year.[113]

127.    Defendants are the dominant manufacturers and sellers of CCAs in the World, as well as in the United States and its territories. On information and belief, Plaintiffs estimate that Defendants' market share in the United States is between eighty and ninety percent (80-90%).[114]

128.    Defendants manufacture and sell numerous types of CCAs around the World. CCA purchasers in the United States and its territories either import CCAs directly from the foreign Defendants (and/or their wholly owned and/or controlled subsidiaries, affiliates, and/or agents) or buy them from the domestic Defendants in the United States and its territories.[115]

129.    The foreign Defendants and/or their wholly owned and/or controlled subsidiaries, affiliates, and/or agents have imported finished CCAs and/or the precursor polymers and other chemicals necessary for the manufacture of finished CCAs into the United States and its territories during the Class Period. These imports—whether of the finished CCAs or of the precursor polymers and other chemicals— qualify as "import trade or import commerce" within the meaning of the Foreign Trade Antitrust Improvement Act ("FTAIA").

130.    The figures below list some of the CCAs that Defendants currently sell and/or have

---

[112]    Mordor Intelligence, North America Concrete Admixtures Market Size & Share Analysis – Growth Trends & Forecasts 2023 – 2028, https://www.mordorintelligence.com/industry-reports/north-america-concrete-admixtures-market.

[113]    U.S. International Trade Commission, U.S. Imports for Consumption HTS6 3824.40, https://hts.usitc.gov/search?query=6%20382440.

[114]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

[115]    *Id.* ¶ 124(b).

sold in the United States and its territories during the Class Period.

131.    **Figure 7** lists some of the CCAs sold by the Sika Group.

### Figure 7: CCAs Sold by the Sika Group

| Chromix | SikaMultiAir | SikaViscoFlow | SikaMix |
|---|---|---|---|
| SikaAEA | SikaPlastiment | Sika Watertight Concrete Powder | SikaPlast |
| SikaAir | SikaPlastocrete | SikaWT | SikaQuick Winter Boost |
| SikaAntisol | SikaRapid | SikaColor | SikaSet |
| SikaCem | SikaRugasol | SikaControl | SikaTard |
| SikaCem Summer Extender | SikaSigunit | Sikacrete | SolarChrome |
| SikaCNI | SikaStabilizer | Sikament | ViscoCrete |
| SikaGrind | Sika FerroGard | Sika Lightcrete Powder | Sika Lightcrete Liquid |

132.    **Figure 8** lists some of the CCAs sold by the Saint-Gobain Group.

### Figure 8: CCAs Sold by the Saint-Gobain Group

| Chryso | | | |
|---|---|---|---|
| CHRYSO Air | CHRYSO Aqua | CHRYSO CI | CHRYSO Control |
| CHRYSO DSF | CHRYSO Dust Suppressant | CHRYSO EnviroMix | CHRYSO Fluid ProPel |
| CHRYSO Fluid Optima | CHRYSO Fluid Premia | CHRYSO NutralSet | CHRYSO Optima |
| CHRYSO Optifinish | CHRYSO PoreTite | CHRYSO Plast | CHRYSO Premia |
| CHRYSO Quad | CHRYSO Quad EMx | CHRYSO Serenis | CHRYSO Tard |
| CHRYSO TurboCast | -- | -- | -- |

41

| GCP | | | |
|---|---|---|---|
| Adva | Daratard | Force | RDA |
| Airalon | Daravair | Hydrophobe | Recover |
| Clarena | Darex | Mira | Synchro |
| Daraccel | DCI | Optec | Tavero |
| Daracem | Dry-Block Admixture | Polarset | Terapave |
| DaraFill | Dry-Block Mortar Admixture | Postrite | Tyronix |
| Darapel | Eclipse | Quantec | Tytron |
| Daraset | FXP | Rasir | V-Mar |
| WRDA | Zyla | -- | -- |

133.  **Figure 9** lists some of the CCAs sold by the Cinven Group.

| *Figure 9: CCAs Sold by the Cinven Group* | | | |
|---|---|---|---|
| MasterAir | MasterGlenium | MasterPolyheed | MasterSet |
| MasterCast | MasterLife | MasterPozzolith | MasterSure |
| MasterCell | MasterMatrix | MasterRheobuild | Master X-Seed |
| MasterColor | MasterPel | --- | --- |

134.  **Figure 10** lists some of the CCAs sold by the BASF Group.[116]

---

[116]    The BASF Group wholly owned and controlled the global MBS brand and assets, including MBSD and MBSA, until it sold them to Lone Star on September 30, 2020.

| Figure 10: CCAs Sold by the BASF Group | | | |
|---|---|---|---|
| CureStar SRA 8710 F | Melflux 5581 F | Starvis 3003 F | Starvis SE 35 F |
| CureStar ICA 5920 F | Melflux 6681 F | Starvis 3040 F | Starvis SE 45 F |
| HyCon A | Melflux AP 101 F | Starvis 3050 F | Starvis RS 421/01 F |
| HyCon R | Melflux BF 11 | Starvis 3070 F | Starvis T 50 F |
| HyCon S | Melflux SELECT | Starvis S 3911 F | Vinapor AE |
| Melflux 2641 F | Melment F | Starvis S 5514 F | Vinapor DF |
| Melflux 2651 F | Melvis C | Starvis SE 25 F | Vinapor WA |
| Melflux 4930 | Starvis 308 F | Starvis SE 30 F | -- |

135.    **Figure 11** lists some of the CCAs sold by the RPM Group.

| Figure 11: CCAs Sold by the RPM Group | | | |
|---|---|---|---|
| Accelguard | Eucon Barracade | Eucon MRX | Eucon Retarder |
| Conex | Eucon BCN | Eucon NR | Eucon WRX |
| Eucon 37 | Eucon CIA | Eucon NW | Eucon X |
| Eucon 1037 | Eucon DS | Eucon SE | Eucon SRA |
| Eucon 537 | Eucon Easy Fill | Eucon SP | Eucon Stasis |
| Eucon A+ | Eucon Integral ARC | Eucon Sureshot | Eucon WR |
| Eucon ABS | Eucon LR | Eucon Vandex | Plastol |
| Eucon Air | Eucon LW | Eucon WO | Visctrol |
| Eucon AWA | Eucon MR | -- | -- |

136.    **Figure 12** lists some of the CCAs sold by the Mapei Group.

| **Figure 12: CCAs Sold by the Mapei Group** | | | |
|---|---|---|---|
| Dynamon Cube 815 | Dynamon NRG 1060 | Mapecure SRA 25 | Mapetard SD 180 |
| Dynamon Cube 846 | Dynamon SX 50 | Mapefast C | Re-Con Zero Evo |
| Dynamon Easy 36N | Dynamon SX 148 | Mapefluid R14 | Vibromix A1 |
| Dynamon EW Plus | Dynamon Xtend W150 | Mapefluid R17 | Vibromix L2 |
| Dynamon HAA | Idrocrete DM | Mapefluid R19 | Vibromix M1 |
| Dynamon MS 100 | Idrocrete KR 1000 | Mapequick AF 70 | Vibromix M5 |
| Dynamon NRG 1010 | Idrocrete KR 1000 | Mapequick AF 701 S | Vibromix M7 |
| Dynamon NRG 1022 | Mapeair AE 20 | Mapetard | Viscostar 3K |

C.     **Numerous Global Antitrust Authorities Are Investigating Defendants' Anticompetitive Conduct in the CCA Industry, and the DOJ Has Impaneled a Criminal Grand Jury in Philadelphia to Investigate the Same**

137.    On October 17, 2023, the EC announced that it had carried out dawn raids at offices

of several firms in the construction chemicals industry in connection with suspected cartel conduct:

> The European Commission is carrying out unannounced antitrust inspections at the premises of companies active in the construction chemicals sector in several Member States.
>
> The [EC] has concerns that the inspected companies *may have violated EU antitrust rules that prohibit cartels and restrictive business practices* (Article 101 of the Treaty on the Functioning of the European Union).
>
> The construction chemicals concerned by the inspection are chemical additives for cement and chemical admixtures for concrete and mortar.[117]

138.    The EC explained that the dawn raids were "conducted in coordination with" the

CMA and the TCA, and further noted that it had also been "in contact with" the DOJ.[118]

---

[117]    Press Release, European Comm'n, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061 (emphasis added).

[118]    *Id.*; *see also* GCR, Sika, Saint-Gobain and Cinven-Owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe; ICIS, EU, UK,

139.    That same day, the CMA confirmed that it was also investigating suspected anticompetitive conduct involving "a number of suppliers of [CCAs] and some industry bodies":

> The CMA has launched an investigation into **suspected anti-competitive conduct in relation to the supply of chemicals for use in the construction industry**.
>
> The [CMA] has reason to suspect **anti-competitive behaviour has taken place involving a number of suppliers of these chemicals and some industry bodies**. This conduct relates to the supply of chemical admixtures and additives which are an essential input for products like concrete, mortars and cement used in the construction industry.[119]

140.    The CMA explained that it was "working closely" with the EC, and further noted that it was also "in contact with" other authorities, including the DOJ.[120]

141.    Plaintiffs have since learned that, on October 12, 2023, the CMA applied to the UK's Competition Appeal Tribunal ("CAT") for three warrants to search the business premises of Sika Group and Cinven Group entities in the UK, and one warrant to search the domestic premises of an associated individual ("Mr. X"), whose identity is protected by court order.[121] The CMA sought to enter the premises for the purposes of an investigation under section 25 of the CA 1998,[122] which requires it to have "reasonable grounds for suspecting that there is an agreement . . . which may affect trade within the [UK], and has as its object or effect the prevention, restriction

---

Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation.

[119]    CMA, CMA Launches Investigation into the Supply of Chemicals for Use in Construction Industry (Oct. 17, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry (emphasis added).

[120]    *Id.*

[121]    Competition and Markets Authority v Competition Appeal Tribunal [2024] EWHC 904 (Admin) AC-2023-LON-003735, [1] (appeal taken from Eng., Wales, Scot.) (Eng., Wales).

[122]    Competition and Markets Authority v Another [2023] CAT 62 1611/13/12/2023 (W), 1612/13/12/2023 (W), 1613/13/12/2023 (W), 1614/13/12/2023 (W), [1] (Eng., Wales, Scot.).

or distortion of competition within the [UK]" before launching such an investigation.[123] After hearing the CMA's applications *ex parte* at a private hearing on October 12, 2023, the CAT granted its applications to enter and search the defendants' business premises but denied its application to enter and search Mr. X's domestic premises.[124] The CAT handed down its Judgment to the CMA on October 17, 2023, and a redacted version was published on December 7, 2023.[125] In that Judgment, the CAT stated that the CMA had "clearly met" the threshold requirement that it have reasonable grounds to suspect an infringement of UK competition law, citing an affidavit from Ms. Deborah Wilkie, the Director of Cartel Enforcement at the CMA.[126] The CMA executed the warrants against the Sika Group and the Cinven Group on October 17, 2023.[127]

142.    Over the next two days, the Saint-Gobain Group, the Sika Group, and the Cinven Group each confirmed that they were subjects of the global antitrust investigation.[128]

143.    On October 17, 2023, the Saint-Gobain Group confirmed its cooperation with the investigations in an email: "We can confirm that Saint-Gobain is aware of competition law investigations and cooperating with these investigations."[129]

144.    On October 18, 2023, the Sika Group confirmed its involvement in the EC's

---

[123]    Competition Act 1998 c. 41 § 25 (UK).

[124]    CMA v. CAT [2024] EWHC 904 (Admin) at [1].

[125]    *See* CMA v Another [2023] CAT 62.

[126]    *Id.* at [13].

[127]    Competition and Markets Authority v Another [2023] CAT 68 1611/13/12/2023 (W), 1612/13/12/2023 (W), 1613/13/12/2023 (W), 1614/13/12/2023 (W), [8(2)] (Eng., Wales, Scot.).

[128]    GCR, Sika, Saint-Gobain and Cinven-Owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[129]    MLex, Saint-Gobain, Sika Are Cooperating with Antitrust Probes into Construction Chemicals (Oct. 17, 2023), https://mlexmarketinsight.com/news/insight/saint-gobain-sika-are-cooperating-with-antitrust-probes-into-construction-chemicals-updates.

investigation in a statement to Construction News, characterizing the investigation as involving "suspected antitrust irregularities in the area of additives for concrete and cement," and stating that it would "support this investigation with all our efforts and cooperate fully with the authorities."[130]

145.    The Cinven Group also confirmed its involvement that same day.[131]

146.    A few months later, the Mapei Group published its Consolidated Financial Statements for the year ending on December 31, 2023, where it also confirmed that it was "one of the European and global companies covered by the investigation" and that it was "fully cooperating with the authorities" in the EU, the UK, Turkey, and North America.[132]

147.    The EC does not carry out dawn raids without justification. The EC must "already possess[] certain information" concerning "a given factual and legal situation" such that it has "reasonable grounds for suspecting an infringement of the competition rules." [133] Only then can the EC carry out a surprise inspection in order to "gather the necessary documentary evidence to check the actual existence and scope of [that] given factual and legal situation."[134]

148.    The standard for the CMA to obtain a warrant to enter and search an entity's business premises without notice is even stricter. The CMA sought the three warrants against the Sika Group and the Cinven Group under section 28(1)(b) of CA 1998, which requires "reasonable

---

[130]    Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[131]    GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[132]    Mapei Italy, 2023 Consolidated Financial Statements, at 57 (Jul. 2024), https://cdnmedia.mapei.com/docs/librariesprovider2/default-document-library/mapei-bilancio-d'esercizio-2023-eng_web.pdf?sfvrsn=5dacfe88_5.

[133]    Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43.

[134]    *Id.*

grounds" for suspecting that (i) there are documents on the business premises which the CMA has the power to require to be produced; and (ii) "if the documents were required to be produced, they would not be produced but would be concealed, removed, tampered with, or destroyed."[135] The CAT made clear that it does not take these requirements likely, emphasizing that section 28 "constitutes [a] considerable intrusion[] into private life and the exercise of these powers must, in all cases, be closely justified."[136] And the CAT exercised particular caution in this case, noting that it was "the first time" the CMA had ever applied for a "UK-wide warrant," stretching across premises in England, Scotland, and Wales.[137] Indeed, although the application could have been granted by the Chair of the Tribunal sitting alone, a full panel of the CAT heard it, which the CAT said "reflect[ed] the UK-wide nature of the application" and "its importance."[138]  Based on the evidence presented by the CMA, the CAT found both requirements of section 28(1)(b) met with respect to the business premises of the Sika Group and the Cinven Group.[139]

149.    The TCA in Turkey must meet a similar standard. The Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, recently held that the TCA can only conduct a dawn raid if it first obtains a search warrant from a Turkish criminal court.[140]

150.    The TCA has since disclosed that the "on-site inspections carried out by the [TCA] on October 17 were conducted simultaneously and in coordination with" the EC and CMA, and that it has opened a formal investigation targeting the BASF Group's Turkish unit, the Sika Group,

---

[135]    CMA v Another [2023] CAT 62 at [8] (citing Competition Act 1998 c. 41 § 25 (UK)).

[136]    CMA v Another [2023] CAT 68 at [10(2)].

[137]    *Id.*

[138]    CMA v Another [2023] CAT 62 at [11].

[139]    *Id.* at [15(3)].

[140]    Lexology, A New Era for the On-Site Inspections by the TCA (Aug. 23, 2023), https://www.lexology.com/library/detail.aspx?g=31016b1d-6615-4bb5-ad85-9a8fd9db3ecf.

Chryso, Cinven's MBS, and the Mapei Group, along with two trade associations, for possible violations of Turkey's equivalent of Section 1 of the Sherman Act by "agreeing on price increases and pricing strategies, exchanging competitively sensitive information [and] bid rigging."[141]

151.    As for the United States, on information and belief, there is a criminal grand jury impaneled in the United States District Court for the Eastern District of Pennsylvania to investigate anticompetitive conduct in the CCA industry, and that grand jury also authorized the issuance of subpoenas to players in the CCA industry on or around October 17, 2023. The DOJ has confirmed the existence of the grand jury investigation into the CCA industry.[142] Specifically, the DOJ submitted a letter to the Court in this action that states, in relevant part, that "a grand jury investigation has been initiated related to the concrete and cement additives industry."[143] The DOJ's decision to submit a letter and warn of its potential intervention in this action indicates that its investigation involves one or more Defendants.[144]

152.    The simultaneous investigations by the EC, the CMA, the TCA, and the DOJ follow several years in which Defendants increased their profits while also imposing price increases and surcharges that are not adequately explained by rising costs or other market factors.

153.    The increases in Defendants' profits during the Class Period are inconsistent with Defendants' pretextual explanations that their price increases were intended to offset rising costs and are more consistent with the existence of an unlawful conspiracy to fix prices.

---

[141]    TCA Press Release, Investigation Initiated About Undertakings Operating in the Market for Construction Chemicals in Turkey (Dec. 19, 2023), https://www.rekabet.gov.tr/en/Guncel/investigation-initiated-about-undertakin-13ea2baf0b9fee118eca00505685da39.

[142]    ECF No. 67.

[143]    *See id.*

[144]    *See id.*

**D.** **Defendants Effectuated the Conspiracy Through Shared Trade Associations**

154.    Defendants in global cartels frequently use trade associations as a means of providing "cover" for their cartel activities. In announcing its coordinated dawn raids of corporate offices in October of 2023, the CMA stated that the anticompetitive conduct at issue involved not only individual companies, but also "some industry bodies."[145] Various industry sources later confirmed that "[c]ompetition authorities in both the UK and Turkey were investigating trade associations,"[146] and that the TCA had carried out dawn raids at the premises of "two industry associations," as part of a probe into the suspected cartel in the CCA industry.[147] This is hardly surprising given that Defendants share membership in numerous CCA trade associations that gave them ample opportunities to meet and conspire in furtherance of their unlawful agreement.

155.    **NRMCA.** In the United States, Defendants BASF USA, Chryso USA, GCP, MBSA, Sika USA, and Euclid are all "super sponsors" of the NRMCA, a trade association founded in 1930, long before most of the construction chemicals at issue came into existence. Chryso USA, GCP, MBSA, Sika USA, and Mapei USA are all current associate members of the NRMCA.

156.    One testimonial on the NRMCA's website claims, "When you make products that

---

[145]    CMA, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry.

[146]    Wilson Sonsini European Antitrust Bimonthly Bulletin, EC, United Kingdom, Turkey Launch Investigation into Potential Construction Chemicals Cartel (Oct. 2023), https://www.wsgr.com/email/European-Antitrust-Bimonthly-Bulletin/European-Antitrust-Bimonthly-Bulletin-SepOct23_wsweb.html; K&L Gates HUB, Antitrust Investigations into Supply of Construction Chemicals (Dec. 18, 2023), https://www.klgates.com/Antitrust-Investigations-Into-Supply-of-Construction-Chemicals-12-18-2023#:~:text=On%2017%20October%202023%2C%20the,mortars%2C%20and%20related%20construction%20products.

[147]    Morrison Foerster, Quarterly Cartel Catch-Up: What to Watch in 2024 (Jan. 10, 2024), https://www.mofo.com/resources/insights/240110-quarterly-cartel-catch-up-what-to-watch-in-2024.

are used in concrete and concrete production, the obvious organization to join is NRMCA."[205]

157.    Among other activities, the NRMCA hosts the NRMCA Annual Convention and is the principal sponsor of CONEXPO-CON/AGG, the "largest exposition ever held in the Western Hemisphere for the construction, [CCA,] and ready mixed concrete industries."[207]

158.    Many of NRMCA's other members are buyers who buy CCAs directly from Defendants and thus were harmed by Defendants' anticompetitive conduct. However, the NRMCA—even if not a co-conspirator—provided Defendants with a further opportunity to meet and collude among themselves under the guise of participation in a legitimate trade association.

159.    Defendants are also members of one or more of the following national CCA trade associations: (a) FIPAH in Belgium;[148] (b) FINCAA in Finland;[149] (c) SYNAD in France;[150] (d) Deutsche Bauchemie e.V. in Germany;[151] (e) ASSIAD in Italy;[152] (f) VHB in the Netherlands;[153] (g) NCCA in Norway;[154] (h) SPChB in Poland;[155] (i) ANFAH in Spain;[156] (j) SACA in Sweden;[157] (k) FSHBZ in Switzerland;[158] (l) KÜB in Turkey, which is in turn a member of the Construction Materials Manufacturers' Federation, also known as the Building Materials Manufacturers'

---

[148]    FIPAH, Members, https://www.fipah.be/fr/membres/.

[149]    EFCA, Finland – FINCAA, https://www.efca.info/efca-members/finland-fincaa/.

[150]    Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[151]    Deutsche Bauchemie, Our Members, https://qdb.de/mitgliedsunternehmen.

[152]    ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[153]    VHB, Members, https://www.vhb-hulpstoffen.nl/leden/.

[154]    NCAA, Welcome, https://ncca.no/.

[155]    SPChB, About Us, https://spchb.pl/o-nas/#czlonkowie.

[156]    ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[157]    SACA, Member Companies, https://www.saca.se/medlemmar.html.

[158]    FSHBZ, Member Companies, https://www.fshbz.ch/html/mitglieder.html.

Federation ("YÜF");[159] and (m) CAA in the UK.[160] Executives of Defendants have held (or currently hold) leadership positions in most of these CCA trade associations, as set forth below.

160.    **ECFA.** Each of these national CCA trade associations is, in turn, a member of the European Federation of Concrete Admixtures Associations ("EFCA"), which is headquartered in Brussels. EFCA is a global umbrella trade association that describes itself as "a partnership of 13 National Admixture Associations, formed in 1984 in order to represent the interests of the industry."[161] According to EFCA's website, "EFCA's total membership provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers.[162]

161.    Each national CCA trade association that belongs to EFCA is allowed to delegate one or more individuals to represent that association in the EFCA General Assembly. The General Assembly is responsible for establishing policy, directing committee work, managing finances, and promoting membership. It also elects the members of the EFCA Executive Board.

162.    The EFCA Executive Board effectively manages EFCA's operations by monitoring committee work, including committees' progress toward agreed-upon goals; advising members when to take action on new and developing issues; and controlling the association's finances.

163.    The current EFCA management include the following individuals on the Executive Board: (a) President Gianluca Bianchin, Business Development Manager at Mapei Italy since 2015; (b) Vice President Thomas Hirschi, Market Manager at Sika AG since January of 2017; (c) Vice President Osman Ilgen, Managing Director at Chryso in Turkey from March 2015 to 2022 and Vice President at the Saint-Gobain Group since 2022; (d) Sustainability Committee Chair

---

[159]    KÜB, About Us, https://kub.org.tr/hakkimizda/.

[160]    Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[161]    EFCA, About Us, https://www.efca.info/about-us/.

[162]    *Id.*

Nihal Kinnersley, Product Stewardship Manager for the EMEA at GCP from February of 2016 to July of 2023, and Product Stewardship Director at the Saint-Gobain Group from July 2023 to the present; (f) Technical Committee Chair Francesco Surico, R&D group leader at Mapei Italy since 2008; (g) Kai Salo, the Sika Group's technical department head from 2013 to the present; (h) Claude Le Fur, Business Development Manager at Sika from September of 2017 to July of 2021; and (i) Suat Seven, Manager of Construction Chemicals at the BASF Group from October of 2017 to March of 2020 and Managing Director at MBS from November of 2020 to August of 2023.

164.    The current EFCA management include the following individuals on the Technical Committee: (a) Ian Ellis, Technical Services Manager at MBS in the UK from January of 2008 to July of 2022 and Head of Technical Admixtures for the Mapei Group in the UK since July of 2022; (b) Marko Kaisanlahti, Admixture Sales Manager at MBS in Finland from October of 2012 to July of 2022 and October 2022 to the present; (c) Franz Wombacher, Head of R&D at the Sika Group from April of 2016 to the present; (d) Trond Solbo of the Sika Group; (e) Osman Tezel, Regional Sales Manager for Admixture Systems at the BASF Group from January of 2013 to August of 2018, Technical Service and Concrete Technology Manager for Admixture Systems at the BASF Group from August of 2018 to October of 2020, and Technical Service and Concrete Technology Manager for Admixture Systems at MBS since October of 2020; (f) Jean-Philippe Bigas, head of R&D at Chryso France since 2012; and (g) Robert Hurkmans of the Saint-Gobain Group.

165.    The current EFCA management include the following individuals on the Environmental Committee: (a) Marko Kaisanlahti and Maxime Julliot of MBS (now Cinven); (b) Mark Schneider, who worked at the Sika Group until October of 2022; (c) Bjorn Stockmann and Anders Larsson of the Sika Group; and (d) Osman Tezel of the Saint-Gobain Group.

166.    **EFCC.** In addition, the Sika Group, Saint-Gobain France, Chryso, GCP, MBS, the

BASF Group, and the Mapei Group are members of the European Federation for Construction Chemicals ("EFCC"). The EFCC, based in Brussels, represents construction chemical companies and associations in Europe. EFCC acts as the spokesperson for the construction chemical industry before EU institutions and other public authorities and communicates the industry's views on policy issues regarding product stewardship, standardization, innovation, and sustainability.

167.    EFCC board members include or included the following individuals: (a) Eric Dehasque, Head of M&A for the EMEA Region for the Sika Group; (b) Dr. Walter Nussbaumer, Head of the Mapei Group's global admixture business; (c) Olivier Bayard, Global Head of Marketing and Sustainability for MBS (now owned by Cinven); (d) Michael Schinabeck, Vice President of Research and Development for the BASF Group's construction additives business; and (e) Thierry Bernard, CEO of construction chemicals for the Saint Gobain Group.

168.    **FIPAH.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Belgian CCA trade association FIPAH, which was founded with the goal of "promoting the common interests" of companies in the CCA industry. [163]

169.    **FINCAA**. The Finnish Concrete Admixture Association was founded in 2018 and has just five members, an unidentified group of "producers of concrete admixtures."[164] On information and belief, two or more Defendants are members of FINCAA.

170.    **SYNDAD.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Belgian CCA trade association SYNAD, whose stated goal is "to establish a relationship between all market players."[165] SYNAD representatives on EFCA

---

[163]    FIPAH, Members, https://www.fipah.be/fr/membres/.

[164]    EFCA, Finland – FINCAA, https://www.efca.info/efca-members/finland-fincaa/.

[165]    Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

committees include Claude Le Fur, Jean-Philippe Bigas, and Maxime Julliot.[166] Claude Le Fur worked for the Sika Group from 2008 until July of 2021, including as a Manager of Business Development for Europe and the Middle East from 2017 until July of 2021.[167] Jean-Philippe Bigas has worked for Chryso France since 2006, serving as its Technical Director of Concrete Materials and Products until August of 2023 and now as its Technical Director of Regulatory and Sustainable Development.[168] Maxime Julliot currently works as a Sales Manager for the Cinven Group's MBS unit in France.[169] During the Class Period, Le Fur, Bigas, and Julliot met with executives and sales representatives from other Defendants in their roles on EFCA committees.

171.    **Deutsche Bauchemie.** The Sika Group, the Mapei Group, the BASF Group, and the Cinven Group are all members of the German CCA trade association Deutsche Bauchemie.[170]

172.    **ASSIAD.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Italian CCA trade association ASSIAD, whose mission is to "bring together" CCA companies or groups "to discuss issues of common interest."[171]

173.    The current President of ASSIAD is Leonardo Messaggi,[172] who has been a Target

---

[166]    EFCA, Committees, https://www.efca.info/efca-committees/.

[167]    Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr.

[168]    Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr.

[169]    Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[170]    Deutsche Bauchemie, Our Members, https://qdb.de/mitgliedsunternehmen.

[171]    ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[172]    ASSIAD Press Release, ASSIAD Announces the Election of the New President and Vice Presidents for the Four-Year Period 2023-2027 (July 21, 2023), https://www.assiad.it/News/assiad-annuncia-lelezione-del-nuovo-presidente-e-dei-vicepresidenti-per-il-quadriennio-2023-2027.

Market Manager for Concrete for the Sika Group since 2016,[173] and the Vice President is Paolo Novello, who was the Executive Managing Director of Chryso in Italy until March of 2021.[174]

174.    ASSIAD's website lists eleven (11) "Consiglio Generale" members, including Leonardo Messaggi of the Sika Group; Luciano Donato, who was a Sales Manager for the BASF Group and MBS from 2001 to June of 2022 and now serves as a Sales Director for the Saint-Gobain Group in Italy; Riccardo Chinosi, a Project Manager for the Mapei Group's additives business in Italy; and Roberto Spaggiari, who has worked for the BASF Group and MBS in Italy since 1996 and now serves as MBS's Managing Director in Italy.[175]

175.    On October 4, 2023, ASSIAD announced a new Technical Evolution Committee made up of thirteen (13) members.[176] Committee members now include Fabrizio Avallone, who has been at the Sika Group since January of 2021 and now serves as its Corporate Global Key Account Manager;[177] Alessandra Buoso and Francis Surico of the Mapei Group; Mario Casali and Pietro Massinari of Chryso in Italy, which is part of the Saint-Gobain Group; Cristiano Cereda of

---

[173]    Leonardo Messaggi, LinkedIn Profile, https://www.linkedin.com/in/leonardo-messaggi-5b949670/?locale=en_US.

[174]    ASSIAD Press Release, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad; Ingenio, Concrete and Construction Post-Covid: Companies Are Ready to Adopt the "Circular Economy" (July 29, 2020), https://www.ingenio-web.it/articoli/calcestruzzo-e-edilizia-post-covid-le-imprese-sono-pronte-ad-adottare-la-circular-economy/; Arketipo Magazine, ICARE Cement Technology by Chryso (Aug. 28, 2020), https://www.arketipomagazine.it/tecnologia-per-il-cemento-icare-by-chryso/; Paolo Novello, LinkedIn Profile, https://www.linkedin.com/in/paolo-novello-bab315b2/?originalSubdomain=it.

[175]    ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[176]    ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad.

[177]    Fabrizio Avallone, LinkedIn Profile, https://www.linkedin.com/in/fabrizio-avallone-a62234143/.

the Sika Group; and Ivana Torresan, who has been with the BASF Group and MBS since 1988 and currently serves as MBS's Segment Manager for Concrete Admixtures in Italy.[178]

176.    ASSIAD President Leonardo Messaggi later announced that the members of the Technical Evolution Committee would participate in roundtables at SAIE Bari, an industry event, in October of 2023.[179] The Sika Group, the Saint-Gobain Group, the Cinven Group's MBS, and the Mapei Group were all scheduled to participate as "exhibitors" at the event.[180]

177.    **VHB.** The Sika Group and the Cinven Group are both members of the Dutch CCA trade association, VHB.[181]

178.    **NCCA.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Norwegian CCA trade association, NCCA.[182] Dan Arve Juvik, who has worked for the Mapei Group since at least 1995,[183] is the Chairman of NCCA and also currently sits on the EFCA Board.[184] Other NCCA representatives on EFCA committees include Trond Solbø and Bjorn Stockmann, who both work for the Sika Group.[185] During the Class

---

[178]    Ivana Torresan, LinkedIn Profile, https://www.linkedin.com/in/ivana-torresan-a729a8126/?originalSubdomain=it.

[179]    Ingenio, ASSIAD Among the Protagonists at the General States on Concrete Technology at SAIE Bari 2023 (Oct. 5, 2023), https://www.ingenio-web.it/articoli/assiad-tra-i-protagonisti-agli-stati-generali-della-tecnologia-del-calcestruzzo-al-saie-bari-2023/.

[180]    SAIE, Exhibitor Preview, https://eventi.senaf.it/preview-espositori.php?CSRFName=CSRFGuard_330546167&CSRFToken=7908882XTY66GK7IT8RA8XB7KGFK67NWMU5BCCDDP5O0T8VC1XGIJSJ3T8EOOB7B&rag_soc=master+builders&rag_soc_inizia=&settore=&ide=1816&action=reimposta.

[181]    VHB, Members, https://www.vhb-hulpstoffen.nl/leden/.

[182]    NCAA, Welcome, https://ncca.no/.

[183]    Dan Arve Juvik, LinkedIn Profile, https://www.linkedin.com/in/dan-arve-juvik-71411334/?locale=en_US.

[184]    NCAA, Welcome, https://ncca.no/.

[185]    EFCA, EFCA Committees, https://www.efca.info/efca-committees/.

Period, Juvik, Solbø, and Stockmann met with executives and sales representatives from other Defendant companies in their roles on the EFCA Board and on EFCA committees.

179.    **SPChB.** The Sika Group, the Cinven Group, and Mapei Group are all members of the Polish CCA trade association, SPChB.[186]

180.    **ANFAH.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Spanish CCA trade association ANFAH.[187] According to ANFAH, its members represent around 90 percent of the CCA market in Spain.[188] The current Vice President of ANFAH is Andreas Fleischhauer,[189] who previously worked for the BASF Group and MBS in Spain and now serves as the Mapei Group's General Director in Spain, a position he took over in early 2023.[190] Carlos Bernus, the Director of the Mapei Group's Additives Division in Spain,[191] serves as the President of ANFAH's Promotion Committee.[192]

181.    **SACA.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the Swedish CCA trade association, SACA.[193] SACA representatives currently serving on EFCA committees include Anders Larsson, who works for the Sika Group in

---

[186]    SPChB, About Us, https://spchb.pl/o-nas/#czlonkowie.

[187]    ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[188]    EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

[189]    ANFAH, Organization, https://anfah.org/quienes-somos/.

[190]    Andreas Fleischhauer, LinkedIn Profile, https://www.linkedin.com/in/andreas-fleischhauer-b1655552/?originalSubdomain=es; Mapei Group Press Release, Andreas Fleischhauer, Nuevo Director General de Mapei Spain (Jan. 12, 2023), https://www.mapei.com/es/es/noticias-y-eventos/noticias-y-eventos/news/2023/01/12/andreas-fleischhauer-nuevo-director-general-de-mapei-spain.

[191]    Carlos Bernus, LinkedIn Profile, https://www.linkedin.com/in/carlos-bernus-33b6b028/?originalSubdomain=es.

[192]    ANFAH, Organization, https://anfah.org/quienes-somos/.

[193]    SACA, Member Companies, https://www.saca.se/medlemmar.html.

Sweden.[194] During the Class Period, Larsson met with executives and sales representatives from other Defendant companies in his role as an EFCA committee member.

182.    **FSHBZ.** There are only three members of the Swiss CCA trade association, FSHBZ: the Sika Group, the Cinven Group, and the Mapei Group.[195]

183.    **KÜB.** All five Defendant groups (the Sika Group, the Saint-Gobain Group, the Cinven Group, the RPM Group, and the Mapei Group) are current members of the Turkish CCA trade association, KÜB.[196] KÜB boasts that its members "dominate[]" 80 percent of the CCA market in Turkey, which itself makes up 40 percent of the overall market for CCAs in Europe.[197]

184.    On March 13, 2020, KÜB (via EFCA) announced the elections of Turgay Özkun of the Sika Group as the Chairman of the Board of KÜB, Osman Ilgen of the Saint-Gobain Group as the Vice President of the Board, and Suat Seven of the Sika Group as a member of the Board.[198] Özkun has worked for the Sika Group since 2004 and has served as the General Manager of the Sika Group in Turkey since March of 2018.[199] Ilgen has worked for the Saint-Gobain Group since 2000, including as the Managing Director of Chryso in Turkey, the Middle East, and Central Asia from 2015 to December of 2023, and as the Saint-Gobain Group's Vice President for Construction Chemicals in Turkey, the Middle East, Central Asia, and Egypt since January of 2023.[200] Ilgen

---

[194]    EFCA, Committees, https://www.efca.info/efca-committees; Anders Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se.

[195]    FSHBZ, Member Companies, https://www.fshbz.ch/html/mitglieder.html.

[196]    KÜB, About Us, https://kub.org.tr/hakkimizda/.

[197]    *Id.*

[198]    EFCA, New KÜB President, https://www.efca.info/2020/03/13/new-kub-president/.

[199]    Turgay Özkun, LinkedIn Profile, https://www.linkedin.com/in/turgay-%C3%B6zkun-b8280813/details/experience/.

[200]    Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr.

also represents the Saint-Gobain Group as the President of KÜB and the Vice President of EFCA.[201] Seven served as the Managing Director of Master Builders in Turkey (which has been owned by the Sika Group since May of 2023) from March of 2020 until August of 2023.[202] Sven also serves on the EFCA Board.[203] During the Class Period, Ilgen and Sven met with executives and sales representatives from other Defendant companies in their roles at EFCA.

185.    As of September 9, 2024, Ilgen is the Chairman of the Board of KÜB, and other members of the Board of Directors include Özkun of the Sika Group; M. Selman Tarmur, the General Manager of the Mapei Group's construction chemicals business; and İsmail ÇİL the General Manager of Egecrete,[204] a licensee of Euclid that sells CCAs in Turkey.[205] The current members of KÜB's Audit Board are Mehmet Gerçeker of the Sika Group; Rıza Altınsoy of Chryso in Turkey, which is part of the Saint-Gobain Group; and Uğur Semih AYTAÇ of FOSROC Construction Chemicals,[206] which was acquired by the Saint-Gobain Group in July of 2024.

186.    **CAA.** The Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group are all members of the UK's CCA trade association CAA.[207] Two MBS executives held leadership positions in the CAA during the Class Period: Chris Fletcher and Ian Ellis.[208] Fletcher,

---

[201]    *Id.*; EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[202]    EFCA, Committees, https://www.efca.info/efca-committees/; Kai Salo, LinkedIn Profile, https://www.linkedin.com/in/kai-salo-72384880/?originalSubdomain=fi; Claude Le Fur, LinkedIn, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr; Suat Seven, LinkedIn, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[203]    EFCA, Committees, https://www.efca.info/efca-committees/.

[204]    KÜB, About, https://kub.org.tr/hakkimizda/.

[205]    Egecrete, A Licensee of Euclid Chemical, https://www.egecrete.com.tr/en/.

[206]    KÜB, About, https://kub.org.tr/hakkimizda/.

[207]    CAA, Members, https://www.admixtures.org.uk/members/.

[208]    CAA, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/https://www.admixtures.org.uk/about-us/caa-structure/.

MBS's Managing Director for the UK since October of 2020,[209] serves as the Chairman of the CAA Council, which is responsible for establishing and implementing CAA policy and managing CAA's committees, task groups, and finances.[210] Ellis, a Technical Services Manager for the BASF Group and MBS in the UK from 2008 to July of 2022,[211] is the Chairman of the CAA Technical Committee,[212] in addition to being a member of the EFCA Technical Committee.[213]

### E.  Defendants Have Consistently Increased CCA Prices During the Class Period, Including through the Imposition of Surcharges, Often in Lockstep

187.  In an article published in August of 2020, a construction industry consultant noted that despite declining sales in the construction industry, the United States had seen an increase of 11% in the construction-cost-index (CCI), including a 4% increase in prices for products made of concrete.[214] The consultant explained that "[t]he fall in prices feared in many branches, like automotive or plant engineering, [was] not noticeable in the construction sector" and suggested that players in construction-related industries should continue to raise their prices.[215]

188.  Defendants have bragged to investors about instituting and maintaining large price increases on CCAs during the Class Period, citing them as a key driver of profit growth.

189.  For example, in a March of 2017 earnings call with industry analysts, Gregory

---

[209]    Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk.

[210]    CAA, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/https://www.admixtures.org.uk/about-us/caa-structure/.

[211]    Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk

[212]    CAA, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/.

[213]    EFCA, Committees, https://www.efca.info/efca-committees/.

[214]    ZKG Cement, Smart Pricing Strategies in the Pandemic, https://www.zkg.de/en/artikel/zkg_Smart_pricing_strategies_in_the_pandemic-3562339.html.

[215]    *Id.*

Poling, GCP's President, CEO, and Director stated that GCP "remain[ed] focused on expanding margins in the concrete admixture business . . . through pricing." And in an earnings call on August 8, 2018, Poling stated, "We are implementing a 3-point plan to improve the profitability of our SCC admixture business and to accelerate the penetration of high-margin technologies such as VERIFI. First, we're raising prices significantly in low-profit, high-volatility admixture markets."

190.    And in February of 2021, the Saint-Gobain Group published an investor report that cited "[u]pward trends in sales prices" as a key driver of its sales growth in 2020.[216] The same report published one year later similarly noted an "acceleration in prices in all segments" in 2021 and boasted that the Saint-Gobain Group had exhibited "strong pricing power and decisive execution" in raising its prices by as much as 10% in 2021 to match the industry trend.[217] A Saint-Gobain Group press release from October of 2021 included a chart showing an average price increase of 9.7% across all the company's segments over the past two years.[218] In the Americas, the Saint-Gobain Group increased prices by 18.6% from October of 2019 to October of 2021.[219]

191.    Similarly, during an earnings call in April of 2022, RPM's VP, Controller, and CAO Michael Laroche pointed to Euclid's concrete admixtures business as one of RPM's "fastest-growing businesses," citing "selling price increases" as a key growth factor.[220] One year later, in April of 2023, RPM published an earnings release that explained that the recent "record" sales in

---

[216]    Saint-Gobain Group, FY 2020 Results and Outlook (Feb. 26, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/fy-2020-ang-a_0.pdf.

[217]    Saint-Gobain France, FY 2021 Results and Outlook (Feb. 25, 2022), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf.

[218]    Saint-Gobain France, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[219]    *Id.*

[220]    RPM Q3 2022 Earnings Call Transcript (Apr. 6, 2022), https://www.rpminc.com/media/3483/rpm-usq_transcript_2022-04-06.pdf.

its construction segment were "driven by price increases and strength in concrete admixtures."[221]

192.    Defendants have also signaled CCA price increases publicly during the Class Period through letters and other statements announcing price increases to their U.S. customers, as part of Defendants' efforts to signal their ongoing adherence to their collusive scheme. On several occasions, multiple Defendants sent out letters announcing CCA price increases within weeks of each other. Indeed, on information and belief, it was a regular practice within the industry for the competitors to announce price increases at approximately the same time.

193.    The following are examples of Defendants' price increase announcements throughout the Class Period:

a)    On May 15, 2017, the BASF Group, which at the time owned MBS, announced a 4 to 7 percent price increase on its construction chemicals products across Europe, including CCAs, effective that same day.[222] This price increase was preceded by a roughly two to three percent increase in prices for its CCAs in the first quarter of 2017.

b)    On May 14, 2018, the BASF Group, which at the time owned MBS, announced that its Japanese subsidiary would increase prices for "all construction chemicals products in small packages," including CCAs, by at least ten percent, effective the next day.[223]

c)    In February of 2019, Sika AG CEO Paul Schuler publicly announced that the company would raise its prices in March for the second time in 2019: "We are going to increase prices further. We have increased prices in January and we will do it again in

---

[221]    RPM Press Release, RPM Reports Record Fiscal 2023 Third-Quarter Results (Apr. 6, 2023), https://www.rpminc.com/media/4672/q3-23-rpm-earnings-release-final.pdf.

[222]    BASF Group Press Release, BASF to Increase Prices for Construction Chemicals Across Europe (May 15, 2017).

[223]    BASF Group Press Release, BASF Increases Prices for Construction Chemicals Products in Japan (May 14, 2018).

March."[224]

d) On November 13, 2020, MBS publicly announced that it would raise its prices on CCAs, such as MasterGlenium, by up to ten percent (10%), effective immediately.[225]

e) One month later, on December 15, 2020, the Saint-Gobain Group publicly announced that it would increase its prices by 1.9% on all products, effective January 1, 2021.[226]

f) That same day, MBS General Manager Julian Pritchard (now employed by the Mapei Group) announced an up to 12 percent increase on prices for MBS CCAs worldwide.[227]

g) On March 10, 2021, MBSA imposed a 6 percent surcharge on its CCAs and other products, allegedly "to account for the rapidly rising raw material costs and supply shortages experienced across the construction industry." [228]

h) Four months later, MBSA told customers that it would increase the previously imposed surcharges on CCAs from 6 percent to 9 percent, effective July 23, 2021, again citing "dramatic upticks" in the costs of certain raw materials as well as packaging.[229]

---

[224]    Reuters, Sika Raises Prices to Counter Jump in Raw Material Costs (Feb. 22, 2019), https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[225]    Sika Press Release, Sika, Master Builders Solutions to Increase Prices for Construction Chemicals (Nov. 13, 2020), https://mbcc.sika.com/en-vn/about-us/news/price-increase-announcement.

[226]    Master Abrasives, Saint-Gobain Price Increase 2021 (Dec. 15, 2020), archived at https://web.archive.org/web/20210116003652/https://www.master-abrasives.co.uk/news/2020/12/overview.aspx.

[227]    Sika Group Press Release, Master Builders Solutions Construction Chemicals LLC to Increase Prices for Construction Chemicals (Dec. 12, 2020), https://mbcc.sika.com/en-ae/about-us/news/price-increase-announcement.

[228]    Letter from Konrad Wernthaler, Senior Vice President at MBSA, to Customers (July 20, 2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

[229]    *Id.*

i) On March 22, 2021, less than two weeks later after MBSA announced a six percent surcharge on its CCAs, Mapei USA imposed a five percent price increase on acrylics and liquids in its Concrete Restoration Systems product line,[230] which includes CCAs such as Planicrete AC, Planicrete UA, Planitop Accelerator, and Mapecure SRA.[231]

j) On April 1, 2021, MBS announced that it was increasing prices for all MBS products, including CCAs, in at least Europe by as much as 20 percent, effective immediately.[232]

k) On July 20, 2021, MBS announced that it would be increasing previously imposed surcharges on its products, including CCAs, from six percent to nine percent.

l) On October 11, 2021, Euclid publicly announced a price increase on its concrete and masonry construction products, including CCAs, effective October 15, 2021.[233] Even though, as discussed herein, changes in input costs do not explain Defendants' dramatic CCA price increases, Euclid blamed the price increase on "significant supply challenges" and "highly elevated" costs for raw materials and freight: "We maintain rigorous cost-control measures across our supply chain to counteract these increases but, despite these efforts, we must modify our pricing in order to ensure that we can

---

[230]    Letter from Kevin S. Smith, Director of National Sales for Concrete Restoration Systems at Mapei USA, to Customers (Mar. 22, 2021), https://secureservercdn.net/198.71.233.37/apq.65 e.myftpupload.com/wp-content/uploads/2021/03/2021-CRS-Price-Increase-Letter-032221.pdf.

[231]    Mapei USA, Concrete Restoration Systems Product Catalog, 22-23 (2024), https://cdnmedia.mapei.com/docs/librariesprovider10/line-technical-documentation-documents/crs-catalog-en.pdf?sfvrsn=cc8b9661_63.

[232]    Sika Group Press Release, MBCC Group Increases Prices for Master Builders Solutions Products in Europe (Apr. 1, 2021).

[233]    Euclid Press Release, Euclid Chemical Announces Price Increase Due to Continued Supply Chain Shortages of Construction Materials (Oct. 11, 2021), https://www.prnewswire.com/news-releases/euclid-chemical-announces-price-increase-due-to-continued-supply-chain-shortages-of-construction-materials-301397115.html.

deliver the products and solutions that our customers rely on."[234]

m) Eleven days later, on October 22, 2021, Sika AG publicly announced that it was raising prices to contend with a "sharp rise" in input costs that was squeezing profit margins.[235] One reporter pointed out the company's hypocrisy, noting that Sika AG had posted "increased nine-month sales and profit" shortly before making the announcement.[236]

n) Just one month later, on November 22, 2021, GCP publicly announced that it would raise its prices on CCAs by up to ten percent for North American customers, effective January 1, 2022.[237] Like Euclid and Sika AG, GCP blamed "unprecedented" global supply chain impacts that it said were "not expected to subside in the near-term."[238]

o) On January 14, 2022, MBS announced plans to increase previously imposed surcharges on its products, including CCAs, to up to forty percent (40%).[239]

p) Also in January of 2022, Sika USA told customers that it would increase previously imposed surcharges on its products, including CCAs, from 16 percent to 20 percent,

---

[234]    *Id.*

[235]    Reuters, Chemicals Group Sika Tackles Higher Costs by Raising Prices, https://www.reuters.com/article/sika-results/update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUKL4N2RI0XW/ (last updated Oct. 22, 2021).

[236]    *Id.*

[237]    NASDAQ, GCP Announces North America Concrete Admixtures Price Increase (Nov. 22, 2021).

[238]    Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[239]    Letter from Konrad Wernthaler, Senior Vice President at MBSA, to U.S. Customers (Jan. 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

effective February 1, 2022.[240] The company's letter cited the "significant negative impacts of raw material costs, supply [and] labor shortages, and trucking/shipping [issues]," which it said had "both constrained supply and continued to exert upward pressure on material costs for Sika and the entire industry."[241]

q)  On March 1, 2022, the Mapei Group implemented a 6 percent price increase on all its products, including CCAs, across at least the UK market.[242]

194.    As the above examples establish, Defendants' price increases were frequent and significant. In addition, these announcements were public and received substantial news coverage.

195.    Notably, these price increases applied to CCAs imported by the Defendants into the United States and its territories. As **Figure 13**, below, shows, the average price of CCAs imported into the United States and its territories climbed exponentially during the Class Period.

---

[240]    Letter from Michal Mastro, Vice President at Sika, to Customers (Jan. 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[241]    *Id.*

[242]    Keyline Civils Specialist, Price Change Notification (Jan. 4, 2022) (describing the Mapei Group's plan to implement a 6 percent price increase across "all products," effective March 1, 2022); CCF, Price Change Notifications (May 25, 2022) (same).

**Figure 13: Prices of CCAs Imported into the United States ($/kg)**



196.    In sum, Defendants' price increases and surcharges have resulted in dramatic increases in prices for CCAs sold in the United States and its territories during the Class Period.

**F.    Normal Market Forces Do Not Explain Defendants' Price Increases**

197.    Defendants have justified their price increases and surcharges during the Class Period by citing increasing input costs and supply chain constraints.

198.    For example, when MBS raised prices for its CCAs by as much as 10 percent in November of 2020, the company blamed "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." Likewise, in explaining its decision to raise its CCA prices by 10% in January of 2022, GCP stated that "[t]he global supply chain impacts on raw material and freight costs have been unprecedented over the

past six months and input costs are not expected to subside in the near-term."[243] RPM's VP, Controller, and CAO Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure" during an earnings call in July of 2022.[244]

199. As noted above, however, economic evidence—based on publicly available data—demonstrates that Plaintiffs paid higher prices for CCAs during the Class Period than can be explained by normal market forces.

200. Specifically, a dummy variable multiple regression—controlling for (1) raw materials cost, (2) freight cost, (3) chemical manufacturing labor cost, (4) cement and concrete production (to account for downstream demand for CCAs), (5) an indicator variable for the COVID-19 period, and (6) calendar quarter fixed effects (to account for seasonality in prices that compared the prices before the Class Period to the prices during the Class Period)—shows that beginning no later than January 1, 2017, the prices for CCAs in the United States were higher than can be explained by normal market forces, a finding that is consistent with collusion.

201. Specifically, this preliminary regression shows that between January 1, 2017, and December 31, 2023, prices for CCAs were, on average, roughly 15 percent higher than can be explained by normal market forces. This is shown in **Figure 14**, where the blue line represents actual prices paid by CCA purchasers in the United States and its territories, and the red line represents the prices that CCA purchasers would have paid but for Defendants' conspiracy.

---

[243]    Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[244]    RPM Q4 2022 Earnings Call Transcript (July 25, 2022), https://www.rpminc.com/media/3784/rpm-usq_transcript_2022-07-25.pdf.

## Figure 14: Actual vs. But-For Prices of CCAs in the United States



202.    These results are consistent across the various CCA types. **Figure 15** shows that the prices for water reducing CCAs during the Class Period were, on average, nearly 16% higher than can be explained by normal market forces; **Figure 16** shows that the prices for expanding agent CCAs were, on average, more than 16% higher than can be explained by normal market forces; **Figure 17** shows that the prices for accelerator CCAs were, on average, nearly 13% higher than can be explained by normal market forces; **Figure 18** shows that the prices for air entrainer CCAs were, on average, more than 13% higher than can be explained by normal market forces; **Figure 19** shows that the prices for corrosion inhibitor CCAs were, on average, more than 16% higher than can be explained by normal market forces; **Figure 20** shows that the prices for retarding agent CCAs were, on average, more than 12% higher than can be explained by normal market forces; and **Figure 21** shows that the prices for other types of CCAs were, on average, more than 15% higher than can be explained by normal market forces.

**Figure 15: Actual vs. But-For Prices of Water Reducing CCAs**



**Figure 16: Actual vs. But-For Prices of CCA Expanding Agents**



**Figure 17: Actual vs. But-For Prices of Accelerator CCAs**



**Figure 18: Actual vs. But-For Prices of Air Entrainer CCAs**



**Figure 19: Actual vs. But-For Prices of Corrosion Inhibitor CCAs**



**Figure 20: Actual vs. But-For Prices of CCA Retarding Agents**



73

## *Figure 21: Actual vs. But-For Prices of Other Types of CCAs*



203.    As **Figures 14-21** suggest, the timing and duration of increased costs of CCA raw materials do not align with Defendants' consistent price increases and surcharges on CCAs during the Class Period. Indeed, **Figure 22**, below, shows that prices for sodium lignosulfonate, a key precursor for water reducer CCAs, actually ***decreased*** from the beginning of 2021 to the end of 2023, the same period when Defendants' CCA price increases were most consistent.

| *Figure 22: U.S. Prices for Sodium Lignosulfonate* |
| :-: |



204.    As the above figures show, increases in input costs alone do not explain Defendants' astronomical CCA price increases and surcharges during the Class Period.

205.    In sum, the findings of the above-described regression analysis are consistent with Plaintiffs' allegation that beginning no later than January 1, 2017, Defendants entered into a price-fixing conspiracy that resulted in Plaintiffs paying supra-competitive prices for CCAs.

**G.    Defendants Have Admitted That Their Price Increases Drove Profit Growth**

206.    Defendants have admitted that their CCA price increases and surcharges outpaced any increases in input costs and therefore resulted in profit growth during the Class Period.

207.    For example, during an earnings call in July of 2019, the CFO of Saint-Gobain France noted that the Saint-Gobain Group had "remained focused on price in spite of … the fact that there was a lower trend in the inflation."[245] He explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increase profits.[246] The Saint-Gobain Group continued to raise its prices and increase its profits over the next two years. A press release from October of 2021 explained that the Saint-Gobain Group was "confident that it w[ould] be able to offset raw material and energy cost inflation over full-year 2021," given "the sharp 8.7% acceleration in prices" over the previous year, as well as "the new price increase announcements in Europe and in the [United States]."[247]

208.    Similarly, Sika AG CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of increases in raw material costs was "only . . . marginal," and that Sika AG had continued to improve its material margin by remaining "very much . . . focused on pricing."[248] During an earnings call one year later, Widmer explained that Sika AG's material margin of 54.8% in 2020 was "supported by ***decreasing*** raw material costs . . . in combination

---

[245]    Saint-Gobain France, First-Half 2019 Earnings Call Transcript (Jul. 26, 2019), https://seekingalpha.com/article/4278326-compagnie-de-saint-gobains-codgf-ceo-pierre-andre-de-chalendar-on-first-half-2019-results.

[246]    *Id.*

[247]    Saint-Gobain France Press Release, Continued Dynamic Organic Growth in the Third Quarter (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[248]    Sika AG FY 2019 Earnings Call Transcript (Feb. 21, 2020), https://seekingalpha.com/article/4326363-sika-ag-sxyay-ceo-paul-schuler-on-full-year-2019-results-earnings-call-transcript.

with *disciplined pricing*," which allowed it to "add[] 50 basis points in price effect."[249]

209.    When RPM CEO Frank Sullivan was asked whether the RPM Group intended to cut its prices due to recent, slumping demand, Sullivan bragged about his company's ability to maintain high prices: "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it."[250]

210.    Several Defendants have even cited their "*pricing discipline*" in explaining increases in their profit margins to investors.

211.    For example, Sika AG CEO Thomas Hasler explained that the "remarkable" increase in Sika AG's margin in the first half of 2023 was "a result of our pricing discipline and excellence."[251] Sika AG's 2023 Half-Year Report echoed the sentiment, crediting the company's "*disciplined sales price management*," coupled with lower costs, for its higher profit margins.[252]

212.    A Saint-Gobain Group press release from October of 2021 cited "[c]onstant focus on the price-cost spread" and "*strong pricing discipline* amid strong inflation" as the company's

---

[249]    Sika AG Q4 2020 Earnings Call Transcript (Feb. 20, 2021), https://seekingalpha.com/article/4407686-sika-ag-sxyay-ceo-paul-schuler-on-q4-2020-results-earnings-call-transcript (emphasis added).

[250]    RPM Q2 2023 Earnings Call Transcript (Jan. 5, 2023), https://www.rpminc.com/media/4564/rpm-usq_transcript_2023-01-05.pdf.

[251]    Sika AG Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[252]    Sika AG 2023 Half-Year Report at 19, https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-year-report.pdf?_gl=1*1smz2e5*_ga*MjA0NzgwMDU4NC4xNjk3O DI0MDYx*_ga_K04G1QB2XC*MTcwMDIzNDU0NC40LjEuMTcwMDIzNDU2OS4wLjAuMA (emphasis added).

"strategic priorities" for 2021.[253]

213.    In July of 2023, when an analyst asked RPM CEO Frank Sullivan about the "significant increase" in profit margin for RPM's construction segment, Sullivan boasted about the RPM Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think **we held our pricing and held our discipline**. And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter."[254]

### H.    Defendants Have Consolidated Their Control Over the CCA Industry

214.    Defendants have taken concerted action both before and during the Class Period to further consolidate and increase their control over the already concentrated CCA industry.

215.    In 2014, Saint-Gobain France launched a hostile takeover of Sika AG.[255] Over the next four years, Saint-Gobain France acquired nearly 25 percent of Sika AG's stock and became its competitor's single largest shareholder.[256] This established a strong shared financial interest between the two Defendants and created opportunities for information sharing and collusion.

216.    In April of 2017, Sika AG Chairman Paul Haelg publicly stated that he expected

---

[253]    Saint-Gobain France Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (emphasis added).

[254]    RPM Q4 2023 Earnings Call Transcript (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (emphasis added).

[255]    Reuters, Saint-Gobain Remains Committed to Deal to Take Over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 5, 2016).

[256]    Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; VY Tyndall Global Select Fund Commentary, at 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Reuters, Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

Saint-Gobain France's hostile takeover of Sika AG to be resolved by 2018.[257]

217.    Saint-Gobain France abandoned its takeover attempt in May of 2018 and agreed to reduce its stake in Sika AG to around ten percent, which it agreed to hold for two years.[258] Saint-Gobain France remained Sika AG's largest shareholder until it sold its remaining stock in 2020.[259]

218.    As the competitors' "merger" faltered, Saint-Gobain France and Sika AG began a coordinated campaign of buying up their smaller CCA competitors, through their shared ownership and in furtherance of their shared financial interests. The Mapei Group, the RPM Group, and MBS all joined the Sika Group and the Saint-Gobain Group in this campaign, as did the BASF Group (at least prior to September of 2020) and the Cinven Group (beginning in May of 2023).

219.    Cinven entered into "exclusive negotiations" to acquire Chryso from LBO France in March of 2017,[260] and the acquisition was completed on June 28, 2017.[261] In the months that followed, Chryso, under Cinven's ownership and control, acquired at least four competing CCA

---

[257]    Yahoo Finance, Sika Chairman Expects Saint-Gobain Takeover Attempt to be Resolved by 2018 (Apr. 11, 2017), https://ca.finance.yahoo.com/news/sika-chairman-expects-saint-gobain-takeover-attempt-resolved-162935089--finance.html.

[258]    Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Reuters, Saint-Gobain's U.S. Deal Will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021).

[259]    VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Reuters, Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[260]    Chryso, Completion of the Acquisition of Chryso by Cinven (Jul. 8, 2017), https://www.chrysogulf.com/news/83/completion-of-the-acquisition-of-chryso-by-cinven.

[261]    Id.

manufacturers,[262] including Italy's Ruredil in June of 2018,[263] Portugal's Euromodal in October of 2018,[264] Ireland's Chemtec in October of 2018,[265] and Morocco's Aptex in October of 2020.[266]

220.    In September of 2021, Saint-Gobain France acquired Chryso from Cinven, meaning that, in one fell swoop, Saint-Gobain France obtained not only Chryso's CCA business, but also the CCA businesses of no fewer than four competing manufacturers that Chryso had already acquired. Just three months later, in December of 2021, Saint-Gobain France acquired GCP.[267]

221.    Saint-Gobain France subsequently consolidated its management of its former competitors under the control of a newly-created "Construction Chemicals Business Unit," appointing the incumbent President of Chryso USA, Steve Williams, as President of the new unit for the North America region[268] and the incumbent CEO of Chryso, Thierry Bernard (who was

---

[262]    Cinven, *Cinven to Sell Chryso to Saint Gobain* (May 20, 2021), https://www.cinven.com/media/news/cinven-to-sell-chryso-to-saint-gobain.

[263]    Cinven Press Release, Chryso to Acquire Certain Ruredil Assets and Enlarge its Offering for Construction Materials in Italy (June 28, 2018), https://www.cinven.com/media/news/chryso-to-acquire-certain-ruredil-assets-and-enlarges-its-offering-for-construction-materials-in-italy/.

[264]    Cinven Press Release, Chryso Acquires Euromodal and Enlarges its Offering for Construction Materials in Portugal (Oct. 19, 2018), https://www.cinven.com/media/news/chryso-acquires-euromodal-and-enlarges-its-offering-for-construction-materials-in-portugal/.

[265]    CHRYSO Press Release, Chryso Acquires Chemtec Admixtures Limited in Ireland (Oct. 3, 2018), https://uk.chryso.com/news/195/chryso-acquires-chemtec-admixtures-limited-in-ireland.

[266]    CHRYSO Press Release, Chryso Strengthens its Presence in Morocco with Aptex (Oct. 15, 2020), https://www.chryso.com/news/chryso-strengthens-its-presence-in-morocco-with-aptex/.

[267]    Chemical & Engineering News, Saint-Gobain to Buy Construction Chemical Maker GCP for $2.3 Billion (Dec. 7, 2021), https://cen.acs.org/business/specialty-chemicals/Saint-Gobain-buy-construction-chemical/99/web/2021/12.

[268]    Business Wire, Steve Williams Appointed President of the Newly Created Construction Chemicals Business Unit for North America (Oct. 17, 2022), https://www.businesswire.com/news/home/20221012005926/en/Steve-Williams-Appointed-President-of-the-Newly-Created-Construction-Chemicals-Business-Unit-for-North-America.

previously employed by Cinven), as its General Manager.[269] Since 2022, Saint-Gobain France has combined Chryso's and GCP's manufacturing and sale of CCAs, such that the former competitors now operate as a single, combined unit, wholly owned and controlled by Saint-Gobain France.[270]

222.    The Saint-Gobain Group's acquisitions of CCA competitors did not stop with GCP and Chryso. In June of 2024, Saint-Gobain France paid €960 million to acquire FOSROC, a CCA manufacturer based in the UK with 3,000 employees and 20 plants around the World.[271]

223.    Meanwhile, beginning in late 2018, Sika AG expressed an interest in acquiring Master Builders Solutions, which at the time was owned by BASF.[272] The combination of Sika AG's CCA business and MBS would have given Sika AG a market share of up to 80 percent in some markets.[273] But after acquiring another major competitor in the CCA space (France's Parex) in January of 2019,[274] Sika AG abandoned its interest in MBS, explaining that it did "not believe a deal for all the company would be possible because of antitrust concerns by regulators."[275]

---

[269]    CHRYSO Press Release, New Business Unit Within Saint-Gobain High Performance Solutions: Constructions Chemicals (Oct. 3, 2022), https://www.chryso.com/news/new-business-unit-within-saint-gobain-high-performance-solutions-construction-chemicals/.

[270]    Concrete Products, Saint-Gobain Institutes Integrated Chryso, GCP Production Strategy (Jul. 3, 2023), https://concreteproducts.com/index.php/2023/07/03/saint-gobain-institutes-integrated-chryso-gcp-production-strategy/; Concrete Products, Saint-Gobain Proceeds with Integrated Chryso, GCP Production (Aug. 14, 2023), https://concreteproducts.com/index.php/2023/08/14/saint-gobain-proceeds-with-integrated-chryso-gcp-production/.

[271]    Construction Wave, Saint-Gobain Buys UK Construction Chemicals Firm for £800M (Jun. 28, 2024), https://constructionwave.co.uk/2024/06/28/saintgobain-buys-uk-construction-chemicals-firm-for-800m/.

[272]    Reuters, Sika Interested in Parts of BASF's Construction Chemical Business, https://www.reuters.com/article/us-sika-ceo-basf/sika-interested-in-parts-of-basfs-construction-chemicals-business-idUSKCN1QB1CP (last updated Feb. 22, 2019).

[273]    Id.

[274]    CVC, Sika Makes Binding Offer to Acquire Parex (Jan. 8, 2019), https://www.cvc.com/media/news/2019/2019-01-08-sika-makes-binding-offer-to-acquire-parex/.

[275]    Reuters, Sika CEO Rules Out Deal for Whole BASF Construction Chemical Business,

Instead, BASF sold MBS to Lone Star, a hedge fund, for €3.17 billion in the fall of 2020.[276]

224.    A year later, in November of 2021, Sika AG announced that it would be acquiring Master Builders Solutions after all—for $5.9 billion, nearly double what Lone Star had paid for it just one year prior.[277] However, due to "competition concerns" raised by the CMA, Sika AG was forced to spin off some assets. As a result, Cinven (which had just sold Chryso to Saint-Gobain France) acquired the Master Builders Solutions brand, as well as its CCA assets in countries in the European Economic Area (including MBS Germany), the United States (including MBSA), Canada, the UK, Switzerland, Australia, and New Zealand, while Sika AG acquired the Master Builders Solutions assets in the rest of the World, including its CCA business in Turkey.[278]

225.    Though this arrangement appeased the CMA and other antitrust regulators, it ultimately yielded anticompetitive effects. Sika AG has admitted that it views Cinven as its partner, not its competitor. Commenting on the deal, Sika AG CEO Thomas Hasler remarked, "Cinven with its extensive expertise in this sector is an ***ideal partner*** for continuing the successful growth path of this business."[279] Hasler also bragged about the Sika Group's dominance of the CCA

---

https://www.reuters.com/article/brief-sika-ceo-rules-out-deal-for-whole/brief-sika-ceo-rules-out-deal-for-whole-basf-construction-chemical-business-idUKZ8N1UN017 (last updated Jan. 8, 2019).

[276]    Concrete Construction, Lone Star Funds to Acquire Master Builders (Dec. 27, 2019), https://www.concreteconstruction.net/products/concrete-construction-materials/lone-star-funds-to-acquire-master-builders_c#:~:text=BASF%20has%20finally%20found%20a,of%20BASF's%20Construction%20Chemicals%20business.

[277]    Chemical Engineering, Sika to Acquire MBCC Group for €5.2 billion (Nov. 11, 2021), https://www.chemengonline.com/sika-to-acquire-mbcc-group-for-e5-2-billion/?printmode=1.

[278]    Adhesives & Sealants Industry, Sika to Sell MBCC Group's Chemical Admixture Assets to Cinven (Mar. 27, 2023), https://www.adhesivesmag.com/articles/100079-sika-to-sell-mbcc-groups-chemical-admixture-assets-to-cinven.

[279]    Reuters, Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021) (emphasis added).

industry after the deal, stating that its CCA product offering was "super strong and almost []
unchallengeable by others" because it now had "really the full innovation pipeline for the future
ready and also very strong backup with the supply chain that is coming together."[280]

226.    The RPM Group also participated in Defendants' rapid industry consolidation.
RPM acquired U.S.-based Brett Admixtures in November of 2021 and bought Chryso's North
American cement grinding additives business from the Saint-Gobain Group in April of 2022.[281]

227.    **Figure 23**, below, shows the timing of Defendants' acquisitions in the CCA space.

### Figure 23: Timeline of Defendants' CCA Acquisitions



228.    Defendants' expensive acquisitions of their competitors at a time when CCA input
costs were allegedly skyrocketing makes little economic sense absent a conspiracy to artificially
inflate the price of CCAs. Indeed, the huge sums involved in these deals are all the more surprising

---

[280]    Sika AG Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/
article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[281]    RPM Proxy Statement (Aug. 24, 2022), https://www.rpminc.com/media/3815/proxy-
statement.pdf.

in light of the trouble that BASF had in unloading MBS's CCA business as recently as 2020.

**I.    The CCA Market Is Highly Susceptible to Collusion**

229.    The structure and other characteristics of the market for CCAs make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

**1.    *The Supply Side of the CCA Market Is Highly Concentrated and Defendants Are the Dominant Firms***

230.    The presence of a small group of major sellers is one of the conditions that the DOJ has identified as being favorable to collusion.[282] Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

231.    The DOJ has explained that "mergers can reduce choices for consumers, workers, and other businesses, *leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals.*"[283] Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as U.S. Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based."[284]

232.    The Defendants that were targeted in dawn raids by European antitrust regulators—at least the Sika Group, the Saint-Gobain Group, the Cinven Group, and the Mapei Group--are

---

[282]    DOJ, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[283]    DOJ Press Release, Justice Department and Federal Trade Commission Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-seek-strengthen-enforcement-against-illegal (emphasis added).

[284]    DOJ Press Release, Justice Department and FTC Seek Comment on Draft Merger Guidelines (July 19, 2023), https://www.justice.gov/opa/pr/justice-department-and-ftc-seek-comment-draft-merger-guidelines.

among the largest CCA producers in the World, including in the United States and its territories.[285]

233.    Towards the end of 2018, the CCA market saw a "wave of consolidation" which led to substantial supply side concentration.[286] Defendants' aggressive acquisition of competitors has contributed to and furthered this concentration, such that Defendants now hold an estimated 80 to 90% share of the market.[287] At least one Defendant has made it clear that this flurry of acquisitions will continue. Sika AG CFO and Board Member Arian Widmer stated during an earnings call on August 3, 2023, that the Sika Group was not "changing in strategy or slowing down our acquisition pipeline and [it] remains quite robust and there will be more to come."[288]

234.    Other CCA manufacturers do not meaningfully compete with Defendants. Several of these other, smaller manufacturers told the CMA that even if they wanted to compete with Defendants, they could not do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA supplier(s).[289]

235.    In fact, at least some of the Defendants' internal documents indicate that they consider the other Defendants to be their only close competitors in the CCA industry.[290]

---

[285]    Industry ARC, Concrete Admixtures Market – Forecast 2023–2028, https://www.industryarc.com/Report/15114/concrete-admixtures-market.html#:~:text=Major%20players%20in%20the%20Concrete,ve%20Tic.&file=/fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf#page=14.

[286]    Nexant, Superplasticizer Market Trends (April 2019), https://www.nexanteca.com/sites/default/files/Nexant%20-%20Superplasticiser%20Market%20Trends%20-%20Blog%2008-Apr-2019_0.pdf.

[287]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

[288]    Sika AG Q2 2023 Earnings Call Transcript (Aug. 3, 2023), https://strike.market/stocks/SXYAY/earnings-call-transcripts/221804 (accessed January 5, 2024).

[289]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶¶ 107, 113, 118 (Sept. 23, 2022; CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 112, 116, 123 (Sept. 22, 2022).

[290]    CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept.

236.    Because the manufacture of CCAs is highly concentrated, with Defendants controlling the vast majority of global production, the market is highly susceptible to collusion.

### 2.    *New Entrants into the CCA Market Face High Barriers to Entry*

237.    Under basic economic principles, a collusive arrangement that raises product prices above competitive levels should attract new entrants seeking to benefit from the supra-competitive prices. But new entrants are much less likely to enter a market that has significant barriers to entry.

238.    A new entrant seeking to effectively compete with Defendants in the manufacture of CCAs faces high barries to entry, including: (a) the time and cost required to effectively scale CCA manufacturing operations (*i.e.*, by building new production and storage facilities in close proximity to CCA purchasers); (b) the research and development investment required to develop new products (*i.e.*, polymers) and get them to market; (c) the tendency of suppliers of the raw materials necessary to manufacture CCAs to favor the larger, entrenched manufacturers; and (d) the long-standing, existing relationships between CCA manufacturers and their customers.[291]

239.    These high barriers to entry are amplified by high switching costs for the purchasers of CCAs. Because smaller suppliers of CCAs cannot quickly build up their scale and capacity to adequately serve potentially-switching customers,[292] and supply contracts typically last for one to three years, CCA purchasers are often locked in to buying CCAs from Defendants.[293]

240.    In determining that Sika AG's acquisition of Master Builders Solutions would be anticompetitive given the structure and characteristics of the CCA market, the CMA explained:

---

23, 2022); CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 91, 101, 106 (Sept. 22, 2022).

[291]    *Id.* at ¶ 128.

[292]    *Id.* at ¶ 50.

[293]    CMA, Initial Report, ¶6.50 (Oct. 25, 2022).

"There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent [a Substantial Lessening of Competition] even if these plans materialise."[294]

241.    The high barriers to competing with Defendants in the manufacture of CCAs make it unlikely that supra-competitive prices would cause new competitors to enter the market. These high barriers to entry therefore make the CCA market more susceptible to collusion.

### 3.    *The Demand Side of the CCA Market Is Unconcentrated*

242.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[295] Such a large number of buyers in a market with such a small number of suppliers means that there is very little incentive for Defendants to cheat on their collusive pricing agreement. The benefit of each potential new customer or sale is miniscule, but the risk of disrupting the collusive pricing agreement carries large penalties.

243.    Thus, the unconcentrated nature of the demand side of the CCA market also makes it susceptible to collusion.

### 4.    *Demand for CCAs Is Inelastic*

244.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in price. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchase substitute products or decline to buy altogether. Thus, inelastic demand is a market characteristic that facilitates collusion, allowing producers to

---

[294]    CMA, Anticipated Acquisition by Sika AG of MBCC, Group Decision to Refer (Aug. 10, 2022), https://assets.publishing.service.gov.uk/media/63469a408fa8f53465d139b4/Decision_to_refer_full_text__Sika-MBCC_.pdf.

[295]    Census.Gov, 2021 County Business Patterns (CBP) Data, https://www.census.gov/programs-surveys/cbp/data/tables.html (last updated May 19, 2022).

raise their prices without triggering customer substitution and lost sales revenue.

245.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from supra-competitive prices. Three primary characteristics demonstrate the inelasticity of the demand for CCAs: (a) there are no substitutes for CCAs; (b) CCAs are essential for the production of cement, concrete, and mortar; and (c) the cost of CCAs makes up a small portion of the overall cost of the final product.

### a.    CCAs are Commodity Products and There Are No Substitutes for Them

246.    The DOJ has recognized that markets for standardized products without substitutes are susceptible to collusion, as purchasers have no alternative options.[296] Substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.[297]

247.    Purchasers of CCAs do ***not*** view CCAs as interchangeable with other products.[298] Nor do purchasers of CCAs consider any other products to be adequate substitutes for CCAs.[299]

248.    But CCAs themselves are commodity products and thus sellers compete largely on price, rendering the market susceptible to collusion. For example, during the CMA's review of the proposed merger between Sika AG and MBS, the companies admitted the following to the CMA:

> Chemical admixtures are commodities and homogenous products, not differentiated products. Any differentiation between suppliers is based on various add-on services and is marginal at best as these services are easily replicated by competitors and generally all suppliers offer such services.

---

[296]    DOJ, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[297]    *Id.*

[298]    *Id.* at ¶¶ 53-64.

[299]    *Id.*

*Competition between suppliers is largely based on price.*[300]

249.    In addition, as explained above, purchasers of CCAs face high switching costs between specific CCAs. There are three main reasons for this. First, "extensive testing is required to ensure that any new [CCA] products are suitable for [the customer's] particular aggregates and requirements, with this process becoming more difficult the larger and more complex a [CCA] customer's operations are."[301] Second, purchasers of CCAs frequently have to obtain their own customers' approval before switching CCAs.[302] Third, purchasers of CCAs frequently must train their employees on how to use new CCAs before those CCAs can be used.[303]

250.    The lack of substitute goods makes the CCA market susceptible to collusion.

> **b.    CCAs Are Essential to the Production of Concrete, Cement, and Mortar and Are Therefore Necessary for Construction**

251.    CCAs are considered essential for projects that involve cement, concrete, or mortar because they provide economic, commercial, and environmental benefits to the final product.[304]

252.    Purchasers of CCAs are thus unable to respond to price increases by buying less.

253.    Purchasers' need for CCAs thus makes the market more susceptible to collusion.

> **5.    *Defendants Had Numerous Opportunities to Collude***

254.    The DOJ notes that competitors who "know each other well through social

---

[300]    CMA, Final Decision on Anticipated Acquisition by Sika AG of MBCC Group, at 20 (Jul. 27, 2022), https://assets.publishing.service.gov.uk/media/632c80f78fa8f51d2cfed942/220727_Sika-MBCC_Decision_FINAL2.pdf (emphasis added).

[301]    DOJ, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, ¶ 11, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[302]    *Id.* at ¶ 51.

[303]    *Id.* at ¶ 50.

[304]    VY Tyndall Global Select Fund Commentary, 4 (Oct. 2019) ("Sika's product offering is…essential to their end users[.]"); CMA, Initial Report, ¶¶ 6.30-6.31 (Oct. 25, 2022).

connections, trade associations, [and] legitimate business contacts" are more likely to collude.[305]

255.    As detailed above, Defendants are deeply interconnected through their shared membership in numerous foreign and domestic CCA trade associations. Executives from different Defendants frequently serve on the same trade association boards and committees, which allows them to gather in the same place on a regular basis and creates opportunities for collusion.

256.    As detailed above, Defendants have also repeatedly engaged in horizontal mergers, acquisitions, and attempted acquisitions with each other during the Class Period. These interactions provided them with numerous opportunities to exchange sensitive information.

**J.    Defendants Fraudulently Concealed Their Conduct**

257.    Plaintiffs had no knowledge of Defendants' anticompetitive conduct as alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced that it was investigating Defendants and coordinating with the CMA, the TCA, and the DOJ to do so. As a result, Plaintiffs did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17, 2023, there was insufficient information to suggest that Defendants were involved in a conspiracy to fix prices for CCAs.

258.    Therefore, the statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants have affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

259.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on Defendants and their co-conspirators keeping their alleged price-fixing

---

[305]    DOJ, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

conduct secret from their customers and from government authorities. As a result, Plaintiffs reasonably believed that they were purchasing CCAs in a competitive industry.

260.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out so as to evade detection. The fact that each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct Defendants engaged in here suggests that Defendants knew their conduct was wrong and intentionally kept it hidden.[306]

261.    Further, the fact that Defendants publicly explained their price increases as motivated by normal market forces (when they were not), is a further, affirmative act of concealment that tolls any applicable statute of limitations.

262.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiffs did not learn or discover the operative facts giving rise to their claims until at least October 17, 2023. No information, actual or constructive, was ever made available to Plaintiffs that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023, at the earliest.

263.    Because Plaintiffs did not and could not have discovered the existence of their claims prior to October 17, 2023, at the earliest, Plaintiffs' claims did not accrue until that date.

### K.    Defendants' Ongoing and Continuing Antitrust Violations

288.    A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants'

---

[306]    Sika, Code of Conduct (May 1, 2021), https://www.sika.com/content/dam/dms/corporate/v/glo-code-of-conduct.pdf; Saint-Gobain Group, General Principles of Conduct and Action, https://www.saint-gobain.com/sites/saint-gobain.com/files/principles_en.pdf; Master Builders Group, Code of Conduct, https://assets.master-builders-solutions.com/en-global/master%20builders%20solutions%20group%20code%20of%20conduct.pdf; RPM, The Values & Expectations of 168 (Apr. 2018), https://www.rpminc.com/media/2114/v_es_final_version_for_the_board_meeting_april_2018.pdf.

anticompetitive conduct causes a continuing harm to Plaintiffs and members of the Classes. Defendants inflicted new and accumulating injury on Plaintiffs and members of the Classes.

289. Defendants' conduct constituted a continuing violation in which Defendants repeatedly sold Additives and Admixtures at supra-competitive prices during the Class Period and each member of the Damages Class paid supra-competitive prices for Defendants' products during the Class Period. Each purchase of a relevant product at supra-competitive prices constitutes a new and distinct injury. A new cause of action accrues every time a member of the Classes suffers a new and distinct injury in the form of paying supra-competitive prices.

290. The accrual of each new cause of action is based on independent, overt acts committed by Defendants within the limitations period. Defendants' price-fixing scheme continued as they continued to sell CCAs, and Plaintiffs and members of the Class purchased CCAs, during the four-year period preceding the filing of the first DPP class action complaint. As such, Defendants' price-fixing necessarily caused Plaintiffs and Class members to suffer new and accumulating injury, harm, and damages at least until the first DPP class action complaint was filed in this action.

## V.    **CLASS ACTION ALLEGATIONS**

264.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased CCAs directly from any of the Defendants or their subsidiaries, predecessors, affiliates, and/or agents during the period beginning no later than January 1, 2017, until the date on which a class is certified in this case. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, and co-conspirators, and the court and its staff.

265.    ***Numerosity.*** Plaintiffs do not know the exact number of members of the Class, but

given Defendants' substantial nationwide presence and the large number of CCA purchasers in the United States, Plaintiffs believe the class size is so numerous that joinder is impracticable.

266.    *Commonality.* Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful conduct, which was generally applicable to all members of the Class, thereby making relief for the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of CCAs in the United States and its territories;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e)    Whether the alleged conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the members of the Class;

(f)    The effect of the alleged conspiracy on the price of CCAs during the Class Period;

(g)    Whether Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the members of the Class;

(h)    The appropriate injunctive and related equitable relief for Plaintiffs and the Class; and

(i)    The appropriate class-wide measure of damages.

267.    **_Typicality._** Plaintiffs' claims are typical of the claims of all members of the Class, and Plaintiffs and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for CCAs from Defendants and/or their co-conspirators.

268.    **_Adequacy._** Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

269.    **_Predominance._** The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual questions relating to liability and damages.

270.    **_Superiority._** Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    <u>INTERSTATE TRADE AND COMMERCE</u>

94

271.    Billions of dollars are exchanged for CCAs each year in interstate commerce in the United States and its territories, and the payments for those transactions flow in interstate commerce.

272.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

273.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States and its territories.

274.    Defendants' unlawful conduct has had a direct and adverse impact on competition in the United States and its territories. If not for Defendants' conspiracy to fix the prices of CCAs, the prices of CCAs would have been determined by a competitive, efficient market.

## VII.    ANTITRUST INJURY

275.    Defendants' antitrust conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to the pricing of CCAs;

(b)    The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Purchasers of CCAs have been deprived of the benefits of free and open competition; and

(d)    Purchasers of CCAs paid artificially inflated prices.

276.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of CCAs.

277.    The precise amount of the overcharges impacting the prices of CCAs paid by Plaintiffs and the Class can be measured and quantified using well-accepted models.

278.    By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.  CLAIMS FOR RELIEF

### Count I: Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade)

279.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

280.    From at least January 1, 2017, until the date on which any Class is certified, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

281.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for CCAs, including surcharges on CCAs, in the United States and its territories.

282.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

      (a)    exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of CCAs, including

surcharges on CCAs, sold in the United States and its territories;

(b)      participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs, sold in the United States and its territories; and

(c)      participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

283.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs.

284.    Defendants' conspiracy had the following effects, among others:

(a)      Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

(b)      Prices for CCAs, including surcharges on CCAs, provided by Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c)      Plaintiffs and members of the Class who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

285.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

286.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

287.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

## IX.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and the Class respectfully request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as representatives of the Class, and direct that reasonable notice of this action be given to each and every member of the Class, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

B.    The Court adjudge and decree that the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators, have been a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of the

first-filed Complaint in this action to the extent provided by law;

E.     That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.     That the Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X.     **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: September 9, 2024                    Respectfully submitted,

*/s/ Jeannine M. Kenney*
Jeannine M. Kenney
**HAUSFELD LLP**
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
jkenney@hausfeld.com

Nathaniel C. Giddings
**HAUSFELD LLP**
888 16th Street, NW
Suite 300
Tel: (202) 540-7200
Fax: (202) 540-7201
ngiddings@hausfeld.com

Scott Martin

**HAUSFELD LLP**
33 Whitehall Street
14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

Michael P. Lehmann
Emma Blake
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
mlehmann@hausfeld.com
eblake@hausfeld.com

*Interim Lead Class Counsel for
the Direct Purchaser Class*

Eric L. Cramer
Candice J. Enders
Patrick F. Madden
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net
cenders@bm.net
pmadden@bm.net
mwallin@bm.net

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Matt Jacobs
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
mjacobs@gustafsongluek.com

Michael L. Roberts
Erich P. Schork
Sarah E. DeLoach
**ROBERTS LAW FIRM US, PC**
1920 McKinney Ave, Suite 700
Dallas, Texas 75201
Tel: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us

*Interim Executive Committee for
the Direct Purchaser Class*