**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: CONCRETE AND CEMENT ADDITIVES ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No. 24-MD-03097 (LJL)<br><br>ORAL ARGUMENT REQUESTED<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**JOINT MOTION TO DISMISS (1) DIRECT PURCHASER PLAINTIFFS' CORRECTED**
**CONSOLIDATED CLASS ACTION COMPLAINT AND (2) INDIRECT PURCHASER**
**PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR**
<u>**FAILURE TO STATE A CLAIM**</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT............................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

ARGUMENT .................................................................................................................... 6

I.     PLAINTIFFS HAVE NOT ALLEGED A COGNIZABLE CONSPIRACY ...................... 6

    A.  Legal Standard............................................................................................... 6

    B.  Plaintiffs Do Not Allege Direct Evidence of a Conspiracy ............................ 7

    C.  Plaintiffs Fail to Allege Parallel Conduct from Which the Court Could Infer a
    Conspiracy .................................................................................................... 8

        i.   Plaintiffs' Allegations Regarding Price Increase Announcements Do Not Reflect
        Parallel Conduct.................................................................................... 9

        ii.  Plaintiffs' Allegations Regarding Earnings Statements Do Not Reflect Parallel
        Conduct, Only Legitimate Business Announcements............................. 11

    D.  Plaintiffs Allege an Alternative Explanation for the Alleged Price Increase
    Announcements That Is Consistent with Each Defendant's Independent Self-Interest ...... 13

        i.   Conspiracy Cannot Be Inferred Where There Is an Obvious Alternative
        Explanation for Parallel Conduct......................................................... 13

        ii.  Plaintiffs' Operative Complaints Allege that Defendants Repeatedly Referred to
        Inflation, Rising Costs, and COVID-19-Related Supply Delays......................... 15

        iii. Plaintiffs' Prior Complaints Also Admitted that the Cost of Key Raw Materials
        Increased (and Remained High) During the Alleged Relevant Time Period ........ 17

II.    PLAINTIFFS FAIL TO ALLEGE SUFFICIENT "PLUS FACTORS" TO INFER A
CONSPIRACY ............................................................................................................. 19

    A.  The Court Cannot Infer a Conspiracy from Membership in Domestic and International
    Trade Associations ....................................................................................... 19

    B.  The Existence of Government Investigations Is Insufficient to Infer a Conspiracy .... 21

    C.  Past Industry Mergers Are Insufficient to Infer a Conspiracy...................................... 23

    D.  Plaintiffs' Regression and Price Index Allegations Undermine, Rather Than Support,
    Their Conspiracy Claims ............................................................................. 24

    E.  Plaintiffs' Profit Motive and Supra-Competitive Pricing Allegations Are Not Plus
    Factors........................................................................................................ 27

    F.  The Market Structure Allegations Are Insufficient to Support an Inference of a
    Conspiracy .................................................................................................. 27

III.   PLAINTIFFS FAIL TO ALLEGE FACTS TYING EACH DEFENDANT TO THE
"CONSPIRACY"............................................................................................................ 29

CONCLUSION.................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ........................................................26

*In re Aluminum Warehousing Antitrust Litigation*,
  2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ........................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................6

*Beatty v. JP Morgan Chase & Co.* (*In re Commodity Exch., Inc. Silver Futures &
  Options Trading Litigation*),
  560 F. App'x 84 (2d Cir. 2014) ................................................................................12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ *passim*

*Bookends & Beginnings LLC v. Amazon.com, Inc.*,
  2022 WL 18144916 (S.D.N.Y. Aug. 24, 2022) ......................................................13

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...................................................................................................14

*In re Bystolic Antitrust Litigation*,
  583 F. Supp. 3d 455 (S.D.N.Y. 2022) .......................................................................6

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities
  Corp.*,
  92 F.4th 381 (2d Cir. 2024) ............................................................................ *passim*

*Consolidated Metal Products, Inc. v. American Petroleum Institute*,
  846 F.2d 284 (5th Cir. 1988) ....................................................................................20

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
  603 F. Supp. 3d 459 (S.D. Miss. 2022) ...................................................................15

*In re Delta/Airtran Baggage Fee Antitrust Litigation*,
  245 F. Supp. 3d 1343 (N.D. Ga. 2017) ....................................................................12

*In re Delta/AirTran Baggage Fee Antitrust Litigation*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2010) ....................................................................12

*In re Dynamic Random Access Memory Indirect Purchaser Litigation*,
  2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ........................................................12

*In re Elevator Antitrust Litigation*,
    2006 WL 1470994 (S.D.N.Y. May 30, 2006) ........................................................................20

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007)................................................................................7, 20, 22

*Eurim-Pharm GmbH v. Pfizer Inc.*,
    593 F. Supp. 1102 (S.D.N.Y. 1984)..................................................................................20

*In re European Government Bonds Antitrust Litigation*,
    2020 WL 4273811 (S.D.N.Y. July 23, 2020) ..............................................................25, 29

*Ferrari v. City Of Suffolk*,
    790 F. Supp. 2d 34 (E.D.N.Y. 2011) ..............................................................................18

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..........................................................................22

*Greco v. Mallouk*,
    2024 WL 4119169 (N.D. Ill. Sept. 9, 2024) ....................................................................24

*Hinds County v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)..................................................................20, 21, 22

*In re ICE LIBOR Antitrust Litigation.*,
    2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ..................................................................20

*Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner &*
    *Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018)...............................................................................7

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ........................................................................15, 19

*In re Late Fee & Over-Limit Fee Litigation*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ........................................................................8, 19, 27

*Litovich v. Bank of America Corp.*,
    568 F. Supp. 3d 398 (S.D.N.Y. 2021)............................................................... *passim*

*LLM Bar Exam, LLC v. Barbri, Inc.*,
    271 F. Supp. 3d 547 (S.D.N.Y. 2017)...............................................................................13

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..................................................................... *passim*

*In re Mexican Government Bonds Antitrust Litigation*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)..................................................................2, 7, 21, 22

*Monsanto Co. v. Spray-Rite Service Corp.*,
  465 U.S. 752 (1984)............................................................................................6

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
  883 F.3d 32 (2d Cir. 2018)................................................................................19

*Oklahoma Firefighters Pension & Retirement System v. Deutsche Bank
  Aktiengesellschaft*,
  2024 WL 4202680 (S.D.N.Y. Sept. 13, 2024)..................................................28

*Pro Music Rights., LLC v. Apple, Inc.*,
  2020 WL 7406062 (D. Conn. Dec. 16, 2020)....................................................28

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................9

*In re Treasury Securities Auction Antitrust Litigation*,
  2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021)..................................................26

*United States v. Citizens & Southern National Bank*,
  422 U.S. 86 (1975)............................................................................................12

*Venture Technology, Inc. v. National Fuel Gas Co.*,
  685 F.2d 41 (2d Cir. 1982)................................................................................27

*Wai Hoe Liew v. Cohen & Slamowitz, LLP*,
  265 F. Supp. 3d 260 (E.D.N.Y. 2017) ..............................................................18

*In re Zinc Antitrust Litigation*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016)..........................................................14, 29

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law* § 307d1 (4th ed. 2014)....................................14

Defendants[1] respectfully submit this memorandum[2] in support of their motion to dismiss the Direct Purchaser Plaintiffs' Corrected Consolidated Class Action Complaint ("DPPC") (ECF No. 157) and the Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint ("IPPC") (ECF No. 135) (with the DPPC, "Complaints") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]

## PRELIMINARY STATEMENT

Defendants are manufacturers of construction chemicals known as admixtures or additives for concrete, cement, and/or mortar, referred to by Plaintiffs as CCAs.[4]  CCAs are used by construction companies during the concrete mixing process to enhance durability and other features of concrete or mortar.  Plaintiffs are alleged purchasers of CCAs who claim that all Defendants formed a near decade-long price-fixing conspiracy in violation of antitrust laws.

The problem for Plaintiffs is that they allege no facts to infer any such conspiracy.  They do not allege **which** individuals formed the alleged agreement, **when** it was formed, **what** its terms were, or **how** it was effectuated.  They never allege **when** any Defendant joined the purported conspiracy.  They even fail to allege a single **communication** between any two Defendants, let alone among all.

---

[1] Defendants include the following (using, in most cases, Plaintiffs' short-cited names used in the Complaints): Saint-Gobain France, Saint-Gobain USA, GCP, Chryso France, Chryso USA, Sika AG, Sika Corporation, Cinven UK, Cinven USA, MBSD, MBSA, BASF Corporation, RPM, Euclid, Mapei Corporation, Emme Esse Vi s.r.l., and Mapei S.p.A.  Defendant BASF SE has been named in this action, but has not been served and takes no part in this motion.

[2] Per Rule 2.I of this Court's Individual Practices in Civil Cases, Defendants have agreed with Plaintiffs on page limits. Plaintiffs will receive the same number of pages as this Memorandum for their Opposition/Response.

[3] Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") are referred to together as "Plaintiffs."

[4] To define CCAs, Plaintiffs combine hundreds of individual products manufactured by Defendants into four categories, (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing, referring to them collectively as "CCAs."  DPPC ¶¶ 1, 113–117; IPPC at 1.

Stripped of conclusory characterizations, the Complaints merely allege unilateral conduct. Plaintiffs spend pages alleging that certain Defendants announced higher prices during the global pandemic in 2020–21. But higher construction industry prices alone do not support an inference of a conspiracy, especially when viewed against the backdrop of a worldwide shutdown. That is particularly true where, as here, there is an "obvious alternative explanation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Like most industries in the U.S., the CCA industry experienced unprecedented global supply chain disruptions, inflationary pressures, and rising raw material costs, **as Plaintiffs' allegations concede**. Higher costs can drive higher prices without collusion. Here, none of Defendants' separate price announcements were inconsistent with rational, independent economic behavior.

None of Plaintiffs' other allegations suffice either. Plaintiffs allege membership in trade associations, but mere membership is common and insufficient to infer the existence of a conspiracy. Plaintiffs also point to press reports of government investigations. But courts have routinely held that the mere existence of government investigations is insufficient to meet the pleading requirements for an antitrust conspiracy. *See, e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390–91 (S.D.N.Y. 2019) (collecting cases). Plaintiffs' unexplained "regression" does not save their claims either, as their analysis is based on unknown details, undisclosed data, and aggregated public sources that say nothing about the specific acts of individual Defendants.

In sum, Plaintiffs do not allege any agreement—or even communication—among any Defendants. Plaintiffs seek to condemn Defendants' rational, independent pricing decisions with speculation and boilerplate recitations of the elements of their claims. These allegations fall far short of the mandatory pleading standards for antitrust claims. *See Twombly*, 550 U.S. at 556–57;

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396–97 (2d Cir. 2024).  The Complaints should be dismissed.

## **FACTUAL BACKGROUND**

Plaintiffs allege a near decade-long antitrust conspiracy to fix the prices in the CCA industry in the U.S.  DPPC ¶ 21; IPPC ¶ 21.  Plaintiffs never allege an exact start date to the conspiracy but speculate that it somehow emerged from a failed merger between two European CCA manufacturers—Compagnie de Saint-Gobain S.A. and Sika AG—at some unidentified point between 2014 and 2017.  Plaintiffs even allege this transaction was a "hostile" and "bitter takeover battle," which undermines Plaintiffs' intended inference that the merging parties were co-conspirators.  DPPC ¶¶ 11–13, 215 n.254; *see also* IPPC ¶¶ 21–22 (alleging generally that the conspiracy was effectuated through "a series of sales and acquisitions" and alleging Saint-Gobain's partial ownership interest in Sika AG).

The mechanism of the alleged conspiracy is as unclear as its roots.  Plaintiffs allege that following this failed merger, the two companies went on "a joint worldwide buying spree ultimately purchasing" about six competitors in an eight-year period.  DPPC ¶ 12; *see also* IPPC ¶¶ 116–121.  They further allege that the remaining Defendants, "[t]he Mapei Group, the RPM Group, and MBS all joined this unlawful conspiracy, as did the BASF Group . . . and the Cinven Group."  DPPC ¶ 12; *see also* IPPC ¶¶ 21–22.  Plaintiffs allege no other details about the formation or operation of this purported "unlawful conspiracy" to consolidate the industry.

Plaintiffs claim to be direct and indirect purchasers who allegedly "paid supra-competitive prices for CCAs in the United States and its territories."  DPPC ¶ 21; *see also* IPPC ¶ 23.  Plaintiffs' allegations fall into four categories: (1) identifying membership in primarily European trade associations, (2) citing CCA price increases during the global pandemic, (3) summarizing news articles regarding ongoing government investigations, and (4) making boilerplate allegations that

the industry "is highly susceptible to collusion."  *See* DPPC §§ IV.C–I; IPPC §§ I, IV.D–F.  None of these allegations are sufficient to plead a conspiracy.

*First*, Plaintiffs point to Defendants' membership in various trade associations, speculating that these groups might present opportunities to collude.  Although Plaintiffs sue for alleged price fixing in the U.S., the Complaints focus on 13 foreign trade associations—in Europe or Turkey— and identify individual European employees (many of whom are employed at unnamed European affiliates) as members.  DPPC ¶¶ 159–186; IPPC ¶¶ 125–129.  They identify only one U.S.-based trade association—the National Ready Mix Concrete Association ("NRMCA")—a group whose membership consists of "[m]any . . . buyers who buy CCAs," like Plaintiffs and the putative class members.  DPPC ¶ 155–158; *see also* IPPC ¶ 123–124.  Whether in the U.S. or outside of the U.S., the allegations stop at membership.  Plaintiffs do not allege a single communication or meeting among *any* Defendants at *any* trade association meetings.

*Second*, Plaintiffs' Complaints are filled with references to rising input costs in the CCA industry during and after the worldwide COVID-19 pandemic.  *See* DPPC ¶ 14 n.15 (citing article titled "Sika Raises Prices to Counter Jump in Raw Material Costs"), DPPC ¶ 198 n.241 (citing article titled "Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase"); *see also* IPPC ¶ 154 (statements referring to "inflationary pressure").  Plaintiffs also have numerous other references to rapidly rising raw material costs, inflation, and supply shortages.  *See, e.g.*, DPPC ¶¶ 193g, 193h, 193l, 193p, 198, 207, 212; IPPC ¶¶ 154, 159.  These references strongly undercut Plaintiffs' theory that rising prices of CCAs resulted from anticompetitive conduct.

Plaintiffs also point to letters Defendants separately issued to their customers announcing planned price increases or surcharges during this period.  DPPC ¶¶ 192–193; IPPC § 4.E.  Each of

these letters was issued by an individual Defendant to its customers at various and different times throughout the relevant time period.  Many of the announcements relate to prices abroad, and Plaintiffs allege **no connection to U.S. prices**.  DPPC ¶ 193a; IPPC ¶ 133 (Europe price increase), DPPC ¶ 193b; IPPC ¶ 135 (Japan price increase), DPPC ¶ 193j; IPPC ¶ 141 (Europe price increase), DPPC ¶ 193q; IPPC ¶ 146 (UK price increase).[5]  The announcements also vary in terms of the relevant products to which they applied and the amount of the price increases.  DPPC ¶¶ 192–193; IPPC § 4.E.  Plaintiffs also point to Defendants' statements during their routine financial reporting events such as public earnings statements, in which senior executives provided high-level commentary to investors on the need to charge higher prices in light of rising raw material costs.  *See* DPPC ¶¶ 188–191; IPPC ¶¶ 154, 159; *see also* DPPC ¶ 191 n.218 (RPM 2023 Third-Quarter Results stating "primary raw material costs up more than 40%, on average, versus a year ago"[6]); DPPC ¶ 212 n.251 (Saint-Gobain Press Release explaining "pricing discipline, amid strong inflation in raw material and energy costs"[7]).

*Third*, Plaintiffs cite news articles discussing ongoing government investigations in the CCA industry.  Plaintiffs summarize press reports of primarily foreign investigations but allege nothing beyond the existence of these investigations—no details as to the investigations' scope, whether any party has been indicted, or whether any government has filed suit.  DPPC ¶¶ 4–10, 137–53 (citing news reports of the European Commission ("EC"), UK Competition and Markets Authority ("CMA"), the Turkish Competition Authority ("TCA"), and the U.S. Department of Justice ("DOJ")); IPPC ¶¶ 7–11 (same).

---

[5] The IPPs omit the geographic scope of the alleged price increases and the citations.

[6] *Edited Transcript: Q3 2022 RPM International Inc Earnings Call*, RPM (April 6, 2022), https://www.rpminc.com/media/3483/rpm-usq_transcript_2022-04-06.pdf.

[7] *Saint-Gobain France Press Release*, SAINT-GOBAIN (October 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

***Fourth***, Plaintiffs include allegations about the general structure of the CCA industry, alleging that it is susceptible to collusion because (1) it is allegedly highly concentrated, (2) it is characterized by high entry barriers, (3) the buy-side market is unconcentrated, and (4) demand is inelastic.  DPPC § 4.I; IPPC § 4.F.  To allege that CCA prices were too high, Plaintiffs also reference an unexplained "regression" based on aggregated public data, with no connection to pricing by any individual Defendant.  DPPC ¶¶ 199–202; IPPC ¶¶ 3–5.

Across 215 pages of allegations in two Complaints, Plaintiffs ***never once allege a single communication*** between any Defendants.

## ARGUMENT

## I.    PLAINTIFFS HAVE NOT ALLEGED A COGNIZABLE CONSPIRACY

### A.    Legal Standard

Under Rule 12(b)(6), dismissal of a complaint is appropriate if plaintiffs have failed to allege sufficient facts to make the asserted claim plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  To state a claim under Section 1 of the Sherman Act, plaintiffs must allege facts supporting a plausible inference that defendants conspired to unreasonably restrain trade.  *See Twombly*, 550 U.S. at 556–57.  Plaintiffs must allege that Defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 753 (1984).

A complaint must offer more than "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertion[s]' devoid of 'further factual enhancement'" to survive dismissal.  *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 471 (S.D.N.Y. 2022) (Liman, J.) (quoting *Twombly*, 550 U.S. at 555, 557) (modification in original).

Plaintiffs can allege the existence of a conspiracy through direct or indirect evidence. "Direct evidence of a conspiracy is 'explicit' and can show one exists without any inferences."

*City of Pontiac*, 92 F.4th at 391; *see Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318–19 (S.D.N.Y. 2018) (statements that "expressly describe agreements among the Defendants, [] are thus direct evidence of concerted action").  Direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *In re Mexican Gov't Bonds*, 412 F. Supp. 3d at 388.  "In the absence of direct evidence, Plaintiffs are left to rely on allegations of circumstantial evidence."  *Id.* at 389.  They can "provid[e] a basis for inferring an agreement by alleging conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id*. (quoting *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

But "it is not enough to make allegations of an antitrust conspiracy that are ***consistent with*** an unlawful agreement; to be viable, a complaint must contain enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct ***was made***."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (emphasis added) (cleaned up); *see also Citigroup*, 709 F.3d at 136–37.  Mere "conclusory allegation[s] of agreement at some unidentified point," or a "suspicion" or "possibility" of agreement, are not enough to survive a motion to dismiss. *Twombly*, 550 U.S. at 556–57.  The Supreme Court has held that "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense" of antitrust litigation.  *Id.* at 559.

### B.    Plaintiffs Do Not Allege Direct Evidence of a Conspiracy

Plaintiffs have not even attempted to allege any direct evidence of a conspiracy.  The Complaints do not specify ***when*** the alleged anticompetitive agreement was reached, ***where*** any meetings to form the agreement occurred, ***who*** participated in the meetings forming the agreement, or ***how*** the conspiracy operated.  The Complaints' allegations fail to place any Defendants in the same meeting, phone line, or email even once.  Plaintiffs never allege even a single communication

among Defendants, let alone the type of inter-Defendant communication required to establish and maintain an alleged nearly decade-long, price-fixing conspiracy among 18 defendants for hundreds of different products.  These failures are fatal to a claim predicated on direct evidence.

Plaintiffs instead make only conclusory assertions that Defendants engaged in a conspiracy.  *See, e.g.*, DPPC ¶ 12 (Defendants "agreed to cease competing with each other in order to ensure they both obtained higher prices for CCAs in the United States"); DPPC ¶ 12 ("co-conspirators agreed to a joint worldwide buying spree"); DPPC ¶ 12 ("[t]he Mapei Group, the RPM Group, and MBS all joined this unlawful conspiracy, as did the BASF Group . . . and the Cinven Group"); DPPC ¶ 21 ("Defendants entered into an agreement to consolidate control of the global CCA industry and charge supra-competitive prices for CCAs."); IPPC ¶ 18 ("Defendants have an understanding that they will not undercut one another on the one thing they can compete on, price."); IPPC ¶ 21 ("Beginning at least as early as January 1, 2017, Defendants . . . entered into an agreement to fix the prices of those products."); IPPC ¶ 222 ("Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy.").

These conclusory allegations are not enough.  *Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  To allege an agreement, plaintiffs must present "concrete allegations about the content and circumstances of any actual agreement."  *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007).  Plaintiffs' allegations do not even come close.

### C.   Plaintiffs Fail to Allege Parallel Conduct from Which the Court Could Infer a Conspiracy

To allege a conspiracy without direct evidence, Plaintiffs first must establish parallel conduct suggestive of a conspiracy.  Where it is "questionable whether Plaintiff[s'] allegations even establish a pattern of parallel conduct," dismissal is appropriate.  *RxUSA Wholesale, Inc. v.*

*Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 237 (E.D.N.Y. 2009).  Here, Plaintiffs have not even alleged parallel conduct.

> ### i.    Plaintiffs' Allegations Regarding Price Increase Announcements Do Not Reflect Parallel Conduct

Plaintiffs allege no start date to the conspiracy, but DPPs allege that it "can be traced to 2014" from failed merger discussions between two Defendants, DPPC ¶ 11,[8] while the IPPs suggest that the conspiracy began in January 2017 with a conclusory allegation of "an agreement to fix the prices," IPPC ¶ 21.  From 2014 through October 2020, Plaintiffs do not allege parallel conduct among Defendants.

- **No price increases before 2017**:  Between 2014 and the start of 2017, there is not one price increase alleged in either Complaint.

- **Few and widely disparate price increases from 2017 to October 2020**:  For nearly a four-year period, from January 2017 to October 2020, Plaintiffs allege only a handful of price increases spaced almost *six months apart* with substantially different price increase amounts and geographic scope.  DPPC ¶¶ 193a–c; IPPC ¶¶ 133–135.

- **Different Geographies**:  A number of the price announcements do not even relate to the U.S.  For example, Plaintiffs point to one announcement related only to "products across Europe" and another related only to a "Japanese subsidiary." DPPC ¶¶ 193a–b.[9]

---

[8] DPPs' class claims only began in 2017, which is inconsistent with this allegation.  They assert no allegations to explain what occurred in the interim three-year period.

[9] DPPs admit that these two price increases are regionally limited, while IPPs cite the same two price increases but omit the geographic limitation.  *Compare* DPPC ¶ 193b (alleging that "[o]n May 14, 2018 . . . [a] ***Japanese subsidiary*** would increase prices . . . by at least ten percent") (emphasis added) *with* IPPC ¶ 135 (alleging that "[o]n May 14,

- **A near two-year gap after February 2019**:  No other Defendant announced a price increase for almost **two years** after Sika allegedly increased its prices twice in early 2019.  DPPC ¶¶ 193c–d; IPPC ¶¶ 137–38.[10]  *Cf. Citigroup*, 709 F.3d at 137 (price increases made "**at the very same time** by multiple competitors" could be parallel conduct) (emphasis added) (quoting *Twombly*, 550 U.S. at 556 n.4).

Nor is parallel conduct sufficiently alleged in the latter part of the alleged conspiracy period (from November 2020 to the present).  While Plaintiffs identify more frequent price increases by Defendants during the pandemic—during the period from November 2020 to March 2022 (*see generally* DPPC ¶ 193, IPPC ¶¶ 133–152)—their allegations do not establish parallel conduct because:

- **Different Price Increases**:  Plaintiffs allege that Defendants' price increases were in substantially varying amounts—ranging from "1.9%" to "up to . . . 40%".  DPPC ¶¶ 193e, 193o; *see* DPPC ¶ 193 (listing price increases and surcharges of 4-7%, at least 10%, 1.9%, 12%, 6%, 6-9%, 5%, as much as 20%, up to 40%, and 16-20%); IPPC ¶¶ 133–152 (price increases varying from 3% to 20%).  These widely varying ranges do not support an inference of coordination or agreement.

- **Different Products**:  The alleged "parallel" price increases also applied to different sets of products.  For example, some are limited to a narrow subset of product offerings (*e.g.*, DPPC ¶ 193i, IPPC ¶ 140 (Mapei USA's "acrylics and liquids in its Concrete Restoration Systems product line")), while others were across "all

---

2018, [a Defendant] . . . announced that it would be increasing prices for 'all construction chemicals' . . . by at least 10%").

[10] IPPs' ¶ 137 lists a date in February 2019 but makes no allegation.

products" or "other products," even beyond CCAs.  *See, e.g.*, DPPC ¶¶ 193e, 193g, 193j, 193k, 193l, 193o, 193q; IPPC ¶¶ 139, 141, 143, 146.

- **Different Geographies**:  And many of the alleged price increases were not applied to products in the U.S., which is where they allege they purchased CCAs. According to DPPs, some increases were allegedly imposed in "at least Europe," some were in "North America," while others were "global," and many geographies are not specified in the Complaints.  *See* DPPC ¶¶ 193f, 193j, 193n.  The IPPs allege nothing regarding the geographic scope of the alleged price increases.  *See* IPPC ¶¶ 132–152.

- **No Parallel Increases Post-Pandemic**:  Following the COVID-19 pandemic and its widespread disruption to global supply chains and financial markets, DPPs allege no price increases following March 1, 2022, and IPPs allege only a handful of price increases in the two and a half years following March 1, 2022.  *See* DPPC ¶ 193; IPPC ¶¶ 148–152.

These sporadic price events at different times, in different regions, and in different amounts are not parallel conduct as a matter of law.  Parallel conduct exists where there are "complex and historically unprecedented changes in pricing structure made ***at the very same time*** by multiple competitors, and made for no other discernible reason."  *Citigroup*, 709 F.3d at 137 (emphasis added) (quoting *Twombly*, 550 U.S. at 556 n.4).

### ii.    Plaintiffs' Allegations Regarding Earnings Statements Do Not Reflect Parallel Conduct, Only Legitimate Business Announcements

Plaintiffs attempt to create the impression of parallel conduct by claiming that Defendants' routine earnings statements, investor reports, and press releases purportedly "signaled" to other Defendants to increase price.  *See* DPPC ¶¶ 189–192, 198, 207–213; IPPC ¶¶ 131–132, 136, 147,

149–151.  However, the only public statements Plaintiffs cite are routine business announcements, common for publicly held companies, that contain only unilateral after-the-fact statements describing past performance of a particular company.  *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017) (holding that pricing information shared on a quarterly earnings call "is precisely the type of information companies legitimately convey to their shareholders" (internal quotation marks and quoted source omitted)); *In re Dynamic Random Access Memory Indirect Purchaser Litig.*, 2020 WL 8459279, at *6 (N.D. Cal. Nov. 24, 2020), *aff'd*, 28 F.4th 42, 50–51 (9th Cir. 2022) ("[N]either the context of the statements—earnings calls and investor presentations . . . [including] observations and forecasts of competitors' actions and affirmance of own actions—suggest conspiracy because they equally demonstrate interdependence.").

Public "dissemination of price information is not itself a *per se* violation of the Sherman Act."  *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975).  Public price announcements alone are insufficient.  To be actionable, Plaintiffs must allege conspiratorial intent, such as allegations that a "[d]efendant signaled its willingness to cut capacity and increase prices if the other [d]efendant acted in concert."  *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010).  None of the public statements that Plaintiffs cite are forward-looking nor do they suggest a willingness to engage in future conspiratorial conduct.

In fact, Plaintiffs do not allege that any Defendant actually heard, let alone acted on, any purported statement.  Nor do they allege that any Defendant actually increased price in response.  These allegations are thus legally insufficient to state a claim.  *See, e.g.*, *Beatty v. JP Morgan Chase & Co.* (*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*), 560 F. App'x 84, 87 (2d Cir. 2014) (affirming dismissal of plaintiffs' claim based on allegations of uneconomic trading

and "price signaling"); *Bookends & Beginnings LLC v. Amazon.com, Inc.*, 2022 WL 18144916, at
*11 (S.D.N.Y. Aug. 24, 2022), *report and recommendation adopted*, 2022 WL 4586213 (S.D.N.Y.
Sept. 29, 2022) (granting dismissal where allegations of "public signals" in various published news
articles were insufficient to infer an agreement).

      **D.**     **Plaintiffs Allege an Alternative Explanation for the Alleged Price Increase
Announcements That Is Consistent with Each Defendant's Independent Self-
Interest**

           **i.**    **Conspiracy Cannot Be Inferred Where There Is an Obvious
Alternative Explanation for Parallel Conduct**

      Plaintiffs' Complaints fail for the additional reason that Plaintiffs' ***own allegations*** provide
an "obvious alternative explanation" for the alleged price increases—the rising raw material costs,
supply chain constraints, and rapid inflation during and following the pandemic.  *Twombly*, 550
U.S. at 567 (stating conduct is "not suggestive of conspiracy" if "we have an obvious alternative
explanation").

      Parallel conduct alone is insufficient to withstand dismissal, and that is especially true
where, as here, those parallel conduct allegations are either explained by rational, independent
behavior—known as "conscious parallelism"—or where the complaint itself suggests a plausible
alternative explanation for the parallel conduct.  *See Citigroup*, 709 F.3d at 136 ("Generally,
however, alleging parallel conduct alone is insufficient, even at the pleading stage."); *Litovich v.
Bank of Am. Corp.*, 568 F. Supp. 3d 398, 415 (S.D.N.Y. 2021) (Liman, J.) ("[P]arallel conduct
does not itself establish conspiracy or a plausible inference of conspiracy"), *vacated and remanded
on other grounds*, 106 F.4th 218 (2d Cir. 2024) (Liman, J.); *see also LLM Bar Exam, LLC v.
Barbri, Inc.*, 271 F. Supp. 3d 547, 577–78 (S.D.N.Y. 2017) (same), *aff'd*, 922 F.3d 136 (2d Cir.
2019).

Conspiracy allegations "***must tend to rule out the possibility*** that the defendants were acting independently." *Twombly*, 550 U.S. at 554 (emphasis added); *see also Citigroup,* 709 F.3d at 136–37 (cautioning that merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss). Courts routinely recognize that companies in the same industry may make similar pricing decisions given market conditions. *Twombly*, 550 U.S. at 553–54 ("[C]onscious parallelism [is] a common reaction of 'firms in a concentrated market [that] recogniz[e] their interests and their interdependence with respect to price and output decisions.'" (second and third alterations in original) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)); *see also* 2 Areeda & Hovenkamp, *Antitrust Law* § 307d1 (4th ed. 2014) ("[T]he mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion."). "Conscious parallelism alone is consistent with both lawful independent conduct and an unlawful conspiracy; the mere fact of even conscious parallelism is, therefore, insufficient to establish an antitrust violation." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *27 (S.D.N.Y. Aug. 29, 2014) (citation omitted); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("Even conscious parallelism in pricing among competitors is not itself unlawful.").

Parallel conduct may suffice at the motion-to-dismiss stage where "complex and historically unprecedented changes in pricing structure [are] made at the very same time by multiple competitors, ***and made for no other discernible reason***." *Citigroup,* 709 F.3d at 137 (emphasis added) (quoting *Twombly*, 550 U.S. at 556 n.4); *Litovich*, 568 F. Supp. 3d at 417 ("There is no reason to assume the existence of a preexisting agreement from each Defendant's actions, even if all of them took similar actions" where "the alleged conspirators' conduct 'made perfect business sense[.]'") (quoting *Citigroup*, 709 F.3d at 138). But where, as here, "discernible

reason[s]" are alleged on the face of the Complaints, then the allegations do not state a claim.  *See Citigroup*, 709 F.3d at 137.

One such "discernible reason" is higher raw material costs.  In *LaFlamme v. Societe Air France*, the court granted a motion to dismiss because "as alleged in the Complaint itself, the factual context, and indeed defendants' actions therein, involved ***rapidly rising jet fuel prices*** - an obvious potential 'stimuli' and 'discernible reason' aside from collusion that plausibly could have instigated independent decisions by defendants to impose surcharges."  702 F. Supp. 2d 136, 152–153 (E.D.N.Y. 2010) (emphasis added).

Indeed, courts have held that the assumption that price increases "during the COVID-19 pandemic" were the result of a conspiracy is particularly suspect, as many industries faced rising costs during that extraordinary time.  *See, e.g.*, *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 464 (S.D. Miss. 2022) (rejecting argument of parallel conduct supporting a price fixing conspiracy when "the top 10 manufacturers of lumber . . . increase[d] lumber prices over 100 percent during the COVID-19 pandemic" and dismissing complaint).

> ### ii.  Plaintiffs' Operative Complaints Allege that Defendants Repeatedly Referred to Inflation, Rising Costs, and COVID-19-Related Supply Delays

Even assuming that Plaintiffs have alleged parallel conduct (they have not, *see* Section I.C), they have also alleged specific "discernible reason[s]" to explain the conduct.  *Citigroup*, 709 F.3d at 137.  The alleged price increases at the heart of the alleged conspiracy are explained by inflation, historically high raw material and shipping costs, and pandemic-related delays in material and shipping, ***all of which are alleged in the Complaints***.  Plaintiffs have cited statements from Defendants explicitly identifying these cost increases.  For example, Plaintiffs allege that:

- MBSA referenced "rapidly rising raw material costs and supply shortages experienced across the construction industry" and "'dramatic upticks' in the costs

of certain raw materials as well as packaging." DPPC ¶¶ 193g–h. IPPs do not allege this price increase, but do allege that the Cinven Group "blamed 'supply constraints in key raw materials' and 'an increase in raw material cost and several other related costs including freight'" for price increases in November 2020. IPPC ¶ 154.

- Euclid referenced "'significant supply challenges' and 'highly elevated' costs for raw materials and freight" stating that these increases have occurred despite "maintain[ing] rigorous cost-control measures across [its] supply chain." DPPC ¶ 193l. IPPs reference the same announcement but omit the citation and source. IPPC ¶ 143.

- Sika AG identified "a 'sharp rise' in input costs that was squeezing profit margins." DPPC ¶ 193m.[11] Sika USA further referred to "'significant negative impacts of raw material costs, supply [and] labor shortages, and trucking/shipping [issues],'" which "constrained supply and continued to exert upward pressure on material costs for Sika and the entire industry." DPPC ¶ 193p. IPPs reference the same announcement but omit the quotation and source. IPPC ¶ 145.

- RPM's VP, Controller, and CAO referenced "significant raw material inflationary pressure." DPPC ¶ 198; IPPC ¶ 154.

- Saint-Gobain's CFO explained that price increases helped "to offset the inflation," DPPC ¶ 207; IPPC ¶ 159, and a Saint-Gobain press release cited to "strong inflation." DPPC ¶ 212.

---

[11] IPPs did not make this allegation.

- Saint-Gobain's February 2021 investor report noted an "acceleration in prices." DPPC ¶ 190; *see also* IPPC ¶ 159 (referencing same in October 2021 press release). DPPs omitted the next sentence of the investor report, which states "amid inflation in raw material and energy costs . . . with inflation of the same order of magnitude expected in 2022." DPPC ¶ 190 n.215.[12]

- GCP's Specialty Construction Chemicals President stated, "[t]he global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term." IPPC ¶ 154.

- RPM's July 2023 earnings transcript noted that the company "held our pricing and held our discipline." DPPC ¶ 213; IPPC ¶ 18. Plaintiffs omitted the context of this statement: RPM's CEO was discussing the company's response to issues it experienced within its "supply chain and internally, dealing with inventory challenges and destocking across [its] distribution." DPPC ¶ 213 n.252.[13]

### iii.  Plaintiffs' Prior Complaints Also Admitted that the Cost of Key Raw Materials Increased (and Remained High) During the Alleged Relevant Time Period

Plaintiffs' initial complaints contained similar allegations regarding other raw material cost increases. For example, the SMBA Construction, LLC ("SMBA") complaint cites a chart tracking prices of polyethylene, which they characterize as "a key raw material in the manufacturing of CCAs." *See* SMBA Compl., Case 1:23-cv-10875, ECF No. 1, ¶ 104. Between March 2020 and

---

[12] *2021 Results and Outlook*, SAINT-GOBAIN (Feb. 25, 2022), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf.

[13] *Edited Transcript: Q4 2023 RPM International Inc Earnings Call*, RPM (Jul. 26, 2023), https://www.rpminc.com/media/4829/rpm-q4-23-transcript.pdf.

January 2022, the cost of polyethylene increased by an extraordinary 69% (reflecting a low price of $5,700 in March 2020 and a high price in October 2021 of $9,640 before leveling off at around $8,000 in mid-2022). *Id.*

Additionally, the Keystone Concrete Block & Supply Co. Inc. ("Keystone") complaint conceded that prices for numerous raw materials and freight costs "spiked" and then remained at historically high levels. *See* Keystone Compl., Case 2:23-cv-04723, ECF No. 1, ¶¶ 118–119 and Figures 12–13. That Complaint alleged that the raw material prices have since "fallen dramatically," *id.*, but other charts Plaintiffs cited (Keystone Compl., Figure 12) tell a very different story. The input costs of fatty acids increased by over 250% (from $50 to over $130) before falling to roughly $100, still 100% higher than the prior price, and the input costs of Synthetic Organic Plasticizers spiked from $70 to over $120 before remaining at prices around $100. *Id.*

Plaintiffs cannot run from their own factual allegations in their prior pleadings. "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings . . . that appear in the court records of prior litigation and that relate to the case sub judice." *Ferrari v. Cty. Of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011); *Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 271 (E.D.N.Y. 2017), as revised (June 16, 2017) (same).

Because Defendants each faced the same dire economic conditions during the pandemic, a similar response is both logical and reasonable. Thus, even assuming Plaintiffs allege parallel conduct (and they do not), they also allege facts to explain how that conduct could, for every Defendant, be a "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. The existence of an alternative explanation for parallel conduct unrelated to conspiracy warrants dismissal, especially because "the

complaint[s] here provide[] just such an alternative explanation." *In re Late Fee*, 528 F. Supp. 2d at 965.

## II.    PLAINTIFFS FAIL TO ALLEGE SUFFICIENT "PLUS FACTORS" TO INFER A CONSPIRACY

A "plus factor" is a catch-all label that courts have given to miscellaneous factors that do not themselves support an inference of conspiracy, but that might enhance the plausibility of such an inference if combined with "very specific allegations about the nature of the defendants' parallel conduct." *Citigroup*, 709 F.3d at 137.  None of the purported "plus factors" Plaintiffs allege are sufficient to infer a conspiracy, and all are consistent with "independent competitive conduct, whether analyzed in isolation or 'holistically.'"  *See Litovich*, 568 F. Supp. 3d at 416.

### A.    The Court Cannot Infer a Conspiracy from Membership in Domestic and International Trade Associations

Plaintiffs allege that Defendants' membership in over a dozen primarily foreign trade associations creates an inference of a conspiracy.  DPPC ¶¶ 16, 154; IPPC ¶¶ 122, 124, 130.  But membership alone is not nearly enough.  *LaFlamme*, 702 F. Supp. 2d at 148 ("membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement").  Membership in trade associations is a common and procompetitive business activity in nearly all industries, and it suggests nothing nefarious.

Critically, Plaintiffs do not allege *any* examples of improper communications, agreements, or collusion arising out of any trade association meetings.  Instead, Plaintiffs cite only to Defendants' *membership* in these—primarily foreign—trade associations.  DPPC ¶¶ 155–186; IPPC ¶¶ 123–130.  That is insufficient as a matter of law.  The Second Circuit has expressly stated that "a trade association is *not* by its nature a 'walking conspiracy,'" and demands more particularized allegations as to the role of individual members.  *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) (emphasis added) (quoting *Consol. Metal*

*Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–294 (5th Cir. 1988)).  Plaintiffs' failure to allege a ***single particularized allegation*** about the role of ***any*** trade association member is fatal to their attempt to rely on trade association participation as a plus factor.  *In re Elevator Antitrust Litig.*,  2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006) (stating "[an] allegation that elevator company executives attend trade, industry, or social functions together is clearly insufficient to state a claim"), *aff'd*, 502 F.3d 47 (2d Cir. 2007); *see also Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) (stating "[a]n allegation that Joint Defendants had the opportunity to interact and make an agreement does not nudge Named Plaintiffs' claims across the line from conceivable to plausible") (internal quotations and citation omitted); *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) ("[S]imply alleging an opportunity to conspire without providing any evidence whatsoever that any such discussions actually took place is insufficient to survive a motion to dismiss.").

In fact, Plaintiffs' allegations do not even suggest an ***opportunity*** to conspire regarding U.S. prices because the Complaints focus on over a dozen trade associations in ***Europe, the UK and Turkey***.[14]  Plaintiffs offer no explanation as to how this foreign conduct translates into a conspiracy affecting U.S. commerce.  *See In re Elevator Antitrust Litig.*, 502 F.3d at 52 ("Allegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'"); *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F. Supp. 1102, 1107 (S.D.N.Y. 1984) (dismissing plaintiffs' claims where they "failed to allege any facts

---

[14] DPPC ¶¶ 159–186.  IPPs allege only generally that some Defendants are members of 13 different national European and Turkish trade groups but do not identify which Defendants are members of which group.  IPPC ¶ 125.

demonstrating a causal connection between defendants' conduct in Europe and the price increase in the United States").

Nor is the single U.S. trade association that Plaintiffs cite suggestive of a conspiracy. Not only do they fail to allege a single meeting or communication regarding that trade association, but Plaintiffs also acknowledge that members include CCA buyers (i.e. **customers**)—like Plaintiffs and their putative class members. DPPC ¶ 158 (stating "many of NRMCA's members are buyers who buy CCAs directly from Defendants"); *see also* IPPC ¶ 124. Plaintiffs' own factual allegations render implausible any inference that its meetings were used as mechanisms for collusion. In sum, Plaintiffs allege nothing more than "participation in trade associations or conferences [which] cannot support the [Plaintiffs'] allegations of a conspiracy." *Hinds*, 620 F. Supp. 2d at 513.

### B.  The Existence of Government Investigations Is Insufficient to Infer a Conspiracy

Plaintiffs cite news reports that the EC, CMA, and TCA carried out inspections of "companies active in the construction chemicals sector in several Member States," DPPC ¶ 4; IPPC ¶ 8, and that the EC and CMA were in communication with the DOJ. DPPC ¶ 5; IPPC ¶¶ 8–9. Plaintiffs implicitly suggest that illegal agreements can be inferred from the existence of these investigations. DPPC § IV.C; IPPC ¶¶ 8–12. But these news reports do not support an inference of conspiracy. They do not disclose any details of the investigation (including specific targets), reveal no evidence of wrongdoing, and do not even mention all of the Defendants in this lawsuit.

*First*, under settled law in this Circuit, "[t]he mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct" cannot constitute a "plus factor." *In re Mexican Gov't Bonds*, 412 F. Supp. 3d at 390 (internal citation omitted); *City of*

*Pontiac*, 92 F.4th at 405 (a DOJ investigation does not "circumstantially allow the inference that a conspiracy existed" particularly where "Plaintiffs do not allege any enforcement action taken or charges brought as a result of the investigation"); *Hinds*, 620 F. Supp. 2d at 514 ("[I]nvestigations, inquiries, and subpoenas do not make the [Complaints'] allegations plausible"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (existence of a pending investigation "carries no weight" in pleading an antitrust claim). Moreover, "there is no information in [Plaintiffs' Complaints] about the progress of [any] of these investigations and there is no indication from any of these proceedings that wrongdoing of the kind alleged has occurred." *Hinds*, 620 F. Supp. 2d at 514. This is fatal under *Twombly*.

**Second**, most of Plaintiffs' allegations involve foreign investigations in Europe. Plaintiffs allege in a conclusory manner that the "conduct in question extended into the [U.S.,]" but Plaintiffs' factual allegations do not connect any non-U.S. conduct to the U.S. DPPC ¶ 5; *see also* IPPC ¶¶ 8–11 (making no allegations of any effect on U.S. markets). "[T]he Second Circuit has expressly rejected this sort of 'if it happened there, it could have happened here' reasoning," and Plaintiffs do not allege any facts that support that inference in this case. *In re Mexican Gov't Bonds*, 412 F. Supp. 3d at 391 (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (allegations of European misconduct "provide an insufficient factual basis for their assertions of a worldwide conspiracy affecting a global market . . . Without adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not 'nudge [their] claims across the line from conceivable to plausible.'") (alteration in original) (quoting *Twombly*, 550 U.S. at 570).

**Third**, Plaintiffs' specific allegations omit most of the Defendants. With respect to the EC and DOJ investigations, the allegations never connect numerous Defendants to either investigation

(including Defendant Cinven UK and Cinven USA, the "BASF Group," or the RPM Group) or to the CMA investigation (including the "BASF Group" or the RPM Group).  Indeed, Plaintiffs admit they are unsure of the scope of the DOJ investigation, merely speculating that "its investigation involves one or more Defendants."  DPPC ¶ 151; *see also* IPPC ¶ 7 (alleging generally the initiation of an investigation without identifying any particular subjects).  Further, the Turkish investigation, as Plaintiffs admit, is limited to "Turkish unit[s]," which are separate affiliates operating in Turkey and never named in any Complaint.[15]  DPPC ¶ 150; IPPC ¶ 11.

**Fourth**, while Plaintiffs ask the Court to infer wrongdoing, the sources they cite do not support such an inference.  *See, e.g.*, DPPC ¶ 5 n.5 (citing source that states "The CMA stated that 'at this stage no assumptions should be made about whether competition law has been broken'.  Similarly, the EC emphasized that its inspections do 'not mean that the companies are guilty of anticompetitive behaviour nor does it prejudge the outcome of the investigation itself.'").[16]  DPPC ¶ 5 n.5 (citing source that states "Unannounced inspections are a preliminary investigatory step, the Commission said, and no allegations have yet been levelled against any company, with no current deadline to complete its inquiries.").[17]

## C.     Past Industry Mergers Are Insufficient to Infer a Conspiracy

Plaintiffs also cite industry acquisitions as purported evidence of a conspiracy.  DPPC ¶ 12; IPPC ¶¶ 116–121.  Without any factual basis or specificity, Plaintiffs allege that Saint-Gobain

---

[15] Plaintiffs only admit this for one Defendant but their source lists only Turkish subsidiaries.  *See* DPPC ¶ 150 n.139, *Investigation Initiated About Undertakings Operating in the Market for Construction Chemicals in Turkey*, REKABET KURUMU (TCA) (Dec. 19, 2023), https://www.rekabet.gov.tr/en/Guncel/investigation-initiated-about-undertakin-13ea2baf0b9fee118eca00505685da39.  IPPs omit this source.

[16] *Competition Regulators Probe Concrete Additive Firms,* CONSTRUCTION NEWS (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023.    IPPs omit this source.

[17] *EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation*, ICIS (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation.  IPPs omit this source.

and Sika AG "agreed to a joint worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their mutual competitors between 2017 and the present." DPPC ¶ 12; *see also* IPPC ¶ 21 (the agreement was effectuated through "a series of inter-defendant sales and acquisitions"). While the Complaints allege that some Defendants acquired competitors, they do not allege any facts plausibly suggesting that any Defendant agreed with any other Defendant (let alone all of them) that they would do so. *See* DPPC ¶ 12; IPPC ¶¶ 117–121. *Twombly* dictates that such bare allegations, "on fair reading . . . are merely legal conclusions" insufficient to survive a motion to dismiss." 550 U.S. at 564; *see also Greco v. Mallouk*, 2024 WL 4119169, at *6–7 (N.D. Ill. Sept. 9, 2024) (rejecting allegation of "communications between [two defendants] about pricing and confidential information in the context of due diligence for mergers and acquisitions" as "conclusory and lacking the requisite factual content" to infer a conspiracy). Although Plaintiffs contend that Defendants' "alleged conspiracy was born from [an] attempted merger," Plaintiffs allege no facts to support their conclusion—just conclusory allegations—that co-Defendants Mapei, RPM, MBS, BASF Group, and Cinven "joined this unlawful conspiracy." *See* DPPC ¶ 12. And with respect to BASF Group, Plaintiffs' *specific* admission—that "BASF Group" sold its construction chemicals business to a hedge fund instead of Sika or another competitor, *see* DPPC ¶ 223—undermines their conclusory allegations.

### D.    Plaintiffs' Regression and Price Index Allegations Undermine, Rather Than Support, Their Conspiracy Claims

Plaintiffs allege that certain pricing indices show increasing prices in the construction industry and thus support an inference of a conspiracy. DPPC ¶ 187.[18] But they support the opposite inference—that Defendants' price increases were economically justified. For example, Plaintiffs allege that the construction-cost-index (CCI) increased by 11%. DPPC ¶ 187. But this

---

[18] IPPs do not make this allegation.

allegation suggests that **all** prices were increasing in the industry, as the CCI measures the costs of materials, equipment, salaries, and transportation across the entire construction industry. CCAs are only a sliver of that index. Industry-wide price increases strongly support an inference that Defendants' price increases were normal, independent behavior given rising costs. DPPC ¶ 187.

Plaintiffs also allege that a "dummy variable multiple regression" analysis suggests that "prices for CCAs in the United States were higher than can be explained by normal market forces." DPPC ¶ 200; *see also* IPPC ¶ 5. Plaintiffs claim that this analysis is "consistent with collusion." DPPC ¶ 200; *see also* IPPC ¶ 5. This claim is fatally defective for three reasons.

***First***, Plaintiffs' "regression"—based on entirely undisclosed data—purports to show aggregated or industry-wide statistical evidence. Courts have repeatedly rejected such analyses as evidence of agreement. *See Litovich*, 568 F. Supp. at 426–31 (rejecting argument that statistical analyses reflecting averages support individualized allegations against defendants); *City of Pontiac*, 92 F.4th at 400 (rejecting regression model because averages can "flatten or hide trends that might tell a different story, and they can be finessed by shifting the time periods being averaged") (internal citation and quotation marks omitted).

Critically, this model does nothing "to tie specific defendants to the conspiracy" as is required. *See In re European Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *15 (S.D.N.Y. July 23, 2020). Instead, Plaintiffs analyze meaningless "averages" that mask variation in the data, which reveal nothing about the individual actions of any Defendant. Lumping together average industry data obscures underlying trends, variations, or outliers. And none of Plaintiffs' charts purport to identify the pricing activity of individual Defendants. Accordingly, Plaintiffs' regressions are "not sufficient to meet the plausibility test under *Iqbal*" or "establish the presence

of a conspiracy." *See 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (dismissing complaint).

**Second,** Plaintiffs provide **no details** as to their regression, yet summarily state that it supports their claims. For example, Plaintiffs do not allege what variables are included, providing only vague indications (*e.g.*, controlling for "raw material cost" but never specifying which raw materials), or **what data** they fed into the regression (not even identifying the public data sources they used). Plaintiffs' Complaints leave the Court with no information to evaluate whether the regression has any legal or economic significance at all.

Plaintiffs describe their regression methodology in **only a single sentence** in their Complaints (DPPC ¶ 200; IPPC ¶ 5) and provide no means by which to confirm that the regression does not suffer from any number of fatal modelling flaws such as omitted-variable bias.[19] Without substantially more details, Plaintiffs' model cannot be credited with the statistical relevance they allege in the Complaints. *See In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *16 (S.D.N.Y. Mar. 31, 2021) (granting motions to dismiss and finding plaintiffs' generalized statistical analysis "which [was] not aimed at any particular [] Defendant" insufficient).

**Third**, even Plaintiffs' regression estimates a significant price increase over the relevant time period in their "but for" model—appearing to start at about $110 in 2017 and peaking at roughly $140 in 2022, a nearly 30% price increase. DPPC ¶ 201; IPPC ¶ 3. This admission undermines Plaintiffs' allegations that any price increases were suspicious.

---

[19] Plaintiffs ignore relevant variables such as inflation, energy costs, research and development costs, fixed costs, supply chain disruptions, and regulatory changes, as well as variations between Defendants, such as product quality, services, and geographic variation.

### E.    Plaintiffs' Profit Motive and Supra-Competitive Pricing Allegations Are Not Plus Factors

Next, Plaintiffs allege that Defendants purportedly share a common motive to conspire: increased profits. DPPC ¶¶ 21, 206–210; IPPC ¶¶ 158–161, 165. Higher profits alone—as a matter of law—are insufficient to prove a common motive or sustain a conspiracy claim. *In re Late Fee*, 528 F. Supp. 2d at 964. Indeed, "if a motive to achieve higher prices were sufficient, every company in every industry could be accused of conspiracy because they all would have such a motive." *Id.* (internal citation and quotations omitted).

These allegations are insufficient to allege a common motive to conspire. Mere allegations that "Defendants' [have a] joint motivation to conspire to *support* the market" "do not plausibly suggest a "common motive to conspire." *Citigroup*, 709 F.3d at 138–39 (emphasis in original) (internal citations omitted). Defendants' conduct is consistent with robust, independent competition. Plaintiffs' unspecific allegations thus do not support an inference of antitrust conspiracy.

### F.    The Market Structure Allegations Are Insufficient to Support an Inference of a Conspiracy

And finally, Plaintiffs allege that the market is "highly susceptible to collusion" because (1) Defendants combined constitute the majority of the market, (2) there are high barriers to entry, (3) there are no substitutes, and (4) demand is inelastic. DPPC § IV.I; IPPC § IV.F. Plaintiffs must allege "more than the existence of a climate in which such a conspiracy may have been formed." *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982) (finding on a full evidentiary record that market-related facts such as the "relationship of these parties to each other" and "the history of the . . . industry" had low "qualitative value" to determine if "the parties actually entered into a conspiracy").

27

*First*, in *Citigroup*, the Second Circuit rejected allegations that common market characteristics were sufficient to allege a common motive to conspire. *See* 709 F.3d at 138–39. The court rejected allegations that the market was "highly concentrated" and full of "barriers that discouraged entry" because they "simply restate the (legally insufficient) fact that market behavior is interdependent." *Id.*; *Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, 2024 WL 4202680, at *9 (S.D.N.Y. Sept. 13, 2024) ("General plus factors indicate only that the market as a whole may be susceptible to collusion, and thus are not enough.") (internal citation and quotations omitted); *Pro Music Rts., LLC v. Apple, Inc.*, 2020 WL 7406062, at *5 (D. Conn. Dec. 16, 2020) ("[T]he structure of the . . . market does not constitute a plus factor or circumstantial evidence in [Plaintiff]'s favor."); *see also Litovich*, 568 F. Supp. at 433 ("Plaintiffs have not plausibly pled a common motive to conspire . . . because Plaintiffs have not demonstrated supracompetitive pricing."). Further, neither size nor market power is a plus factor. *Citigroup*, 709 F.3d at 139 (rejecting allegations of a "highly concentrated" market with "barriers that discouraged entry" as "legally insufficient" and mere evidence of an "oligopolistic market").

Here, Plaintiffs allege only basic and common industry characteristics as evidence of a conspiracy. This is insufficient to establish a plus-factor.

*Second*, Plaintiffs' own alleged sources contradict their allegations. Plaintiffs, without citation (and contrary to their own source), allege that Defendants represent 80% of the CCA market and 80–90% of the U.S. market, but cite only to a British CMA Report calculating shares for the **United Kingdom**. DPPC ¶ 127 n.112.[20] Plaintiffs' own Complaints name six different corporate families (and 18 different legal entities), and other unnamed companies, as competitors.

---

[20] IPPs allege the same in a conclusory manner—that the CCA market is "highly concentrated"—but they provide no source or even estimate of market shares for this conclusion and, like DPPs, cite to a British CMA Report analyzing the UK market for support. *See* IPPC § IV.F.1, ¶ 168.

*See* DPPC ¶¶ 2, 101; IPPC ¶¶ 40–88.  A market comprised of numerous competitors does not support an inference of high concentration.

 **Third**, Plaintiffs allege that Defendants' existing customer and supplier relationships are a barrier to entry.  But this is a universal characteristic of every industry—existing competitors have customers and suppliers while future or nascent competitors do not—which cannot constitute an independent "plus factor."  *See Citigroup*, 709 F.3d at 139.[21]

 For all of these reasons, Plaintiffs' so-called "plus factors" are insufficient to support any inference that a conspiracy existed.

## III. PLAINTIFFS FAIL TO ALLEGE FACTS TYING EACH DEFENDANT TO THE "CONSPIRACY"

 Plaintiffs fail to allege sufficient facts tying each individual Defendant to the alleged conspiracy and instead rely on group pleading which fails as a matter of law.

 A plaintiff must plead facts "to tie specific defendants to the conspiracy."  *In re European Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *15.  Particularly "at the pleading stage in [an] antitrust case . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 384.  Generalized allegations are insufficient if Plaintiffs have not done enough to allege "whether--and, if so, which--of the" Defendants "participated in the alleged conversations or, more broadly, the conspiracy."  *City of Pontiac*, 92 F.4th at 396–97.

 Plaintiffs' allegations fall far short of this requirement.  A few examples illustrate this point.  Plaintiffs point to government investigations in foreign countries but allege only broadly

---

[21] Plaintiffs also contend that "the research and development investment required to develop new products" is a barrier to entry.  DPPC ¶ 238; *see also* IPPC ¶ 171.  But that contention is directly contradicted by Plaintiffs' own allegations and sources.  In particular, Plaintiffs allege that CCAs are commodity products that are "not differentiated," and are "homogenous[.]"  DPPC ¶ 248; *see also* IPPC ¶ 112 ("There is no innovation concern in this case. 'True' innovation and R&D in the supply of chemical admixtures is extremely limited.").

that these investigations "related to the concrete and cement additives industry" in the U.S. and that subpoenas were issued to "CCA market players, including on information and belief all of the U.S.-based Defendants."  IPPC ¶ 7; *see also* DPPC ¶ 6.  But the Complaints do not base any of these vague allegations on real-world factual allegations.  For Defendants RPM and Euclid, for example, the Complaints never specifically allege that either entity was investigated by any antitrust authority in the world, including the DOJ.  This lack of specific allegations is fatal to Plaintiffs' claims because they fail to sufficiently allege facts tying specific Defendants to the alleged conspiracy.

Similarly, Plaintiffs do not allege that RPM raised prices, or that RPM or Euclid were even members of nearly a dozen trade associations.  What is left as to RPM and Euclid is not much— only allegations that (1) some of their senior executives made earnings statements that discussed prices or profits (DPPC ¶¶ 14, 191, 198, 209, 213; IPPC ¶¶ 18, 147, 150, 154, 157, 160, 164); (2) RPM acquired Brett Admixtures (DPPC ¶ 226), and a part of Chryso (DPPC ¶¶ 19, 226; IPPC ¶ 119); (3) RPM, or its Turkish subsidiary, is a member of a single Turkish trade association (DPPC ¶ 183);[22] (4) Euclid is a member of a single U.S. trade association and has a licensee that is a member of a Turkish trade association (DPPC ¶¶ 155, 185); and (5) Euclid has raised prices a single time during the entire seven-year alleged conspiracy period (DPPC ¶ 193l)  Taken together, Plaintiffs have alleged only basic competitive behavior for this particular Defendant group which is not remotely sufficient to infer participation in a conspiracy.

---

[22] IPPs identify 13 different national European and Turkish trade groups but never which Defendants are members of each group.  IPPC ¶ 125.

The allegations are even more sparse for Defendant BASF Corporation.[23]  Plaintiffs allege a single allegation specific to this entity—that it is a member of the NRMCA.  DPPC ¶¶ 17, 155; IPPC ¶ 123.  For all other allegations, Plaintiffs seek only to tie BASF Corporation to its corporate parent or sister affiliates.  These allegations are woefully insufficient.  For example, there is nothing to suggest that Defendant BASF Corporation was involved in any conspiracy prior to or after selling its CCA business to hedge fund Lone Star in 2020.  DPPC ¶ 223.  The sole allegation tying BASF Corporation to the alleged conspiracy is a statement that in 2023 the TCA announced an investigation into "BASF Group's Turkish unit"—not BASF Corporation.  DPPC ¶ 9; *see also* IPPC ¶ 11 (alleging same as to "BASF's Turkish unit").  Nor does either Complaint allege that any BASF entity is being or has been investigated by the DOJ.  Further, Plaintiffs allege only that "BASF Group"—not BASF Corporation—raised prices two times during the seven-year class period, allegedly affecting two locations outside the U.S.—Europe (on May 15, 2017) and Japan (on May 14, 2018), neither of which is alleged to have any effect on the U.S. market.  DPPC ¶¶ 193 a–b.  Together, these allegations do nothing to tie BASF Corporation to the alleged conspiracy.

The same is true as to Mapei Corporation.  There is not a single allegation tying Mapei Corporation to any conspiracy.[24]  There are no allegations that even suggest Mapei Corporation coordinated—or even communicated—with anyone, let alone any of the Defendants, to fix prices in the CCA market.  And there are no allegations that Mapei Corporation engaged in any of the acquisition activity that is central to the Plaintiffs' claims regarding the alleged conspiracy's origin and expansion.  *See* DPPC ¶ 12; IPPC § IV.C.  Instead, the Complaints allege only that Mapei Corporation is a member of a single trade association (the NRMCA), *see* DPPC ¶¶ 17, 155; IPPC

---

[23] The Complaints sometimes refer to BASF Corporation as BASF USA.

[24] The Complaints sometimes refer to Mapei Corporation as Mapei USA.

¶ 123, and that it issued a single price increase during an alleged seven-year conspiracy, *see* DPPC ¶ 193i; *see also* IPPC ¶ 140.  The very few vague allegations elsewhere that reference "Mapei Group,"[25] or even more vaguely "Mapei,"[26] are, in fact, impermissibly vague and do not tie Mapei Corporation to anything.

These examples not only highlight the insufficiency of allegations as to these particular entities but also cast doubt broadly on the sufficiency of **all** of Plaintiffs' allegations, as they rely throughout the Complaints on generalized allegations, foreign conduct without a U.S. effect, and groupings of Defendant families to make broader allegations as to U.S.-based Defendants.

## <u>CONCLUSION</u>

For the foregoing reasons, all claims should be dismissed with prejudice.

---

[25] Plaintiffs allege that the "Mapei Group" increased prices in the UK in March 2022, *see* DPPC ¶ 193q; and that the "Mapei Group" is under investigation by antitrust authorities in the United Kingdom, Turkey, and North America, *see* DPPC ¶ 9, 10, 146.

[26] Plaintiffs allege that "Mapei" increased prices in an unknown jurisdiction in January 2023, *see* IPPC ¶ 148, and March 2024, *see* IPPC ¶ 152.

Dated: November 8, 2024

Respectfully submitted,

/s/ *Mark H. Hamer*
Mark H. Hamer (*pro hac vice*)
Mark G. Weiss (*pro hac vice*)
Ashley B. Eickhof (*pro hac vice*)
BAKER MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: (202) 452-7000
mark.hamer@bakermckenzie.com
mark.weiss@bakermckenzie.com
ashley.eickhof@bakermckenzie.com

*Counsel for Defendants Sika Corporation and Sika AG*

/s/ *Marguerite M. Sullivan*
Marguerite M. Sullivan
Jennifer L. Giordano
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
marguerite.sullivan@lw.com
jennifer.giordano@lw.com

Elizabeth B. Prewitt
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (202) 906-1200
elizabeth.prewitt@lw.com

*Counsel for Defendants Compagnie de Saint-Gobain, S.A., Saint-Gobain Corporation, Chryso S.A.S., Chryso, Inc., and GCP Applied Technologies, Inc.*

/s/ *Daniel E. Laytin*
Daniel E. Laytin (*pro hac vice*)
Christa C. Cottrell (*pro hac vice*)
Anne I. Salomon (*pro hac vice*)
KIRKLAND & ELLIS
333 West Wolf Point Plaza
Chicago, IL 60654
Tel: (312) 862-2000
daniel.laytin@kirkland.com
ccottrell@kirkland.com
anne.salomon@kirkland.com

*Counsel for Defendants Cinven Ltd., Cinven, Inc., Master Builders Solutions Admixtures US, LLC, and Master Builders Solutions Deutschland GmbH*

/s/ *Shylah R. Alfonso*
Shylah R. Alfonso (*pro hac vice forthcoming for Emme Esse Vi S.r.l. & Mapei S.p.A.*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Tel: (206) 359-8000
salfonso@perkinscoie.com

Shari A. Brandt
PERKINS COIE LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
Tel: (212) 262-6900
sbrandt@perkinscoie.com

*Counsel for Defendants Mapei Corporation, Emme Esse Vi S.r.l., and Mapei S.p.A.*

/s/ *Andrew S. Marovitz*
Andrew S. Marovitz (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
amarovitz@mayerbrown.com

Rachel J. Lamorte
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3262
rlamorte@mayerbrown.com

*Counsel for Defendant BASF Corporation*

/s/ *Abram Ellis*
Abram Ellis
SIMPSON THATCHER & BARTLETT LLP
900 G Street, NW
Washington, D.C. 20001
Tel: (202) 636-5579
aellis@stblaw.com

Peter Guryan
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
peter.guryan@stblaw.com

*Counsel for Defendants RPM International Inc. and The Euclid Chemical Company*