UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/25/2025__

| |
|---|
| IN RE: CONCRETE AND CEMENT ADDITIVES ANTITRUST LITIGATION |
| This documents Relates To: <br><br> ALL ACTIONS |

24-md-3097 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This multidistrict litigation concerns an alleged conspiracy to fix the price of (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing additives or admixtures (collectively "CCAs").

Defendants consist of six corporate families that manufacture and sell the vast majority of CCAs sold in the United States and its territories, as well as in Europe.[1]  There are two putative plaintiff classes: (1) direct purchasers that directly purchased CCAs from the Defendants ("Direct Purchaser Plaintiffs") and (2) indirect purchasers that indirectly purchased CCAs that were manufactured by one of more of the Defendants ("Indirect Purchaser Plaintiffs" and, together with the Direct Purchaser Plaintiffs, "Plaintiffs").

Plaintiffs seek relief under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, as well as a host of state antitrust and consumer protection statutes and common law unjust enrichment. Dkt. No. 135 ¶¶ 220–536; Dkt. No. 157 ¶¶ 282–290.  Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6), to dismiss all of Plaintiffs' claims.  Dkt. Nos. 223, 225, 227, 229, 297.

---

[1] Defendants consist of the Sika Group, Saint-Gobain Group, Cinven Group, BASF Group, RPM Group, and Mapei Group, all of which are described in greater detail below.

For the following reasons, Defendants' motions to dismiss are granted.

## BACKGROUND

For purposes of the motions to dismiss, the Court accepts as true the allegations of the relevant complaints.

### A.     Relevant Parties

The Direct Purchaser Plaintiffs are U.S. businesses that directly purchased CCAs from one or more of the Defendants.  Dkt. No. 157 ¶¶ 27–33.

The Indirect Purchaser Plaintiffs are U.S. businesses that purchased CCAs other than directly from one or more of the Defendants.  Dkt. No. 135 ¶¶ 28–39.

Defendants are six corporate families that manufacture and sell CCAs.[2]  The following descriptions state the families' alleged current compositions.

The "Sika Group" consists of Swiss corporation Sika AG and its wholly owned New Jersey-based subsidiary Sika Corporation ("Sika USA").  Dkt. No. 135 ¶¶ 6, 43–45; Dkt. No. 157 ¶¶ 2, 34–37.

The "Saint-Gobain Group" consists of the French conglomerate Compagnie de Saint-Gobain S.A. ("Saint-Gobain France"), three wholly owned U.S. subsidiaries—the Pennsylvania-based Saint-Gobain Corporation d/b/a Saint-Gobain North America ("Saint-Gobain USA"), the Georgia-based GCP Applied Technologies, Inc. ("GCP"), and the Texas-based Chryso, Inc. ("Chryso USA")—and Chryso USA's French parent, Chryso S.A.S. ("Chryso France" and together with Chryso USA, "Chryso").  Dkt. No. 135 ¶¶ 6, 53–60; Dkt. No. 157 ¶¶ 2, 49–57.

---

[2] The Direct Purchaser Plaintiffs also assert claims against Doe Defendants 1–100, which they describe as "members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiffs" and include "industry bodies" as well as "each Defendant's wholly owned and/or controlled subsidiaries, affiliates, and/or agents that imported CCAs into the United States and its territories" other than those named herein.  Dkt. No. 157 ¶ 101.

The "Cinven Group" consists of British corporation Cinven Limited ("Cinven UK") and New York-based U.S. corporation Cinven, Inc. ("Cinven USA" and together with Cinven UK, "Cinven"), as well as Cinven's wholly owned subsidiaries Master Builders Solutions Admixtures U.S., LLC ("MB-USA"), which was based in Ohio, and Master Builders Solutions Deutschland GmbH ("MB-Germany" and together with MB-USA, "MBS"). Dkt. No. 135 ¶¶ 6, 72–75; Dkt. No. 157 ¶¶ 2, 75–80. Cinven UK. also owned Chryso until 2021, when it sold the company to Saint-Gobain France. Dkt. No. 135 ¶ 72.

The "BASF Group" consists of German conglomerate BASF SE and its wholly-owned, New Jersey-based U.S. subsidiary, BASF Corporation ("BASF USA"). *Id.* ¶¶ 6, 40–42; Dkt. No. 157 ¶¶ 2, 84–88. BASF SE also owned MB-Germany and MB-USA until September of 2020 when it sold the companies to Cinven. Dkt. No. 157 ¶ 89.

The "RPM Group" consists of U.S. corporation RPM International Inc. ("RPM") and its wholly-owned U.S. subsidiary, the Euclid Chemical Company ("Euclid"). Dkt. No. 135 ¶¶ 6, 78–79; Dkt. No. 157 ¶¶ 2, 90–92. Both RPM and Euclid are based in Ohio. Dkt. No. 135 ¶¶ 6, 78–79; Dkt. No. 157 ¶¶ 90–91.

The "Mapei Group" consists of the Italian conglomerate Emme Esse VI S.R.L. ("Emme Esse"), its wholly owned Italian subsidiary Mapei S.p.A. ("Mapei Italy"), and its wholly owned Illinois-based U.S. subsidiary Mapei Corporation ("Mapei USA"). Dkt. No. 135 ¶¶ 6, 81–83; Dkt. No. 157 ¶¶ 2, 95–99.

Collectively, Defendants control between 80–90% of the U.S. market share for CCAs. Dkt. No. 135 ¶ 114; Dkt. No. 157 ¶ 127.[3]

---

[3] Plaintiffs allege that "[o]n information and belief, Plaintiffs estimate that Defendants' market share in the United States is between eighty and ninety percent (80–90%)." Dkt. No. 135 ¶ 114; Dkt. No. 157 ¶ 127. While the Indirect Purchaser Plaintiffs do not provide a basis for their belief,

B.    CCAs

Cement is a binding agent made from limestone and clay.  Dkt. No. 135 ¶ 95; Dkt. No. 157 ¶ 109.  It is used extensively in buildings in the United States.  Dkt. No. 135 ¶ 95.  In 2022, cement production in the United States reached a ten-year high, amounting to 95 million metric tons.  *Id.*; Dkt. No. 157 ¶ 106.  Traditional cement, known as Portland cement, is a mixture of burned limestone, clay, and other minerals and chemicals, including cement additives, that are ground to create a powder that hardens when combined with water.  Dkt. No. 135 ¶ 95; Dkt. No. 157 ¶ 109.  Cement manufacturing is highly energy-intensive and produces a large amount of $CO_2$ gases.  Dkt. No. 135 ¶¶ 95, 98.

Concrete mix is a combination of cement, aggregates such as sand and gravel or crushed stone, water, and often admixtures depending on the application.  *Id.* ¶ 96; Dkt. No. 157 ¶ 109.  It is a key resource for construction projects in the United States—over half of structures shorter than three-stories in the United States are built using concrete.  Dkt. No. 135 ¶ 96; Dkt. No. 157 ¶ 107.

---

the Direct Purchaser Plaintiffs cite a report by the United Kingdom's antitrust agency.  Dkt. No. 157 ¶ 127 n.112 (citing Competition and Markets Authority, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022)).  Defendants argue that the Direct Purchaser Plaintiffs' cited source pertains only to market share in the United Kingdom and thus contradicts Plaintiffs' allegations.  Dkt. No. 224 at 28 & n.20.  The Second Circuit has made clear that "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from "pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant."  *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quotations and citation omitted); *see also SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 533 n.6 (S.D.N.Y. 2022).  For the purposes of the motions to dismiss, the Court will consider only Plaintiffs' allegations; it will not consider unquoted materials minutely referenced and not appended to either complaint.  *See Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2022 WL 17067984, at *16 (S.D.N.Y. Nov. 17, 2022).  Furthermore, even if the Court could consider Defendants' argument that the cited report speaks only to Defendants' share of the U.K. market for CCAs, that would not contradict Plaintiffs' allegation pertaining to Defendants' share of the U.S. market.

Mortar is a combination of cement and sand and is primarily used to hold in place ready-made building units such as bricks or blocks.  Dkt. No. 135 ¶ 97; Dkt. No. 157 ¶¶ 108–109.

CCAs are chemicals that are added to concrete, cement, or mortar before or during the aggregate's mixing with water in order to give the finished product certain qualities, such as reducing the amount of energy needed to grind the cement, reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing the product or preventing cracking, and inhibiting corrosion.  Dkt. No. 135 ¶¶ 90, 94, 102–104; Dkt. No. 157 ¶¶ 1, 105, 113, 115–116.  CCAs are made by blending various polymers and other chemicals.  Dkt. No. 157 ¶ 117.

## C.    The CCA Market

CCA manufacturers sell CCAs both directly to suppliers of cement and ready-mix concrete and masonry, as well as indirectly to distributors and retailers.  Dkt. No. 135 ¶¶ 108, 110; Dkt. No. 157 ¶ 125.  CCAs are sold in either liquid or powder form and are usually sold ready-to-use so that they can be added to cementitious products either at the plant where the cementitious products are produced or at the jobsite where the cementitious products are to be used.  Dkt. No. 135 ¶ 106; Dkt. No. 157 ¶¶ 119–122.  In 2022, the global market for CCAs reached more than $27 billion.  Dkt. No. 135 ¶ 111.  The U.S. market was valued at $3.1 billion in 2022 and is expected to reach an estimated $4.7 billion by 2032.  *Id.*

Plaintiffs allege that the structure and other characteristics of the market for CCAs make it highly susceptible to collusion.  *Id.* ¶¶ 165–180; Dkt. No. 157 ¶¶ 229–256.

The market is highly concentrated, with Defendants controlling 80–90% of the market. Dkt. No. 135 ¶¶ 16, 114; Dkt. No. 157 ¶¶ 127, 230–233, 236.  Other, smaller, CCA manufacturers cannot meaningfully compete with Defendants because of challenges in scaling up their

operations, as well as the reluctance of CCA purchasers to switch from their existing CCA suppliers. Dkt. No. 157 ¶ 234.

Would-be entrants to the market face high barriers to entry including (a) the time and cost required to effectively scale CCA manufacturing operations (*i.e.*, by building new production and storage facilities in close proximity to CCA purchasers); (b) the research and development investment required to develop new products and get them to market; (c) the tendency of suppliers of the raw materials necessary to manufacture CCAs to favor the larger, entrenched manufacturers; (d) the long-standing, existing relationships between CCA manufacturers and their customers; and (e) the fact that supply contracts typically last for one to three years, thereby locking purchasers into contracts to purchase from existing manufacturers. Dkt. No. 135 ¶¶ 171–173; Dkt. No. 157 ¶¶ 237–239.

The demand side of the market is unconcentrated and inelastic. Dkt. No. 135 ¶¶ 175–178; Dkt. No. 157 ¶¶ 242–252. In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States. Dkt. No. 135 ¶ 176; Dkt. No. 157 ¶ 242. CCA purchasers typically buy the majority of their CCAs from a single supplier. Dkt. No. 157 ¶ 124. CCAs are commodity products and sellers compete largely on price as opposed to quality or other differing attributes. Dkt. No. 135 ¶ 112; Dkt. No. 157 ¶¶ 114, 248. CCAs are homogenous products and, controlling for the type of CCA, any differentiation between products produced by different manufacturers is marginal. Dkt. No. 135 ¶ 112; Dkt. No. 157 ¶ 114. CCA manufacturers use the same equipment and chemicals to produce CCAs, so the manufactures can quickly and cost-effectively shift production from one category of CCA to another. Dkt. No. 135 ¶¶ 105, 112–113.

Purchasers of CCAs may face high costs when switching between specific CCAs because switching often requires: (1) testing to ensure that the new CCA products are suitable for the customer's needs, (2) obtaining approval from any downstream clients for whom the aggregate is intended, and (3) training employees on how to use the new CCAs.  Dkt. No. 157 ¶ 249.  CCAs are considered essential for projects that involve cement, concrete, or mortar, and purchasers cannot respond to price increases by decreasing their consumption of CCAs.  *Id.* ¶¶ 251–252. Furthermore, there are no interchangeable substitutes for CCAs.  Dkt. No. 135 ¶ 180; Dkt. No. 157 ¶¶ 114, 247.

### D.    Defendants' Consolidation of the CCA Market

Plaintiffs allege that Defendants further consolidated their control of the market for CCAs though several means, including by buying and selling subsidiaries among the Defendants and through common membership in trade associations.  Dkt. No. 135 ¶¶ 117–130; Dkt. No. 157 ¶¶ 154–186, 215–228.

For example, Saint-Gobain France launched a hostile takeover of Sika AG in 2014.  Dkt. No. 157 ¶ 215.  Over the next four years, Saint-Gobain France acquired nearly 25% of Sika AG's stock and became its single largest shareholder, thus establishing a strong shared financial interest and creating opportunities for information sharing and collusion between the two companies.  *Id.* In May of 2018, Saint-Gobain France abandoned its takeover attempt and agreed to reduce its stake in Sika AG to around 10%.  *Id.* ¶ 217.  Saint-Gobain France remained Sika AG's largest single shareholder until Saint-Gobain France sold its remaining stock in 2020.  *Id.*

Cinven entered the CCA business in 2017 when it purchased Chryso.  Dkt. No. 135 ¶ 117. In the months that followed, Chryso, under Cinven's ownership and control, acquired at least four competing CCA manufacturers.  Dkt. No. 157 ¶ 219. On September 29, 2021, Saint-Gobain announced that it had acquired Chryso from Cinven.  Dkt. No. 135 ¶ 118; Dkt. No. 157 ¶ 219.

7

In December 2021, Saint-Gobain France acquired GCP, which had also previously been a competitor. Dkt. No. 135 ¶ 119; Dkt. No. 157 ¶ 221. Several months after that, Saint-Gobain sold Chryso's North American cement grinding aids and additives business to yet another competitor and fellow Defendant, RPM. Dkt. No. 135 ¶ 119.

In late 2018, Sika AG expressed an interest in acquiring a subsidiary of BASF called MBCC. Dkt. No. 157 ¶ 223. But after acquiring another major competitor in the CCA space in January of 2019, Sika AG abandoned its interest in MBCC, explaining that it did "not believe a deal for all the company would be possible because of antitrust concerns by regulators." *Id.* In the fall of 2020, BASF sold MBCC to Lone Star, a hedge fund. Dkt. No. 135 ¶¶ 40; Dkt. No. 157 ¶¶ 134 n.114, 223.[4] Approximately one year later, in November of 2021, Sika acquired MBCC, from Lone Star, paying nearly double what Lone Star had paid to BASF. Dkt. No. 135 ¶ 120; Dkt. No. 157 ¶ 224. Sika then split MBCC in half, selling its U.S. and European assets—MB-USA and MB-Germany—to Cinven, while keeping Master Builder Solutions's remaining global assets. Dkt. No. 135 ¶ 120; Dkt. No. 157 ¶ 224. Sika's Chief Executive Officer ("CEO") described Cinven as a partner rather than a competitor, remarking that "Cinven with its extensive expertise in this sector is an ideal partner for continuing the successful growth path of this business." Dkt. No. 135 ¶ 121; Dkt. No. 157 ¶ 225.[5] The CEO also stated that Sika's "product offering in the segment of concrete admixture is super strong and almost [] unchallengeable by others because we

---

[4] The Plaintiffs disagree as to the date on which the BASF Group sold MBCC to Lone Star. The Indirect Purchaser Plaintiffs allege that BASF SE sold "its Additive and Admixture businesses (Master Builders entities collectively known in the industry as 'MBCC') on October 1, 2020." Dkt. No. 135 ¶ 40. The Direct Purchaser Plaintiffs allege that "the global MBS brand and assets, including [MBS-Germany] and [MB-USA]" were sold "to Lone Star on September 30, 2020." Dkt. No. 157 ¶ 134 n.14. This difference of a day is irrelevant for the purposes of the motions to dismiss.

[5] Plaintiffs do not allege when this comment was made.

now have really the full innovation pipe-line for the future ready and also very strong backup with the supply chain that is coming together."  Dkt. No. 135 ¶ 121; Dkt. No. 157 ¶ 225.

RPM acquired U.S.-based Brett Admixtures in November of 2021 and bought Chryso's North American cement grinding additives business from the Saint-Gobain Group in April of 2022.  Dkt. No. 157 ¶ 226.

In June of 2024, Saint-Gobain France paid €960 million to acquire FOSROC, a CCA manufacturer based in the UK with 3,000 employees and 20 plants around the world.  *Id.* ¶ 222.

### E.    Defendants' Membership in Trade Associations

Plaintiffs also allege that "Defendants share membership in a multitude of trade associations around the world" and that the common membership "gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for [CCAs]."  Dkt. No. 135 ¶ 122; *see id.* ¶¶ 123, 125–129 (listing trade associations of which multiple of Defendants are members); Dkt. No. 157 ¶¶ 155, 159–160, 166, 168–172, 177–183, 186 (same).  Many of Defendants' officers or former officers occupy leadership roles in the trade associations.  Dkt. No. 157 ¶¶ 161–165, 167, 170, 173–175, 180–181, 184–186.

In particular, BASF Corp., Chryso, Inc., GCP, MB-USA, Sika USA, and Euclid are all "super sponsors," and Sika USA, GCP, Chryso, Inc., MB-USA (listing BASF Coatings Ltd as its subsidiary) and Mapei Corporation are associate members of the National Ready-Mix Concrete Association ("NRMCA"), a trade association.  Dkt. No. 135 ¶ 123; Dkt. No. 157 ¶ 155.  Those Defendants' membership in the NRMCA provided them not only with the opportunity to meet and collude among themselves under the guise of participation in a trade association but also with a benchmarking analysis that Defendants could misuse to further their efforts to fix the prices of CCAs.  Dkt. No. 135 ¶ 124.  For example, NRMCA benchmark analysis includes a Performance Benchmarking Survey for ready mixed concrete by collecting information on ready-mixed

concrete production and the costs associated with the sales and support of concrete. *Id.* Monthly, quarterly, and yearly Reporting of Key Metrics including average sales and cost metrics are also available to NRMCA members. *Id.*

### F.    Defendants' Price Increases

Between January 1, 2017, and the present (the "Class Period"), Defendants have consistently raised the prices of CCAs, including through surcharges. *Id.* ¶¶ 131–153; Dkt. No. 157 ¶¶ 187–196. According to Plaintiffs, the price increases were often publicly announced and were also incorporated into contracts between Defendants and customers. Dkt. No. 135 ¶ 131; Dkt. No. 157 ¶ 194. Plaintiffs allege the following announcements and increases:

- In the first quarter of 2017, BASF raised prices for its CCAs roughly 2–3%. Dkt. No. 135 ¶ 133; Dkt. No. 157 ¶ 193(a).

- On May 15, 2017, BASF Group announced a 4–7% price increase for its construction chemicals products across Europe, including CCAs, which became effective that same day. Dkt. No. 135 ¶ 133; Dkt. No. 157 ¶ 193(a).

- On November 10, 2017, Sika announced price increases between 3–5% on all products, effective January 1, 2018. Dkt. No. 135 ¶ 134.

- On May 14, 2018, BASF Group announced that its Japanese subsidiary would increase prices for all construction chemicals, including concrete admixtures, by at least 10%, effective the next day. *Id.* ¶ 135; Dkt. No. 157 ¶ 193(b).

- On August 8, 2018, GCP's President, CEO & Director announced a three-point plan to improve the profitability of the company's SCC admixture business. Dkt. No. 135 ¶ 136. The first of those points was to "rais[e] prices significantly in low profit, high volatility admixture markets." *Id.* However, Plaintiffs do not allege when any price increase associated with this announcement was confirmed or implemented.

- In January of 2019, Sika AG raised its prices. Dkt. No. 157 ¶ 193(c).

- In February of 2019, Sika AG announced that it would raise its prices again, effective in March of 2019. *Id.*

- On November 13, 2020, MBS—then owned by Lone Star—announced a 5–10% increase in the prices for liquid admixtures effective immediately. Dkt. No. 135 ¶ 138; Dkt. No. 157 ¶ 193(d).[6]

- On December 15, 2020, MBS announced a worldwide increase of up to 12% on CCA prices. Dkt. No. 157 ¶ 193(f).

- On December 15, 2020, the Saint-Gobain Group publicly announced that it would increase its prices by 1.9% on all products, effective January 1, 2021. Dkt. No. 157 ¶ 193(e).

- On December 21, 2020, MBCC raised prices for all Master Builders Solutions products by an average of 4–6%. Dkt. No. 135 ¶ 139.

- In February of 2021, the Saint-Gobain Group published an investor report that cited "[u]pward trends in sales prices" as a key driver of its sales growth in 2020. Dkt. No. 157 ¶ 190. Plaintiffs do not allege whether the products with upward trending prices included CCAs or when the increases occurred.

- On March 10, 2021, MB-USA imposed a 6% surcharge on its CCAs and other products. Dkt. No. 157 ¶ 193(g).

- On March 22, 2021, Mapei USA imposed a 5% price increase on acrylics and liquids in its Concrete Restoration Systems product line, which includes liquid admixtures. Dkt. No. 135 ¶ 140; Dkt. No. 157 ¶ 193(i).

- On April 1, 2021, MBCC increased prices for all Master Builders Solutions products in at least Europe by 5–20% effective immediately. Dkt. No. 135 ¶ 141; Dkt. No. 157 ¶ 193(j).

- On July 20, 2021, MB-USA announced that it would increase the previously-imposed surcharges on CCAs from 6% to 9%, effective July 23, 2021. Dkt. No. 157 ¶ 193(h), (k).[7]

- In October of 2021, the Saint-Gobain Group issued a press release that included a chart showing an average increase of 9.7% across all the company's segments for the preceding two years. Dkt. No. 157 ¶ 190. Between October of 2019 and October of 2021, the Saint-Gobain Group increased prices by 18.6% in the

---

[6] Plaintiffs plead that Lone Star owned the global MBS brand and assets from at least October 1, 2020 until November of 2021, and thus do not plead that these price increases were attributable to any of the six Defendant groups. Dkt. No. 135 ¶¶ 40, 120; Dkt. No. 157 ¶¶ 134 n.114, 223–224.

[7] The Indirect Purchaser Plaintiffs refer to the entity that announced a price increase on July 20, 2021, as the "Cinven Group Master Builders Solution." Dkt. No. 135 ¶ 142. They do not define that entity or refer to it anywhere else in their complaint. Plaintiffs do not allege that the Cinven Group acquired MB-USA or MB-Germany until after Sika acquired MBCC in November of 2021. Dkt. No. 135 ¶ 120. It is unclear whether the Indirect Purchaser Plaintiffs referred to Cinven in error or whether an otherwise unmentioned entity owned by Cinven announced an identical price increase to MB-USA on the same day.

Americas.  *Id.*  It is unclear what, if any, portion of that increase is attributable to increases in the prices of the Saint-Gobain Group's CCAs.

- On October 11, 2021, Euclid announced a price increase for its line of concrete and masonry construction products, effective October 15, 2021.  Dkt. No. 135 ¶ 143; Dkt. No. 157 ¶ 193(l).

- On October 22, 2021, Sika AG publicly announced that it was raising prices to contend with a "sharp rise" in input costs that was squeezing profit margins.  Dkt. No. 157 ¶ 193(m).  It is unclear what products increased in price.

- On November 22, 2021, GCP announced it was implementing price increases for concrete admixtures in North America of up to 10%, effective January 1, 2022. Dkt. No. 135 ¶ 144; Dkt. No. 157 ¶ 193(n).

- In January of 2022, Sika USA announced that it would be increasing surcharges on its products, including CCAs from 16% to 20%, effective February 1, 2022.  Dkt. No. 135 ¶ 145; Dkt. No. 157 ¶ 193(p).

- On January 14, 2022, MBS announced plans to increase previously imposed surcharges on its products, including CCAs, to up to 40%.  Dkt. No. 157 ¶ 193(o).

- In February of 2022, an investor report stated that the Saint-Gobain Group had raised its prices by as much as 10% in 2021.  *Id.* ¶ 190.  Plaintiffs do not allege whether the products with upward trending prices included CCAs or when the increases occurred.

- In April of 2022, RPM's vice president, controller, and chief administrative officer cited "selling price increases" as a key growth factor for Euclid's concrete admixture businesses.  *Id.* ¶ 191.  Plaintiffs do not allege when the price increases occurred.

- On March 1, 2022, the Mapei Group implemented a 6% price increase on all its products, including CCAs, across at least the U.K. market.  Dkt. No. 135 ¶ 146; Dkt. No. 157 ¶ 193(q).

- On January 3, 2023, Mapei implemented a 9% price increase on all its products, including CCAs.  Dkt. No. 135 ¶ 148.

- On February 23, 2023, Saint-Gobain's chief executive officer noted that the Saint-Gobain Group had "once again delivered record results thanks to a 14.6% price increases overall" and a 9.3% price increase in its High-Performance Solutions ("HPS") business, which includes Chryso and GCP.  *Id.* ¶ 149.  Plaintiffs do not allege when the price increase occurred or what portion of the increase was attributable to CCAs.

- In April of 2023, RPM published an earnings release that explained that its recent "record" sales in its construction segment were "driven by price increases and strength in concrete admixtures."  Dkt. No. 157 ¶ 191.  RPM's vice president, controller, and chief administrative office repeated that point on a conference call with industry analysts on July 26, 2023.  Dkt. No. 135 ¶ 150.  Plaintiffs do not clarify whether the price increases pertained to concrete admixtures as opposed to

other products in RPM's construction segment and do not allege when the increases occurred.

- On February 29, 2024, Saint-Gobain's chief executive officer stated in a press release that sales and margins for its HPS business had benefitted from an increase in sales prices mainly from Defendants GCP and Chryso. *Id.* ¶ 151. Plaintiffs do not allege when the price increase occurred or what portion of the increase was attributable to CCAs.

- On March 1, 2024, Mapei implemented a 3% price increase on all its products, including CCAs. *Id.* ¶ 152.

Plaintiffs allege that normal market forces do not explain these price increases. Although Defendants have, at times, cited increasing input costs and supply chain constraints, Dkt. No. 135 ¶ 154; Dkt. No. 157 ¶¶ 193(g)–(h), (l)–(n), (p), 197–198, the prices of several of the raw materials used to make CCAs have remained steady or decreased during the Class Period, Dkt. No. 135 ¶¶ 155–157; Dkt. No. 157 ¶ 203. And while ocean freight rates spiked sharply and briefly during the Covid-19 epidemic, they have since fallen dramatically. Dkt. No. 135 ¶ 155. Several of Defendants' officers made statements indicating that Defendants' profit margins increased during the Class Period. *Id.* ¶¶ 132, 158–164; Dkt. No. 157 ¶¶ 193, 206–213.

The Direct Purchaser Plaintiffs additionally rely on their own statistical analysis of what the unfixed price of CCAs throughout the Class Period should have been. They claim that:

> [A] dummy variable multiple regression—controlling for (1) raw materials cost, (2) freight cost, (3) chemical manufacturing labor cost, (4) cement and concrete production (to account for downstream demand for CCAs), (5) an indicator variable for the COVID-19 period, and (6) calendar quarter fixed effects (to account for seasonality in prices that compared the prices before the Class Period to the prices during the Class Period)—shows that beginning no later than January 1, 2017, the prices for CCAs in the United States were higher than can be explained by normal market forces, a finding that is consistent with collusion.

Dkt. No. 157 ¶ 200. According to the Direct Purchaser Plaintiffs, "this preliminary regression shows that between January 1, 2017, and December 31, 2023, prices for CCAs were, on average, roughly 15 percent higher than can be explained by normal market forces." *Id.* ¶¶ 201–202. The

Direct Purchase Plaintiffs do not, however, plead the data set upon which the regression was run, the methodology used to develop the regression, or the weights given to any of the variables.

To illustrate, the Direct Purchaser Plaintiffs include a graph charting the "actual prices paid by CCA purchasers in the United States and its territories" as compared to "the prices that CCA purchasers would have paid but for Defendants' conspiracy." *Id.* ¶ 201. The chart states that but for the conspiracy, consumers would have paid lower CCA prices from approximately January 2010 through April 2011 and November 2015 onward but that they would have paid higher prices from roughly April 2011 through November 2015. *Id.* The Direct Purchaser Plaintiffs also include a series of graphs comparing the actual and but-for prices of different types of CCAs. *Id.* ¶ 201. The graphs all analyze the CCA market as a whole and contain no Defendant-specific information.

### G. Investigations

Several antitrust authorities have launched investigations into Defendants' alleged anticompetitive conduct in the CCA industry.

On October 12, 2023, the United Kingdom's Competition and Markets Authority ("CMA") applied to the United Kingdom's Competition Appeal Tribunal ("CAT") for three warrants to search the business premises of Sika Group and Cinven Group entities in the UK, and one warrant to search the domestic premises of an associated individual ("Mr. X"), whose identity is protected by court order. Dkt. No. 157 ¶ 141. The CMA sought the three warrants under a British law that requires "reasonable grounds" for suspecting that there are documents on the business premises which the CMA has the power to require to be produced, and that "if the documents were required to be produced, they would not be produced but would be concealed, removed, tampered with, or destroyed." Dkt. No. 135 ¶ 10; Dkt. No. 157 ¶ 148. After reviewing the CMA's applications *ex parte*, the CAT found that both requirements of Section 28(1)(b) were met with respect to Sika Group and Cinven Group's business premises and granted that part of the CMA's applications.

Dkt. No. 157 ¶¶ 141, 147.  But the CAT denied the CMA's application to enter and search Mr. X's domestic premises.  *Id.* ¶ 141.  The CAT's judgment stated that the CMA had "clearly met" the threshold requirement that it have reasonable grounds to suspect an infringement of UK competition law, citing an affidavit from Ms. Deborah Wilkie, the Director of Cartel Enforcement at the CMA.  *Id.*  The CAT noted that it was "the first time" the CMA had ever applied for a "UK-wide warrant," stretching across premises in England, Scotland, and Wales.  *Id.* ¶ 148.

On October 17, 2023, the European Commission ("EC") announced that it had carried out surprise antitrust inspections, also known as "dawn raids," at offices of several firms in the construction chemicals industry in connection with suspected cartel conduct.  Dkt. No. 135 ¶ 8; Dkt. No. 157 ¶¶ 4, 137.  To conduct a dawn raid, the EC must "already possess[] certain information" concerning "a given factual and legal situation" such that it has "reasonable grounds for suspecting an infringement of the competition rules."  Dkt. No. 157 ¶ 147.  Once it has that information, the EC may then carry out a surprise inspection in order to "gather the necessary documentary evidence to check the actual existence and scope of [that] given factual and legal situation."  *Id.*  The EC stated that:

> The European Commission is carrying out unannounced antitrust inspections at the premises of companies active in the construction chemicals sector in several Member States.
>
> The [EC] has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).
>
> The construction chemicals concerned by the inspection are chemical additives for cement and chemical admixtures for concrete and mortar.

*Id.* ¶ 137.  The EC further stated that the dawn raids were "conducted in coordination with" the CMA and the Turkish Competition Authority ("TCA"), and further noted that it had also been "in contact with" the United States Department of Justice's Antitrust Division ("DOJ").  *Id.* ¶¶ 4, 138.

That same day, the CMA confirmed that it too was investigating suspected anticompetitive conduct involving "a number of suppliers of [CCAs] and some industry bodies."  Dkt. No. 135 ¶ 9; Dkt. No. 157 ¶¶ 139, 141.  It stated:

> The CMA has launched an investigation into suspected anti-competitive conduct in relation to the supply of chemicals for use in the construction industry.
>
> The [CMA] has reason to suspect anti-competitive behaviour has taken place involving a number of suppliers of these chemicals and some industry bodies.  This conduct relates to the supply of chemical admixtures and additives which are an essential input for products like concrete, mortars and cement used in the construction industry.

Dkt. No. 157 ¶ 139.  The CMA further confirmed explained that it was "working closely" with the EC, and that it was also "in contact with" other authorities, including the DOJ.  *Id.* ¶ 140.

The TCA has also disclosed that the "on-site inspections carried out by the [TCA] on October 17 were conducted simultaneously and in coordination with" the EC and CMA, and that it has opened a formal investigation targeting the BASF Group's Turkish unit, the Sika Group, Chryso, Cinven's MBS, and the Mapei Group, along with two trade associations, for committing possible violations of Turkey's equivalent of Section 1 of the Sherman Act by "agreeing on price increases and pricing strategies, exchanging competitively sensitive information [and] bid rigging."  Dkt. No. 135 ¶ 11; Dkt. No. 157 ¶ 150.

In the days following the dawn raids, the Saint-Gobain Group, the Sika Group, and the Cinven Group each confirmed that they were subjects of the global antitrust investigation.  Dkt. No. 135 ¶¶ 7, 12–13; Dkt. No. 157 ¶¶ 142–145.  A few months later, in its consolidated financial statements for the year ending December 31, 2023, the Mapei Group confirmed that it was a subject of the investigation and that it was cooperating with the authorities in the European Union, the United Kingdom, Turkey, and North America.  Dkt. No. 135 ¶¶ 7, 14; Dkt. No. 157 ¶ 146.

Plaintiffs allege on information and belief, that there is a criminal grand jury impaneled in the United States District Court for the Eastern District of Pennsylvania to investigate anticompetitive conduct in the CCA industry, and that grand jury also authorized the issuance of subpoenas to players in the CCA industry on or around October 17, 2023.  Dkt. No. 157 ¶ 151. The DOJ submitted a letter stating, in relevant part, that "a grand jury investigation has been initiated related to the concrete and cement additives industry."  Dkt. No. 135 ¶ 7; Dkt. No. 157 ¶ 151.

On April 22, 2024, CAT granted the CMA permission to search a private residence in connection with the CMA's probe of the chemicals admixtures industry.  Dkt. No. 135 ¶ 10.

## PROCEDURAL HISTORY

Starting in December of 2023, Plaintiffs filed numerous individual actions across several federal districts.  Dkt. No. 1 at 1.[8]  One of the Plaintiffs, SMBA Construction, LLC, moved pursuant to 28 U.S.C. § 1407 to centralize the litigation in the Southern District of New York.  *Id.* At the time, the litigation consisted of five actions pending in two districts, though the parties informed the United States Judicial Panel on Multidistrict Litigation that they were aware of an additional ten related actions pending in six districts.  *Id.*  All responding parties supported centralization, but several disagreed as to the appropriate transferee forum.  *Id.*  On April 12, 2024, the United States Judicial Panel on Multidistrict Litigation determined that centralization in the Southern District of New York was appropriate.  *Id.* at 2.

At present, the litigation includes eighteen individual cases.[9]

---

[8] ECF pagination.

[9] The litigation previously included an additional case, but on November 13, 2025, D'Onofrio General Contractors Corp., one of the Direct Purchaser Plaintiffs, voluntarily dismissed the member case captioned *D'Onofrio General Contractors Corp. v. Sika AG et al*, 24-cv-3255 (S.D.N.Y.) pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Dkt. No. 239.

In October 2024, the DOJ moved to intervene, and the Court granted the DOJ's unopposed motion.  Dkt. Nos. 198, 202, 236.  On October 18, 2024, the parties stipulated to a stay of discovery "that refers or relates to the Investigation being conducted by the United States concerning CCAs, including any party's or witness's communications with the United States or with the grand jury investigating CCAs" until December 31, 2025.  Dkt. No. 206.  The parties also stipulated to a limited stay of depositions and discovery "that refers or relates to any alleged understandings, agreements, meetings, or communications between competitors relating to the sale of CCAs" until July 1, 2025.  *Id.*

On November 8, 2024, Defendants filed four motions to dismiss along with a memorandum of law in support of each.  Dkt. Nos. 223–230.  On January 7, 2025, Plaintiffs filed a joint memorandum of law in opposition to the motions to dismiss.  Dkt. No. 265.  On February 6–7, 2025, Defendants filed four reply memoranda of law in further support of their motions to dismiss. Dkt. Nos. 271–273, 275.  On February 26, 2025, Plaintiffs filed a notice of supplemental authority attaching *In re Fragrance Direct Purchaser Antitrust Litigation*, 2025 WL 579639 (D.N.J. Feb. 21, 2025).  Dkt. No. 278.  On February 28, 2025, Defendants filed a notice of supplemental authority attaching *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681 (N.D. Ohio 2025).  Dkt. No. 279.

On June 13, 2025, BASF SE filed an additional motion to dismiss along with a memorandum of law in support of the motion.  Dkt. Nos. 297–298.  BASF SE also filed a notice of joinder stating that it joined certain of the previous motions to dismiss.  Dkt. No. 299.

## LEGAL STANDARD

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  This requirement "is

inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).    Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).    The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.    "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.    Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

## DISCUSSION

The four motions to dismiss filed on November 8, 2024, seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), but each articulates a different theory as to why Plaintiffs fail to state a claim for relief.    The first was filed jointly by all Defendants and argues that (1) Plaintiffs have not alleged the direct evidence or parallel conduct necessary to infer conspiracy under the Sherman Act, (2) Plaintiffs fail to allege sufficient "plus factors" to infer a conspiracy, and (3) Plaintiffs fail to allege facts tying each Defendant to the conspiracy.    Dkt. No. 224.    The second was filed jointly by all Defendants and argues that the Indirect Purchaser Plaintiffs fail to state a claim for (1) violation of any state's antitrust law, (2) violation of any state's consumer protection law, or (3) unjust enrichment.    Dkt. No. 226.    The third was filed by Cinven and argues that

Plaintiffs fail to plead that Cinven, a private equity firm, is liable for the anticompetitive conduct of the CCA manufacturer in which it invested.  Dkt. No. 228.  The fourth was filed by Cinven, Saint-Gobain France, Saint-Gobain USA, MBS-Germany, RPM, Sika AG, Chryso France, Emme Esse, and Mapei Italy and argues that Plaintiffs fail to allege those foreign parent companies had any involvement in the conspiracy including through control of their subsidiaries.  Dkt. No. 230. BASF SE's motion to dismiss seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6) for failure to plead personal jurisdiction over BASF SE and for failure to state a claim for relief.  Dkt. No. 298.

The Court begins with Plaintiffs' Sherman Act claims.[10]

## I.  Sherman Act

Section 1 of the Sherman Act prohibits any "contract, combination . . . or conspiracy, in restraint of trade."  15 U.S.C. § 1.  "Accordingly, the first question in any Section 1 case is whether there is an agreement to conspire."  *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024).  Plaintiffs can allege such an agreement through direct or circumstantial evidence.  *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (noting the "smoking gun" necessary for direct evidence "can be hard to come by" in antitrust cases, especially at the pleading stage, and thus "a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed");

---

[10] Because the Court finds that Plaintiffs fail to plead a conspiracy in restraint of trade such that all of Plaintiffs' claims must be dismissed, the Court does not address the arguments raised in the motions to dismiss filed by Cinven, BASF SE, and the foreign parent companies.  Although courts ordinarily address challenges to jurisdiction, such as those advanced by BASF SE, before addressing the merits of a claim, the Second Circuit has held that "in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012).

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) ("[E]ven in the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices.").

Plaintiffs acknowledge that they do not plead direct evidence of a conspiracy, and instead proceed by way of allegations concerning Defendants' parallel conduct and other circumstantial evidence.  Dkt. No. 265 at 8.  The Court begins with Plaintiffs' allegations of parallel conduct and then turns to Plaintiffs' plus factors.

### A.    Parallel Conduct

The Supreme Court noted in *Twombly* that "a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement.'"  550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)); *but see Citigroup*, 709 F.3d at 136 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage.").  "'Parallel conduct' refers to the same or substantially similar actions taken by actors on the same level."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 461 (E.D.N.Y. 2017) (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428–29 (4th Cir. 2015), *cert. denied*, 579 U.S. 917 (2016)), *aff'd*, 883 F.3d 32 (2d Cir. 2018).  Parallel conduct sufficient to state a Section 1 claim includes "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  *Twombly*, 550 U.S. at 556 n.4.

Plaintiffs attempt to allege parallel conduct in the form of Defendants' price increases throughout the Class Period.  Dkt. No. 265 at 9–19.  Defendants argue that the alleged price

increases are sporadic and differing in ways that undermine any parallels between the increases. Dkt. No. 224 at 10–11; Dkt. No. 275 at 3–7. In particular, Defendants argue that the price increases do not show parallel conduct because: (1) they pertained to different geographies, (2) they varied dramatically in terms of size, (3) they covered different products, and (4) they occurred at different times. Dkt. No. 224 at 10–11. In response, Plaintiffs argue that courts evaluating parallel conduct allegations do not demand allegations that the defendants acted with precise synchronicity. Dkt. No. 265 at 12–19.

Conspiracies "are not always tidy and symmetric." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (holding that "price-fixing includes more than the mere establishment of uniform prices" and agreements to raise or lower prices violate the Sherman Act no matter what "machinery for price-fixing was used"); *SD3*, 801 F.3d at 428–29 (holding that a plaintiff may plead parallel conduct even where it does not plead the defendants "move[d] in relative lockstep" or achieved their common anticompetitive ends "only by substantially identical means"). In *SD3*, the Fourth Circuit noted that conspiring defendants may be motivated to stagger their collusive acts because "if the defendants employed different courses of action, then their conspiracy might better avoid detection." 801 F.3d at 428; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) ("Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct."). Courts have found that "it is adequate at the motion to dismiss stage to plead parallelism through a pattern of frequent price increases in similar intervals and amounts." *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 161 (W.D.N.Y. 2020); *see In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d

712, 721 (S.D.N.Y. 2017) (holding price increases to be indicative of parallel conduct where, "while it is true that defendants' price increases did not always align on a monthly basis, defendants consistently raised prices on a bi-monthly and quarterly basis"); *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, 2021 WL 1109128, at *7 (S.D. Fla. Mar. 23, 2021) (holding parallel conduct was adequately alleged where "Plaintiffs include pricing charts illustrating the Norwegian Defendants all increased their wholesale salmon prices at roughly the same time and at similar levels"). Some variances in conduct therefore will not undermine the inference of a conspiracy so long as the increases are "reasonably proximate in time and value." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 & n.209 (E.D. Pa. 2018) (collecting cases); *see also Broiler Chicken*, 290 F. Supp. 3d at 791–92 (collecting cases).

However, a conspiracy cannot be based only upon disconnected or dissimilar events. The defendants' alleged conduct must still be sufficiently parallel to support the plausible inference that the defendants entered an agreement to act in consort. Wide variations in the timing, scope, and amount of pricing changes signal competition rather than the lack thereof. *See LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (holding that "it is dubious at the outset as to whether the conduct alleged in the Complaint can accurately be characterized as 'parallel'" where the price increases were divergent "(in some instances varying by a factor of three)," were imposed weeks apart, and included action by either a solitary defendant or a subset of defendants and inaction by the other defendants). Thus, lengthy delays or conduct that does not obtain a common result will undermine the inference of a conspiracy.

The relative timing of supposedly parallel conduct is particularly critical. Courts have held that unseasonably long delays between the allegedly parallel acts will "refute rather than support" allegations of conspiracy. *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D.

Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131–32 (3d Cir. 1999); *see also Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) (rejecting characterization of price increase attempts as "lockstep" where some increases lagged behind others by more than a month). Markets in which a price increase by one company is not followed by increases by other companies tend to be competitive, as customers will be incentivized to switch providers. For that reason, even highly similar actions separated by a lengthy delay are not truly parallel. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (holding that parallel conduct was insufficiently alleged where "[t]he only allegation that hints at parallel conduct is that both CVS and Express Scripts terminated Irmat from their networks. But the terminations lack temporal proximity.").[11] Individual price increases not adopted by other market players do not support an inference of parallel conduct. *See Baby Food*, 166 F.3d at 128–32 (price increases not parallel where the majority of price increases were taken by only one defendant or a subset of defendants).

Beyond temporal similarity, the price increases must pursue a similar pricing outcome to constitute parallel activity. *See In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) (finding parallel conduct where plaintiffs "aver[red] near-parallel price movements"). Price increases need not be made in the same precise amounts. *See City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009), *aff'd sub nom. City of Moundridge, KS v. Exxon Mobil Corp.*, 409 F. App'x 362 (D.C. Cir. 2011); *see Blood*

---

[11] There is no categorical rule governing how temporally proximate acts must be to give rise to an inference of collusion. The delay between purportedly parallel conduct must be viewed in the context of the case; among other things, courts must account for any restrictions on market participants' ability to enact price changes sooner. *See Park Irmat*, 911 F.3d at 517 ("We do not hold that actions taken within six months of each other can never constitute parallel conduct, but only that the terminations here, executed under dissimilar circumstances and separated by six months, did not constitute parallel conduct.").

*Reagents*, 756 F. Supp. 2d at 630 (rejecting argument that "because the price increases are stated in percentage terms, it is impossible to determine whether the same reagents were offered by one defendant at a lower price than the other defendant during periods of the alleged conspiracy"). Conspirators that begin their unlawful combination at differing starting points may have to increase their prices by varying amounts to arrive at a common pre-agreed destination. However, where a plaintiff does not plead that the defendants' price increases are generally commensurate with one another, it must show some other parallel, such as that the prices are controlled by an agreed-upon external factor or that the varying increases caused the defendants' prices for similar products to approach parity as opposed to further skewing the playing field. *See Socony-Vacuum*, 310 U.S. at 222 ("[P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices."); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 770 (E.D. Pa. 2017) (holding that defendants' price increases could be parallel behavior where they represented varying percentage increases but brought the defendants' prices closer together); *In re Text Messaging Antitrust Litig.*, 2009 WL 5066652, at *1–2, 5 (N.D. Ill. Dec. 10, 2009) (holding that plaintiffs alleged parallel conduct where the result of defendants' price increases was that defendants offered roughly equivalent pricing).

Other dissimilarities can undermine otherwise possible inferences of parallel behavior. It is definitional that wher a company increases prices for a product and its competitor does not increase prices for that product, those companies have not engaged in parallel conduct with respect to that product. *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022) (disparate policies are not "'substantially similar' so as to constitute parallel conduct for purposes of federal antitrust law" where they are "different in their

particulars").  Price increases affecting only a subset of the market thus will not parallel increases affecting other subsets.  Plaintiffs argue that "[a] plaintiff is not required to plead the precise boundaries of a product market prior to discovery."  Dkt. No. 265 at 18–19 (quoting *In re Auto. Parts Antitrust Litig.*, 2018 WL 1138422, at *4 (E.D. Mich. Jan. 16, 2018)); *see, e.g.*, *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *10 (E.D. Pa. Aug. 12, 2011) (declining to determine whether zippers, snap fasteners, and buttons should be included in the same fasteners product market at the motion to dismiss stage); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *11 & n.12 (N.D. Cal. Jan. 21, 2014) ("Given the high degree of standardization among battery cell formats and types, the Court perceives no reason to distinguish among consumer products at the pleading stage" in part because "[t]he conspiracy alleged here fixed the prices of battery cells of all three formats.").  That proposition is true where a plaintiff alleges that the defendants fixed the prices of all of the products in the identified market, not where, as here, the price increases single out differing subsets of the alleged market.

For the same reason, if a firm raises prices in one geographic region, that increase is not reasonably similar to a price increase in a wholly other region.  Customers in either location remain free to patronize the competitors who did not raise prices where they are.  *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("Allegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'").

In light of the differences in timing, amount, geography, and product line, the price increases at issue here are not sufficiently similar to give rise to an inference of parallel conduct.  While every Defendant Group increased prices over the length of the Class Period alleged by

Plaintiffs, they did so in different amounts, covering different geographic regions and product lines, and at different times.

The price increases alleged by Plaintiffs were episodic and inconsistent with coordinated activity. For the period from the first quarter of 2017 to May 2018, only the BASF Group and Sika announced price increases, but one of the price increases by BASF was in Europe and another (one year later) was by a Japanese subsidiary. Dkt. No. 135 ¶ 133; Dkt. No. 157 ¶ 193(a). Only Sika announced a price increase for all CCA products during that time. Dkt. No. 135 ¶ 134. In August 2018, Sika announced that it would raise prices significantly in low profit, high volatility admixture markets, but there is no allegation explaining which markets fit that description or when those prices were raised. In January and February of 2019, Sika AG announced further price increases. Dkt. No. 157 ¶ 193(c). There is no allegation of an increase by any other Defendant until November 13, 2020, when MBS announced an increase for just liquid admixtures and followed it up a month later by announcing a worldwide increase for all CCAs. Dkt. No. 135 ¶ 138; Dkt. No. 157 ¶ 193(d), (f). There are no allegations about any price increase by the Saint-Gobain, Cinven, RPM, or Mapei Groups, until December 2020—four years into the alleged Class Period.

After January 2022, Plaintiffs allege only a handful of scattered price increases. On March 1, 2022, the Mapei Group increased prices for all of its products in the United Kingdom, and potentially in other, unidentified markets. Dkt. No. 135 ¶ 146; Dkt. No. 157 ¶ 193(q). Plaintiffs do not identify any price increases implemented by other Defendants after that date—the next alleged price increase is by Mapei again in January 2023, Dkt. No. 135 ¶ 148, and the last alleged price increase—also attributable to Mapei—occurred in March 2024, *id.* ¶ 152.

Over the entire class period, only one Defendant, GCP, is alleged to have announced a price increase specifically relating to CCAs in North America. Dkt. No. 135 ¶ 144; Dkt. No. 157 ¶ 193(n). And even that increase pertained only to concrete admixtures, a subset of the broader CCA market. While many of the other price increases stated no geographic boundary,[12] many others relate to geographic markets other than North America. *See, e.g.*, Dkt. No. 157 ¶ 193(a) (Europe); Dkt. No. 135 ¶ 141 (same); Dkt. No. 157 ¶ 193(j) (same); Dkt. No. 135 ¶ 146 (United Kingdom); Dkt. No. 157 ¶ 193(q) (same). Several of the other alleged price increases covered only a subset of CCAs such as liquid CCAs, *see, e.g.*, Dkt. No. 135 ¶¶ 140, 144; Dkt. No. 157 ¶ 193(i), while still more price increases were announced in the form of company-wide increases not specifically related to CCAs, such that it is unclear whether the company even increased CCA prices at all. *See, e.g.*, Dkt. No. 135 ¶¶ 149–151; Dkt. No. 157 ¶¶ 190–191, 193(c), (m).

The price increases varied from 1.9% of the unalleged previous price to up to 20%. Dkt. No. 135 ¶ 145; Dkt. No. 157 ¶ 193(e), (p). Although, as stated, a plaintiff may proceed by alleging percentages instead of absolute prices, Plaintiffs plead neither that Defendants' price increases were generally commensurate with one another in either percentage or amount, nor that the result of the increases was to bring the Defendants' prices for CCAs closer together. *See Blood Reagents*, 266 F. Supp. 3d at 770; *Text Messaging*, 2009 WL 5066652, at *1–2, 5. The Court's obligation to draw all plausible inferences in Plaintiffs' favor does not permit it to infer that the Defendants that offered lower prices at the start of the Class Period implemented the higher percentage increases while the Defendants with higher prices at the start of the Class Period implemented the lower percentage increases. Nor do Plaintiffs identify any other form of price-coordination Defendants'

---

[12] For the purpose of this motion, the Court will assume that the price increases without stated geographic bounds were imposed worldwide.

varying increases might suggest, such as an agreement to peg prices to a common factor.  *See Socony-Vacuum*, 310 U.S. at 222 (noting that parallel price increases could be related to market prices by "various formulae").

Plaintiffs do not identify any overarching pattern connecting these divergent increases to one another, such as simultaneous adoption, a follow-the-leader stratagem whereby one defendant's conduct is always adopted by the others[13], regularly-timed price increases across the market, or increases prompted by some common external signal.  *See Text Messaging*, 2009 WL 5066652, at *1–2, 5 (alleging that when one of the four major wireless service providers raised prices, the others would follow); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 721 (S.D.N.Y. 2017) ("defendants consistently raised prices on a bi-monthly and quarterly basis" (emphasis omitted)); *Socony-Vacuum*, 310 U.S. at 222.  Absent allegations that these isolated and unsynchronized price increases resulted in parallel prices, the increases themselves do not constitute parallel conduct.

The most Plaintiffs do is "specifically describe a ten-month period between 2021 and January 2022 when *every* Defendant group increased its prices."  Dkt. No. 265 at 9 (citing Dkt. No. 135 ¶¶ 140–145; Dkt. No. 157 ¶ 193).[14]  However, that characterization is inaccurate, as Plaintiffs do not identify any increase attributable to BASF Group during that time.  Furthermore,

---

[13] "[F]ollow-the-leader practices are legal and do not, by themselves, give rise to an inference of prior agreement."  *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1269 (11th Cir. 2019).  Under a "follow the leader" theory, "if one firm in an interdependent market makes a risky business move and its competitors follow, all firms will benefit and 'supracompetitive prices and other anticompetitive practices, once initiated, can spread through a market without any prior agreement.'"  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 48 & n.3 (9th Cir. 2022) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015)).

[14] Plaintiffs offer no explanation as how this ten-month span could support an inference of parallel conduct prior to early 2021.

the price increases announced during that period were dissimilar in key ways that mimic the dissimilarities throughout the purported Class Period. The increases ranged from as low as 5% to as high as 20%. *See, e.g.*, Dkt. No. 135 ¶¶ 140–141; Dkt. No. 157 ¶ 193(i)–(j). The price increases related to different product lines, with one relating only to liquid admixtures, Dkt. No. 135 ¶ 140; Dkt. No. 157 ¶ 193(i), one to concrete admixtures, Dkt. No. 135 ¶¶ 144, 149; Dkt. No. 157 ¶ 193(n), one to CCAs across the board, Dkt. No. 157 ¶ 193(h), (k), and the remainder to broad product lines that included, but were not limited to, CCAs, Dkt. No. 135 ¶¶ 141, 143, 145; Dkt. No. 157 ¶ 193(g), (j), (l)–(p). While most of the increases during the ten-month time frame have no specified geographic target, one of the increases is specified to have targeted Europe exclusively. Dkt. No. 135 ¶ 141; Dkt. No. 157 ¶ 193(j).

Even absent these differences, the fact that out of the alleged Class Period of over one hundred months, the Plaintiffs are able to isolate a ten-month period during which most of the Defendants raised prices does little to establish parallel conduct. Ten months is a long time. Plaintiffs do nothing to establish how a price increase in the last month or two of that period has any relation to a price increase at the beginning of the period. *Cf. Miami Prods.*, 449 F. Supp. 3d at 158 (price increases announced over three years constituted parallel conduct where the increases were made "at around the same time" with announcements following "within days of each other"); *Text Messaging*, 2009 WL 5066652, at *1–2, 5 (price increases made over two years were parallel where the end result was that defendants offered roughly equivalent pricing). The simple fact that multiple market participants increased their prices at some point during such a lengthy time frame is by not itself suspicious. Such disconnected increases are just as indicative of inflation as they are of collusion and do not constitute "plausible grounds to infer an agreement." *Twombly*, 550 U.S. at 556; *see id.* at 554 (rejecting inference of interdependence where defendants' alleged

conduct was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"). Any inference Plaintiffs would have the Court draw is further undermined by the fact that the Defendants acted in disparate fashions both before and after the ten-month period.

Next, Plaintiffs attempt to obscure the differences and delays between the price increases by taking an even lengthier view of the market. Plaintiffs argue that the domestic prices of CCAs rose dramatically from 2017–2022. Dkt. No. 265 at 10–11 (citing Dkt. No. 157 ¶¶ 195–196). That argument is unavailing. Price inflation can and does occur in competitive markets. The mere fact that each Defendant increased prices over the eight-year duration of the Class Period thus does not suggest they did so in combination. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 509 (M.D. Tenn. 2023) ("[I]t is hardly surprising that rent prices increased between 2013 and 2023 even in a competitive, normally-functioning market."). And Plaintiffs' allegations about market-wide price increases do not show that any particular Defendant or group of Defendants, was engaged in an anticompetitive conspiracy. *See Ok. Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, 2024 WL 4202680, at *7 (S.D.N.Y. Sept. 13, 2024) (holding that where plaintiffs' allegations do not distinguish between defendants and nondefendants, such "aggregate statistics do not alone suffice to impute wrongful conduct to any particular defendant." (quoting *In re European Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *17 (S.D.N.Y. Jul. 23, 2020))); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019) ("[T]here is no particular reason to believe that the other defendants named in this suit were involved apart from plaintiffs' say-so. The conspiracy could well have involved some of them, or none of them, or a mix[;] . . . [t]he Court has no meaningful way of distinguishing, and plaintiffs' statistics do not help."); *In re Commodity Exch., Inc., Gold Futures & Options*

*Trading Litig.*, 328 F. Supp. 3d 217, 227 & n.13 (S.D.N.Y. 2018) (holding that plaintiffs' allegations "are as consistent with parallel, market-following behavior . . . as they are with participation in a price-fixing scheme" where plaintiffs do not show that defendant "quoted prices that were at a greater variance from the trend line than other market participants").

The Direct Purchaser Plaintiffs' references to a dummy regression similarly fails to show Defendants acted together to raise prices. It purports to show that that "between January 1, 2017, and December 31, 2023, prices for CCAs were, on average, roughly 15 percent higher than can be explained by normal market forces." Dkt. No. 157 ¶¶ 200–202. But the Second Circuit has expressly held that a statistical model which "improperly relies on averages spread over a long span of time . . . do not plausibly allege parallel conduct among the [defendants]." *City of Pontiac*, 92 F.4th at 396; *accord Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2025 WL 934319, at *15 (S.D.N.Y. Mar. 26, 2025). Plaintiffs' use of "averages statistics . . . may flatten or hide trends that might tell different stories." *Eur. Gov't Bonds*, 2020 WL 4273811, at *17; *accord City of Pontiac*, 92 F.4th at 400.

The regression further fails to support Plaintiffs' claim of conspiracy due to its lack of supporting information. Plaintiffs claim that they ran a dummy multi-variable regression and provide the broad categories of variables for which they controlled. Dkt. No. 157 ¶ 200. But absent more information, Plaintiffs' vague description of a regression provides no factual support for their conclusion that prices exceeded those that could be explained by market forces. A plaintiff may not disguise a conclusory statement by merely alleging that the conclusion derives from mathematical calculations done behind the scenes.

Even if the regression did show the CCA market behaved abnormally, Plaintiffs' regression "obscure[s] whether any of the . . . Defendants—and if so, which—were driving the supposed

market irregularities." *City of Pontiac*, 92 F.4th at 399. The regression does not distinguish between Defendants' prices and other market participants' prices. *See id.* ("A conspiracy is characterized by an agreement among its members; it cannot be alleged solely by reference to some (much) broader group of which they are a subset."). Plaintiffs' reliance on market-wide averages thus "obscure[s] any given Defendant's contribution to an observed trend." *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019); *see id.* (holding plaintiffs failed to allege parallel conduct where plaintiffs' statistical allegations "do not distinguish between Defendants and non-defendant auction participants *at all*"); *GSE Bonds*, 396 F. Supp. 3d at 365 (holding that because "it is impossible to have any confidence that the statistics actually capture something different about each and every defendant," the allegations at best evidence a "conspiracy [that] could well have involved some of [the Defendants], or none of them, or a mix of the named defendants and other" market participants (emphasis omitted)); *but see In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) (holding that aggregate statistical trends presented circumstantial evidence of trading by the defendants because they were the "only entities" that could have produced the observed phenomenon). Plaintiffs cite *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litigation*, as "holding that antitrust plaintiffs adequately pleaded parallel conduct where their allegations included charts demonstrating price increases during the alleged conspiracy and cited defendants' earnings reports linking higher profits to increased prices." Dkt. No. 265 at 11 (citing *Farm-Raised Salmon*, 2021 WL 1109128, at *13). But the charts in that case were defendant-specific and showed that defendants "all increased their wholesale salmon prices at roughly the same time and at similar levels." *Farm-Raised Salmon*, 2021 WL 1109128, at *7. The Indirect Purchaser Plaintiffs' regression and charts show nothing of the like.

The Second Circuit has held that allegations of parallel conduct are a necessary but insufficient basis for pleading a Section 1 claim based on circumstantial evidence. *See City of Pontiac*, 92 F.4th at 401 ("Because Plaintiffs fail to allege parallel conduct with respect to the alleged . . . conspiracy, they cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors."); *Ok. Firefighters*, 2024 WL 4202680, at *8 ("Much more is required, namely, specific allegations that demonstrate parallel conduct and tie each defendant to the alleged price-fixing scheme."); *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *19 (S.D.N.Y. Mar. 31, 2021) ("Absent any actual parallel conduct, [allegations of plus factors] do not suffice to plead an antitrust conspiracy."). Plaintiffs' failure to plead parallel conduct thus is fatal to their claims under Section 1.

### B.    Plus Factors

Even if Plaintiffs had alleged parallel conduct, they do not allege sufficient plus factors to create the inference that Defendants' pricing decisions were the product of a pre-existing agreement to fix prices. The Supreme Court has held that evidence of parallel conduct alone is not sufficient to establish a plausible inference of an agreement in restraint of trade because there are many reasons players in the same market might take similar actions. *See Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (noting that it is not unlawful for companies to engage in "[t]acit collusion, sometimes called oligopolistic price coordination or conscious parallelism," which describes the process by which "firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and

their interdependence with respect to price and output decisions"); *Kleen Prods.*, 910 F.3d at 935–36 ("Each firm in a tight oligopoly might think that it will reap greater profits if it imitates, rather than undermines, its peers' price hikes."); *In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *18 (N.D. Ga. Jan. 28, 2009) ("In a homogeneous industry each major player has the same incentive to charge the same surcharge and realize the same improved profit margin."). Accordingly, courts "hedge[] against false inferences from identical behavior at a number of points in the trial sequence." *Twombly*, 550 U.S. at 554. At the pleading stage, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Here, the majority of the purported plus factors are merely consistent with, and not indicative of, a price-fixing conspiracy. At most, they suggest that it is possible that Defendants engaged in an antitrust conspiracy and not that it is plausible. *See Iqbal*, 556 U.S. at 678–80.

### 1.    Trade Associations

Common membership in a trade association may, as Plaintiffs allege, provide an opportunity to meet and conspire to fix prices. Dkt. No. 135 ¶ 122. However, industry members may belong to an industry group without being coconspirators. *See Twombly*, 550 U.S. at 567 n.12, ("belong[ing] to the same trade guild as one['s] . . . competitors" does not render conspiracy plausible); *N. Am. Soccer League*, 883 F.3d at 40 ("[A] trade association is not by its nature a 'walking conspiracy.'" (quoting *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988))); *Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("An allegation that Joint Defendants had the opportunity to interact and make an agreement does not nudge Named Plaintiffs' claims across the line from conceivable to plausible." (quotation omitted)); *cf. Miami Prods.*, 449 F. Supp. 3d at 165 (holding that defendants' common participation in trade associations was a plus factor where "Plaintiffs do not just allege

that Defendants' membership in trade associations *could* have been a means for them to make an agreement; they allege facts sufficient to infer that Defendants *did* use trade association meetings to make an agreement").

### 2.    Market Structure and Consolidation

Similarly, the fact that several Defendants have engaged in a series of mergers that led to a highly consolidated market increases the chance that a price-fixing conspiracy could succeed but falls short of plausibly suggesting that one was actually formed.  *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (rejecting argument that defendants had numerous opportunities to conspire and that "the general structure of the poultry market made it susceptible to price-fixing" because "the law is clear that '[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.'" (quotation omitted) (quoting  *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993))); *accord Int. Rate Swaps*, 261 F. Supp. 3d at 471; *Hinds County*, 620 F. Supp. 2d at 513.  Plaintiffs' allegations concerning the structure of the CCA market are unavailing for the same reason.

### 3.    Motive to Conspire

Plaintiffs' allegations of a common motive to conspire to fix prices at supracompetitive levels also cannot suffice.  *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing."); *accord Baby Food*, 166 F.3d at 133 ("[I]f, as the plaintiffs contend, the defendants had a motive to achieve higher prices, then every company in every industry would have such a 'motive.'" (quotation omitted)).  "[T]he motive to conspire is not here so obvious or compelling

that it suffices to create more than a '*suspicion* [of] a legally cognizable right of action.'" *Go N.Y.*

*Tours, Inc. v. Gray Line N.Y. Tours, Inc.*, 831 F. App'x 584, 586 (2d Cir. 2020) (summary order)

(quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)).

### 4.    Antitrust Investigations

Among Plaintiffs' most superficially appealing allegations is that in 2023, the DOJ and

regulators in the UK and Europe at large launched antitrust and competition investigations into the

CCA industry.   However, courts have held that "the mere fact that regulatory entities have

investigated, and may still be investigating, the possibility of misconduct with respect to [the

alleged price-fixing conspiracy] is not a 'plus factor.'" *In re Commodity Exch., Inc.*, 213 F. Supp.

3d 631, 662 (S.D.N.Y. 2016); *see Hinds County*, 620 F. Supp. 2d at 514 ("Plaintiffs' citations to

these investigations do not constitute factual averments of a § 1 claim that would allow such a

claim to survive a motion to dismiss."); *Mexican Gov't Bonds*, 412 F. Supp. 3d at 390–91

(collecting cases).   "Unlike this Court, whose jurisdiction is predicated on a specific case or

controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or

even just because it wants assurance that it is not.'" *United States v. R. Enters., Inc.*, 498 U.S. 292,

297 (1991) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)).   As one court

explained:

> [The mere existence of an antitrust investigation by the DOJ] carries no weight in
> pleading an antitrust conspiracy claim.   It is unknown whether the investigation will
> result in indictments or nothing at all.   Because of the grand jury's secrecy
> requirement, the scope of the investigation is pure speculation.   It may be broader
> or narrower than the allegations at issue.   Moreover, if the Department of Justice
> made a decision not to prosecute, that decision would not be binding on plaintiffs.
> The grand jury investigation is a non-factor.

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007);

*see In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 51 (S.D.N.Y. 2022) ("While

not determinative of Plaintiffs' claims, the fact that DOJ's investigation appears to have concluded

without a prosecution or any sort of enforcement action weakens Plaintiffs' arguments concerning the significance of the DOJ investigation and the purportedly robust combination of factual allegations in the Amended Complaint." (citation omitted)), *aff'd*, 92 F.4th 381; *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) ("[D]efendants cite no case to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy.").

By contrast, where an investigation turns up inculpatory material or is necessarily predicated upon evidence of a conspiracy, such investigation can provide support for the existence of an antitrust conspiracy. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) (holding that "penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and for the very conduct alleged in the Complaint . . . provide non-speculative support for the inference of a conspiracy"); *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *32 (E.D.N.Y. Nov. 20, 2019) (holding that plaintiffs alleged more than just parallel conduct where they alleged that "Defendants' conduct has been investigated, litigated, and regulated in many jurisdictions around the world, with decisions that acknowledge the Bank Defendants' role in the conspiracy"). Even absent a court's ultimate determination of the defendants' wrongdoing, the initiation of an enforcement action—which must be predicated upon the agency's evidentiary support, *see* Fed. R. Civ. P. 11(b)(3)—may also constitute a plus factor. *See Hyland v. Homeservices of Am., Inc.*, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) (plus factors included plaintiffs' "references to the enforcement actions brought by the Department of Justice"); *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 5 n.4 (D.D.C. 2008) (noting that

allegations of government enforcement actions could support an inference of an agreement to conspire).

The investigations by foreign antitrust authorities cited by Plaintiffs, Dkt. No. 135 ¶¶ 7–14; Dkt. No. 157 ¶¶ 137–151, are merely consistent with and do not plausibly suggest, *see Twombly*, 550 U.S. at 557, the claimed conspiracy. The Direct Purchaser Plaintiffs allege that the CAT found reasonable grounds to issue warrants to "search the business premises of Sika Group and Cinven Group entities in the UK." *Id.* The EC's dawn raids—which must have been predicated upon "reasonable grounds for suspecting an infringement of the competition rules"—are alleged to have targeted entities within the Saint-Gobain, Sika, Cinven, and Mapei Groups. Dkt. No. 157 ¶¶ 147, 232. Plaintiffs thus allege that only four of the six groups alleged to be members of the conspiracy have been investigated. There are no allegations with respect to the BASF or RPM Groups. Moreover, by their terms, the investigations are limited to conduct in and affecting Europe and the United Kingdom. The European Commission's mandate was to investigate conduct that "may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union)." *Id.* ¶ 137.[15] Similarly, the CMA stated that its investigation concerned "a suspected infringement or infringements of Chapter I [of the Competition Act 1998 ]," the United Kingdon's equivalent of the Sherman Act, which prohibits "agreements and concerted practices between undertakings (businesses) and decisions by associations of undertakings (trade associations) which have as their object or effect the prevention, restriction or distortion of competition within the UK and which

---

[15] Article 101, by its terms, is limited to "undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the internal market." Treaty on the Functioning of the European Union art. 101.

may affect trade within the UK." *Id.* ¶¶ 7, 141.  Plaintiffs make no allegation that the investigating authorities have found evidence that goes beyond the suspicion that the investigated entities actually engaged in a price-fixing conspiracy.  Plaintiffs also do not allege the time period involved or that the investigations concern conduct that may affect the United States markets, as opposed to focusing the European CCA market.

Plaintiffs do allege that the EC and CMA were in contact with the DOJ and that the DOJ has launched an investigation.  Dkt. No. 135 ¶¶ 8 (the EC announced "that it had also been in contact with the US Department of Justice's Antitrust Division"), 9 (the CMA "confirmed that it was working with the U.S. DOJ in connection with its investigation"); Dkt. No. 157 ¶¶ 5 ("[T]he EC and the CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids."), 138 (the EC "noted that it had also been 'in contact with' the DOJ"), 140 ("The CMA explained that it was 'working closely' with the EC, and further noted that it was also 'in contact with' other authorities, including the DOJ.").  The fact that a foreign regulator is in contact with a United States law enforcement agency in connection with the foreign regulator's investigation does not alone give rise to an inference that anticompetitive conduct occurred in or affecting the United States.  Foreign regulators are limited in the discovery they can obtain on their own from within the United States. Invariably, they rely upon the assistance of United States authorities through means such as Mutual Legal Assistance Treaties.  *See United States v. Vilar*, 729 F.3d 62, 85 n.20 (2d Cir. 2013) (noting that Mutual Legal Assistance Treaties, such as the one between the United Stated and the United Kingdom, provide that the party countries will assist each other in the investigation and prosecution of criminal offenses, including by "executing requests for search[es] and seizures" (quoting Treaty on Mut. Legal Assistance on Crim. Matters, U.K.-U.S., Jan. 6, 1994, S. Treaty

Doc. No. 104-2)).  The fact that a foreign regulator may have had contact with United States law enforcement thus does not alone say anything about whether the foreign regulator has uncovered evidence of an antitrust conspiracy in violation of United States law.

Plaintiffs, of course, allege more.  They allege that the foreign regulators were in contact with United States law enforcement and also that United States law enforcement then began a grand jury investigation.  Dkt. No. 135 ¶¶ 7–9; Dkt. No. 157 ¶¶ 5, 138, 140, 151.  But the fact that the Justice Department began an investigation does not alone create an inference that the Defendants engaged in the antitrust conspiracy alleged in the complaint.  It would make sense that United States law enforcement authorities hearing that a foreign regulator had suspicion of anticompetitive behavior abroad would investigate whether there was corresponding domestic anticompetitive conduct.  Plaintiffs do not allege that the DOJ has reached any conclusions in its investigation.  Plaintiffs also do not allege precisely who the DOJ is investigating and for what.  There are no allegations that DOJ has found probable cause with respect to any Defendant so as to support a search warrant.  That the Justice Department has launched an investigation does not make it any more than possible, and not plausible, that the Defendants violated the Sherman Act.

### 5.    Input Costs and Defendants' Statements

Finally, Plaintiffs claim that Defendants' price increases cannot be explained by normal market forces.  Plaintiffs allege that "[t]he purported increases in input costs and freight costs during COVID-19 were either non-existent or short-lived, while Defendants' CCA price increases have been both extreme and persistent."  Dkt. No. 157 ¶ 15; Dkt. No. 135 ¶ 19.  They expressly identify a few inputs that decreased in price at some point during the Class Period, *see, e.g.*, Dkt. No. 135 ¶ 155 (ocean freight), Dkt. No. 157 ¶ 203 (sodium lignosulfonate), and identify several statements by representatives of certain Defendants indicating that marginal profits had increased at some points during the Class Period, *see, e.g.*, Dkt. No. 135 ¶¶ 157 (RPM), 159 (Saint-Gobain

Group and Sika AG), 160 (RPM), 162 (Sika AG), 164 (RPM); Dkt. No. 157 ¶¶ 208 (Sika AG),

209 (RPM), 211 (Sika AG), 213 (RPM).  They assert that Defendants' explanations of their price

increases as motivated by rising costs were thus pretextual.  Plaintiffs identify the following

allegedly pretextual statements:

- MBS raised prices for its CCAs by as much as 10 percent in November of 2020, blaming "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." Dkt. No. 135 ¶ 154; Dkt. No. 157 ¶ 198.[16]

- On March 10, 2021, MB-USA imposed a 6 percent surcharge on its CCAs and other products, allegedly "to account for the rapidly rising raw material costs and supply shortages experienced across the construction industry." Dkt. No. 157 ¶ 193(g).

- In August of 2021, MB-USA told customers that it would increase the previously imposed surcharges on CCAs from 6 percent to 9 percent, effective July 23, 2021, again citing "dramatic upticks" in the costs of certain raw materials as well as packaging. *Id.* ¶ 193(h).

- On October 22, 2021, Sika AG publicly announced that it was raising prices to contend with a "sharp rise" in input costs that was squeezing profit margins. *Id.* ¶ 193(m).

- On November 22, 2021, GCP announced that it would raise its prices on CCAs by up to ten percent for North American customers and blamed "unprecedented" global supply chain impacts that it said were "not expected to subside in the near-term." *Id.* ¶ 193(n).

- In January of 2022, GCP raised its CCA prices by 10%, stating that "[t]he global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term." Dkt. No. 135 ¶ 154; Dkt. No. 157 ¶ 198.

- Also in January of 2022, Sika USA told customers that it would increase previously imposed surcharges on its products, including CCAs, from 16 percent to 20 percent and cited the "significant negative impacts of raw material costs, supply [and] labor shortages, and trucking/shipping [issues]," which it said had "both constrained supply and continued to exert upward pressure on material costs for Sika and the entire industry." Dkt. No. 157 ¶ 193(p).

*See* Dkt. No. 265 at 39 n.33.

---

[16] While the Direct Purchaser Plaintiffs refer to the entity as "MBS," the Indirect Purchaser Plaintiffs refer to the entity as "Cinven."

The decision by a group of ostensibly independent defendants not to adjust their prices in response to substantial decreases in costs can constitute a plus factor suggestive that the defendants were not acting independently. It would make sense for all, or at least some, of the defendants to lower prices in response to lower costs. The failure of the defendants as a group to take what would appear to be an economically rational decision in a competitive market is suggestive that the market is not competitive. *See Starr*, 592 F.3d at 323 (noting that the allegation that "none of the defendants dramatically reduced their prices for Internet Music (as compared to CDs), despite the fact that all defendants experienced dramatic cost reductions in producing Internet Music," was a plus factor); *Moundridge*, 429 F. Supp. 2d at 133 ("[P]rice increases which occur in times of surplus or when the natural expectation would be a general market decline, must be viewed with suspicion.").

In addition, "[c]ourts have recognized that pretextual explanations for price increases can support an inference that defendants were not acting independently." *Miami Prods.*, 449 F. Supp. 3d at 160; *see City of Moundridge*, 429 F. Supp. 2d at 133 ("Courts have also held that pretextual reasons given for a defendant's actions can give rise to an inference of a conspiracy in certain cases."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("[I]n the face of steeply falling costs, the defendants increased their prices. This is anomalous behavior because falling costs increase a seller's profit margin at the existing price, motivating him, in the absence of agreement, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price.").

However, Plaintiffs' allegations fall short of suggesting that the price increases were not the product of normal market forces or that the explanations given were pretextual so as to suggest an antitrust conspiracy. Plaintiffs do not sufficiently allege that Defendants' costs decreased so

substantially that "the natural expectation would be a general market decline." *City of Moundridge*, 429 F. Supp. 2d at 133. As stated, Plaintiffs' conclusory allegations concerning their regression are not sufficient to show that any Defendant's price increases outstripped normal market forces. Beyond that, Plaintiffs focus on only two of the inputs: ocean freight and sodium lignosulfonate. The Indirect Purchaser Plaintiffs allege that "ocean freight rates spiked sharply and briefly during Covid, particularly for freight cargo, but have since fallen dramatically." Dkt. No. 135 ¶ 155. Plaintiffs do not plead when, following the end of the Covid-19 pandemic, ocean freight rates fell, such that it is impossible to contrast the decreased shipping cost with any price increase by Defendants. And Plaintiffs do not allege that ocean freight costs represented such a large portion of the cost of manufacturing and selling CCAs that a marketwide price decrease would be expected. Similarly, the Direct Purchaser Plaintiffs allege that "prices for sodium lignosulfonate, a key precursor for water reducer CCAs, actually decreased from the beginning of 2021 to the end of 2023." Dkt. No. 157 ¶ 203.[17] But Plaintiffs do not plead that sodium lignosulfonate was a major contributor to the cost of CCAs or that the other components of water reducer CCAs did not rise in price during that time. *See id.* ¶ 116 (alleging that the active ingredients in water reducing CCAs include lignosulfonates, hydroxylated carboxylic acids, melamine sulfonate, phosphonate salts, and naphthalene sulfonate). Plaintiffs thus also fail to plead that Defendants' statements concerning rising costs were pretextual, as the complaints do not demonstrate that overall input costs did not in fact rise as Defendants stated.

---

[17] Plaintiffs' chart indicates that the price for sodium lignosulfonate actually increased during the first quarter of 2021 and throughout much of 2022. *Id.*

Plaintiffs alternatively point to more general statements concerning Defendants' expanding profit margins or "disciplined pricing."  Dkt. No. 265 at 11–12, 21–22.  The statements span the period 2017 to 2023:

- During an earnings call in March 2017, GCP's CEO stated that GCP "remain[ed] focused on expanding margins in the concrete admixture business . . . through pricing."  Dkt. No. 157 ¶ 189.

- During an earnings call on August 8, 2018, GCP's CEO stated, "We are implementing a 3-point plan to improve the profitability of our SCC admixture business and to accelerate the penetration of high-margin technologies such as VERIFI.  First, we're raising prices significantly in low-profit, high-volatility admixture markets."  Dkt. No. 157 ¶ 189.

- During an earnings call in July 2019, Saint-Gobain Group's chief financial officer ("CFO") stated that Saint-Gobain Group had "remained focused on price in spite of . . . the fact that there was a lower trend in the inflation."  Dkt. No. 135 ¶ 159; Dkt. No. 157 ¶ 207.  The CFO explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increased profits.  Dkt. No. 135 ¶ 159; Dkt. No. 157 ¶ 207.

- During an earnings call in February 2020, Sika AG's CFO stated that the impact of increases in raw material costs was "only . . . marginal," and that Sika AG had continued to improve its margin by remaining "very much . . . focused on pricing."  Dkt. No. 135 ¶ 159; Dkt. No. 157 ¶ 208.

- During earnings call in 2021, Sika AG's CFO explained that Sika AG's margin of 54.8% in 2020 was "supported by decreasing raw material costs . . . in combination with disciplined pricing," which allowed it to "add[] 50 basis points in price effect."  Dkt. No. 135 ¶ 159; Dkt. No. 157 ¶ 208.

- A Saint-Gobain Group press release from October of 2021 cited "[c]onstant focus on the price-cost spread" and "strong pricing discipline amid strong inflation" as the company's "strategic priorities" for 2021.  Dkt. No. 135 ¶ 163; Dkt. No. 157 ¶ 212.

- Sika AG' CEO explained that the "remarkable" increase in Sika AG's margin in the first half of 2023 was "a result of our pricing discipline and excellence."  Dkt. No. 135 ¶ 162; Dkt. No. 157 ¶ 211.

- Sika AG's 2023 Half-Year Report echoed the sentiment, crediting the company's "disciplined sales price management," coupled with lower costs, for its higher profit margins.  Dkt. No. 135 ¶ 162; Dkt. No. 157 ¶ 211.

- In July of 2023, RPM's CEO stated that "we held our pricing and held our discipline." Dkt. No. 135 ¶¶ 18, 164; Dkt. No. 157 ¶ 213.[18]

Plaintiffs do not allege that any of these statements relate specifically to Defendants' CCA businesses as opposed to each company as a whole. But even if the Court assumes that the statements concerned Defendants' expanding margins or disciplined pricing with respect to CCAs only, they still do not show that the Defendants were acting collusively or that any particular Defendant's pricing decisions resulted from a prior agreement as opposed to normal market forces.

Courts have held that a defendant's statements concerning pricing discipline may signal conspiracy where they break with the company's prior practice or suggest a mechanism to enforce or execute a price-fixing agreement. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 62–63 (D.D.C. 2016) (explaining that defendants' "public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry . . . is notable because it involves more than a mere announcement of Defendant's own planned course of conduct" and constitutes a "deviation from past business practices"); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360–61 (N.D. Ga. 2010) (collecting cases); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 892 (N.D. Ill. 2009) (defendants' statements in speeches at industry conferences regarding the industry "work[ing] together to keep the prices high" and maintaining "discipline" in cutting capacity followed by competitors cutting capacity supported an inference of conspiracy). But all Plaintiffs allege here is that certain Defendants informed investors that the company either did not,

---

[18] Plaintiffs also allege that RPM's CEO responded to industry analysts asking whether the company intended to cut prices in the face of slumping demand by stating: "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it." Dkt. No.135 ¶ 160; Dkt. No. 157 ¶ 209. Plaintiffs do not allege when this exchange transpired.

or did not plan to, instantly react to changes in demand or input costs.  There are no allegations that the changes in demand or costs were so substantial as to give rise to an expectation that market participants would lower their prices.

Similarly, the allegations that some Defendants announced increased profit margins during the Class Period does not on its own indicate that the Defendants were acting in concert.  It may be true that "consumers gain the most when firms slash costs to the bone and pare price down to cost, all in pursuit of more business."  *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989).  But that does not mean that a firm is required to charge breakeven prices at pain of antitrust discovery.  Plaintiffs do not allege that Defendants' profit margins were themselves unusual or suspect.  *Cf. Starr*, 592 F.3d at 324 (observations of industry commentators suggested that "some form of agreement among defendants would have been needed to render the enterprises profitable"); *see Citigroup*, 709 F.3d at 138.  There are no factual allegations suggesting Defendants' increased profits resulted from a conspiracy, as opposed to at most mutually-beneficial interdependent behavior.  *See DRAM Indirect Purchaser*, 28 F.4th at 48 & n.3.

Ultimately, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  A holistic view of Plaintiffs' allegations does not give rise to the plausible inference that Defendants entered into an agreement to fix the prices of CCAs.  Plaintiffs allege no behavior by Defendants that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Twombly*, 550 U.S. at 557.  Because Plaintiffs fail to allege parallel conduct, they cannot  demonstrate an agreement based on indirect evidence "regardless of their plus factors."  *City of Pontiac*, 92 F.4th at 415 n.17.

\*    \*    \*

"Whether standing alone or considered together, . . . none of the factors adduced by Plaintiffs would help their cause." *Id.* (citation omitted). Plaintiffs' allegations concerning the structure and consolidation of the market for CCAs as well as the allegations concerning Defendants' general profit motives and overlapping memberships and roles in trade associations show nothing beyond the fact that Defendants "are capable of conspiring." *Vedder Software Grp. Ltd. v. Ins. Servs. Off., Inc.*, 545 F. App'x 30, 32 (2d Cir. 2013) (summary order). But a complaint must do more than demonstrate the mere possibility of the plaintiff's claims—it must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see Gamm*, 944 F.3d at 466. And Plaintiffs' allegations as to the investigations into certain Defendants do not suggest that any of the regulators have evidence that any Defendant engaged in anticompetitive behavior affecting the United States. Finally, that certain Defendants at certain times increased CCA prices when prices for certain inputs were not increasing does not suggest that their decisions were other than independent. Defendants' motions to dismiss Plaintiffs' Sherman Act claims are granted.

## II.  State Laws

Because the Indirect Purchaser Plaintiffs' state law claims are based upon the same allegations of price-fixing conspiracy as Plaintiffs' Sherman Act claims, they must be dismissed as well. *See In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum Warehousing I*"), 2014 WL 4277510, at \*37 (S.D.N.Y. Aug. 29, 2014) ("Plaintiffs' state law claims rely upon the same allegations of conspiracy, monopolization and unfair conduct as their antitrust claims. For the same reasons, none survive."), *supplemented*, ("*Aluminum Warehousing II*") 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, ("*Aluminum Warehousing III*") 833 F.3d 151 (2d Cir. 2016).

48

First, the Indirect Purchaser Plaintiffs allege violations of the antitrust laws of twenty-six states, the District of Columbia, Guam, and Puerto Rico.  Dkt. No. 135 ¶¶ 233–384.[19]  "Because the Court dismisses the federal antitrust claims, . . . Plaintiffs' claims under the antitrust laws of various states—based on the same factual allegations—fail too."  *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 497 (S.D.N.Y. 2022), *aff'd sub nom. Watson Lab'ys, Inc. v. Forest Lab'ys Inc.*, 101 F.4th 223 (2d Cir. 2024); *see, e.g., In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) ("[S]ince Plaintiffs fail to state a claim under the Sherman Act, and since the state antitrust law claims are based on the same allegations, those claims are also dismissed."), *aff'd*, 466 F.3d 187 (2d Cir. 2006).  Those claims are therefore dismissed.

Second, the Indirect Purchaser Plaintiffs' complaint alleges eighteen causes of action for violations of various states' consumer protection laws.  Dkt. No 135 ¶¶ 389–530.[20]  The Indirect Purchaser Plaintiffs "do not contest dismissal of their claims under the consumer protection laws of Massachusetts, Michigan, and Utah."  Dkt. No. 265 at 67.  Those claims are therefore dismissed with prejudice.  The only allegedly wrongful conduct the Indirect Purchaser Plaintiffs identify as the basis for their claims concerning the remaining states' consumer protection laws—fixing the prices of CCAs at supracompetitive levels and misrepresenting the cause of price increases, Dkt. No. 135 ¶¶ 389–530—cannot support a claim to relief in light of Plaintiffs' failure to allege a price-fixing conspiracy.  *See Aluminum Warehousing III*, 833 F.3d at 163 (affirming dismissal where plaintiffs "fail to demonstrate why any of these [state law consumer protection] claims should

---

[19]  The states are Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

[20]  The states are Arkansas, California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, Utah, and Vermont.

survive if the antitrust claims are dismissed"); *Aluminum Warehousing I*, 2014 WL 4277510, at *37. Those claims must therefore be dismissed as well.

Third, the Indirect Purchaser Plaintiffs bring a cause of action for unjust enrichment under the common law of thirty-five jurisdictions.[21] "[W]ithout a viable underlying claim of illegality, an unjust enrichment claim must be dismissed." *Int. Rate Swaps*, 261 F. Supp. 3d at 500 (quotation marks and citations omitted). Because Plaintiffs' antitrust and consumer protection claims fail, Plaintiffs' unjust enrichment claim must also be dismissed. *See id.*; *Mexican Gov't Bonds*, 412 F. Supp. 3d at 391; *Aluminum Warehousing II*, 2014 WL 4743425, at *4.

## CONCLUSION

Defendants' motions to dismiss are GRANTED. The Indirect Purchaser Plaintiffs' claims under the consumer protection laws of Massachusetts, Michigan, and Utah are dismissed with prejudice. All of Plaintiffs' other claims are dismissed without prejudice.

Plaintiffs may file amended complaints no later than 30 days after the date of this Opinion and Order.

The Clerk of Court is respectfully directed to close Dkt. Nos. 223, 225, 227, 229, and 297.

SO ORDERED.

Dated: June 25, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[21] The jurisdictions are Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.