USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/02/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: CONCRETE AND CEMENT ADDITIVES ANTITRUST LITIGATION

This documents Relates To:

ALL ACTIONS

24-md-3097 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This multidistrict litigation concerns an alleged conspiracy to fix the price of (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing additives or admixtures (collectively "CCAs").

Defendants consist of three corporate families that manufacture and sell the vast majority of CCAs sold in the United States and its territories, as well as in Europe.[1] There are two putative plaintiff classes: (1) direct purchasers that directly purchased CCAs from the Defendants ("Direct Purchaser Plaintiffs") and (2) indirect purchasers that indirectly purchased CCAs that were manufactured by one or more of the Defendants ("Indirect Purchaser Plaintiffs" and, together with the Direct Purchaser Plaintiffs, "Plaintiffs").

By Opinion and Order of June 25, 2025, the Court dismissed Plaintiffs' complaints for failure to state a claim for relief. Dkt. No. 300; *In re Concrete & Cement Additives Antitrust*

[1] Defendants are Sika AG, Sika Corporation, Sika S.A.S. (collectively, "Sika" or "Sika Defendants"), Master Builders Solutions Admixtures U.S., LLC, Master Builders Solutions France S.A.S., Cinven Ltd. (collectively, "Master Builders" or "Master Builders Defendants"), Mapei S.p.A., Mapei Corporation, and Mapei France SA (collectively, "Mapei" or "Mapei Defendants"). The amended complaints originally brought claims against a fourth corporate family consisting of Compagnie de Saint-Gobain S.A., Saint-Gobain Corporation, Chryso S.A.S., Chryso, Inc., and GCP Applied Technologies, Inc. (collectively, "Saint-Gobain"), but they have since reached a settlement with Plaintiffs. *See* Dkt. Nos. 307–08, 315–16.

*Litig.*, 2025 WL 1755193, at *1 (S.D.N.Y. June 25, 2025). Plaintiffs' original complaints alleged that, during a class period running from January 1, 2017 to the present, Defendants conspired to fix the prices of CCAs they sold to customers in the United States. *Id.* at *5. The Court held that Plaintiffs did not plausibly allege an antitrust conspiracy. Significantly, Plaintiffs did not allege parallel pricing. Although over the class period each Defendant group increased the prices of certain CCA products that they sold to consumers, the price increases "were episodic and inconsistent with coordinated activity." *Id.* at *14. The Court concluded that "[t]he mere fact that each Defendant increased prices over the eight-year duration of the Class Period thus does not suggest they did so in combination." *Id.* at *16. The Court further concluded that Plaintiffs had not alleged "sufficient plus factors to create the inference that Defendants' pricing decisions were the product of a pre-existing agreement to fix prices." *Id.* at *18. The factors Plaintiffs alleged at most were consistent with but not indicative of a price-fixing conspiracy. *Id.* With a limited exception,[2] the Court permitted Plaintiffs to file amended complaints.

At the time of the original motions to dismiss, antitrust authorities from the United States, the United Kingdom, the European Commission, and Turkey had opened investigations into the conduct of Defendants. With the exception of the European Commission's inquiry, those investigations have now closed. *See* Dkt. Nos. 367, 404; ISAC ¶ 121.

Plaintiffs filed amended complaints which significantly narrow their claims. *See* Dkt. Nos. 320, 382. The amended complaints focus principally on the conduct of executives of four French companies—Sika S.A.S., Master Builders Solutions France S.A.S., Mapei France SA (collectively, the "French Defendants"), and non-party Chryso S.A.S.—and price increases in

---

[2] The Court dismissed with prejudice the Indirect Purchaser Plaintiffs' claims under the consumer protection laws of Massachusetts, Michigan, and Utah. *Id.* at *25.

Europe during three time periods: (1) April and May 2021; (2) October 2021 and January 2022; and (3) March and May 2022.

Defendants now move to dismiss those complaints for failure to state a claim for relief as against all Defendants and for lack of personal jurisdiction over the French Defendants. *See* Dkt. Nos. 384, 388, 393, 397, 399.

For the reasons that follow, the motions to dismiss on 12(b)(6) grounds are granted and the motions to dismiss on 12(b)(2) grounds are denied as moot.

## BACKGROUND

The Court accepts the factual allegations of the Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint ("DFAC") and the Indirect-Purchaser Plaintiffs' Corrected Second Amended Consolidated Class Action Complaint ("ISAC") as true, identifying the differences between those complaints only where relevant.[3]

### I. The Market for CCAs

CCAs are ingredients added to cement, concrete, and mortar to modify and improve their safety and functionality. ISAC ¶ 197. They include the following product types: (a) super plasticizers; (b) accelerators; (c) water reducers/retarders; (d) mid-range water reducing grinding aids; (e) corrosion inhibitors; (f) recovery admixtures; (g) quality improvers; (h) air control admixtures: (i) shrinkage reducer admixtures; (j) specialty admixtures; (k) efflorescence control; (l) water repellants; (m) plasticizers; (n) mortar admixtures; and (o) strength enhancers. *Id.* Most construction projects use cement, concrete, or mortar, and CCAs are essential inputs for such projects. *Id.* ¶ 198. Globally, the market for CCAs exceeded $18 billion in 2023. *Id.* ¶ 211. The United States is one of the largest markets worldwide, generating approximately $3

[3] Citations are to the ISAC except where otherwise indicated.

billion in annual revenue; at least $100 million worth of CCAs are imported into the United States each year. *Id.*

CCAs are homogenous products and competition between suppliers is driven primarily by price. *Id.* ¶ 203. At the same time, demand for CCAs is inelastic because (a) there are no substitutes for CCAs; (b) CCAs are essential inputs for construction projects; (c) customers face high costs when switching between CCA suppliers; and (d) CCAs are commodity products sold primarily based on price. *Id.* ¶ 194. In particular, suppliers of CCAs typically provide customers with specialized equipment to ensure proper dosing and dispensing of their products, making it difficult for a CCA customer to change suppliers. *Id.* ¶ 202.

The marketplace for CCAs contains thousands of small buyers and only a handful of large suppliers. *Id.* ¶¶ 206, 216. The purchasers of CCAs tend to be cement manufacturers, ready-mix concrete manufacturers, and pre-cast concrete manufacturers who are numerous, dispersed, and fragmented. *Id.* ¶¶ 205–07. In 2021, in the United States alone, there were nearly 9,000 concrete and cement product manufacturing establishments. *Id.* ¶ 206. The supply side of the market is highly concentrated and comprised of a small group of major sellers. *Id.* ¶ 213. There are high barriers to entry. *Id.* ¶ 218. Towards the end of 2018, the CCA market experienced a wave of consolidation that substantially increased supply-side concentration. *Id.* ¶ 212.

## II. The Relevant Parties

The Direct Purchaser Plaintiffs are United States corporations who purchased CCAs directly from one or more Defendants in the United States during the period from at least March 11, 2021, through the date on which any Direct Purchaser Plaintiff Class is certified in this action or the anticompetitive effects of Defendants' conduct cease (the "Class Period"). DFAC ¶¶ 10,

15–18. They are Keystone Concrete Block & Supply Co. Inc., 570 Concrete LLC, J&L Imperium Industries LLC, and Jamestown Macadam Inc. *Id.*

The Indirect Purchaser Plaintiffs are United States businesses that indirectly purchased CCAs manufactured by one or more of the Defendants.[4] The Indirect Purchaser Plaintiffs are BH Warne Construction, Inc., Morgan Building Constructors, Coomer Concrete Contractors, Inc., Chris Mark d/b/a Make Your Mark Construction, Park Construction Co., Sioux City Engineering Co., Covered Bridge Outdoor Construction Corp., Vento Masonry and Cement Company, Inc., Lakewood Concrete Corp., SMBA Construction, LLC, Charles W. Hughes Construction, LLC, Lucas Contracting, LLC, Jon Tate Construction, LLC, Jon S. Garrett d/b/a Black River Masonry, and Tower Concrete LLC. ISAC ¶¶ 16–30.

The Defendants consist of three separate corporate families that manufacture and sell the vast majority of CCAs globally: (1) Sika; (2) Master Builders; and (3) Mapei. *Id.* ¶¶ 2, 31–47. Also relevant to the complaints is a fourth corporate family: Saint-Gobain. The parent of each of the corporate families is a foreign corporation. Each corporate group has a United States affiliate which markets and sells CCAs in the United States.

Sika AG ("Sika AG") is a Swiss corporation with its principal place of business in Baar, Switzerland that manufactures, markets and sells CCAs worldwide, including in the United States, either directly or through its affiliates, subsidiaries, or agents. *Id.* ¶ 31. Sika S.A.S. ("Sika France") is a French corporation with its principal place of business in Le Bourget, France. *Id.* ¶ 32. Sika Corporation ("Sika US") is a company incorporated in New Jersey, with

[4] The ISAC likewise defines the "Class Period" as "from at least March 11, 2021, through the date on which any Indirect Purchaser Class is certified in this action or the anticompetitive effects of Defendants' conduct cease." ISAC at 1.

its principal place of business in New Jersey. *Id.* ¶ 33. Sika France and Sika US are controlled either directly or indirectly by Sika AG. *Id.* ¶ 34.

Cinven Ltd. ("Cinven") is a British private equity firm with its principal place of business in London, England. *Id.* ¶ 39. Master Builders Solutions France S.A.S. ("Master Builders France") is a French corporation with its principal place of business in Lisses, France. *Id.* ¶ 40. Master Builders Solutions Admixtures U.S., LLC ("Master Builders US") is a limited liability company registered in Delaware with its principal place of business in Beachwood, Ohio. *Id.* ¶ 41. From June 30, 2017 until September 28, 2021, Cinven wholly owned and controlled Chryso S.A.S. and Chryso, Inc. *Id.* ¶ 42. Since May 2, 2023, Cinven has owned and controlled Master Builders France and Master Builders US. *Id.* ¶ 43.

Mapei S.p.A. ("Mapei Italy") is an Italian corporation with its principal place of business in Milan, Italy. *Id.* ¶ 44. Mapei France SA ("Mapei France") is a French corporation with its principal place of business in Saint-Alban Cedex, France. *Id.* ¶ 45. Mapei Corporation ("Mapei US") is an Illinois corporation with its principal place of business in Deerfield Beach, Florida. *Id.* ¶ 46. Mapei Italy owns and controls, either directly or indirectly, Mapei France and Mapei US. *Id.* ¶ 47.

Compagnie de Saint-Gobain S.A. ("Saint-Gobain France") is a French corporation with its principal place of business in Courbevoie, France. *Id.* ¶ 35. Chryso S.A.S. ("Chryso France") is also a French corporation with its principal place of business in Sermaises-du-Loiret, France. *Id.* ¶ 36. Chryso, Inc. ("Chryso US") is a Michigan corporation with its principal place of business in Dallas, Texas. *Id.* ¶ 37. Since September 29, 2021, Chryso France and Chryso US have been controlled either directly or indirectly by Saint-Gobain France. *Id.* ¶ 38.

Sika US, Master Builders US, Mapei US (collectively, the "U.S. Defendants") and Chryso US all manufacture, market, and sell CCAs in the United States. *Id.* ¶¶ 33, 37, 41, 46. Sika AG, Cinven, Mapei Italy (collectively, the "Parent/Sponsor Defendants"), and Saint-Gobain France each manufacture, market, and sell CCAs worldwide, either directly or indirectly through their affiliates and subsidiaries, including in the United States. *Id.* ¶¶ 31, 35, 39, 44. In addition, Sika France, Chryso France, Master Builders France, and Mapei France manufacture, market, and sell CCAs worldwide, either directly or indirectly through their affiliates and subsidiaries, including in the United States. *Id.* ¶¶ 32, 36, 40, 45.

With Saint-Gobain, Defendants account for more than two-thirds of all CCA sales in the United States. *Id.* ¶ 2; *see id.* ¶ 213 ("[D]uring the Class Period, Defendants [and Saint-Gobain] collectively controlled more than two-thirds of the CCA market in the United States.").

## III. The Alleged Conspiracy to Fix Prices

Plaintiffs allege a conspiracy to fix prices in the market for CCAs originating at the start of the global COVID-19 pandemic in March 2021 and orchestrated by executives of the French affiliates of each of the Defendant groups of families. Dkt. No. 420 at 9–10.

The principal players in the conspiracy were: (1) Claude LeFur ("LeFur"), who was head of Sika France and who served as Sika France's Manager of Business Development for Southern Europe and the Middle East (until July 2021); (2) Franck Gimer ("Gimer"), who was in charge of Chryso France's French operations and served as Chryso France's Executive Vice President for Western Europe; (3) Guillaume Francqueville ("Francqueville"), the President of Master Builders France; and (4) Christophe Jeauneau ("Jeauneau"), the Director General of Mapei France. ISAC ¶ 4. The following other individuals also are alleged to have been involved in the conspiracy: (1) Chryso France's Commercial Director, Eric Lebre ("Lebre"); (2) LeFur's successor, Pascal Malafosse ("Malafosse"), who also served as Sika France's Managing

Director; (3) Sika France's Director of Concrete Sales, Philippe Reneaux ("Reneaux"); (4) Master Builders France's Director of Key Accounts, Leon Devaux ("Devaux"); and (5) Mapei France's Director of Concrete, Cement, and Export Activities, Patrick Montagne ("Montagne"). *Id.*; *see also id.* ¶ 52 (alleging that the primary architects of the conspiracy were LeFur, Malafosse, and Reneaux from Sika France, Gimer and Lebre from Chryso France; Francqueville and Devaux from Master Builders France; and Jeauneau and Montagne from Mapei France).

The conspiracy is alleged to have been executed through a French trade organization, the Syndicat National des Adjuvants pour Bétons et Mortiers ("SYNAD"), whose leadership team was comprised of representatives of each of the three French Defendants and Chryso France: LeFur (and later Malafosse), Gimer, Francqueville, and Jeauneau. *Id.* ¶ 5.

The conspiracy is alleged to have resulted in three coordinated price increases: in Spring 2021, Fall/Winter 2021, and Spring 2022. *Id.* ¶ 51. Plaintiffs allege that in or around April and May 2021, "Defendants implemented their first round of coordinated price increases on some or all of the CCAs they sold to customers around the world, including customers in the United States." *Id.* ¶ 70. They also allege that in or around October 2021 and January 2022, "Defendants implemented a second round of coordinated price increases on some or all of the CCAs they sold to customers around the world, including customers in the United States." *Id.* ¶ 80. Finally, they allege that, in or around March and May 2022, "Defendants implemented a third round of coordinated price increases on some or all of the CCAs they sold to customers around the world, including customers in the United States." *Id.* ¶ 98.

### A. The First Price Increase

The first alleged coordinated price increase involved communications among Chryso France's Gimer, Sika France's LeFur, Mapei France's Jeauneau, and Master Builders France's Francqueville in the time period from mid-March 2021 to early April 2021. *Id.* ¶¶ 55–70. It was

sparked by a press release drafted by the French industrial mortars trade association, the Syndicat National des Mortiers Industriels ("SNMI"), and sent to Mapei, about the anticipated effects of rising raw material costs on the prices of construction chemicals, and it involved a press release from SYNAD regarding the need for CCA manufacturers to increase CCA prices due to an alleged raw material shortage. *Id.* ¶¶ 55, 58. On or around March 11, 2021, the Secretary General of SNMI sent the press release regarding rising raw material costs to Mapei France's Jeauneau, who then forwarded the press release a week later, on March 19, 2021, to Chryso France's Gimer and SYNAD's Secretary General, Yves Adam ("Adam"). *Id.* ¶¶ 55, 57. On or around March 22, 2021, SYNAD drafted a press release about the need for CCA manufacturers to increase their prices which Adam sent to Jeauneau, Gimer, LeFur, and Francqueville. *Id.* ¶ 58. The following day, the four had a meeting following which SYNAD circulated a revised draft press release that parroted a narrative that Chryso France had been drafting regarding the need to increase CCA prices, and added language emphasizing raw material cost increases of double-digit percentages and warning that higher costs would be reflected in the prices of finished products. *Id.* ¶¶ 56, 59. The press release was approved the following day and published the day after. *Id.* ¶ 61. Meanwhile, according to Plaintiffs, the representatives of each of the French companies set about accomplishing what the press release foresaw in terms of price increases. Gimer and LeFur spoke directly and exchanged information about their companies' planned price increases on March 23, 2021. *Id.* ¶ 60. On or around March 31, 2021, Gimer was further asked by Chryso France's Commercial Director, Lebre, to confirm that Sika and Mapei were moving forward with their CCA price increases and Gimer agreed to do so, contacting LeFur to discuss the planned price increases about thirty minutes later. *Id.* ¶ 64. He also shared confidential information with Francqueville about their respective companies' planned price

increases by product family and the anticipated timing of their letters to customers. *Id.* ¶ 65. On or around April 9, 2021, Lebre relayed to his colleagues that Sika France would be announcing price increases of four to six percent effective May 1, 2021. *Id.* ¶ 68.

Defendants implemented their first round of price increases in or around April and May 2021. *Id.* ¶ 70.

**B. The Second Price Increase**

The second alleged coordinated price increase was the product of communications among Gimer of Chryso France, Francqueville of Master Builders France, Jeauneau of Mapei France, and Malafosse of Sika France, who had replaced LeFur after LeFur left Sika's employment in or around July 2021. *Id.* ¶¶ 71–80. Gimer and Francqueville remained in frequent contact following the Spring 2021 price increase, exchanging WhatsApp messages on almost a daily basis. *Id.* ¶ 73. On or around September 24, 2021, Gimer told Francqueville that Chryso had sent a memorandum to customers about anticipated 2022 market conditions, and Francqueville told Gimer that Master Builders planned to communicate its increase to customers in October. *Id.* ¶ 74. Once Gimer and Francqueville were in accord on implementing a second price increase, they sought concurrence from Sika and, on or around October 8, 2021, Gimer, Francqueville, and Malafosse met at a café in France and discussed their plans to announce CCA price increases in the coming months. *Id.* ¶¶ 75–76. Between the October 8, 2021 meeting and the next SYNAD meeting scheduled for December 3, 2021, Gimer and Francqueville spoke on the phone at least 19 times, often discussing particulars of their price increase plans. *Id.* ¶ 77. Gimer, Francqueville, Malafosse, and Jeauneau met to discuss how to respond to the rising raw material costs on December 3, 2021 and again on December 6, 2021. *Id.* ¶ 78. On or around December 8, 2021, SYNAD issued a press release noting that the alleged raw material situation had worsened since the spring, conditioning CCA customers to expect price increases. *Id.* ¶ 79.

In or around October 2021 and January 2022, Defendants implemented their second round of coordinated price increases. *Id.* ¶ 80.

### C. The Third Price Increase

The third alleged coordinated price increase was the product of communications in March 2022 and early April 2022 between Gimer and Francqueville and between Lebre of Chryso France and his counterparts—Reneaux of Sika France, Devaux of Master Builders France, and Montagne of Mapei France. *Id.* ¶¶ 81–98. On or around March 1, 2022, Francqueville told Gimer that Francqueville would sound the alarm about material shortages and price increases. *Id.* ¶ 84. That same day, Francqueville was quoted in a news article, which Gimer then sent to Lebre, discussing raw material cost increases in the CCA industry and indicating a need to further increase prices. *Id.* ¶ 85. Several days later, Gimer met with Francqueville at a restaurant in a Paris suburb. *Id.* ¶ 86. On or around March 11, 2022, Gimer asked Francqueville to send Master Builders France's price increase letter to him through Gimer's wife's private email account, while also instructing his wife to forward the letter to his colleague Lebre and telling Lebre to forward the letter to him and to state it came from a customer. *Id.* ¶ 87. All parties did as told and Lebre forwarded the letter to Gimer, falsely stating that it came from a customer. *Id.* Later the same day, Gimer called Francqueville and the two spoke about coordinating price increases. *Id.* They continued to exchange confidential pricing information through Gimer's wife's email account throughout the Spring of 2022. *Id.* ¶¶ 88–91. The two also exchanged confidential pricing information through SYNAD. *Id.* ¶ 93. In parallel, Lebre of Chryso France discussed price increase plans and exchanging confidential pricing information with Sika France's Reneaux, Master Builders France's Devaux, and Mapei France's Montagne, and conveyed what he learned from them to Gimer. *Id.* ¶¶ 94–95. On April 9, 2022, Gimer relayed to Chryso France's Export Development Director the information he had learned from

Francqueville that Sika planned to issue a price increase letter that day and Master Builders would do the same the following week. *Id.* ¶ 96. When Master Builders failed to send its price increase letter the following week, Francqueville reassured Gimer that it would go out the following week and Gimer conveyed this information to Lebre. *Id.* ¶ 97.

The third round of coordinated price increases was implemented in or around March and May 2022. *Id.* ¶ 98.

**D. Price Increases in the United States**

The complaints allege in conclusory fashion that the communications among the French conspirators resulted in price increases worldwide, including to "customers in the United States." *Id.* ¶¶ 70, 80, 98. The complaints contain limited factual allegations about activity involving United States actors or in the United States.

Specifically, Plaintiffs allege that on or around March 19, 2021, at the time of the SNMI press release regarding rising costs for raw materials but before the first draft of the SYNAD press release, Mark Plancon ("Plancon"), the Deputy Director of Chryso France's Concrete Business Unit, emailed Chryso country managers, including Chryso US Chief Executive Officer Steve Williams ("Williams"), with a draft communication for Chryso US to send to its customers to prepare them for an across-the-board price increase on CCAs along with the message that Plancon expected that Chryso's main competitors, the other Defendants, would also communicate price increases to their customers around the world, including in the United States, in the near future. *Id.* ¶ 106. The draft communication echoed themes that would later appear in the SYNAD draft press release. *Id.* Chryso US initially pushed back on Chryso France's directive due to fear of losing market share to competitors, but relented after Chryso France made clear that the CCA price increases were mandatory and needed to be imposed expeditiously. *Id.* ¶ 107. Chryso US executives prepared price increase letters using templates

supplied by Chryso France, and by on or around April 14, 2021, Chryso US had sent those letters to all of its CCA customers. *Id.* Plaintiffs do not allege that Plancon or anyone at Chryso France spoke to any other company about price increases in the United States or that Williams or anyone at Chryso US communicated with any of Chryso US's competitors.

As to the second price increase, Plaintiffs allege that on or around November 5, 2021, Chryso France CEO Thierry Bernard ("Bernard") advised Chryso US CEO Williams and other country managers in an email that they must not negotiate prices with customers and must be prepared to stop selling CCAs to customers who would not agree to pay higher prices on CCAs. *Id.* ¶ 108. Plaintiffs do not allege what Chryso US did in response. There are no allegations in the complaints that any other competitor in the United States increased prices at this time. There are no allegations that Bernard or anyone at Chryso France spoke to any competitor about prices in the United States or that Williams or anyone at Chryso US spoke to any of its competitors.

Plaintiffs' most specific allegations relate to the third price increase. Plaintiffs allege that Chryso France executives met with Williams and told him that Chryso US was required to increase prices for CCAs as expeditiously as possible. *Id.* ¶ 109. Shortly thereafter, Chryso France's Nicolas Théodon ("Théodon") spoke to Chryso US's Vice President of Sales and Marketing, Daniel Bentz ("Bentz"), following which, Bentz proposed that Chryso US impose a fuel surcharge of $0.37/gallon, together with a price increase on CCAs, to be effective April 1, 2022. *Id.* ¶ 109. Sika US had imposed the identical fuel surcharge on all CCAs a few weeks prior, to be effective March 15, 2022. *Id.* Once again, there are no allegations that Chryso France spoke to any competitors about prices in the United States or that Williams or anyone else at Chryso US spoke to any of its competitors.

**E. The Antitrust and Competition Investigations**

The complaints refer to several investigations of alleged anticompetitive conduct in the CCA industry or construction chemicals industry. On or around October 17, 2023, the European Commission ("EC") conducted unannounced inspections at the offices of several companies in the construction chemicals industry in connection with suspected cartel conduct. *Id.* ¶ 118. The EC explained that the inspections concerned "chemical additives for cement and chemical admixtures for concrete and mortar" and that the companies "may have violated EU antitrust rules that prohibit cartels and restrictive business practices." *Id.* The EC is permitted to conduct unannounced inspections only when it has sufficiently serious evidence to suspect a violation of competition law. *Id.*

The Turkish Competition Authority ("TCA") also carried out coordinated dawn raids on or around October 17, 2023, and later announced that it was opening an investigation into several CCA companies and trade associations for alleged collusion, including price-fixing and information-sharing. *Id.* ¶ 119. In May 2025, the TCA determined that Mapei and Chryso subsidiaries based in Turkey violated Article 4 of Turkey's Act No. 4054 on the Protection of Competition and fined Mapei the Turkish Lira equivalent of approximately $800,000 and Chryso the Turkish Lira equivalent of approximately $290,000. *Id.* ¶ 121.

In the United States, a criminal grand jury was empaneled in the Eastern District of Pennsylvania to investigate anticompetitive conduct in the CCA industry. *Id.* ¶ 117. The EC cooperated with that investigation. *Id.* ¶ 118. Each of the Defendant corporate families has acknowledged being subjects of the investigations. *Id.* ¶ 120. The United States grand jury investigation has now closed without action having been taken. Dkt. Nos. 367, 404. The only remaining open investigation is that of the EC.

## PROCEDURAL HISTORY

### I. The Prior Motions to Dismiss

This matter originated with the filing of numerous individual actions across several federal districts starting in December 2023. Dkt. No. 1 at 1. The United States Judicial Panel on Multidistrict Litigation ordered the actions pending in the Eastern District of Pennsylvania to be transferred to this District for coordinated or consolidated pretrial proceedings. *Id.* at 2. By orders of July 9, 2024, the Court appointed the Hausfield Group as Interim Lead Class Counsel to represent the putative Direct Purchaser Plaintiff class and Berger Montague PC, Gustafson Gluek PLLC, and the Roberts Law Firm U.S., PC as the Executive Committee for the putative Direct Purchaser Plaintiff class, Dkt. No. 126, and appointed Kaplan, Fox & Kilsheimer LLP, Lockridge Grindal Nauen PLLP, and Cuneo, Gilbert & Laduca LLP as interim co-lead counsel for the Indirect Purchaser Plaintiff classes, Dkt. No. 125.

On September 9, 2024, Plaintiffs filed amended consolidated complaints alleging that Defendants engaged in a conspiracy to fix prices for CCAs. Dkt. Nos. 135, 142. Plaintiffs alleged that price increases effected by the Defendants over a period of time ranging from the first quarter of 2017 to March 1, 2024 were the product of a price-fixing conspiracy. *Concrete*, 2025 WL 1755193, at *5–7. Plaintiffs pleaded solely an indirect, circumstantial claim of price-fixing. They claimed that the price increases effective over an eight-year time period by different Defendants at different times and in different amounts were the product of a prior agreement among the competitors to fix prices, and that the inference of price-fixing was bolstered by evidence that Defendants all belonged to the same trade associations and were subject to investigations by European and United States competition authorities, and by the consolidated nature of the CCA market.

The Court issued an Opinion granting Defendants' motions to dismiss on June 25, 2025. *Id.* at *25. The Court held that Plaintiffs did not plead evidence of parallel conduct. Rather, Plaintiffs alleged disparate conduct without any evidence of "any overarching pattern connecting these divergent [price] increases to one another." *Id.* at *15. Tellingly, the Court noted that over the entire putative class period, only one Defendant was alleged to have announced a price increase specifically relating to CCAs in North America, and that such price increase pertained only to concrete admixtures which was a subset of the broader CCA market. *Id.* The Court held that common membership in trade associations and a consolidated market were not sufficient to allege "plus factors" which support an inference of a conspiracy. *Id.* at *18. The Court also rejected arguments that the fact of investigations by United States and foreign authorities provided sufficient plus factors. *Id.* at *19. Plaintiffs did not allege that any of the investigations had actually turned up evidence of a price-fixing conspiracy. *Id.* at *20.

## II. The Instant Motions to Dismiss

On September 26, 2025, the Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs each filed further amended consolidated class action complaints. Dkt. Nos. 320–21, 326–27. The Indirect Purchaser Plaintiffs filed a corrected second amended consolidated class action complaint on November 24, 2025. Dkt. Nos. 382–83.[5]

The Direct Purchaser Plaintiffs bring claims under Sections 1 and 3 of the Sherman Act for injunctive relief and treble damages. DFAC ¶¶ 232–40. The Indirect Purchaser Plaintiffs bring claims under Sections 1 and 3 of the Sherman Act for injunctive relief, ISAC ¶¶ 259–68, and for violations of the antitrust or competition laws of the following States and territories:

[5] On August 15, 2025, Plaintiffs filed motions for preliminary approval of a settlement by Plaintiffs with the Saint-Gobain Defendants. Dkt. Nos. 307–08. The Court granted preliminary approval on August 27, 2025. Dkt. Nos. 315–16.

Arizona, California, Connecticut, the District of Columbia, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin; and the unfair or deceptive trade practices acts or consumer protection laws of Arkansas, California, Florida, Illinois, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, and Vermont, *id.* ¶¶ 269–551. The Indirect Purchaser Plaintiffs also bring a state common law unjust enrichment claim under the laws of Arizona, Arkansas, California, Connecticut, the District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. *Id.* ¶¶ 552–59.

The following motions, supported by memoranda and declarations in support, were filed on November 25, 2025: (1) the French Defendants' joint motion to dismiss both complaints for lack of personal jurisdiction, Dkt. Nos. 384–87; (2) the Parent/Sponsor Defendants' joint motion to dismiss both complaints for failure to state a claim for relief, Dkt. Nos. 388–91; (3) Defendants' joint motion to dismiss both complaints for failure to state a claim for relief, Dkt. Nos. 393–95; (4) Defendants' joint motion to dismiss the ISAC for failure to state a claim, Dkt. Nos. 397–98; and (5) the Mapei Defendants' motion to dismiss both complaints for lack of personal jurisdiction and failure to state a claim for relief, Dkt. Nos. 399–402.

On January 26, 2026, the Indirect Purchaser Plaintiffs filed their opposition to Defendants' joint motion to dismiss the ISAC. Dkt. No. 417. Plaintiffs filed a joint

memorandum of law and supporting declarations in opposition to the remaining motions to dismiss on the same day. Dkt. Nos. 419–24. Plaintiffs included in their opposition a request for leave to amend should the Court grant any of Defendants' motions due to pleading deficiencies. Dkt. No. 420 at 89–90. On February 25, 2026, Defendants filed reply memoranda and additional declarations in support of their motions to dismiss. Dkt. Nos. 430–31, 433, 434–35, 437–41, 442–44. The Court heard oral argument on the motions to dismiss on June 22, 2026. *See* Transcript of June 22, 2026 Oral Argument ("June 22, 2026 Hearing Tr."), Dkt. No. 466.[6]

**III. Plaintiffs' Supplemental Submission**

Two weeks after oral argument on the motions to dismiss, Plaintiffs submitted a letter and accompanying appendix setting forth additional factual allegations, "which Plaintiffs would be able to assert in substantially similar form in amended complaints," that purportedly address the following issues: (1) "Domestic Defendants' parallel U.S. price increases, drawn from their transactional data and price increase notifications sent to customers" over the putative class period; (2) "why large global CCA customers' buying practices and leverage required global price increases, including in the United States"; (3) "how the foreign Defendants used country-level CCA trade associations to adopt a unified message across countries, including in the United States, to facilitate and expand their global agreement to fix prices, with the knowledge and often

[6] On December 17, 2025, Defendants requested that the Court limit discovery during the pendency of Defendants' motions to dismiss and adopt their discovery proposal. Dkt. No. 406. On December 19, 2025, Plaintiffs filed a letter response opposing Defendants' request. Dkt. No. 413. On March 27, 2026, Plaintiffs moved for leave to file a ten-page sur-reply to the French Defendants' reply in support of their joint motion to dismiss for lack of personal jurisdiction, Dkt. No. 442, and to the Parent/Sponsor Defendants' reply in support of their joint motion to dismiss, Dkt. No. 437, and to file with the sur-reply two expert declarations responding to Parent/Sponsor Defendants' expert opinions. Dkt. No. 448. On March 31, 2026, the French and Parent/Sponsor Defendants filed a letter response in opposition to Plaintiffs' motion for leave. Dkt. No. 449. Because the Court herein dismisses Plaintiffs' claims with prejudice, both letter motions are denied as moot.

direct participation of the Parent Defendants, and how the Domestic Defendants used the same playbook to announce parallel price increases in the United States"; and (4) "how the Parent Defendants controlled their subsidiaries' pricing and directed the price increases in the United States." Dkt. Nos. 464, 464-1. Defendants thereafter filed a letter response to Plaintiffs' supplemental submission asserting that it was both "procedurally improper and substantively futile" and marshals support for dismissal of the complaints with prejudice. Dkt. No. 469.

Though the Court did not request at the hearing any further submissions from the parties, it will consider Plaintiffs' proposed new facts as if they were properly pleaded as part of the operative complaints for purposes of deciding the motions to dismiss. *See Anderson v. Greene*, 2017 WL 3503686, at *8 (S.D.N.Y. Aug. 16, 2017) ("As when considering a motion to dismiss under Rule 12(b)(6), [a] court considering a motion for leave to amend must accept as true all well-pleaded facts in a plaintiff's proposed amended complaint and draw all reasonable inferences in the [plaintiff's] favor." (cleaned up)), *aff'd*, 774 F. App'x 694 (2d Cir. 2019) (summary order).

## LEGAL STANDARD

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The

ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"There is no heightened pleading standard in antitrust cases." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (citing *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016)). "[A]t the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

## DISCUSSION

The motions to dismiss present a wide array of issues, including whether Plaintiffs adequately plead either direct or circumstantial evidence of a conspiracy in restraint of trade, the applicability of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") to Plaintiffs' claims, the direct or indirect liability of the Parent/Sponsor Defendants, if any, for the alleged misconduct of their subsidiaries, jurisdictional issues as to the French Defendants, whether the Indirect Purchaser Plaintiffs separately state a claim for pass-through of overcharges and violations of state antitrust and consumer protection laws, and 12(b)(6) arguments specific to the Mapei Defendants. The Court begins its analysis with the threshold question of whether

Plaintiffs have plausibly alleged the existence of an agreement to fix the price of CCAs in the United States before turning to any remaining issues.[7]

## I. Plaintiffs Do Not Plead a Conspiracy to Fix Prices in the United States

Plaintiffs argue that they plausibly allege the existence of "a global agreement to fix prices" for CCAs or "a global agreement to raise the price of CCAs around the world, including in the United States." Dkt. No. 420 at 1–2. According to Plaintiffs, this agreement was "hatched in France" and executed through "assurances sought and received through the French Defendants' direct competitor-to-competitor communications," but was implemented in the United States and elsewhere. *Id.* at 26, 46. The allegations that Defendants used their shared trade associations and a common narrative to facilitate their global price increases, and the fact that Defendants had a shared motive and need to conspire in order to mitigate the risk of price arbitrage across jurisdictions, render, in Plaintiffs' view, the worldwide conspiracy plausible. *Id.* at 28–32. Plaintiffs also assert that Defendants' alleged conspiracy "resulted in direct domestic effects within the meaning of the FTAIA." *Id.* at 46.

Defendants contend that Plaintiffs' complaints contain no facts regarding U.S.-based misconduct or a U.S. conspiracy, that they fail to allege parallel conduct in the United States,

[7] Although personal jurisdiction is typically treated "as a threshold question to be addressed prior to consideration of the merits of a claim . . . that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) (internal citation omitted). "In cases involving 'multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,'" courts in this District have "proceeded directly to the merits on a motion to dismiss." *Id.* (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012)); *see Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 524 (S.D.N.Y. 2018) (addressing personal jurisdiction questions last because "only the Foreign Defendants move for lack of personal jurisdiction" and "the jurisdictional question relies in part on the underlying claims and plausible scope of the conspiracy"), *aff'd sub nom. Sonterra Cap. Master Fund, Ltd. v. UBS AG*, 152 F.4th 404 (2d Cir. 2025). The Court does so here.

even when supplemented by their additional factual submissions, and that the allegations regarding antitrust investigations, market structure, trade associations, and global pricing are not plus factors which support an inference of a conspiracy. Dkt. No. 394 at 12–21. Defendants further argue that Plaintiffs' Sherman Act claims are barred by the FTAIA because the import commerce exclusion does not apply and Plaintiffs cannot establish that the alleged French conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. *Id.* at 22–28.

Section 1 of the Sherman Act prohibits any "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Sherman Act is addressed to conduct that affects U.S. commerce. Such conduct need not take place physically in the United States. The United States antitrust laws reach conduct located outside the United States that "was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582, n.6 (1986)); *see United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945) (L. Hand, J.); Restatement (Third) of Foreign Relations Law of the United States § 415, and Reporters' Note 3 (1987); 1 Phillip E. Areeda & Donald F. Turner, Antitrust Law ¶ 236 (1978); *cf. Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704 (1962); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 288 (1952); *United States v. Sisal Sales Corp.*, 274 U.S. 268, 275–76 (1927). The Sherman Act applies to purchases by United States entities directly from members of an alleged cartel even if the cartel was formed, and its members are located, outside the United States, so long as the foreign conduct creates "actual and intended effects on U.S. commerce." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 855 (7th Cir. 2012); *see Aluminum Co.*, 148 F.2d at

444. But, in passing the Sherman Act, Congress did not intend to "interfere with a foreign nation's ability independently to regulate its own commercial affairs." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004). Canada, Great Britain, and Japan may have their own views "about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies." *Id.* So too may France. The application of the Sherman Act thus must be guided by "principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Id.* The Sherman Act does not reach the "alleged cartelization of [a foreign] market, because American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita*, 475 U.S. at 582.

"[T]he first question in any Section 1 case is whether there is an agreement to conspire." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024). Plaintiffs can allege such an agreement through direct or circumstantial evidence. "Direct evidence of a conspiracy is 'explicit' and can show one exists without any inferences." *Id.*; *see also id.* at 405. The Second Circuit has given as examples of direct evidence "'a recorded phone call in which two competitors agreed to fix prices at a certain level' or 'an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price.'" *Id.* (internal citations omitted); *see In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591–92 (S.D.N.Y. 2015) (complaint offered direct evidence of price-fixing conspiracy where it alleged that FX traders from defendant banks used chat rooms and instant messaging to share nonpublic, market-sensitive information with rivals and thereby manipulate the fix); *In re GSE Bonds Antitrust*

*Litig.*, 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019) (chats showing traders, acting on behalf of defendants, "agreeing to fix prices at a specific level before bringing the bonds to the secondary market" presented "the rare smoking gun"); *cf. O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 2023 WL 2563689, at *15 (E.D.N.Y. Mar. 17, 2023) (no direct evidence where "Plaintiffs have provided no writings or recordings of Defendants agreeing").

"[A] complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "'[E]ven in the absence of direct 'smoking gun' evidence,' a horizontal agreement . . . 'may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'" *Id.* (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)). An antitrust conspiracy can be alleged by showing parallel conduct, but "allegations of parallel conduct must be reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *City of Pontiac*, 92 F.4th at 391. "Such factors include 'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Id.* (quoting *Citigroup*, 709 F.3d at 136).

Plaintiffs do not plead either direct evidence or indirect evidence of a conspiracy to affect United States commerce.[8]

[8] At oral argument, Plaintiffs clarified that they are pleading both direct evidence allegations as well as allegations that support an inference as to the scope of the conspiracy. *See* June 22, 2026 Hearing Tr. at 37:16–38:8.

### A. There Are No Well-Pled Allegations of Direct Evidence of a Conspiracy to Fix Prices in the United States

Plaintiffs do not identify direct evidence of a conspiracy to fix prices in the United States. They allege communications between executives of French companies, in part through a French trade organization, regarding price increases that those companies would implement. But Plaintiffs "cannot recover antitrust damages based solely on an alleged cartelization of the [French or European] market." *Matsushita*, 475 U.S. at 582. It is up to those countries to regulate the conduct of companies affecting their economies.

Plaintiffs organize their pleadings around discussions of three separate sets of price increases. They do not allege any explicit conversations about prices in the United States in connection with those discussions or facts to support that such discussions resulted in any coordinated price increase in the United States for any CCA product. There are no allegations that Sika US, Master Builders US, Mapei US, and Chryso US reached an agreement to raise CCA prices in the United States, or that the U.S. Defendants communicated at all with one another or with Chryso US about U.S. CCA prices. The only "traditional tools of a conspiracy" that Plaintiffs identify are those allegedly employed by the French executives; the complaints do not allege any texts, phone conversations, or in-person meetings among the U.S. affiliates regarding the amounts and timing of domestic CCA price increases. *See* Dkt. No. 420 at 7. Plaintiffs have "tacked on" the phrase "including in the United States" to their allegations of conspiratorial conduct by the French Defendants without alleging any facts that would support the existence of a U.S. conspiracy. *Am. Copper & Brass, Inc. v. Halcor S.A.*, 494 F. Supp. 2d 873, 877 (W.D. Tenn. 2007); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (allegations in complaint conclusory where allegedly conspiratorial activity was described in "entirely general terms without any specification of any particular activities by any particular

defendant"). Put differently, the purportedly direct evidence of a conspiracy to raise U.S. CCA prices in the complaints is "at best inferential, rather than explicit." *Int. Rate Swaps*, 261 F. Supp. 3d at 466.

Plaintiffs allege, for example, that before the first coordinated price increase, Gimer, who was head of Chryso France and Executive Vice President for Western Europe, and LeFur, who was Sika France's Manager of Business Development for Southern Europe and the Middle East, "spoke directly and exchanged information about their companies' planned price increases," ISAC ¶ 60, that Gimer, LeFur and Francqueville, President of Master Builders France, "coordinated with one another to issue their respective price increase letters as soon as possible after the SYNAD press release was published," *id.* ¶ 62, and that Gimer and Francqueville "shared confidential information about the amounts of their companies' planned price increases by product family and the anticipated timing of their letters to customers," *id.* ¶ 65. But the companies of which those individuals were executives were the French companies—Chryso France, Sika France, and Master Builders France. ISAC at viii, ix–x. Plaintiffs do not specifically allege that any of the companies for whom those individuals served themselves manufactured, marketed, or sold CCAs to customers in the United States or in United States commerce. *See, e.g.*, *id.* ¶ 32 (alleging in conclusory fashion that Sika France sells CCAs "worldwide, including in the United States, directly and/or through its affiliates, subsidiaries, or agents, including Sika US").[9] There is no well-pled allegation that any of those individuals had control over the prices that would be charged by their company's U.S. affiliate or knowledge of those prices, or that any of these communications involved price increases in the United States.

[9] By contrast, Plaintiffs do affirmatively allege that each of the United States affiliates manufactures, markets, and sells CCAs in the United States. *See, e.g.*, *id.* ¶ 33.

To the contrary, Plaintiffs allege that Chryso France's Lebre told his colleagues that "Sika France would be announcing price increases of four to six percent effective May 1, 2021." *Id.* ¶ 69. There is also no allegation that any company in the United States, in fact, increased prices as a result of the discussions among the French executives. Indeed, the only company that is alleged in the complaints to have increased prices in the United States is non-party Chryso US, and it is alleged to have increased prices solely because Chryso France made clear that the CCA price increases were mandatory and notwithstanding its fears that it would lose market share to competitors. *Id.* ¶ 107. The allegations are inconsistent with direct evidence of a conspiracy to fix prices in the United States.

The same can be said with respect to the second and third price increases. There are no allegations of conversations among the alleged French conspirators about an agreement to fix prices in the United States. Plaintiffs allege that on or around October 8, 2021, Gimer, Francqueville, and Malafosse (who had replaced LeFur as Manager of Business Development for Southern Europe and the Middle East for Sika France) met at a café in France and discussed their plans to announce CCA price increases in the coming months, *id.* ¶ 76, and that Gimer and Francqueville spoke frequently between October 8 and December 3, 2021 about the "particulars of their price increase plans," *id.* ¶ 77. But, in context, "their price increase plans" can only be understood to be a reference to the price increases that they (or their companies) planned to implement. They are not alleged to be a reference to the price increases that other companies within their larger corporate families intended to implement. There are no facts alleged that those plans involved the activities of the United States affiliates. There also are no allegations that the United States affiliates increased prices as a result of the discussions. Plaintiffs allege that, in March 2022, Master Builders France's Francqueville sent Chryso France's Gimer Master

Builders France's draft price increase letter and the two then spoke further about coordinating price increases, *id.* ¶ 87, and that on or around April 5, 2022, Francqueville told Gimer that Master Builders France would issue price increase letters the following week, *id.* ¶ 93. That allegation may support a claim that the two agreed to increase prices in France. There are no allegations that the individuals were speaking about the United States or for the United States entities—nor do Plaintiffs plead that any U.S. Defendant was involved in or had knowledge of the alleged French conduct.

The few conversations that Plaintiffs allege that even mention prices outside of France fall far short of providing direct evidence of a conspiracy to fix prices in the United States. Plaintiffs allege that, at one point, Chryso France's CEO, Thierry Bernard, conveyed through Chryso France's Frederic Guimbal ("Guimbal") that he wanted the price increases to be extended in a consistent way outside of France, and that thereafter Gimer spoke to Sika France's LeFur to discuss planned price increases. *Id.* ¶¶ 63–64. But companies can agree to coordinate price increases outside the United States without exposing themselves to treble damages in the United States. *See Matsushita*, 475 U.S. at 582–84; *Empagran*, 542 U.S. at 161 ("[T]he Sherman Act does not prevent [American exporters or firms doing business abroad] from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets."). "Allegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.'" *Elevator*, 502 F.3d at 52; *see In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 707 (N.D. Ohio 2025); *Oklahoma Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, 2024 WL 4202680, at *9–10 (S.D.N.Y. Sept. 13,

2024); *In re Mexican Gov't Bonds Antitrust Litig.*, 2025 WL 104099, at *2 n.5 (S.D.N.Y. Jan. 15, 2025). There is no allegation that when Bernard was speaking about price increases outside of France, he was speaking about increases in the United States. After all, Gimer had responsibility for Western Europe. ISAC ¶ 4. Indeed, the inference that Plaintiffs would want to draw is not strengthened but weakened by the further allegations that Guimbal emailed his colleague Plancon and several executives at Chryso subsidiaries in *Eastern Europe*, that he was 100% convinced that Chryso's competitors would move ahead with increases. *Id.* ¶ 66. Tellingly, there is no allegation that he emailed anyone with Chryso US, the entity Plaintiffs allege is responsible for sales in the United States.

Plaintiffs allege that on or around April 7, 2021, Gimer told the Director of Chryso France's Cement Business Unit, Nicolas Théodon, that Sika France would be increasing its prices on CCAs. *Id.* ¶ 67. They further allege that on or around April 8, 2021, Théodon told others at Chryso France that he was reviewing each subsidiary's CCA price increases to ensure consistency in every country where Chryso sold CCAs, including in the United States. *Id.* ¶ 68. It is fair to infer from that allegation that Chryso France had consistent prices in every country where it sold CCAs, including to United States customers. It may also be fair to infer that, because Chryso aimed for consistency across national borders, the prices Chryso US charged in the United States were in turn influenced by the conversations that Théodon had with his French counterparts at Chryso France. But that Chryso US decided to set the prices it charged U.S. customers consistent with the prices that Chryso France charged its customers does not mean that Chryso US was part of a price-fixing conspiracy with Chryso France's alleged co-conspirators. Nor does the fact that other U.S. Defendants decided to increase their prices on certain CCA products around the same time as Théodon's review necessarily suggest that they did so in

concert to further the purported scheme orchestrated by their foreign parents, or even that each of the companies decided to raise prices on the same CCA products. *See, e.g.*, Dkt. No. 464-1 ¶ 5 (alleging that "[o]n or around March 22, 2021, Mapei US notified its U.S. customers of 5% price increases on liquid acrylic admixtures, effective May 1, 2021"); *id.* ¶ 8 (alleging that "[o]n or around April 1, 2021, Master Builders US began issuing CCA price increase notices to its United States CCA customers"). Notably, there is no allegation that Chryso's Théodon was involved in any of the discussions with other companies about the prices they would charge, even in Europe.

The remaining allegations supporting a purported extension of the conspiracy to the United States involve communications entirely internal to Chryso. For example, Plaintiffs allege that in March 2021, Gimer shared the first SYNAD press release with Chryso country managers and asked them to push their respective trade associations to issue similar press releases, that Chryso France's Plancon emailed Chryso US's Williams with a draft communication to send to customers to prepare them for an across-the-board price increase on CCAs, and that Chryso US ultimately sent those letters to all of its customers. ISAC ¶¶ 105–07.[10] With respect to the

[10] Plaintiffs' allegations regarding trade association press releases independently fall short. Plaintiffs never allege that the SYNAD press release was actually shared with any individual or entity in the United States, or that any Defendant used U.S. trade associations to facilitate an alleged conspiracy. Plaintiffs' assertion that "a top executive at corporate parent Chryso SAS provided *Chryso US* with a template based on the European press releases," Dkt. No. 420 at 2, does not itself connect the alleged French conduct to the United States, as there is no allegation of concerted action among the U.S. Defendants or any other Defendant with respect to the U.S. price increase announcements. Moreover, Plaintiff's assertion that the U.S. Defendants' price increase announcements recited the same "mantra" used by their European counterparts "confuse[s] the possibility of a conspiracy with the plausibility of one" and ignores the fact that the COVID-19 pandemic would have supplied an obvious alternative explanation for comparable language and themes in the U.S. Defendants' justifications to their customers for higher CCA prices. Dkt. No. 469 at 5. In other words, "a natural explanation for the noncompetition alleged" may be that each Defendant independently decided to raise prices due to pandemic-related supply chain disruptions, "expecting their neighbors to do the same thing." *Twombly*, 550 U.S. at 568.

second price increase, Plaintiffs also allege that Chryso France CEO Bernard advised Chryso US CEO Williams and other country managers that they must be prepared to stop selling CCAs to customers who would not agree to higher prices. *Id.* ¶ 108. But those allegations establish no more than unilateral conduct. Chryso wanted price discipline and to impose higher prices on its customers. The allegations do not support that Chryso believed it could do so because of an antecedent agreement among competitors to fix prices in the United States. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 897 (S.D.N.Y. 2018) (chat messages which referenced "apparently unilateral or bilateral attempts to manipulate" silver fixing did not present direct evidence of agreement between non-fixing banks and fixing banks involving silver fix); *see also LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 147 n.17 (E.D.N.Y. 2010) ("[A] conspiracy necessarily involves more than a single participant, and . . . the Complaint fails to articulate how the isolated announcement of a sole defendant can constitute direct evidence of conspiracy.").

The closest Plaintiffs come to a well-pled allegation of a conspiracy to fix CCA prices in the United States is the allegation that, on or around March 19, 2021, Chryso France's Plancon and Guimbal told Williams of Chryso US that its competitors would not compete on price after Gimer of Chryso France had a discussion with Sika France's LeFur, Master Builders France's Francqueville, and Mapei France's Jeauneau confirming that Sika France would raise prices. ISAC ¶ 8. But Plancon and Guimbal's view that Chryso US's competitors would not raise prices, even if informed by their knowledge of what Chryso France's competitors would do in their regions, falls far short of evidence that Sika US, Mapei US, and Master Builders US agreed with one another (directly or indirectly) to raise prices. The U.S. affiliates each would have had an independent interest in raising prices to meet market conditions. The allegation that each of

Mapei US, Master Builders US, and Chryso US began notifying their U.S. customers of price increases in late March and early April 2021, and Sika US did so by May 26, 2021, *see* Dkt. No. 464-1 ¶¶ 5–10, may be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.[11]

Plaintiffs' allegations regarding the structure of each of the corporate families do not make up the difference. Plaintiffs make the sweeping claim that "Sika, Master Builders, and Mapei (all like Chryso), concentrate decision-making in centralized business units based in Europe that set pricing strategy worldwide, including in the United States." ISAC ¶ 111. But the complaints do not plead any specifics that would allow that declaration to be credited, "let alone facts suggesting that this alleged structure was used to increase US prices." Dkt. No. 394 at 15.

Once these conclusory allegations are stripped away, the factual allegations pled do little more to bridge the gap. Plaintiffs allege that Sika AG's Organizational Rules give its executive bodies control over the entire Sika group of companies, including Sika France and Sika US, ISAC ¶ 132; that Malafosse of Sika France operated under the direct legal authority of Sika AG,

---

[11] Plaintiffs also rely on a number of cases in which allegations that coordinated price increases in the United States were based on assurances of noncompetition stated a plausible claim for conspiracy. *See* Dkt. No. 420 at 27–28. But those cases involved allegations that the defendants directly conspired with their competitors to inflate prices in the United States. *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1059 (allegation that "Parent Defendants directly conspired with their respective subsidiaries" through telephone and email conversations and meetings). Here, the alleged assurances were internal to Chryso only and thus do not supply a basis from which to infer that an agreement to not undercut competitors on price extended beyond France. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769, 771 (1984) (holding that parent and wholly owned subsidiary are not legally capable of conspiring with each other for purposes of § 1 of the Sherman Act because they have a "complete unity of interest" and "an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police").

*id.* ¶ 143; and that Sika US has no independent directors and is wholly controlled by executives and board members of Sika AG, one of whom serves in a dual role as Sika AG's Area Manager for the United States and as President and CEO of Sika US, *id.* ¶¶ 146, 151. Chryso France and Chryso US were owned by Cinven until September 28, 2021 and by Saint-Gobain thereafter. *Id.* ¶¶ 161, 173. The companies had the same organizational structure under both sets of owners. *Id.* ¶ 178. Chryso US's CEO Williams, who was responsible for the North American region, and Chryso France's Gimer, who was responsible for the French business zone, reported to Chryso France's CEO Bernard. *Id.* ¶¶ 167, 179–80. Williams and Gimer collaborated with Chryso France's business unit leaders to develop pricing strategies for their respective countries. *Id.* ¶ 168. Plaintiffs further allege that top Mapei Italy executives direct Mapei France's operations in France and Mapei US's operations in the United States, and that the joint CEOs of Mapei Italy, Marco Squinzi and Veronica Squinzi, serve as the only two directors of Mapei US. *Id.* ¶ 184.[12]

Those allegations tend to support that Chryso is highly integrated and that pricing decisions made at Chryso US would tend to be consistent with pricing decisions made elsewhere within the corporate family. They do not suggest that the messages conveyed between the French conspirators were made on behalf of each of the individual's corporate families as a whole or that those communications concerned the prices for CCAs to be charged in each of the regions in which each family did business, including in the United States. *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *27 (E.D.N.Y. Jan. 4,

[12] With respect to Master Builders, Plaintiffs simply allege that before September 2020, Master Builders France and Master Builders US made up the construction chemicals division of BASF SE, that BASF SE was acquired in September 2020 by private equity firm Lone Star Funds, and that in May 2023, Cinven acquired ownership and control, either directly or indirectly, of the two entities. *Id.* ¶¶ 156–57, 159.

2011) (recommending dismissal of Sherman Act claims where complaint was "silent" as to how defendants and conduct alleged in local conspiracies "connected to each other into one global conspiracy connected by common actors, methods and goals"), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

### B. Plaintiffs Do Not Plead Indirect Evidence of a Conspiracy to Fix Prices in the United States

In the absence of direct evidence of a conspiracy to fix prices in the United States, a plaintiff can make out a Section 1 claim by pleading "sufficient indirect, circumstantial evidence." *City of Pontiac*, 92 F.4th at 391. A claim may be made out by evidence of "[p]arallel conduct . . . suggesting an antecedent agreement . . . reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *Id.* In their amended complaints, Plaintiffs offer less in the way of circumstantial evidence than the insufficient facts that they pled initially.

#### 1. There Are No Well-Pled Allegations of Parallel Conduct

The complaints—even when supplemented by Plaintiffs' additional factual allegations, *see* Dkt. No. 464-1—once again fail to adequately plead parallel conduct. That alone is fatal to Plaintiffs' Sherman Act claims. *See In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *19 (S.D.N.Y. Mar. 31, 2021) ("Absent any actual parallel conduct, [plus factors] do not suffice to plead an antitrust conspiracy.").

Plaintiffs' initial complaints relied heavily on Defendants' global price increases throughout the eight-year putative class period in order to allege parallel conduct. *See Concrete*, 2025 WL 1755193, at *12–17. In dismissing those complaints, the Court concluded that "differences in timing, amount, geography, and product line" precluded an inference of parallel conduct. *Id.* at *14. This was especially true where Plaintiffs did not "identify any overarching pattern connecting these divergent increases to one another, such as simultaneous adoption, a

follow-the-leader stratagem whereby one defendant's conduct is always adopted by the others, regularly-timed price increases across the market, or increases prompted by some common external signal." *Id.* at *15 (citing cases).

Plaintiffs now make only a single allegation about price increases in the United States in their operative complaints. Sometime prior to March 15, 2022, Sika US imposed a fuel surcharge on all CCAs to be effective March 15, 2022. ISAC ¶ 109. Thereafter, Chryso US's Vice President of Sales and Marketing proposed that Chryso US impose a fuel surcharge in the same amount together with a price increase on CCAs to be effective on April 1, 2022. *Id.* Conspicuously, Plaintiffs do not allege in the complaints that either Mapei US or Master Builders US increased their prices. Nor do Plaintiffs therein allege that Sika US increased its prices on CCAs (other than the fuel surcharge). "[L]awful parallel conduct fails to bespeak unlawful agreement." *Twombly*, 550 U.S. at 556. There are no allegations that the Chryso US surcharge was the product of a prior agreement with Sika US or that Sika US and Chryso US communicated at all, much less with respect to their planned fuel surcharges. (According to the complaints, it was not until after April 1, and in early April 2022, that Chryso France was discussing pricing information with Sika France. ISAC ¶ 94.) *See LaFlamme*, 702 F. Supp. 2d at 147–48 (rejecting allegations of agreement to implement fuel surcharges as direct evidence of conspiracy where plaintiffs "fail to allege any specific facts providing any basis to infer an actual unlawful agreement by defendants" to do so).

"[C]onscious parallelism [is] a common reaction of firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions [and] is not in itself unlawful." *Twombly*, 550 U.S. at 553–54 (citations omitted). There is no allegation of fact that would support the inference that Chryso US's

decision to "follow the leader" was anything other than the product of independent decisionmaking. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009). It is logical that Chryso US would increase its prices after Sika US increased its prices; it no longer had to fear that Sika US would undercut Chryso US's prices. Chryso US's conduct is thus consistent "with a wide swath of rational and competitive business strategy unilaterally prompted by [a] common perception[] of the market." *Twombly*, 550 U.S. at 554. Indeed, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566. The decision to impose a fuel surcharge could very well result from "independent responses to common stimuli . . . unaided by an advance understanding among the parties," such as widespread supply chain disruptions from the COVID-19 pandemic. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1425 (5th ed. 2026); *see Twombly*, 550 U.S. at 567–68 (common reactions to common industry conditions is not suggestive of conspiracy).

Plaintiffs contend that similar claims in *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) survived dismissal after pleading far more general allegations with respect to a purported agreement in restraint of trade. *See* June 22, 2026 Hearing Tr. at 50:2–15. But what they ignore is that in *Air Cargo*, the court determined the complaints to contain well-pled allegations of price-fixing in the air cargo industry for consumers *in the United States*. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008 WL 5958061, at *2, *5 (E.D.N.Y. Sept. 26, 2008) (alleging that the price-fixing conspiracy was reached after defendants held "secret meetings" around the world, including in the United States, and "affected thousands of routes flown by the defendants worldwide, including flights to, from, and within the United States"), *report and recommendation adopted in part*, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009), *aff'd*, 697 F.3d 154 (2d Cir. 2012). Plaintiffs' complaints lack those

same "plausible grounds" from which the Court can infer an agreement among Defendants to increase domestic CCA prices.

As noted *supra*, Plaintiffs submitted after oral argument additional factual allegations regarding, *inter alia*, "Domestic Defendants' parallel U.S. price increases, drawn from their transactional data and price increase notifications sent to customers" over the putative Class Period. Dkt. No. 464. But as with their original complaints, "differences in timing, amount, geography, and product line [make] the price increases at issue here . . . not sufficiently similar to give rise to an inference of parallel conduct." *Concrete*, 2025 WL 1755193, at *14.

Some of the price increases, standing alone, appear to be "reasonably proximate in time and value." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 & n.209 (E.D. Pa. 2018) (citation omitted). On or around March 22, 2021, for example, "Mapei US notified its United States CCA customers of 5% price increases on liquid acrylic admixtures, effective May 1, 2021." Dkt. No. 464-1 ¶ 5. Ten days later, "Chryso US finalized its price increase letter to its United States CCA customers announcing 5% price increases on various CCAs, also effective May 1, 2021." *Id.* ¶ 6. Other increases, however, were weeks or months apart. Sika US did not notify its U.S. CCA customers of its planned price increase until "[b]y no later than May 26, 2021." *Id.* ¶ 9. As to the second coordinated price increase, Plaintiffs allege that "each Domestic Defendant again announced U.S. price increases on some or all of their CCAs" across a three-month period between October 2021 and December 2021. *Id.* ¶ 13. There is no allegation that these price increases were applied to the same CCA products. Some announcements were made at unspecified dates, giving no measure by which to assess the relative timing of the supposedly parallel conduct. *See id.* ¶¶ 23–24 (alleging that Master Builders US and Sika US announced price increases "[b]y no later than April 8, 2022").

Temporal proximity aside, Defendants' pricing outcomes are vastly dissimilar. Plaintiffs assert, for example, that between October 8 and November 1, 2021, "Chryso US notified its United States CCA customers of 10% price increases on accelerators and 5% increases on all other CCAs effective January 1, 2022," while Sika US the following month announced 13% increases on products in its "Concrete" line to be effective February 15, 2022. *Id.* ¶¶ 14, 16. Elsewhere, Plaintiffs allege a range of average CCA price increases across all U.S. Defendants spanning from 2.7% to 13.83% between November 1, 2021 and January 31, 2022. *Id.* ¶ 19. While price increases "need not be made in the same precise amounts," Plaintiffs do not offer "some other parallel, such as that the prices are controlled by an agreed-upon external factor or that the varying increases caused the defendants' prices for similar products to approach parity as opposed to further skewing the playing field." *Concrete*, 2025 WL 1755193, at *13. Moreover, Plaintiffs' allegations that customers of the same U.S. Defendant reported notices of price increases in varying amounts undermines an inference of broader across-the-board price increases. *See* Dkt. No. 464-1 ¶ 9 n.2 (alleging that Chryso US customer Lhoist "received notice of a 5% increase on certain CCAs effective May 1, 2021, and SLB (known as Schlumberger) received notice of 5-10% increases on certain CCAs effective July 1, 2021").

Crucially, Plaintiffs allege price increases across a wide range of products, from liquid acrylic admixtures, CCAs containing sodium-thiocyanate, and accelerators to "various CCAs" or "most or all CCAs" sold in the United States, without alleging that the competitors increased prices on the same products at the same time. *Id.* ¶¶ 5, 6, 10, 14, 23, 24. Plaintiffs again fail to identify any "overarching pattern connecting these divergent increases to one another," instead

pleading the kind of "episodic" price increases that this Court already found to be "inconsistent with coordinated activity." *Concrete*, 2025 WL 1755193, at *14–15.[13]

### 2. There Are No Well-Pled Allegations of Plus Factors

Plaintiffs also do not allege sufficient plus factors to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In the Court's original motion-to-dismiss decision, it held that Plaintiffs did not allege sufficient plus factors to satisfy the *Twombly* standard. There, the fact that common membership in a trade association could provide an opportunity to meet and conspire to fix prices did not render it plausible that Defendants did in fact use trade association meetings to make an agreement. *Concrete*, 2025 WL 1755193, at *18. "Similarly, the fact that several Defendants have engaged in a series of mergers that led to a highly consolidated market increases the chance that a price-fixing conspiracy could succeed but falls short of plausibly suggesting that one was actually formed." *Id.* The Court also dismissed Plaintiffs' allegations of "a common motive to conspire to fix prices at supracompetitive levels" and of investigations by foreign antitrust authorities that were "merely consistent with," but did not plausibly suggest, the claimed conspiracy. *Id.* at *18–20. Finally, Plaintiffs alleged that Defendants' explanations of price

[13] Plaintiffs also indicate that they performed a "multi-variable regression using a 'before-during' approach" which estimates the effect of Defendants' anticompetitive agreement on CCA prices by controlling for "competitive market factors known to affect prices," such as demand, Defendants' cost data, and the impact of the COVID-19 pandemic. *See* Dkt. No. 464-1 ¶¶ 28–30. They allege that this preliminary regression "shows, at a 95% confidence level, that the Domestic Defendants increased their prices above a competitive level across all CCAs sold by them in the United States," and that each price increase is statistically significant. *Id.* ¶¶ 31–32. Plaintiffs' supplemental submission does not describe, however, "the data set upon which the regression was run, the methodology used to develop the regression, or the weights given to any of the variables." *Concrete*, 2025 WL 1755193, at *8, *17. Without more, "Plaintiffs' vague description of a regression provides no factual support for their conclusion that prices exceeded those that could be explained by market forces." *Id.* at *17.

increases as motivated by rising costs were pretextual, but the statements offered "[fell] short of suggesting that the price increases were not the product of normal market forces." *Id.* at *21–22.

**a. Antitrust Investigations**

Plaintiffs' allegations are even weaker this time around. Plaintiffs forcefully argued at the initial motion-to-dismiss stage that the Court should consider the existence of governmental investigations of Defendants to be a plus factor supporting the existence of a price-fixing conspiracy. The Court found that argument to be "superficially appealing." *Id.* at *19. If government authorities believed there was a sufficient basis for them to request documents from Defendants or to conduct a raid, perhaps that should be enough for Plaintiffs to be able to obtain discovery from Defendants. Still, the Court followed the decisions holding that "the mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct with respect to [the alleged price-fixing conspiracy] is not a 'plus factor.'" *Id.* (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016)). The argument is even less appealing now. Plaintiffs point to the same investigations set forth in the original complaints: a criminal grand jury impaneled in the Eastern District of Pennsylvania to investigate anticompetitive conduct in the CCA industry, *see* ISAC ¶ 117; an investigation by the European Commission ("EC") involving unannounced inspections at company offices, *see id.* ¶ 118; and an investigation by the Turkish Competition Authority ("TCA") into several CCA companies and trade associations for alleged collusion, *see id.* ¶ 119. However, in November 2025, the DOJ informed the Court that the "United States has closed the grand jury investigation related to the concrete and cement additives industry." *See* Dkt. No. 367. "While not determinative of Plaintiffs' claims, the fact that DOJ's investigation appears to have concluded without a prosecution or any sort of enforcement action weakens Plaintiffs' arguments concerning the significance of the DOJ investigation and the purportedly robust combination of

factual allegations in the Amended Complaint." *In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 51 (S.D.N.Y. 2022) (internal quotation marks omitted).[14]

**b. Common Motive to Conspire**

Plaintiffs also rely on allegations of a common motive to reach an international conspiracy. They allege that for the conspiracy that was agreed upon to be fully effective, the conspirators would have had to agree "to act in concert globally to mitigate the risk of international customers leveraging lower prices in one jurisdiction to obtain cheaper prices in others (*i.e.*, pricing arbitrage), which would have undermined their conspiracy." ISAC ¶ 7. Without citing facts, Plaintiffs allege that "Defendants understood that limiting their agreement to France, or even Europe, would allow price-shopping customers . . . to exploit geographic price differences" and thus "agreed to extend their restraint globally, including to the United States, . . . with the mutual understanding that all Defendants would raise prices worldwide, including in the United States." *Id.* ¶ 103. To say that the conspirators would have had an interest in extending their conspiracy globally, however, does not say that they did so. *See* Dkt. No. 420 at 7–8 (alleging only that "large, global key-account customers" had "the opportunity . . . to reject price increases in one country that were not implemented elsewhere," not that they took advantage of it); *Tires*, 767 F. Supp. 3d at 708 (holding that "[w]hile defendants may have been motived [sic] to increase profits, plaintiffs fall short of plausibly alleging that defendants were

[14] Although the Court accepts as true Plaintiffs' allegations that the TCA determined that Mapei and Chryso subsidiaries in Turkey violated Turkey competition laws and imposed fines upon them, *see* ISAC ¶ 121, the complaints plead no finding of wrongdoing by Master Builders or Sika, nor do they explain why sanctionable local conduct makes U.S. misconduct plausible. And even if the ongoing EC investigation were to produce evidence of wrongdoing by Defendants in Europe or elsewhere, its scope would necessarily be limited to potential violations of European law regarding price-fixing of concrete and cement additives. *See Tires*, 767 F. Supp. 3d at 707 ("[T]he mere existence of the EC investigation adds nothing to the plausibility of the conspiracy alleged here and is not a plus factor."); *Am. Copper*, 494 F. Supp. 2d at 876–78 (rejecting use of facts from a European Commission decision to enhance allegations of a domestic conspiracy).

motivated to conspire as a means of doing so" where they failed to account for "conscious parallelism and the pressures of an interdependent market").

There is no affirmative allegation of fact that a French customer confronted with the price increases in France could have or would have purchased their CCAs in the United States and then imported them back to France. Indeed, there is no allegation that any company that used CCAs in France or in Europe ever purchased their CCAs in the United States, exploiting an opportunity for "price arbitrage" between the United States and Europe. Thus, there is no allegation of fact that the risk of price arbitrage that Plaintiffs say would have required a conspiracy in the United States to make a conspiracy in France effective ever existed. Plaintiffs allege only that Defendants' large global customers "have historically sought to leverage lower prices in one jurisdiction *and/or* from one Defendant to secure more favorable terms in other jurisdictions *and/or* from other Defendants." ISAC ¶ 102 (emphasis added).

While Rule 8 affords litigants "substantial leeway" to plead claims in the alternative, "each alternative theory must itself be sufficient to state a claim." *Kwan v. Schlein*, 246 F.R.D. 447, 451–52 (S.D.N.Y. 2007) (dismissing plaintiff's second alternative claim because plaintiff failed to allege any facts supporting the alternative claim); *see* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1282 (4th ed. 2025) (explaining that Rule 8's allowance for the pleading of alternative or hypothetical claims must "be read in conjunction with" Rule 11 because "[t]he ability to plead hypothetically is not so broad as to allow a plaintiff to sue for a hypothetical injury" and does not "absolve the pleader from honoring the principle that there be good grounds to support the allegations in a complaint or answer"); *cf. TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017) (describing the use of "and/or" between the names of defendants for key factual

allegations as "impliedly acknowledging that one or more defendant may have played no role in the alleged activity" and therefore constitutes impermissible group pleading).

Plaintiffs do not plead facts to state a claim under either of their "and/or" theories of price arbitrage. In their supplemental submission, Plaintiffs name Lafarge Holcim ("LH") and Heidelberg as examples of large CCA buyers with "specialized cross-border sourcing teams" and "hybrid procurement" frameworks, but do not plead that they were subject to any of Defendants' price increases in Spring 2021, Fall/Winter 2021–2022, or Spring 2022 or that these customers have actually purchased from Defendants. Dkt. No. 464-1 ¶¶ 33–39. To support their contention that "Defendants knew from experience that these customers would exploit any geographic price difference," Plaintiffs point to an allegation that in April 2020, Chryso executives expressed concern that "LH was moving country to country and using Chryso's concessions on pricing and payment terms in one market as its benchmark for prices in others." *Id.* ¶¶ 37–38. Taken as true, those facts are entirely consistent, however, with the economic behavior of rational customers who observe differences in the prices offered by the same company in different jurisdictions and urge one affiliate to charge it prices consistent with the prices that another affiliate has charged in a different country. That conduct does not bespeak conspiracy.

A single instance of price negotiation by Chryso US involving a single customer cannot support a broader inference of rampant cross-border price arbitrage across all of Defendants' U.S. customers. *See Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270–71 (D.C. Cir. 2005) (rejecting broad assumption of price arbitrage where appellants failed to allege a direct causal relationship between the domestic effects and foreign injury); *In Re Graphite Electrodes Antitrust Litig.*, 2007 WL 137684, at *4 (E.D. Pa. Jan. 16, 2007) (same). Plaintiffs do not offer any factual support whatsoever for the alternative theory that Defendants' customers

have historically sought to leverage lower prices from one Defendant in one country to secure more favorable terms from the others in a different country. Even if they had, that alone would not establish that Defendants had no choice but to agree to extend their conspiracy worldwide. One would expect in a competitive market for CCAs that customers would constantly bid one supplier against another to secure the strongest deal possible. *See Great Atl. & Pac. Tea Co. v. F.T.C.*, 440 U.S. 69, 80 (1979) ("In a competitive market, uncertainty among sellers will cause them to compete for business by offering buyers lower prices."). In any event, customers would need to exploit price variations across jurisdictions *and* across competitors for their arbitrage strategy to pose a real risk—neither of which Plaintiffs adequately plead here.

The absence of facts suggesting that the CCA products sold into each market are the same only underscores that the purported conspiracy is broader than the complaints' allegations can support. While Plaintiffs may plead that Defendants manufactured and sold CCAs in their respective jurisdictions, "they do not meaningfully connect the U.S. and European markets such that a European price-fixing conspiracy should be expected to have carried over into the United States." *Tires*, 767 F. Supp. 3d at 706. Plaintiffs plead that "[w]hile a particular CCA from one producer may be technically interchangeable with the same type from another," CCA customers face high costs to switching suppliers because suppliers "typically provide customers with specialized equipment to ensure proper dosing and dispensing of their products." ISAC ¶ 202. They further allege that CCAs are "commodities and homogenous products, not differentiated products." *Id.* ¶ 203. But to say that a particular CCA from one producer is technically interchangeable with the same type of CCA from another says nothing. The question is whether the type of CCAs that are sold in France are interchangeable with those that are usable in the United States. And Plaintiffs plead nothing with respect to the fungibility of CCAs across

borders. Among other things, they do not plead that regulatory standards or technological specifications governing CCAs are consistent across regions or that the formulation of a CCA suitable and permissible for building in France would also be considered suitable and permissible for building in the United States and vice versa. The commodity in *Air Cargo*, for example, was inherently cross-border. Central to the viability of the alleged global price-fixing scheme was the fact that "[a]irfreight shipping services are a fungible commodity product such that the services provided by one carrier may be easily substituted by those provided by another carrier." *Air Cargo*, 2008 WL 5958061, at *5. Here, the fact that the Parent/Sponsor Defendants operate separate subsidiaries in France and in the United States undermines any plausible inference of a global conspiracy, or a global market for CCAs for that matter, because it suggests, in the absence of any other factual allegations, that the European and North American markets are in fact distinct and that CCAs are purchased for consumption entirely within one country.

Thus, there is no allegation of fact that it would have been necessary to fix prices in the United States to make the price-fixing conspiracy pleaded by Plaintiffs effective in France, or even in Europe. *See Am. Copper*, 494 F. Supp. 2d at 879–80 (finding "no support for Plaintiffs' claim that a European cartel requires a corresponding U.S. cartel" where "the two markets have distinct standards and . . . their products are not interchangeable"); *Elevator*, 502 F.3d at 52 (holding that plaintiffs "provide[d] an insufficient factual basis for their assertions of a worldwide conspiracy affecting a global market for elevators and maintenance services" where, *inter alia*, "there are no allegations of global marketing or fungible products").

According to Plaintiffs, "courts have held that evidence which 'did not expressly state [the defendants] acted to fix prices in the United States, . . . [but] did state that a conspiracy to fix prices in Europe must necessarily involve the fixing of prices in other markets, including the

United States,' is sufficient evidence of acts directed at and impacting the United States." Dkt. No. 420 at 31. But the cases cited in support of this proposition are distinguishable from the instant action. The quoted holding in *In re Bulk (Extruded) Graphite Prods.*, for example, relied on deposition testimony indicating that defendants intended to fix the prices of the relevant product worldwide, not just in Europe. 2007 WL 2212713, at *9 (D.N.J. July 30, 2007). And in *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd. ("Panalpina II")*, the court found the conspiracy plausible where plaintiffs alleged that defendants agree to fix prices and "those agreements were reported to and implemented by the affiliates"—unlike here, where there is no allegation that the U.S. entities knew of or agreed to effectuate Defendants' alleged conspiracy. 2013 WL 6481195, at *16 (E.D.N.Y. Sept. 20, 2013), *report and recommendation adopted*, WL 298594 (E.D.N.Y. Jan. 28, 2014).

There are many reasons why French conspirators might not have wanted to extend their conspiracy to the United States, even if they had the authority and capacity to do so, including the different regimes for competition and the different mechanisms for competition enforcement in the different countries. *See In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 163 (2d Cir. 2021) (describing "deterrence value" of U.S. antitrust enforcement regime "against foreign companies whose anticompetitive conduct causes substantial and foreseeable economic injury to American consumers"). And, even if they had the capacity and the authority, and even if it would have made a local conspiracy more effective to spread it worldwide, there is neither law nor logic to support the conclusion that parties must agree to a worldwide conspiracy in order to agree to a local one. Parties can agree to a price-fixing conspiracy without agreeing to all guardrails that might make such conspiracy most effective or prevent one side or another from cheating.

**c. Market Structure**

Plaintiffs also cite conditions and structure that they claim make the market for CCAs highly susceptible to collusion. ISAC ¶¶ 192–220. Specifically, they claim that demand for CCAs is inelastic, that the demand side of the CCA market is fragmented, that the supply side is dominated by Defendants, and that the supply side has high barriers to entry. *Id.* The Court previously rejected the identical argument. *See Concrete*, 2025 WL 1755193, at *18. "The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); s*ee Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (following *Cap. Imaging* and rejecting allegations that "the general structure of the poultry market made it 'susceptible to price-fixing'").

**d. Trade Associations**

Finally, Plaintiffs allege that Defendants had the opportunity to collude given their shared membership and participation in trade associations. ISAC ¶¶ 221–25. Membership in trade associations is a relevant factor in considering whether competitors engaged in an antitrust conspiracy, but it is not a sufficient condition. "[I]ndustry members may belong to an industry group without being coconspirators." *Concrete*, 2025 WL 1755193, at *18; *see AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (stating that the Second Circuit "require[s] a factual showing that each defendant conspired in violation of the antitrust laws, and [has] not adopted a 'walking conspiracy' theory in place of such a showing" and that "every action by a trade association is not concerted action by the association's members"); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) ("[E]ven though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy." (cleaned up)). What is conspicuous

about the allegations here is that while Plaintiffs in a footnote list a large number of trade organizations to which affiliates of all Defendants belong, they identify only one in the United States—the National Ready Mixed Concrete Association—and identify nothing about the nature of that organization, its membership, or Defendants' participation in it (including whether Defendants or just their affiliates are members). ISAC ¶ 223 n.4; *cf. Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 165 (W.D.N.Y. 2020) (holding that defendants' common participation in domestic trade associations was a plus factor where plaintiffs "allege facts sufficient to infer that Defendants *did* use trade association meetings to make an agreement"). Thus, tellingly, Plaintiffs do not identify any forum in which the United States companies (or their executives) would have met that could have served as a forum for discussions of a price-fixing conspiracy. Nor do Plaintiffs draw any meaningful connection between the alleged European trade association conduct and any impact in the United States.

Whether considered alone or taken together, Plaintiff's purported plus factors do not "create the inference that Defendant's pricing decisions were the product of a pre-existing agreement to fix prices." *Concrete*, 2025 WL 1755193, at *18.

## II. Plaintiffs Fail to Allege Facts Tying Each Individual Defendant to the Alleged Conspiracy

Even if Plaintiffs had alleged the plausible existence of an antitrust conspiracy, which the Court concludes they have not, Plaintiffs' claims fail for the separate reason that "they have not alleged anything that would 'plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy.'" *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388–89 (S.D.N.Y. 2019) (citing *GSE Bonds*, 396 F. Supp. 3d at 365). To state a viable claim against each defendant, plaintiffs "must allege a factual connection between each Defendant and the alleged conspiracy." *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith*

*Inc.*, 340 F. Supp. 3d 285, 316 (S.D.N.Y. 2018) (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010)). "Group pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P. v. Ent. Prop. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016); *see In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (plaintiffs "failed to separately state a claim against each and every defendant joined" in the lawsuit where allegations as to a number of defendants were "grouped together with specific allegations relating to their affiliated but legally separate entities").

The rationale of this requirement is rooted in Federal Rule of Civil Procedure 8 and the important notice function it serves. At the pleading stage in antitrust conspiracy cases, "*Twombly* makes clear that . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose." *Zinc*, 155 F. Supp. 3d at 383–84 (citing *Twombly*, 55 U.S. at 557–58); *see In re SSA Bonds Antitrust Litig.*, 2020 WL 1445783, at *5–6 (S.D.N.Y. Mar. 25, 2020) (plaintiffs failed to cure improper group pleading in amended complaint where, *inter alia*, they "make nearly identical conclusory allegations of taking directions from their overseas counterparts to manipulate SSA bond trades with U.S. counterparties against all of the Domestic Dealer Defendants").

Indeed, "[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *Mexican Gov't Bonds*, 412 F. Supp. 3d at 388–89. While a complaint need not be detailed with "overt acts by each defendant," *Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011), plaintiffs are not relieved of the requirement to plead facts plausibly alleging that each defendant knew of and participated in the conspiratorial agreement.

As Judge Oetken explained in *Mexican Government Bonds*, the court in *Hinds* "undertook a painstaking, defendant-by-defendant analysis of the allegations, and ultimately dismissed most of the claims because the complaint did not furnish allegations against each individual defendant that satisfied the strictures of Rule 8." 412 F. Supp. 3d at 389. That case and the rest of *Twombly*'s progeny thus "exemplify the requirement that an antitrust complaint must provide some basis for inferring that the specific defendants participated in the alleged conspiracy." *Id.* Courts may not demand that plaintiffs "adduce direct evidence (such as a chatroom transcript) for each and every defendant named . . . [b]ut there must be something in the complaint that ties each defendant to the conspiracy." *GSE Bonds*, 396 F. Supp. 3d at 364.

Plaintiffs seem to suggest that by virtue of the structure of the Defendant companies and the CCA market itself, an alleged French conspiracy to increase CCA prices in France must have passed through entities up and down the corporate ladder. But conspiracies do not travel by osmosis. An antitrust conspiracy cannot exist "in the air" untethered to well-pled allegations which, accepted as true, would implicate each defendant in the purported conspiracy.

**A. The Complaints Lack Specific Allegations Against the U.S. Defendants**

As discussed *supra*, Plaintiffs do not allege that any U.S. Defendants communicated or met with a competitor or attended trade association meetings at which the Court could plausibly infer that they reached an agreement to raise CCA prices in the United States. Nor do they plead that the U.S. Defendants had actual knowledge of the alleged French conspiracy. Instead, Plaintiffs fall back on their assertion that by virtue of the corporate structure of the Defendant companies, the U.S. Defendants *had* to know what was going on in France and Europe. Plaintiffs point to the top-down structures and control that the Parent/Sponsor Defendants allegedly exercised over their country-level subsidiaries. As to Sika, for example, the complaints allege that Sika AG's Regional Manager for the Americas "serve[d] as one of only three

directors on Sika US's Board" and was "responsible for implementing Sika AG's overall strategy in the Americas, including in the United States," yet also sat on the Group Management Team or "KL" and had a "direct reporting line to Sika AG's Board." ISAC ¶¶ 146–47, 149, 153. At the same time, Sika AG executive Ivo Schädler, who was also a member of the KL, served as Sika France's "chief legal and executive officer" and "directly supervised" Pascal Malafosse, "one of the Sika France executives most responsible for engaging in and implementing the conspiracy." *Id.* ¶¶ 140–43. "[T]o suggest that Sika, the parent, and the U.S. entity didn't understand or know what was happening in France," in Plaintiffs' view, "is implausible given that structure." June 22, 2026 Hearing Tr. at 35:10–36:5.

With respect to the other U.S. Defendants, Plaintiffs allege that because Chryso US received assurances from Chryso S.A.S. that its competitors would not undercut Chryso on price, and because Chryso S.A.S. knew that Gimer was in active communication with Sika's LeFur, Master Builders' Francqueville, and Mapei's Jeauneau, and because all U.S. Defendants increased prices on some CCA products around the same time on three separate occasions (albeit in varying amounts and for different products), "[t]he Court may properly infer . . . that the other Domestic Defendants, like Chryso US, received similar assurances from their respective parent companies" and acted on their directions to increase prices. Dkt. No. 420 at 42; *see* June 22, 2026 Hearing Tr. at 84:14–16 ("[W]e think we have alleged enough to show why those assurances would impute knowledge, if you will, on the domestic defendants.").

Even if Plaintiffs did sufficiently allege knowledge within each of the corporate families of conspiratorial discussions, that alone would not be enough. To hold Sika US, Mapei US, and Master Builders US responsible for a Sherman Act antitrust conspiracy, Plaintiffs must plead facts that those companies agreed to participate in an antitrust conspiracy. It is not sufficient that

Chryso US was told by Chryso S.A.S. what Chryso S.A.S. expected Sika US, Mapei US, and Master Builders US to do. *See In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16 (D.D.C. 2004) ("Knowledge alone is not sufficient to prove that any particular [d]efendant intended to join [a] conspiracy."); *cf. Panalpina II*, 2013 WL 6481195, at *21 (plaintiffs established "how the antitrust misconduct . . . naturally involved (and often required) the knowledge *and participation* of the members of the corporate families in the conspiracies" where complaint included allegations that "each Defendant individually entered into the conspiracies alleged herein on behalf of, and reported these meetings and discussions to, their respective corporate families or parent" (emphasis added)). Because Plaintiffs do not "specifically allege[] that each Defendant," including the U.S. Defendants, "agreed to participate in the conspiracy," the complaints cannot survive dismissal. *Iowa Pub. Employees' Ret. Sys.*, 340 F. Supp. 3d at 317 (complaint did not rely impermissibly on group allegations where it pled specific instances of conspiratorial conduct by each defendant or its employees).

In their opposition to Defendants' motions to dismiss, Plaintiffs turn to the "single enterprise" theory of liability established by the Ninth Circuit in *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018), to save their claims against the U.S. Defendants. There, the Ninth Circuit looked to the Supreme Court's instruction in *Copperweld* that "[t]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act" because "[a] parent and its wholly owned subsidiary have a complete unity of interest." *Arandell*, 900 F.3d at 630 (citing *Copperweld*, 467 U.S. at 771). Under that logic, the Ninth Circuit held that a subsidiary "*cannot* innocently advance an anticompetitive scheme . . . for a legitimate business purpose, while its parent and sister companies purposely advance the very same scheme . . . for an illegal,

anticompetitive purpose." *Id.* at 631. The court then applied this "single enterprise" theory to hold a subsidiary liable for its parent's price-fixing scheme where the subsidiary sold gas at prices rigged by the parent upstream and then distributed the inflated profits to its parent, because until the subsidiary did so, "the rigged and inflated prices were not passed on to buyers *outside* of the [defendant's] economic unit and there was no gain to the [defendant] enterprise." *Id.* at 635.

This theory of liability presupposes, however, that the parent company was a knowing participant in the alleged conspiracy and that the subsidiary acted as its agent. Indeed, the parent in *Arandell* had "admitted to engaging in wash trades during the Class Period and ha[d] reached settlements with several government agencies," while its subsidiary disclaimed any knowing participation in the scheme. Here, well-pled allegations of misconduct by the Parent/Sponsor Defendants are absent from the complaints.

### B. The Complaints Lack Specific Allegations Against the Parent/Sponsor Defendants

Plaintiffs repeat the same conclusory allegations that "Sika, Master Builders, and Mapei (all like Chryso) concentrate decision-making in centralized business units based in Europe that set pricing strategy worldwide, including in the United States" and that parent-level executives in Europe directed their U.S. subsidiaries to "increase their CCA prices in the United States in order to ensure Defendants' conspiracy was successfully implemented." ISAC ¶ 111. The complaints point to Mapei S.p.A. executives, for example, who oversee and direct the operations of Mapei France and Mapei US, *id.* ¶¶ 184–90, and allege that Sika AG "controls the operations of its subsidiaries, including Sika France and Sika US" through its Board of Directors, CEO, and KL, who approve the company's annual budget and set strategic goals and "fundamental policies," *id.* ¶¶ 132–36. Plaintiffs also rely on the dual roles that some parent company executives held in

managing subsidiaries to infer a plausible connection between the alleged French conspiracy and a more global scheme. *See generally id.* ¶¶ 131–92. But to state that French executives therefore "necessarily communicated with their parents regarding both the SYNAD press release and their inter-competitor pricing discussions and undertook those efforts under the authority of their parents" assumes too much. Dkt. No. 464-1 ¶ 67. And it certainly does not suggest that the parents directed either the French or U.S. price increases. Even if Sika's LeFur, for example, was acting in his capacity as an executive of both Sika France and Sika AG when he allegedly conspired with the other French Defendants to coordinate messaging regarding planned price increases in France, Plaintiffs plead nothing connecting that dual role to pricing strategy at Sika US. That the Parent/Sponsor Defendants could have used their corporate relationships to further a worldwide conspiracy does not suggest they did. Without "further factual enhancement," the complaints "stop[] short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

What is more, the complaints are devoid of factual allegations regarding communications between the French executives and their parent companies about pricing. To tie the Parent/Sponsor Defendants to a purported global conspiracy, Plaintiffs would need to specifically plead discussions among the parents of worldwide pricing, not just European pricing. In their supplemental submission, Plaintiffs state that if leave to amend were granted, they would allege that on April 1, 2021, "while the conspirator-executives in France were coordinating CCA prices and the trade associations were issuing press releases throughout Europe," MBCC Group, the parent to Master Builders' country subsidiaries, "through MBCC's President for Europe, announced price increases for all Master Builders Solutions products in Europe with immediate effect." Dkt. No. 464-1 ¶ 69. They would further allege that "[it] was shortly after this

announcement that Master Builders US began notifying its customers of price increases." *Id.* ¶ 70. Plaintiffs assert that "[t]he announcement from MBCC's Europe Business Unit head verifies that pricing decisions across countries were made at the parent level by MBCC parent executives." *Id.* ¶ 71(e). But this allegation speaks at most to parent-level direction at a regional level across Europe. It says nothing about the United States. Inching closer to factual enhancements that might suggest worldwide pricing concentrated at the parent level, Plaintiffs' supplemental submission further asserts that "[c]onsistent with its centralized management structure through its KL," Sika AG's CEO publicly announced family-wide price increases "[i]n at least October 2021" that were "not limited to any jurisdiction." *Id.* ¶ 72. But one parent's announcement of price increases which applied globally does little to move the needle towards well-pled allegations of concerted action.

Plaintiffs appear to assert a conspiracy that was hatched *by the Parent/Sponsor Defendants* and executed through the French Defendants as their agents. But the complaints do not allege communications between and among the French Defendants recognizing that they were acting as agents or were otherwise directed by the Parent/Sponsor Defendants. *Cf. Panalpina II*, 2013 WL 6481195, at *16 (denying motion to dismiss where plaintiffs "offered extensive allegations as to both the defendants' corporate structure and the means and method of executing the conspiracies," which "support[ed] the inference that corporate affiliates both entered into the agreements and aided and assisted in executing them"). Moreover, that framework would be wholly inconsistent with the triangular theory of the conspiracy which also echoes throughout the complaints, whereby the conspiracy was hatched in France and extended worldwide with the help of the parents. *See* ISAC ¶¶ 55–70 (alleging that conspiracy first began in March 2021 when French executives issued the coordinated SYNAD press release); *id.* ¶ 8

(alleging that Chryso France executive who "oversaw Chryso's global CCA business" directed various Chryso country managers, including Chryso US's Williams, to share a "draft communication modeled on the conspiratorial SYNAD press release" with their CCA customers); *see also* Dkt. No. 420 at 33 ("The allegations in the Complaints, and restated herein, show that Chryso SAS and the French Defendants reached an agreement to increase CCA prices, which they reported to the Parent Defendants, who then directed their other country-specific subsidiaries, including the Domestic Defendants, to similarly increase their prices in a consistent way across jurisdictions, and each of the Domestic Defendants did so."). In any event, Plaintiffs do not plead that any parent company besides Chryso S.A.S. communicated at all with the U.S. Defendants or that they even had actual knowledge of the alleged French conduct—only that "like Chryso SAS, the parent companies of the other conspirators *would have been aware* of the architects' conspiratorial communications." Dkt. No. 420 at 12 (emphasis added).

Without a coherent explanation for either the U.S. Defendants' or Parent/Sponsor Defendants' participation in the alleged conspiracy, Plaintiffs' claims against them must be dismissed. *See Mexican Gov't Bonds*, 412 F. Supp. 3d at 388.

## III. To the Extent That Plaintiffs Plead a French Conspiracy with an Effect on United States Commerce, It Is Barred by the FTAIA

The absence of allegations that any of the Defendants who allegedly reached an agreement to fix prices sold products to United States customers is not necessarily fatal to Plaintiffs' claims. Under the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), "the Sherman Act applies to foreign 'conduct' with a certain kind of harmful domestic effect." *Empagran*, 542 U.S. at 173. The FTAIA provides:

> 15 U.S.C. § 6a. Conduct involving trade or commerce with foreign nations
>
> Sections 1 to 7 of this title [*i.e.,* the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with

> foreign nations unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

"The FTAIA provides two exemptions from its general rule that the Sherman Act does not apply to conduct involving foreign trade or commerce. The first is for import trade or commerce and the second is for certain *nonimport* trade or commerce." *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 98 (2d Cir. 2019). "Congress accounted for conduct that immediately affects domestic commerce by excluding import commerce from the FTAIA at the outset." *Id.* at 99. "[T]he import exclusion applies to conduct by a defendant that has a direct or immediate effect on import commerce." *Id.* at 100. The second exception applies when the activity involving foreign commerce has a "direct, substantial, and reasonably foreseeable effect" on American domestic commerce and such effect is of the kind antitrust law considers harmful, *i.e.*, it gives rise to the Sherman Act claim. *Empagran*, 542 U.S. at 162; *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 404 (2d Cir. 2014). The "direct effect" or "domestic injury" exception applies if "there is a reasonably proximate causal nexus between the conduct and the effect." *Lotes*, 753 F.3d at 398, 412–13.

The FTAIA "dictates the kinds of effects that truly foreign commerce must have in the U.S. market." *Minn-Chem*, 683 F.3d at 854. "Conduct 'involving trade or commerce . . . with foreign nations' must have 'a direct, substantial, and reasonably foreseeable effect' on *either* [A] U.S. domestic commerce (phrased awkwardly as 'trade or commerce which is not trade or

commerce with foreign nations') or U.S. import commerce, *or* [B] the export trade or commerce of a U.S. exporter." *Id.* (citing 15 U.S.C. § 6a(1)).

Defendants argue that Plaintiffs' allegations do not fall within either exception. They contend that the import exclusion does not apply because Plaintiffs do not allege that customers in the United States purchased CCAs that were imported from France. Dkt. No. 394 at 24. Nor does the domestic injury exception apply, in Defendants' view, because Plaintiffs do not allege that the purported domestic harm they suffered was within the scope of the risk of raising CCA prices in France. *Id.* at 25. They note that Plaintiffs' import allegations suggest that all foreign trade (not just trade with France or Europe) makes up only about 3.3% of total annual U.S. admixture sales. *Id.* at 26 (citing ISAC ¶ 211). Defendants also argue that any price increase in the United States would have been the result of superseding or intervening causes because it "would necessarily have been implemented through separate and distinct acts of the US Defendants' employees, such as negotiating prices with their customers, issuing their own price increase letters, and responding to changing costs in the United States." *Id.* at 26.

Plaintiffs have all but abandoned any claim to the import exclusion. *See* June 22, 2026 Hearing Tr. at 25:11–26:22 (stating that Plaintiffs do not allege that the parent companies or French companies conspired to fix the prices of products imported into the United States); *id.* at 26:8 ("[T]his is not an import case."). In any event, the complaints do not contain well-pled allegations that would support the application of the import exclusion. Plaintiffs allege that "[a]t least $100 million worth of CCAs are imported into the United States each year," ISAC ¶ 211, but do not specify by whom. The complaints identify certain French executives as holding titles that suggest responsibility over export activities, *see id.* ¶¶ 4 (stating that Patrick Montagne served as Mapei France's Director of Concrete, Cement, and Export Activities), 96 (identifying

Pierre Baigue as Chryso France's Export Development Director), but Plaintiffs do not affirmatively allege that any French Defendant exported CCAs to the United States. Indeed, the complaints do not allege any discussions or conduct by the alleged French co-conspirators concerning imports of CCAs into the United States, nor do they contain allegations that Defendants' conduct had a "direct or immediate effect on import commerce" so as to bring it within the exclusion's scope.

That leaves Plaintiffs with the domestic injury exception. The Seventh Circuit's opinion in *Minn-Chem, Inc. v. Agrium, Inc.* is instructive in setting forth the types of factual allegations that give rise to direct, substantial, and reasonably foreseeable effects on domestic, non-import commerce. There, the Seventh Circuit held that conduct had a "direct" effect on import or domestic commerce if it had a "reasonably proximate causal nexus." 683 F.3d at 857–58. Much of the conduct alleged in *Minn-Chem*, which concerned an alleged price-fixing scheme involving potash, was "straightforward import transactions" that were squarely covered by the import exclusion. *Id.* at 858. However, the court reasoned that conduct which fell outside the import exclusion could nevertheless be subject to the Sherman Act under the FTAIA in at least two circumstances. First, where "plaintiffs describe[d] a tight-knit global cartel, similar to OPEC in its heyday, that restrained global output of potash so that prices throughout this homogenous world market would remain artificially high." *Id.* The resulting domestic effects were foreseeable and direct, even for co-conspirators whose conduct did not "literally involve[] import trade," because "[t]he alleged supply reductions led to price hikes in . . . foreign markets, and those increases showed up almost immediately in the prices of U.S. imports." *Id.* at 859. Second, where plaintiffs "alleged that the cartel established benchmark prices in markets where it was relatively free to operate, and it then applied those prices to its U.S. sales." *Id.*

Two years later, the Second Circuit in *Lotes* followed the Seventh Circuit's approach in *Minn-Chem* and drew upon the following principles from the proximate causation doctrine to further articulate the scope of the domestic injury exception: (1) whether the injury was "within the scope of the risk created" by defendant's conduct; (2) whether the injury was a "natural or probable consequence" of the conduct, and (3) whether there was a "superseding or intervening cause." *Lotes*, 753 F.3d at 412. Courts have found the domestic injury exception to apply in cases where plaintiffs have pled a mechanism similar to those described in *Minn-Chem* by which the alleged domestic injury would fall within the "scope of risk created" by the alleged foreign anticompetitive conduct. In *In re Vitamin C Antitrust Litigation*, for example, though the import exclusion separately applied because defendants had specifically contracted for the delivery of vitamin C to the United States, 904 F. Supp. 2d 310, 317 (E.D.N.Y. 2012), defendants' conduct also fell within the domestic injury exception because "[s]uper-competitive prices for vitamin C in the United States were the 'direct, substantial, and foreseeable effect'" of defendants' agreement to restrain production and fix vitamin C prices, *id.* at 318–20. In *In re Automotive Parts Antitrust Litigation*, the court held that plaintiffs had "sufficiently alleged an anticompetitive conspiracy directly aimed at the United States automotive industry" where a foreign corporation's U.S. subsidiary "manufactured and sold price-fixed bearings directly into the United States market at the direction of" the foreign corporation. 2014 WL 4209588, at *6–7 (E.D. Mich. Aug. 26, 2014). Courts also agree that antitrust claims alleging "the manipulation of a benchmark that is globally disseminated and serves as a pricing component of derivatives sold widely in the United States" would not be barred by the FTAIA. *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 569 (S.D.N.Y. 2017). In each of these

circumstances, the alleged domestic harm suffered was a "direct, substantial, and reasonably foreseeable effect" of the foreign anticompetitive conduct pled.

Here, Plaintiffs do not plead "price hikes" in foreign markets that "showed up almost immediately" in the price of U.S. imports or the manipulation of benchmark prices that were then applied to U.S. sales. Instead, they allege, in conclusory fashion, that "Defendants' anticompetitive conduct abroad resulted in higher prices in the United States, and that those higher prices directly caused Plaintiffs' injuries, providing the necessary proximate nexus between Defendants' agreement and the resulting effects in the United States." Dkt. No. 420 at 4. Though Defendants may characterize the alleged conspiracy as one "confined to France that only indirectly impacted the United States," Dkt. No. 420 at 46, Plaintiffs argue that they do in fact plead a clear mechanism by which the French Defendants' alleged conduct resulted in direct, substantial, and reasonably foreseeable effects in the United States: namely, that Defendants agreed to fix CCA prices worldwide, not just in France or Europe, and the U.S. Defendants increased CCA prices for customers in the United States pursuant to that agreement, *id.*

Plaintiffs point to *Empagran* as support for the notion that similar claims have survived FTAIA attacks, arguing that this case, too, involves "(1) significant foreign anticompetitive conduct with (2) an adverse domestic effect." 542 U.S. at 159. A closer look at the facts of *Empagran* suggests otherwise. As an initial matter, the focus of the underlying case in *Empagran* was materially different from the circumstances at bar; it concerned whether "allegations of a global price fixing conspiracy that affect[ed] commerce both in the United States and in other countries [gave] persons injured abroad in transactions otherwise unconnected with the United States a remedy under our antitrust laws." *Empagran S.A. v. F. Hoffman-La Roche, Ltd.*, 2001 WL 761360, at *2 (D.D.C. June 7, 2001), *rev'd and vacated sub nom.*

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003), *vacated sub nom. F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004), and *aff'd sub nom. Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005). Plaintiffs were domestic and foreign purchasers of vitamins who directly purchased vitamins from the defendants or their co-conspirators for delivery outside the United States. *Id.* at *1. The complaint alleged that defendants had engaged in "conspiratorial and price fixing actions both within the United States and abroad, including meetings and agreements among the defendants, many of which took place within the United States." *Id.* at *3. The Supreme Court ultimately concluded that where "vitamin sellers *around the world* . . . agreed to fix prices, leading to higher vitamin prices in the United States . . . a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury." *Empagran*, 542 U.S. at 159 (emphasis added). Here, while Plaintiffs may be able to demonstrate higher CCA prices in the United States, they have not adequately pled that they were the result of a global conspiracy to raise those prices. In the absence of such allegations, Plaintiffs offer no answer as to why alleged conduct which raised CCA prices in France would include within its scope the risk of higher U.S. CCA prices.

Plaintiffs' reliance on *In Re European Government Bonds Antitrust Litigation* is likewise misplaced. Plaintiffs cite Judge Marrero's holding that, consistent with *Empagran*, where the plaintiffs alleged conduct involving sellers of European Government Bonds ("EGBs") in Europe "that agreed to fix prices, leading to higher EGB prices in the United States . . . United States purchasers of EGBs such as Plaintiffs can bring their Sherman Act claim under the FTAIA based on their domestic injuries." 2020 WL 4273811, at *14 n.6 (S.D.N.Y. July 23, 2020). But the factual allegations in *European Government Bonds* compelled the result—factual allegations

which Plaintiffs do not make here. Plaintiffs purchased or sold EGBs in the United States directly from foreign and domestic defendants. *Id.* at *1. The complaint alleged that so-called "Primary Dealer Defendants" "acquire[d] EGBs from government issuers in the 'Primary Market,' and Defendants trade[d] those EGBs with other investors in the 'Secondary Market.'" *Id.* at *2. The alleged anticompetitive conduct was that the Primary Dealer Defendants colluded when bidding for EGBs in the primary market and paid above-market prices in order to acquire greater inventories, and Defendants then recouped those costs by charging other investors inflated prices for those EGBs in the secondary market. *Id.* at *2–3. The mechanism by which the alleged foreign conduct reached the United States was that U.S. investors "directly traded EGBs with named Defendants at prices that had been artificially altered as a result of the price-fixing conspiracy." *Id.* at *12. Specifically, the plaintiffs alleged that "Foreign Defendants either directly transacted EGBs through their New York trading hubs or indirectly transacted EGBs through New York-based broker-dealer affiliates, who sold the EGBs from Foreign Defendants' inventories at prices set by Foreign Defendants." *Id.* at *6. Here, Plaintiffs do not sufficiently describe a similar mechanism by which the alleged French conspiracy led to higher CCA prices in the United States.

Plaintiffs' claims could also be read to articulate price arbitrage as another mechanism by which the domestic effects of the alleged French conspiracy were reasonably foreseeable. In other words, on that theory, the domestic injury suffered by Plaintiffs would be within the scope of risk of raising CCA prices in France because the French Defendants knew that if they raised prices, each of their U.S. counterparts also could and would implement corresponding price hikes in order to mitigate the risk that Defendants' large, global customers would seek to exploit price differentials across jurisdictions.

Such a theory is not only unsupported by the pleaded facts, but it is wholly implausible. It presumes that each of the U.S. Defendants would risk market share to protect its French affiliate's ability to charge supra-competitive prices—a bet no rational company would make absent some assurance that its competitors would follow suit and the price increases would hold. In that sense, a coordinated price increase among the U.S. affiliates is not a natural and probable consequence of a price-fixing conspiracy in France. Indeed, there are no well-pled allegations of parallel price hikes by the U.S. Defendants. Moreover, the assurances that might have incentivized concerted action could have taken the form of an agreement among competitors to restrain trade. *Twombly* teaches, however, that the knowledge that an external force will affect all companies alike could unilaterally prompt parallel conduct without such coordination. 550 U.S. at 554. A market-wide shock like the COVID-19 pandemic would serve as an intervening cause standing between the alleged conspiratorial conduct and the domestic price effects, breaking the causal chain that the FTAIA requires, unless the complaints plead a mechanism that plausibly ties the conduct to the effect beyond what the shock alone would predict. Plaintiffs have not done so.

Plaintiffs fail to establish a "reasonably proximate causal nexus" between the alleged foreign anticompetitive conduct and resulting domestic effects for yet another reason. In *Minn-Chem*, price arbitrage was possible because plaintiffs had adequately pled a homogenous, global market for potash. *See Minn-Chem*, 683 F.3d at 859 (holding that "[t]he effects of forcing foreign purchasers to accept higher prices in a commoditized and cartelized market" were foreseeable and substantial, as "[e]ither someone in the cartel would cheat, or a new entrant would begin to arbitrage its purchases, or, as the plaintiffs allege, the cartel would succeed in pushing prices up across all of its markets, including the United States"). Here, Plaintiffs'

allegation that there is a "global market for CCAs" and that Defendants' customers would seek to leverage geographical price differences to obtain cheaper prices presupposes that CCAs sold in France, for example, are equivalent in all material respects to those sold in the United States. ISAC ¶¶ 7, 102–04. But, as discussed *supra*, the complaints are devoid of allegations indicating that CCAs are in fact fungible across markets such that higher prices for a particular CCA product in the United States would be the natural or probable consequence of a conspiracy to fix the prices of CCAs sold in France. That CCAs could be readily substituted between and among jurisdictions would plausibly suggest that price-fixed CCAs might naturally enter the domestic market in the ordinary course of international trade. But Plaintiffs do not even allege that a U.S. customer has ever purchased a CCA product from anyone other than a U.S. supplier. And they conspicuously do not allege that a U.S. customer has purchased a CCA product from a French supplier. It may be that the CCA market is global in some way, but for Plaintiffs' claims to survive, at the least, they must sufficiently allege that *U.S. CCAs in particular* are fungible with CCAs sold in other countries. French CCAs might be interchangeable with Chinese CCAs, but whether U.S. CCAs can be easily replaced with CCAs produced in other markets is a different question altogether. In the absence of such facts, the complaints do not plausibly allege that Defendants had to fix CCA prices in the United States in order to foreclose the ability of French customers to circumvent the cartel and exploit lower prices in the United States.

Indeed, to accept Plaintiffs' price arbitrage theory would require the Court to violate the comity concerns that animated the Supreme Court's decision in *Empagran*. To construe the scope of foreseeable risk so broadly would permit the United States to extend the reach of its antitrust enforcement regime to any foreign jurisdiction so long as plaintiffs minimally pled a global market for the relevant product. That kind of interference with the sovereign interests of

other nations in regulating anticompetitive conduct within their own borders is not what the FTAIA intends or permits.

For the foregoing reasons, Plaintiffs have not established that the domestic injury exception applies to Defendants' alleged conduct.

## IV. Remaining Issues

Because the Court again finds that Plaintiffs fail to plead a conspiracy in restraint of trade such that all of Plaintiffs' claims must be dismissed, the Court does not address the remaining arguments raised in Defendants' motions to dismiss.

On the direct or indirect liability of the Parent/Sponsor Defendants, the Court's Opinion largely disposes of the issue because (1) Plaintiffs have not pled conduct tying any Parent/Sponsor Defendant to antitrust misconduct or alleged that they played a direct role in their subsidiaries' purportedly anticompetitive conduct; and (2) Plaintiffs have not adequately pled that the French or U.S. subsidiaries engaged in conduct that would state a Sherman Act violation, so there is no underlying liability for which to pierce the corporate veil and hold the Parent/Sponsor Defendants liable. It also follows that the Court need not address what veil-piercing law to apply to these questions. Whether the alleged conduct of the French executives states a violation under French or European antitrust law and should be imputed to their parent companies may be a question for foreign regulators, but not one presented here.

As the Court has determined that Plaintiffs fail to state either a domestic price-fixing conspiracy or a foreign conspiracy with domestic effects, the Indirect Purchaser Plaintiffs' pass-through claims necessarily fail. Without an adequately pled conspiracy to raise, fix, or maintain CCA prices at supra-competitive levels, those Plaintiffs cannot state a claim for the resulting harm they suffered when any purported overcharges were passed through from direct purchasers of CCAs. Finally, as this Court explained in its Opinion on the prior motions to dismiss,

"[b]ecause the Indirect Purchaser Plaintiffs' state law claims are based upon the same allegations of price-fixing conspiracy as Plaintiffs' Sherman Act claims, they must be dismissed as well." *Concrete*, 2025 WL 1755193, at *24.

**V. Dismissal with Prejudice**

While leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), a court may properly deny leave to amend if amendment would be futile. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). "Amendment is futile when a proposed amendment would not cure any deficiencies and would also fail to state a claim." *Zinc*, 155 F. Supp. 3d at 385 (citing *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999)); *see Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam))).

This Court gave Plaintiffs the opportunity to amend their initial complaints with the benefit of the Court's views as to their pleading deficiencies. The parties still have not cured them. The operative complaints purportedly incorporate details from a year's worth of settlement cooperation from Saint-Gobain. *See* ISAC at 2 ("The allegations are based upon information and belief, IPPs' personal knowledge, and documents and information provided by the Saint-Gobain Defendants pursuant to the terms of the settlement agreement executed between IPPs and the Saint-Gobain Defendants on August 11, 2025."). Plaintiffs have asserted additional factual allegations they would plead if given leave to amend "based on Plaintiffs' ongoing investigations; witness interviews conducted since the Complaints were filed; additional documents obtained in June from settling Defendant Saint-Gobain; and econometric analysis of the Domestic Defendants' transactional data, which was only produced to Plaintiffs after

Plaintiffs filed their operative complaints." Dkt. No. 464 at 2. But even those facts give no indication that the complaints' defects are curable.[15]

For these reasons and because the Court concludes that any amendment would be futile, the complaints are dismissed with prejudice.

**CONCLUSION**

Defendants' motions to dismiss for failure to state a claim are GRANTED. Plaintiffs' claims are dismissed with prejudice. The French Defendants' joint motion to dismiss for lack of personal jurisdiction and the Mapei Defendants' motion to dismiss pursuant to Rule 12(b)(2) as to claims against Mapei France are DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. Nos. 384, 388, 393, 397, 399, 406, and 448 and to enter judgment in Defendants' favor.

SO ORDERED.

Dated: September 2, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge

[15] This is especially so given that the terms of Plaintiffs' settlement agreement with Saint-Gobain compelled Saint-Gobain to turn over any conspiratorial communications with the other Defendants that might raise a plausible inference of a global conspiracy, *see* Dkt. No. 310-1 (providing that Saint-Gobain "shall produce to Plaintiffs all documents relevant to the subject matter of the Released Claims"), yet the only discussions regarding U.S. CCA price increases that Plaintiffs have been able to identify to date are purely internal to Chryso.